**IN THE UNITED STATES DISTRIC**T ~~JUDGE KOELTL~~
**FOR THE SOUTHERN DISTRICT OF** ~~NEW YORK~~

| | |
|---|---|
| RICHARD WHITLEY, on behalf of himself and those similarly situated, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) ) |
| J.P. MORGAN CHASE & CO.; J.P. MORGAN INVESTMENT MANAGEMENT INC., aka J.P. MORGAN ASSET MANAGEMENT; J.P. MORGAN RETIREMENT PLAN SERVICES LLC; and J.P. MORGAN DEFINED CONTRIBUTION INVESTMENT SOLUTIONS, | ) ) ) ) ) ) ) |
| *Defendants*. | ) ) ) |

**12 CV 2548**

Case No. _____

**COMPLAINT**

Richard Whitley brings this action against J.P. Morgan Chase & Co., J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management, J.P. Morgan Retirement Plan Services LLC, and J.P. Morgan Defined Contribution Investment Solutions (collectively, "JPM" or "Defendants") on behalf of himself and similarly situated retirement investors. Based on personal knowledge and information obtained upon investigation by counsel, Plaintiff alleges as follows:

## INTRODUCTION

1.     Defendants sold and currently sell the J.P. Morgan Stable Value Fund to retirement plan investors as a conservative investment option.[1]  Targeting retirement investors, Defendants maintain that stable value strategies are "your most conservative investment option."

---

[1]     The J.P. Morgan Stable Value Fund may also be known as a Private Labeled J.P. Morgan Stable Value Fund ("STIF Fund").  For purposes of simplicity, this investment vehicle is referenced herein as "the Fund."

(*See* http://www.jpmorgan.com/pages/stablevalue (last viewed March 29, 2012).)  The head of Defendants' stable value fund management group, Victoria Paradis, describes Defendants' stable value asset class as "among the most conservative in the DC [defined contribution retirement] plan line-up."  (*See* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed March 29, 2012).)

2.     This sales ploy is a ruse, and it has been for some time.  While Defendants tout the conservatism of the Fund, Defendants have in fact for years been using that very fund as a vehicle for high-risk gambling – only in this casino, the chips are Plaintiff's and the proposed Class's retirement savings.

3.     Plaintiff and members of the proposed Class are retirement investors who elected to invest their retirement funds via their Defined Contribution and Profit Sharing 401(k) plans in the Fund.  At all material times, while Defendants sold the Fund as a true blue, fundamentally conservative stable value fund, Defendants in fact were diverting a substantial portion of the assets of the Fund into unduly risky mortgage-backed assets that, before the Fund purchased them, were owned, priced and even rated *by Defendants themselves.*

4.     Given that they are, as explained below, indisputably fiduciaries to Plaintiff and the proposed Class under the federal Employee Retirement Security Act of 1974 ("ERISA"), 29 USC § 1002, *et seq.*, why would Defendants do something so rash with Plaintiff's and the proposed Class's retirement nest eggs?  As is often the case, the answer lies in one word: money.

5.     Defendants collectively are the only major American investment bank that was relatively unscathed by the recent mortgage loan-driven credit crisis.  Unfortunately, Defendants

accomplished this seemingly remarkable feat by underhanded means. Those means, which Defendants employed at the direct expense of Plaintiff and the proposed Class, are at the center of this case.

6.    To wit, Defendants decided in October 2006 – shortly before the subprime storm hit Wall Street and Main Street alike with full force – to dump the vast majority of their then-considerable investment positions in troubled mortgage assets. (*See, e.g.*, http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune/index.htm (last viewed on March 27, 2012).) This matter was such an urgent concern to Defendants in October of 2006 that Defendants' CEO, Jamie Dimon, at the time called his then-head of Defendants' securitized products division, William King, while the latter was in Africa, "to fire a red alert. 'Billy, I really want you to watch out for subprime!' Dimon's voice crackled over King's hotel phone. 'We need to sell a lot of our positions. I've seen it before. This stuff could go up in smoke!" (*Id.*)

7.    And Defendants did just that – selling off, starting in late 2006, more than $12 billion worth of subprime mortgage assets that Defendants had originated. (*Id.*) As detailed further below, these mortgages or similar mortgage positions were sold to the Fund – and thereby to retirement investors in the Fund, such as Plaintiff and members of the proposed Class.

8.    While this play benefited Defendants hugely, it has concomitantly harmed Plaintiff and other retirement investors in the Fund, who were stuck with risky mortgage assets that Defendants were desperate to unload off their books at the end of 2006. These very mortgage positions explain one otherwise strikingly perplexing fact: while the Fund outperformed competitor stable value funds until 2006, as explained further herein, after 2006

3

the Fund fell behind its competitor funds return-wise by a wide margin. The timing of this development was not happenstance.

9.      Through the aforementioned course of self-dealing, Defendants engaged in serial breaches of the fiduciary duties they owe to Plaintiff and members of the proposed Class under ERISA, which imposes duties on fiduciaries that are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). These breaches have directly and proximately caused Plaintiff and members of the proposed Class to suffer significant financial harm. Damages to Plaintiff and the proposed Class have manifested themselves in, among other things, substantial diminutions in their investment returns on the Fund. This action seeks to obtain relief from Defendants' wrongful acts, including damages sustained by Plaintiff and the proposed Class as a direct and proximate result of those acts.

10.     Defendants at all material times were plowing a substantial portion of Plaintiff's ostensibly "stable" and "conservative" retirement investments into what were actually high-risk mortgage assets, a move undertaken with an "eye single" to Defendants' benefit. Defendants' posture here was diametrically opposed to ERISA's mandate that fiduciaries operate with an "eye single" to the interests of plan participants and beneficiaries. *See, e.g., John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994).

11.     Defendants' greedy and wrongful conduct has directly and proximately harmed Plaintiff and the proposed class. This action seeks to recover the losses sustained as a result of Defendants' ERISA violations.

4

**PARTIES**

12.     Plaintiff Richard Whitley at all relevant times has been, and continues to be, a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Hospira, Inc. 401(k) Retirement Plan ("the Hospira Plan"). The Hospira Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Whitley's 401(k) funds have been allocated to the Fund. Mr. Whitley sues on his own behalf and, as specified below, on behalf of participants in 401(k) plans in which the Fund is or has been offered as an investment option and who have allocated monies to the Fund during the class period.

13.     Defendant J.P. Morgan Chase & Co. is a financial services provider whose headquarters are in New York, New York. It was a fiduciary with respect to the Fund at all relevant times.

14.     Defendant J.P. Morgan Investment Management Inc., a.k.a. J.P. Morgan Asset Management ("JPAM") is a wholly-owned subsidiary of J.P. Morgan Chase & Co. JPAM touts itself as "a leading comprehensive retirement solutions provider" and "global leader in investment management." It was a fiduciary with respect to the Fund at all relevant times.

15.     J.P. Morgan Retirement Plan Services LLC ("JPRS") is a wholly-owned subsidiary of J.P. Morgan Chase & Co. JPRS claims to "provide[] bundled defined contribution services to more than 650 clients and 1.8 million plan-level participants, representing more than $125 billion in retirement plan assets as of December 31, 2011." It was a fiduciary with respect to the Fund at all relevant times.

16.     J.P. Morgan Defined Contribution Investment Solutions ("JPDC") is a wholly-owned subsidiary of J.P. Morgan Chase & Co. JPDC has stated that it "manages more than $61

billion in defined contribution assets as of December 31, 2011." JPDC was a fiduciary with respect to the Fund at all relevant times.

## JURISDICTION AND VENUE

17.　The Court has subject matter jurisdiction over this matter pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

18.　Venue is proper in this District because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

## FACTUAL ALLEGATIONS

### The 401(k) Plans

19.　At all times relevant to this Complaint, the 401(k) plans involved in this matter were employee benefit plans within the meaning of ERISA.

20.　At all times relevant to this Complaint, the plans were "defined contribution" or "individual account" plans within the meaning of ERISA because, among other reasons, the plans provided for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, as well as any income, expenses, gains and losses, and forfeitures of accounts of other participants that could be allocated to such participant's accounts.

21.　At all times relevant to this Complaint, the plans provided to Plaintiff and members of the proposed Class various options for investment. At all relevant times Defendants served as Investment Advisor, Investment Manager, Administrator, Trustee and/or Custodian of the plans' fund(s). During the class period, the plans provided the Fund as one of the investment options offered to plan participants.

6

22.     At all times relevant to the Complaint, the retirement investors participating in the plans could direct the plans to purchase investments from among the investment options available under the plans and allocate them to their individual accounts. Included among these options was the Fund.

23.     At all times relevant to this Complaint, Defendants unilaterally calculated the Fund's Net Asset Value ("NAV") as Administrator of the Fund. "The NAV's unit price is quoted on a private market that is not active."[2]

24.     At all times relevant to this Complaint, Independent Certified Public Accountants performing the ERISA-required annual plan audits have relied on Defendants' reporting of NAV and valuations of the wrapped bond funds held within the Fund (as was standard in the industry).

25.     At all times relevant to this Complaint, other plan fiduciaries, such as those of the Hospira Plan, have relied on Defendants' accurate reporting of NAV and the underlying valuations used to calculate the NAV.

26.     Mr. Whitley at all relevant times was and is a participant in the Hospira Plan. The Hospira Plan is typical of the plans involved in this matter, and Mr. Whitley typical of their participants in the instant matter. Among the options offered by the Hospira Plan and other such 401(k) plans was an investment vehicle managed and offered by Defendants known as the Hospira Stable Value Fund, which is more commonly known as the J.P. Morgan Stable Value Fund (referenced herein as "the Fund").

### Stable Value Funds

27.     A stable value fund is a capital preservation investment vehicle. A stable value fund is usually invested in a high-quality, diversified, fixed-income portfolio that is designed to

---

[2] Hospira's 401(k) Plan 2009 Form 5500 Filing Note B - Summary of Significant Accounting Policies: Investment Valuation Collective Trust Funds.

preserve the capital of those who buy into the fund while providing steady, positive returns. Stable value funds are marketed as a conservative investment option on account of their ostensible safety and stability.

28.     Stable value funds are a popular investment option in 401(k) plans. Offered as an option in approximately half of all defined contribution plans, stable value funds are usually the largest conservative investment option available in such plans.

29.     While stable value funds are not entirely insulated from market distress, they are typically affected far less than most other investment options in such scenarios. Because stable value funds are generally comprised of well-diversified portfolios of high credit quality fixed-income securities, they were one of the few 401(k) investment options that provided positive returns throughout the market upheaval of the late 2000's.

### J.P. Morgan's Stable Value Fund

30.     Defendants sponsor one of the largest and most utilized stable value funds in the country. Between 2003 and 2009, Defendants more than doubled the stable value fund assets they managed, growing from less than $10 billion to more than $22 billion during that period.

31.     The Fund is managed by Defendants and offered as an investment option to numerous ERISA defined contribution 401(k) plans in the United States. At all relevant times, Defendants have served as Investment Advisors, Fully Discretionary Investment Managers, Plan Administrators, Trustees and/or Custodians (per ERISA § 403(a)) of the Hospira Plan and the numerous other defined contribution 401(k) plans that offered the Fund as an investment option. As such, at all relevant times Defendants under ERISA have been fiduciaries of the defined contribution 401(k) plans.

32.    Defendants frequently and consistently stated publicly that the Fund was a typical stable value fund, as described above.  For instance, in 2009 marketing materials, Defendants described the investment objectives of the Fund as follows: it "seeks to preserve the value of money invested, perform better than the average money market fund, and earn consistent, reliable returns."  The 2009 materials go on to identify Defendants' investment strategy for the Fund as follows:

> The strategy invests in a high quality fixed income portfolio.
>
> The fixed income portfolio is "wrapped" by insurance policies that provide principal protection for the investment instruments held in the Stable Value Fund and that effectively stabilize the return on those instruments.
>
> The wrap contracts, which are issued by insurance companies and banks, provide principal preservation of participant balances, regardless of market conditions.
>
> The wraps also help to stabilize the returns of the fund, even when markets are volatile.
>
> The fixed income portfolio consists of investment grade fixed income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed, asset-backed, and privately placed mortgage debt.

33.    Defendants internally established and adopted the Fund's investment objectives. Defendants stated the Fund will:

> a.    "protect the principal balance of participant accounts,
>
> b.    generate stable, positive book value returns that exceed those of alternative principal protection vehicles, such as money market funds, during normal market conditions." [3]

34.    Defendants emphasized that the Fund was a typical stable value fund, not only by calling it a "Stable Value Fund," but also by their characterization of the risk level of the Fund. On a scale of 1-5, with 1 being the most conservative and 5 being the most aggressive,

---

[3] J.P. Morgan Investment Management, Inc., Investment Guidelines: Stable Value Fund Management.

Defendants consistently stated that the Fund was a 1 (most conservative). JPM's head of its Stable Value Fund Management Group, Victoria Paradis, has stated publicly, again, that Defendants' Fund is among the "most conservative" investments possible in a defined contribution plan.

35.    Yet the results of recent litigation and related arbitration between Defendants and their business partners suggest that on this score, Defendants say one thing, and do quite another. To that end, recently, one of Defendants' erstwhile stable value sector business partners, American Century Investments, won a $373 million judgment against one of the Defendants here because, among other things, that Defendant misrepresented the risk profile of their investment funds at issue in that case, in which a "key focus" was the stable value funds of both the Defendant before the Court here and those of American Century Investments. (*See* http://www.bizjournals.com/kansascity/news/2012/03/22/american-century-wins-373m-judgment.html?page=all (last viewed March 27, 2012).) A press report on this litigation stated that "JP Morgan misrepresented the risk profile of the funds, which [one of the lawyers involved in the case] said contained mortgage-backed securities." (*Id.*) Defendants in like manner misrepresented to retirement plan investors, including Plaintiff and the proposed Class members, the risk profile of the Fund, given its significant position (as discussed below) in Defendants' toxic mortgage products.

### Performance of the Stable Value Fund

36.    The Fund consistently reported results that outperformed its competitors through at least 2006. Defendants drew investors to the Fund by emphasizing this above-market performance (compared to other stable value funds) during that time period, yielding an annualized return of nearly 6%. (For example, the Fund's annualized return in 2006 was 5.99%,

whereas Fifth Third's Stable Value Fund's annualized return that year was nearly 20% lower, or 4.81%.)

37. Defendants reported that their Fund consistently outperformed its applicable benchmarks. The Fund at times referenced the Lehman Brothers Intermediate Aggregate Index (now the Barclays Intermediate Aggregate Index) as a benchmark, and yet it strikingly outperformed this benchmark through at least 2006. At other times in this period, the Fund compared its book-value return performance as consistently above the Citigroup 3-month Treasury Bill Index, which Defendants often held out as the relevant benchmark. (Both benchmarks are comprised entirely of liquid, high-quality, investment grade securities.)

38. From 2007-2010, however, the Fund's performance changed dramatically. Suddenly, competitor stable value funds and even the Fund's own benchmarks markedly outperformed the Fund. Over this period, the Fund's investment yields dropped precipitously. At the same time, the Fund's benchmarks greatly exceeded this yield, and competitors' stable value funds were still yielding relatively healthy, much higher annual returns. Had the Fund not been invested in such a large quantity of unduly risky mortgage debt, as discussed below -- and not paid the significant fees to Defendants for those inappropriate investments -- the Fund's yielded returns would have been substantially higher.

39. These losses to the Fund's investors are significant. For the years 2008-2011, the estimated reduction in yielded returns of the Fund owing to Defendants' instant wrongful conduct is estimated to be not less than $1 billion. This underperformance relative to the Fund's competition accretes daily as Defendants continue to conceal their mismanagement of Plaintiff's and the proposed Class's retirement funds and abstain from selling the Fund out of these toxic mortgage positions, or otherwise diversify or hedge against them. There is a direct relation

11

between the injurious actions complained of herein and economic loss to the Plaintiff and the proposed Class. *Cf. In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, -- F. Supp. 2d --, 2012 WL 333774, at *38 (S.D.N.Y. Feb. 1, 2012).

### Defendants Expose Plaintiff and the Class to Toxic and Unduly Risky Mortgage Assets

40.     Throughout the class period, Defendants stated that the Fund's portfolio of investments consisted of investment grade, fixed-income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed, asset-backed, and privately placed mortgage debt.

41.     A confidential witness ("CW") close to this situation has stated that these representations were simply untrue.[4] Contrary to Defendants' aforementioned representations, during the class period Defendants caused the Fund to purchase certain proprietary JPM mortgage assets known as Alternative Private Placement Commercial Mortgages ("APPCMs"). In fact, during the class period, as much as *20%* of the Fund's assets consisted of APPCMs.

42.     Defendants invested Plaintiff and the Class in APPCMs through a fairly complex scheme, as discussed below. The upshot, however, is that Defendants surreptitiously buried their APPCMs in the Fund through investments in various of JPM's other funds that, in turn, invested in the APPCMs.

43.     Defendants adopted a self-interested fund-layering methodology to conceal the strategies detailed in this Complaint. Defendants used the Fund's assets to invest in as many as five layers of other JPM-sponsored funds. Defined contribution 401(k) plan participants, such as Plaintiff, invested in Defendants' Fund, which then invested in the JPM Intermediate Bond Fund,

---

[4]     The CW is the source of some of the information alleged in this Complaint. That witness works on structuring retirement plans, such as 401(k) plans, and components of such plans, such as stable value funds. The CW is a former employee of a company that worked with Defendants regarding their Fund. That engagement gave him firsthand access to materials that form the basis for his personal knowledge and understanding as alleged herein.

which in turn invested in APPCMs and other JPM funds. Those other JPM funds, in turn, also invested in APPCMs and yet additional funds, which invested further in APPCMs. And so on.

44.     This entirely deliberate fund-layering strategy allowed Defendants not only to mask the magnitude of the Fund's exposure to hyper-risky APPCMs, but also to profit from additional layers of fees and expenses generated by the investments in each of the many layers of the funds in question – in some cases, capturing fees for a fund multiple times by investing in it more than once.

45.     This layering scheme resembles a strategy adopted by State Street Bank and Trust, another large and well-noted custodial bank that also sponsors a leading conservative stable value fund. State Street Bank and Trust concealed similar investment activities inside its fund and was forced to make a $700 million cash infusion to prevent its stable value fund from collapsing under the weight of such risky investments. Less than two months ago, as detailed below in paragraphs 69-73, this Court held that State Street Bank and Trust's actions – similar to those challenged here – violated ERISA. *In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, -- F. Supp. 2d --, 2012 WL 333774 (S.D.N.Y. Feb. 1, 2012).

### Defendants' Credit Ratings and Investment Guidelines for APPCMs

46.     The Fund's APPCMs, according to the CW, were not anywhere close to "investment grade." Nor were these APPCMs rated by a third party credit rating agency, which would have produced an objective credit rating for the APPCMs.

47.     Defendants, according to their own Investment Guidelines, made up their own credit ratings for the APPCMs and adopted a policy to pass off the ratings conferred on the APPCMs as "those of a nationally recognized rating agency." To wit, Defendants stated that "[t]he Portfolio may invest in unrated securities which, in the opinion of the Investment

Manager, meet the quality standards specified above. In the case of unrated securities, the Investment Manager will assign such unrated securities a rating determined by it in its sole discretion in accordance with the Investment Manager's internal rating system, in which case such ratings will be deemed to be those of a nationally recognized rating agency."

48.     Defendants, according to their own Investment Guidelines for the Fund, prohibited the purchase of "issues rated below investment grade (below BBB- and/or Baa3). This exclusion includes both high yield corporate and below investment grade sovereign debt." Since Defendants maintained unilateral and self-interested control over rating their own subprime mortgage debt assets in the respects before this Court, they could surreptitiously ensure that they never appeared to violate the Fund's investment guidelines.

49.     Defendants systematically fabricated ratings through investing in other funds. "Unrated securities may only be held within a commingled fund and not as directly held investments," said Defendants.

50.     Defendants, according to their own Investment Guidelines, required exposure limits concerning assets such as the APPCMs buried in the Fund to be based on a marked-to-market value. However, Defendants failed to mark-to-market the APPCMs – a direct violation of their own stated valuation policy.

### Defendants' Self-Dealing Caused Substantial Damages to Plaintiff and the Class

51.     Defendants themselves once owned the toxic APPCMs (or components thereof) that they dumped into the Fund. In other words, these risky mortgage investments were issued, managed, valued, rated, and priced by Defendants. Defendants' deportment with respect to the APPCMs relative to the Fund was, again, uniformly to the benefit of Defendants and to the

detriment of Plaintiff and the proposed Class. This conduct violates numerous ERISA fiduciary duty rules, as detailed in this Complaint.

52.     Defendants have admitted that they were aware that risky mortgages and mortgage-related assets (such as, among others, their APPCMs) were unsuitable for a supposedly conservative retirement fund (such as the Fund). As detailed above, Defendants' CEO recognized the toxicity of this very asset class no later than 2006. Yet moving into early 2007, Defendants, well aware that the housing market and mortgage-based securities derived from the housing market were about to collapse, still aggressively structured and marketed the sale of mortgage products of various sorts designed to leverage exposure to a deteriorating housing market. In doing so, Defendants offloaded their risky mortgage-related assets and even took advantage of their knowledge on this issue by helping hedge funds take substantial short positions on mortgage assets that would pay off when the housing market collapsed.

53.     According to internal JPM correspondence in March 2007, a "[b]lowout of the subprime market resulted in . . . a [m]ajority of investors globally stopping taking direct and indirect subprime exposure." Concerning Defendants' need to rid themselves of their exposure to mortgage-related risk, one JPM salesperson emphasized in a March 22, 2007, email, "we are soooo pregnant on this deal, we need a wheel-barrow to move. . . . Let's schedule the cesarean, please!"

54.     Defendants thus looked to and did unload their significant exposure to toxic mortgage assets such as the APPCMs. Among other things, Defendants dumped them on vulnerable retirement investors, such as Plaintiff and proposed Class members.

55.     Instead of investing 100 percent of the Fund in investment-grade securities, Defendants caused the Fund to invest as much as 20 percent of its assets in the below-investment

grade APPCMs. Moreover, as discussed above, Defendants concealed this by, among other improper conduct, assigning illegitimate credit ratings to the APPCMs.

56.     The Fund's previously described performance arc (above average before Defendants dumped their risky mortgage assets into the Fund and subpar thereafter) indicates that Defendants failed meaningfully or even completely to hedge the Fund to protect Plaintiff and the proposed Class from the riskiness of the APPCMs, or otherwise to take similar available risk management precautions to protect Plaintiff and the proposed Class's retirement savings. Defendants' failure to diversify and/or hedge or risk-manage thus is all the more shocking in light of the fact that Defendants knew of the significant risk that the APPCMs posed. If substantial holdings in mortgage assets were too risky for a financial behemoth like J.P. Morgan to bear in late 2006 and beyond, surely they were too risky for holding – especially without prudent risk management bulwarks emplaced to protect against downturns in those holdings – in the Fund.

57.     In the end, Defendants' scheme caused the Fund and Plaintiff to pay too much money – in purchase prices and fees – for assets that were far too risky for the Fund to own, and led to diminished returns in the Fund as a result.

58.     According to the CW, the Fund's APPCMs have suffered a substantial loss of value, and Defendants accordingly have begun to write down the valuations and related prices for APPCMs and related assets within the Fund. The magnitude of this "write down" is indicated by the precipitous decline of the Fund's annual yield during the class period, especially relative to its competitor stable value funds. Defendants have adopted the excuse of blaming the Fund's lower returns on low interest rates in concealing these write-downs, when in actuality

Defendants' self-interested dumping of assets known to be toxic pursuant to the directives of Defendants' CEO explains these investment decisions and the Fund's relative underperformance.

59.     The annual returns on the Fund, while affected substantially by this wrongful and substantially disguised activity, remain net-positive – albeit far less positive than they had been in the past and far less positive than the Fund's benchmarks over this period. Moreover, the minimal positivity of the Fund's absolute total return figure conceals the extent of the losses the Fund has incurred on account of Defendants' self-dealing, their APPCM valuation-related chicanery and their related fiduciary breaches.

60.     Moreover, Defendants worked with certain insurance companies (the "wrap providers") to produce monthly credit ratings by negotiation, rather than by the formulas required by the wrap contracts in place to protect investors in the Fund. If Defendants had disclosed the actual rate earned under the instant "wrap" formula – as the rate was calculated in the past – Fund participants would have been aware of the severe losses in the Fund due to APPCMs. But they were not.

61.     Furthermore, Defendants failed to fully advise Plaintiff and other retirement fund investors in the Fund of the instant APPCM-related losses, according to the CW, by intentionally omitting important accounting facts about the Fund's investment in APPCMs. Defendants, that is, concealed Fund losses, according to the CW, by not marking the APPCM portfolios to market, thereby masking their substantial decline in value and the losses they have caused to the Fund.

62.     Tellingly, the aforementioned Ms. Paradis, a Managing Director with Defendants, has publicly attempted to pass the buck to retirement plan sponsors in order to get Defendants off the hook for Defendants' inadequate APPCM/Fund-related and valuation-related disclosures.

She recently – and strikingly – acknowledged in an article on Defendants' Internet site that Defendants have apparently withheld materially important information from retirement plan sponsors concerning Defendants' risky stable value investment strategies: "In short, plan sponsors simply haven't had adequate tools to support their fiduciary responsibilities with respect to these [stable value] funds." (*See*

http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed March 27, 2012).)

63.    In other words, Ms. Paradis, the head of Defendants' stable value fund management group, acknowledges that an ERISA-violative fiduciary breach or breaches concerning the Fund appear to have occurred here.  Given who – namely, Defendants, and not plan sponsors – alone here held the critically important information about the APPCMs' risks and valuations and did not apparently share that information with plan sponsors (and, thus, their plan participants like Plaintiff and the members of the proposed Class here), Ms. Paradis's admission is especially notable for its frankness.  Her statement further underscores Defendants' awareness of their wrongful conduct and their transparent attempt to divert responsibility for same – just as they diverted their toxic mortgage assets to unsuspecting retirement investors in the Fund in 2006 and thereafter.

**Defendants Knew That Their Conduct Was Improper, But Refused to Change Course**

64.    Defendants gained at least two advantages from the alleged wrongful conduct. First, they were able to unload onto unsuspecting investors in the Fund, such as Plaintiff, below-investment grade APPCMs from their own inventory at a price not marked-to-market, but instead

a higher price. Second, because Defendants were on both sides of the transactions at issue, they could and did receive substantial fees based on the APPCMs' improperly assigned values.

65.    Defendants were well aware that the actions complained of herein – both prior to and during the class period – were improper. On separate occasions, at least two individuals who worked in the investment industry were aware of the allegations detailed here, and told Defendants about the improprieties detailed in this Complaint. One of those individuals is the CW referenced throughout this Complaint, who had a conversation with high-ranking employees of Defendants, including Ms. Paradis, regarding the matters complained of herein. The other individual, a former colleague of the CW, disclosed to the CW that he similarly apprised Defendants of the impropriety of their actions.

66.    Further demonstrating that Defendants were aware that conduct challenged herein was improper, Defendants requested that others not discuss Defendants' scheme for dumping APPCMs into the Fund. According to the CW, the wrap providers were also aware of Defendants' wrongful conduct. Yet, upon Defendants' pleading for silence concerning this issue, the wrap providers acceded to Defendants' request and – again, upon information provided by the CW – did not inform the public regarding the nature and status of the Fund's APPCMs.

67.    Unfortunately, even after being confronted by the CW and his colleague regarding the impropriety of the complained-of conduct, Defendants still have not meaningfully disclosed the consequences of their selling APPCMs to the Fund and still have not rid the Fund of the APPCMs. Nor have Defendants, as is indicated by the Fund's striking performance collapse and its timing as juxtaposed with Defendants' admitted offloading of its risky mortgage assets onto its clients, otherwise diversified the Fund's assets – when they could have done so by, say, having the Fund hold a much smaller percentage of APPCMs or none at all, or even hedge

APPCM downturn-associated risks or otherwise use available prudent risk management techniques to protect Plaintiff and the other victimized retirement investors now before this Court. Further, Defendants did not commence producing objective credit ratings for the APPCMs or otherwise attempt to correct their improper and wrongful conduct.

68.     By virtue of Defendants' use of and then following refusal to change the course of their aforementioned wrongful conduct, Plaintiff and the members of the proposed Class invested in a Fund that in substantial part was a pig in a poke. Because it contained imprudently risky investments (the high risks of which were craftily obscured as detailed herein by Defendant), Plaintiff and members of the proposed Class overpaid for investments in the Fund, received a lower rate of return than the Fund would have yielded if it had contained *only* proper and prudent investments for a fund of this one's aims and character, and in the end collectively put billions of their supposedly "stable" retirement savings assets at risk in the Fund. In addition, Plaintiff and the Class further overpaid for their investment options in the Fund because of the excessive costs associated with the APPCMs that they paid to Defendants. There is a direct relation between the losses to Plaintiff (and the Class) and Defendants' illegal conduct, which proximately caused the Plaintiff's (and the Class's) injury.

### *In re State Street Bank and Trust* Litigation

69.     The instant lawsuit bears striking similarities to *In re State Street Bank and Trust Co. Fixed Income Funds Investment Litigation ("SSBT")*, -- F. Supp. 2d --, 2012 WL 333774 (S.D.N.Y. Feb. 1, 2012). In that case, Judge Holwell recently held a trial, found that State Street Bank and Trust violated ERISA, and held that the class's damages, *exclusive* of interest and attorneys' fees, equaled approximately $77 million. *Id.* at *43.

70.    *SSBT* was an ERISA action filed and certified as a class action on behalf of a class

of retirement plans. *Id.* at *1. The plaintiff alleged that State Street Bank and Trust

impermissibly invested its supposedly conservative Enhanced Index Fund (similar in many

important ways to a stable value fund) in unduly risky mortgage assets (similar for present

purposes to APPCMs). *Id.* at *12-*13. These unduly risky investments violated ERISA,

plaintiff alleged, because State Street Bank and Trust, an ERISA fiduciary of the plans at issue,

did not manage the funds prudently, did not manage the funds solely in the interest of the plans,

and did not adequately diversify the funds' assets. *Id.* at *1.

71.    This Court in that matter certified the class proposed and held a bench trial. After

the conclusion of the trial, the court issued a 44-page opinion that held, *inter alia*, that State

Street Bank and Trust's investing its purportedly conservative Enhanced Bond Fund in unduly

risky mortgage assets violated its ERISA duties of care, skill, prudence, and diligence, *id.* at *29-

*33, as well as its ERISA duty of diversification, *id.* at *35-*37. The same is true in the matter

at bar, where Defendants' self-interested and objectively imprudent investment of APPCMs in

their Fund violated these well-established ERISA duties.

72.    The *SSBT* court further held that State Street Bank and Trust's actions did not

violate ERISA's duty of loyalty because the evidence adduced at trial did not reveal why the

defendant in that case invested its Enhanced Bond Fund in risky mortgage assets. *Id.* at *34-*35.

Here, by contrast, Defendants' motivation is pellucid: Defendants viewed their subprime

mortgage holdings in late 2006 and thereafter as risky, and in fact utterly toxic assets that they

needed to unload off their books. As discussed above, Defendants' CEO admitted this.

Defendants' motivation was fear (exposure to significant losses) and greed (ability to sell the

APPCMs to the Fund at an inflated price, and thereby take in substantial monies in the process).

21

73.     In *SSBT*, this Court ultimately held that State Street Bank and Trust's ERISA

violations injured the class in the amount of nearly $77 million, *id.* at *43, exclusive of interest

and fees, *id.* at *44. Whereas Defendants' Fund is one of the largest in the world, and whereas

the extent of Defendants' ERISA breaches are even more clear and significant than those in

*SSBT*, the damages to the class here likely are far greater than those in *SSBT*.

### Defendants Are Fiduciaries Pursuant to ERISA

74.     ERISA defines a fiduciary as someone who "(i) exercises any discretionary

authority or discretionary control respecting management of such plan or exercises any authority

or control respecting management or disposition of its assets, (ii) renders investment advice for a

fee or other compensation, direct or indirect, with respect to any moneys or other property of

such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority

or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29

U.S.C. § 1002(21)(A)(i). People and entities are fiduciaries pursuant to ERISA not only when

they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when

they perform such fiduciary functions.

75.     Investment managers are also ERISA fiduciaries. ERISA defines in relevant part

an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset

of a plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing

that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

76.     Defendants are fiduciaries with respect to the Fund. Defendants are fiduciaries

because, among other reasons, they possessed investment discretion at all relevant times as to the

Fund. Neither Plaintiff nor any other member of the Class possessed the ability to direct the

manner in which Defendants invested or allocated any of the Fund's assets. Moreover,

22

Defendants are trustees and custodians with respect to the Fund pursuant to ERISA § 403(a), and are also investment managers with respect to the Fund.

### ERISA Requirements

77.    ERISA §§ 404(a)(1)(A) and (B) provide, in relevant part, that fiduciaries shall discharge their duties with respect to a plan solely in the interests of the participants and beneficiaries. They must act for the exclusive purpose of providing benefits to participants and their beneficiaries. ERISA fiduciaries must act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

78.    These fiduciary duties under ERISA § 404 are known as the duties of loyalty, exclusive purpose, and prudence. The duties are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

79.    Fiduciary duties under ERISA § 404 include, among others:

(A)    The duty to act *exclusively* in the best interest of the plans, their participants, and their beneficiaries. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

(B)    The duty to disclose and inform, which encompasses a negative duty not to misinform; an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and an affirmative duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

23

(C)     The duty to avoid conflicts of interest; and should such conflicts occur, the duty to resolve them promptly. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

(D)     The duty to conduct an independent, thorough, and honest investigation into, and to continually monitor, the merits of all the investments of a plan.

(E)     The duty to diversify sufficiently the investment portfolio of the plan.

80.     The U.S. Department of Labor ("DOL") and case law have interpreted this ERISA provision. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration" to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio. "Appropriate consideration," according to DOL regulations, includes, but is not necessarily limited to: determining that the particular investment or investment course of action is reasonably designed to further the purposes of the plan; and considering the composition of the portfolio with regard to diversification, the liquidity and current return of the portfolio relative to the plan's anticipated cash flow requirements, as well as the projected return of the portfolio relative to the plan's funding objectives.

81.     As discussed above and below, Defendants disregarded and violated each of these duties. Their wrongful conduct directly and substantially harmed Plaintiff and the proposed Class. Had the Fund consisted of only prudent investments that were properly managed, it would have not have seen its investment returns crater under the weight of its imprudent

24

mortgage holdings, and Plaintiff and the Class in that event would have far more money

available to help them achieve their retirement dreams than they do today.

## CLASS ALLEGATIONS

82. Class Definition. Plaintiff brings this matter as a class action pursuant to Federal

Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3). Plaintiff files this

case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries and named fiduciaries of those plans, who were invested directly or indirectly in the J.P. Morgan Stable Value Fund or Privately Labeled J.P. Morgan Stable Value Fund between July 1, 2007 and December 31, 2010. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party, other than qualified ERISA plans offered by Defendants or any of their affiliates to their employees and that suffered losses due to investment in the J.P. Morgan Stable Value Fund or Privately Labeled J.P. Morgan Stable Value Fund.

83. *Numerosity*. The members of this Class are so numerous that joinder of all

members is impracticable. While the exact number of Class members is unknown to Plaintiff at

this time, and can be ascertained only through discovery, Plaintiff reasonably believes that more

than 100 ERISA plans throughout the country offered the Fund during the Class Period, had

assets invested in the Fund during the Class Period, and sustained losses during the Class Period

as a result of Defendants' conduct. These Plans collectively have more than one million

participants and beneficiaries.

84. *Commonality*. The claims of Plaintiff and members of the Class have a common

origin and share a common basis. All Class members suffered from the same misconduct

complained of herein, and they all suffered injury as a result of the breaches of duties and

violations of ERISA that form the basis of this lawsuit. Proceeding as a class is particularly appropriate here because the Fund is held in a collective trust managed by Defendants, in which the assets of every plan that invests in the Fund are pooled; therefore, Defendants' imprudent actions clearly affected all plans that invested in the Fund.

85.    Furthermore, common questions of law and fact exist as to all members of the class. The many questions of law and fact common to the Class include, but are not limited to:

a.    whether Defendants are fiduciaries under ERISA;

b.    whether Defendants breached their fiduciary duties under ERISA;

c.    whether Defendants deviated from the proper and/or stated purpose of the Fund when they sold to the Fund highly risky APPCMs;

d.    whether Defendants failed to provide complete and accurate information when they sold to the Fund the highly risky APPCMs;

e.    whether Defendants' actions complained of herein injured the plans that invested in the Fund, their participants, and their beneficiaries.

86.    *Typicality*. Plaintiff's claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the class Members. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

87.    *Adequacy*. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has no interests that are, or would be, antagonistic to or in conflict with those of the Class members. Plaintiff will vigorously protect the interests of the members of the Class.

88.     Moreover, Plaintiff has retained counsel who are competent and experienced in class actions and ERISA matters. Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits. The undersigned counsel will devote the time and other resources necessary to litigate this case as effectively as possible.

89.     Rule 23(b)(1)(A) and (B) requirements. Class certification in this ERISA action is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

90.     Rule 23(b)(2) requirements. Class certification under Federal Rule of Civil Procedure 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.

91.     Rule 23(b)(3) requirements. In the alternative, certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Class predominate over any questions (if any) affecting only individual Class members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I: VIOLATION OF ERISA § 404(a)(1)
### BREACH OF DUTIES OF PRUDENCE, LOYALTY, AND DIVERSIFICATION

92.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if set forth fully herein.

27

93. Defendants were fiduciaries, as discussed above, for the plans and their participants, including Plaintiff.

94. A fiduciary must comply with the duties of prudence and loyalty. As discussed above, fiduciaries must discharge their duties solely in the interest of the participants and beneficiaries. They must do so for the exclusive purpose of providing benefits to the participants and beneficiaries. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence under the circumstances then prevailing of a prudent person.

95. Defendants' conduct with respect to the Fund violated – in numerous ways – its fiduciary duties of prudence and loyalty. Defendants' conduct complained of herein violated their fiduciary duties of prudence and loyalty in the following manner:

- Defendants inappropriately invested the Fund in securities (APPCMs) that were far too risky for the stated and/or reasonable objectives of such a Fund. The APPCMs were significantly more risky than that which should be contained in a fund of like character and like aims.

- In selling these overly risky securities to the Fund, Defendants exacted unreasonable fees from the Fund.

- Defendants unlawfully failed to diversify the asset base of the Fund sufficiently when they invested the Fund in a substantial percentage of APPCMs. After receiving repeated warnings about the weakness of the mortgage market, Defendants still unloaded vast amounts of mortgage assets known to Defendants to be risky ones, in the form of APPCMs, into the Fund. Without meaningful hedging or use of other available loss-avoidance and risk management strategies that could have otherwise protected the retirement investors in the Class from the

financial harms complained of herein, Defendants violated the duty to diversify by purchasing for an ostensibly highly conservative retirement fund a significant amount of mortgage assets that Defendants knew at the time posed a substantial risk of complete depreciation while failing to use risk management measures for the Fund and its investors that may have partially or totally mitigated the losses at issue here. *Cf. In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, -- F. Supp. 2d --, 2012 WL 333774, at \*35-\*37 (S.D.N.Y. Feb. 1, 2012).

- Defendants unlawfully disguised from plan participants the true loss in value of the APPCMs that they unlawfully sold to the Fund and the impact of those positions on the Fund.

96. Defendants' actions directly and proximately caused substantial financial harm to Plaintiff and the proposed Class. As a result of this wrongdoing, Defendants are liable for all resulting loss and damage. Defendants must also disgorge all monies they wrongfully made through use of the plans' assets.

### COUNT II: VIOLATION OF ERISA SECTION 404(a)(1)(A) EXCLUSIVE BENEFIT

97. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if set forth fully herein.

98. Defendants were fiduciaries, as discussed above, for the plans and their participants, including Plaintiff.

99. ERISA Section 404(a)(1)(A) requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

100. Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), Defendants, while fiduciaries, caused the plans invested in the Fund to purchase – again, from themselves – and hold substantially overvalued, overly risky mortgage assets (APPCMs). During the purchase process, Defendants substantially overvalued the APPCMs, to Defendants' benefit but to the detriment of Plaintiff and the other investors in the Fund who are members of the proposed Class.

101. Defendants' aforementioned actions were not in the best interest of the Fund's participants and beneficiaries. In fact, Defendants' primary motivation in selling its own APPCMs to the Fund was self-interest: it wanted to unload risky mortgage assets from its own books.

102. While a conflict of interest alone is not a *per se* breach of ERISA fiduciary duties, any benefit accruing therefrom to the plan's fiduciary truly must be "incidental" to a decision that otherwise is in the best interests of the plan participants. *See, e.g., Bonavan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). For the reasons specified above and below, Defendants' actions complained of herein were not only beneficial to the Defendants, but knowingly harmful to Plaintiff and the proposed Class members. The aforementioned benefits to Defendants were hardly incidental.

103. Defendants themselves were aware of this conflict of interest; as set forth before, Defendants knew (at least as early as 2006) that the mortgage assets like those that ended up in the APPCMs were extremely risky to hold in large quantities – so risky that the Defendants' CEO called one of his subalterns while on vacation in Africa "to fire a red alert" about the need to dump these assets precisely because they were so risky. (*See, e.g.,* http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune/index.htm (last viewed

on March 27, 2012).). If the securities were too risky for Defendants to hold in bulk, they surely were too risky for a putatively *uber*-conservative investment vehicle like the Fund to hold in bulk.

104. In the end, Defendants' conduct caused the Plaintiff and members of the proposed Class to pay too much money for mortgage assets that were far too risky under the instant circumstances and led to a massive diminution in the Fund's returns as a result.

105. Defendants' actions directly and proximately caused substantial financial harm to Plaintiff and the proposed Class. As a result of this wrongdoing, Defendants are liable for all resulting loss and damage. Defendants must also disgorge all monies they made through wrongful use of the plans' assets.

**COUNT III: VIOLATION OF ERISA SECTION 406(a)(1)(A)**
**PROHIBITED TRANSACTIONS**

106. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if set forth fully herein.

107. Defendants were fiduciaries, as discussed above, for the plans, as well as for Plaintiff and members of the Class.

108. ERISA Section 406(a)(1)(A) prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

109. Defendants here were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A),(B). Here, Defendants were parties in interest because, as discussed above, they were both fiduciaries and persons who provided services to the plans.

110.    Despite the clear prohibition of Section 406(a)(1)(A), Defendants, while fiduciaries and parties in interest, caused the Fund to purchase and hold substantially overvalued and unduly risky mortgage assets *from themselves*.

111.    Defendants' actions directly and proximately caused substantial financial harm to Plaintiff and the proposed class. As a result of this wrongdoing, Defendants are liable for all resulting loss and damage. Defendants must also disgorge all monies they made through wrongful use of the plans' assets.

## COUNT IV: VIOLATION OF ERISA SECTION 406(b)(1) PROHIBITED TRANSCATIONS

112.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if set forth fully herein.

113.    Defendants were fiduciaries, as discussed above, for the plans and their participants, including Plaintiff.

114.    ERISA Section 406(b)(1) prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

115.    Despite the prohibitions of this section, Defendants caused Plaintiff and other retirement plan participants in the Fund to purchase *from themselves* (*i.e.*, from Defendants) severely overvalued and unduly risky mortgage assets. Defendants' actions directly and proximately caused substantial financial harm to Plaintiff and the proposed Class. As a result of this wrongdoing, Defendants are liable for all resulting loss and damage. Defendants must also disgorge all monies they made through wrongful use of the plans' assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.    A determination that this action is a proper class action and certification of the proposed Class, with Plaintiff as class representative and its counsel as Class Counsel, pursuant to Federal Rule of Civil Procedure 23.

B.    A declaration that the Defendants, and each of them, have breached their ERISA duties to the Plaintiff and the Class.

C.    An order compelling the Defendants to make good to the Plaintiff, the Class, and their plans the losses resulting from Defendants' breaches of their fiduciary duties; and to disgorge to the Plaintiff and the Class all monies the Defendants made through their wrongful use of the Plaintiff and the Class's assets;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plaintiff, the Class and their plans as a result of the aforementioned ERISA violations;

E.    An order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the relevant ERISA plans' funds;

F.    Actual damages in the amount of any losses to the Plaintiff, the Class, and the ERISA plans included in the class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

G.    An award of costs pursuant to 29 U.S.C. § 1132(g);

H.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and other law;

I.    An award for equitable restitution and other appropriate equitable and injunctive relief against the Defendants;

J.    An award of such other and further relief as the Court deems just and proper.

Dated: April 3, 2012                                     Respectfully submitted,

                                                        Kevin Madonna (Bar No. KM5595)
                                                        KENNEDY & MADONNA, LLP
                                                        48 Dewitt Mills Rd.
                                                        Hurley, NY  12443
                                                        Tel: (845) 481-2622
                                                        Fax: (845) 230-3111

The following attorneys will be submitting motions to appear *pro hac vice*:

Garrett W. Wotkyns, Esq.                    Joseph Peiffer, Esq.
SCHNEIDER WALLACE COTTRELL                  FISHMAN HAYGOOD PHELPS
BRAYTON KONECKY LLP                         WALMSLEY WILLIS & SWANSON, LLP
8501 N. Scottsdale Road, Suite 270          201 St. Charles Avenue, Suite 4600
Scottsdale, Arizona 85253                   New Orleans, Louisiana 70170
Tel: (480) 428-0144                         Tel: (504) 586-5252
Fax: (866) 505-8036                         Fax: (504) 586-5250
gwotkyns@schneiderwallace.com               jpeiffer@fishmanhaygood.com


Adam B. Wolf, Esq.                          Peter Mougey, Esq.
SCHNEIDER WALLACE COTTRELL                  James Kauffman, Esq.
BRAYTON KONECKY LLP                         LEVIN PAPANTONIO THOMAS
180 Montgomery Street, Suite 2000           MITCHELL RAFFERTY & PROCTOR, P.A.
San Francisco, California 94104             316 So. Baylen Street, Suite 600
Tel: (415) 421-7100                         Pensacola, FL 32502
Fax: (415) 421-7105                         pmougey@levinlaw.com
awolf@schneiderwallace.com                  jkauffman@levinlaw.com


Thomas R. Meites, Esq.
Michael M. Mulder, Esq.
MEITES, MULDER & GLINK
321 S. Plymouth Ct., Ste. 1250
Chicago, Ill.  60604
Tel: 312-263-0272
Fax: 312-263-2942
trmeites@mmmglaw.com
mmmulder@mmmglaw.com


ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS

34