**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| RICHARD WHITLEY, CAROLETA M. DURAN, TERRY J. KOCH, MARK D. GRANDY, JOHN M. GATES, and SCOTT NEWELL, on behalf of themselves and those similarly situated, | ) ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) ) | Case No. 12-cv-2548 The Honorable John G. Koeltl |
| | ) | |
| J.P. MORGAN CHASE & CO.; JPMORGAN CHASE BANK N.A.; J.P. MORGAN INVESTMENT MANAGEMENT INC., aka J.P. MORGAN ASSET MANAGEMENT; and JPMORGAN RETIREMENT PLAN SERVICES LLC, | ) ) ) ) ) ) ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| *Defendants*. | ) ) | |

EXHIBIT A

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

PARTIES ...........................................................................................................................8

JURISDICTION AND VENUE ....................................................................................11

FACTUAL ALLEGATIONS .........................................................................................11

    The 401(k) Plans ........................................................................................................11

    Stable Value Funds ....................................................................................................14

    JPM's Stable Value Funds.........................................................................................14

    Performance of the JPM Stable Value Funds ...........................................................16

    JPM Surreptitiously Exposed Plaintiffs and the Proposed Class to Unduly
    Risky Mortgage Assets ..............................................................................................17

    JPM's Manipulation of Credit and Liquidity Ratings, its Investment Guidelines,
    and the Wrap Process.................................................................................................20

    *In re State Street Bank and Trust* Litigation ............................................................25

    ERISA Requirements.................................................................................................26

CLASS ALLEGATIONS ...............................................................................................28

COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C) BREACH OF DUTIES
OF PRUDENCE AND DIVERSIFICATION .....................................................................31

COUNT II: VIOLATION OF ERISA § 404(a)(1)(A) EXCLUSIVE BENEFIT .................33

COUNT III: VIOLATION OF ERISA § 404(a)(1)(B) DUTY OF LOYALTY AND
CANDOR............................................................................................................................34

COUNT IV: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED
TRANSACTIONS ..............................................................................................................35

COUNT V: VIOLATION OF ERISA §§ 406(b)(1) AND (b)(3) PROHIBITED
TRANSACTIONS ..............................................................................................................36

PRAYER FOR RELIEF ................................................................................................37

Richard Whitley, Caroleta M. Duran, Terry J. Koch, Mark D. Grandy, John M. Gates and Scott Newell (collectively, "Plaintiffs") bring this action against J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management, and JPMorgan Retirement Plan Services LLC (collectively, "JPM" or the "JPM entities") on behalf of themselves and similarly situated 401(k) plan participants. Based on personal knowledge and information obtained from investigation by counsel, Plaintiffs allege as follows:

**<u>INTRODUCTION</u>**

1.      Defendants are J.P. Morgan Chase & Co. and various of its wholly owned subsidiaries. JPM sold and currently sells a number of investment funds that are offered to 401(k) plan participants and represented as being stable in value (collectively referred to in this Complaint as the "Stable Value Funds"). These funds are called, among other things, the Stable Value Fund, the Stable Asset Fund, Stable Value, Stable Principal Fund, Short-Term Investment Fund ("STIF"), and Stable Asset Income Fund ("SAIF"). All of these Stable Value Funds are advertised as being stable in value, and thus all were presented as conservative investment options.

2.      Plaintiffs and members of the proposed Class are investors who elected to invest their retirement funds via their Defined Contribution and Profit Sharing 401(k) plans into JPM's Stable Value Funds.

3.      Targeting retirement investors, JPM maintained that stable value strategies are "your most conservative investment option."[1] The then-head of JPM's stable value fund management group, Victoria Paradis, described JPM's stable value asset class as "among the

---

[1]*See* http://www.jpmorgan.com/pages/stablevalue (last viewed September 18, 2012).

most conservative in the DC [defined contribution retirement] plan line-up."[2] In a document titled Solutions Stable Value Strategy (June 30, 2009), JPM described its "Stable Value Strategy" as "seeking to preserve the value of the money invested" and "perform[ing] better than the average money market fund, and earn[ing] consistent, reliable returns." However, this sales ploy is a ruse, and has been one for some time.

4.       While JPM touted the conservative nature of the Stable Value Funds, JPM has in fact for years been using those very funds as a vehicle for high-risk gambling—only in this casino, the chips are the Plaintiffs' and the proposed Class's retirement savings.

5.       As set forth below, JPM breached its duty of prudence and duty to diversify to the plans that offered its Stable Value Funds and the participants in those plans by causing the Stable Value Funds to imprudently fund risky and undiversified investments, many of which were also illiquid and lacked any objective quality rating. JPM also breached its duty of loyalty and candor when, faced with investment losses from these imprudent and poorly diversified investments, it disguised the extent of those losses from Plaintiffs and the proposed Class. In addition, JPM breached its duty of loyalty and engaged in a conflict of interest by causing the Stable Value Funds to engage in prohibited transactions with JPM itself. The undisclosed investment losses described above caused those yields to the Plaintiffs and the other participants in the Stable Value Fund to be substantially lower than they would have been absent JPM's breaches of its fiduciary duties.

6.       Specifically, JPM caused each of the Stable Value Funds to invest a substantial portion of its assets in JPM's Intermediate Bond Fund. The Intermediate Bond Fund in turn made

---

[2] *See* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed September 18, 2012).

substantial investments in what JPM called Pension Trust Funds, including JPM's Mortgage Private Placement Fund.

7.     A substantial portion of the Intermediate Bond Fund's assets—both directly and indirectly through the Pension Trust Funds—were invested in risky mortgage-backed securities (including commercial mortgage obligations and commercial mortgage backed securities) and equally risky, and also illiquid, private placement mortgages (referred to collectively in this Complaint as "mortgage assets"). JPM originated and underwrote many of these private placement mortgages, and many were unrated, except by JPM itself. In addition, JPM unilaterally determined the liquidity of many of these assets.

8.     Despite these investments directly through the Intermediate Bond Fund and indirectly through the Pension Trust Funds, including the Private Placement Mortgage Fund, JPM described its "Stable Value Strategy" as investing only in a "high quality fixed income portfolio" that "consists of investment-grade fixed income securities."

9.     While times were good, this risky strategy allowed JPM's Stable Value Funds to offer ostensibly higher returns than competing funds and thus attract new participants—which insured to JPM's financial benefit through the generation of additional fees and otherwise and inured to the benefit of the JPM executives who received substantial bonuses tied to the growth of JPM's stable value fund business. When the financial crises hit, however, the market value of the assets held in the Stable Value Funds (through the Intermediate Bond Fund and Pension Trust Funds) declined precipitously. This type of volatility was exactly what investors sought to avoid by placing their retirement funds in the Stable Value Funds in the first instance rather than funds that were more transparently exposed to market volatility.

10.     To compound this wrongdoing, JPM engaged in a systematic effort to disguise the full extent of these investment losses by, among other things, conspiring with the "wrap" providers for the Stable Value Funds to report the book value of the Stable Value Funds in a manner that differed from the formulas required by their contracts and industry practice. This had the effect of "smoothing" the losses over a long period of time and preventing Plaintiffs and the proposed Class from contemporaneously ascertaining the actual performance of the Stable Value Funds.

11.     Given that the JPM entities are, as explained below, fiduciaries to Plaintiffs and the proposed Class under the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 USC § 1002, *et seq.*, why would JPM be so careless with Plaintiffs' and the proposed Class's retirement nest eggs? As is often the case, the answer lies in one word: money. JPM exposed Plaintiffs and the proposed Class's retirement savings to substantial market risks in an effort to chase yield and thus hopefully grow JPM's share of the market in the stable value fund business, thereby reaping additional fees, and when those risks materialized, engaged in a cover-up to prevent disclosure of the deteriorating situation so it could keep collecting such fees.

12.     To make matters worse, JPM knew how dangerous excessive exposure to the real estate market could be even before the 2008 financial crises.

13.     To wit, JPM decided in October 2006—shortly before the subprime storm hit Wall Street and Main Street alike with full force—to dump the vast majority of its considerable investment positions in mortgage assets that it owned for its own account.[3] This matter was such an urgent concern to JPM in October of 2006 that its CEO, Jamie Dimon, at the time called his then-head of JPM's securitized Funds division, William King, while the latter was in Africa, "to

---

[3]*See* http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune (last viewed on September 18, 2012).

fire a red alert. 'Billy, I really want you to watch out for subprime!' Dimon's voice crackled over

King's hotel phone. 'We need to sell a lot of our positions. I've seen it before. This stuff could

go up in smoke!'"

14.     And JPM did just that—selling off, starting in late 2006, more than $12 billion

worth of mortgage assets that it owned itself.[4] Despite its acute concern about the risks attending

the assets held on its own books, however, JPM continued to keep mortgage assets in the Stable

Value Funds (through the Intermediate Bond Fund and Pension Trust Funds, in which 401(k)

participants—not JPM—were the indirect holders as noted above).

15.     JPM was also the originator of many of the mortgages that were among the

mortgage assets held by the Stable Value Funds. Thus, JPM knew well the risks inherent in such

assets and knew or should have known that they were inappropriate for inclusion in a stable

value fund portfolio under the market conditions prevailing during the period of time at issue in

this case.

16.     In summary, JPM pushed a substantial portion of the Plaintiffs' and proposed

Class's ostensibly "stable" and "conservative" retirement investments into what it knew were

actually high-risk mortgage assets and—when those known risks materialized—acted to disguise

the actual consequences of its imprudent strategy, moves undertaken with an "eye single" to

JPM's benefit and not Plaintiffs'. Its posture here was diametrically opposed to ERISA's

mandate that fiduciaries operate with an "eye single" to the interests of plan participants and

beneficiaries. *See, e.g.*, *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo
Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994).

---

[4]*Id.*

17.     JPM thus engaged in serial breaches of its fiduciary duties to Plaintiffs and the proposed Class under ERISA, duties that are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). Its imprudent investments, failure to disclose the true extent of the losses from those investments, and participation in prohibited transactions violated ERISA and its obligations to Plaintiffs and the proposed Class.

18.     These breaches and violations have directly and proximately caused Plaintiffs and the proposed Class to suffer significant financial harm. Damages to Plaintiffs and the proposed Class have manifested themselves in, among other things, substantial diminutions in their investment returns on the Stable Value Funds. This action seeks to obtain relief for JPM's wrongful acts and violations of ERISA, including damages sustained by Plaintiffs and the proposed Class as a direct and proximate result of those acts.

## PARTIES

19.     Plaintiff Richard Whitley has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Hospira, Inc. 401(k) Retirement Plan ("the Hospira Plan"). The Hospira Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Whitley prior to withdrawing from the Hospira Plan, on, or about, July 27, 2012, had 401(k) funds allocated to JPM's Hospira Stable Value Fund, which is one of the Stable Value Funds described above.

20.     Plaintiff Terry J. Koch has been, and continues to be, a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The Caterpillar Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Koch has had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

21.     Plaintiff Caroleta M. Duran has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The Caterpillar Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times prior to withdrawing from Caterpillar's Retirement Plan, on, or about, August 1, 2012, Ms. Duran had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

22.     Plaintiff Mark D. Grandy has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mitsubishi Motors North America, Inc. Manufacturing Division 401(k) Savings Plan (the "Mitsubishi Plan"). The Mitsubishi Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Grandy has had 401(k) funds allocated to JPM's Stable Value Fund, which is one of the Stable Value Funds described above.

23.     Plaintiff John M. Gates has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan International, Inc., Employees' Retirement Savings Plan (the "Titan Plan"). The Titan Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Gates has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

24.     Plaintiff Scott Newell has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan Plan. The Titan Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Newell has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

25.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, and Newell sue on their own behalf and, as specified below, on behalf of participants in 401(k) plans in which any of the

Stable Value Funds is or has been offered as an investment option and who have allocated monies to any of the Stable Value Funds during the class period.

26.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a financial services provider whose headquarters is in New York, New York. JPMC was a fiduciary with respect to the plans offering any of the Stable Value Funds and the participants in such plans at all relevant times.

27.     JPMorgan Chase, N.A. ("JPMC, NA") is a bank operating in the United States and abroad with a registered address of 270 Park Avenue, New York, New York 10017-2014. JPMC, NA acts as trustee and fiduciary (either directly or through one or more wholly-owned subsidiaries) of the Stable Value Funds. For example, the Commingled Pension Trust (Stable Asset Income) of JP Morgan Chase, N.A. is a collective trust fund established and maintained by JPMC, NA under a declaration of trust. JPMC, NA was a fiduciary with respect to the plans offering any of the Stable Value Funds and the participants in such plans at all relevant times.

28.     JPMorgan Retirement Plan Services LLC ("JPRS") is a wholly-owned subsidiary of J.P. Morgan Chase & Co. JPRS claims to "provide[] bundled defined contribution services to more than 650 clients and 1.8 million plan-level participants, representing more than $125 billion in retirement plan assets as of December 31, 2011." As a fiduciary, JPRS provided account balances and fund performance information to Plaintiffs and fund participants (either directly or indirectly) in conjunction with the Stable Value Funds. JPRS was a fiduciary with respect to the plans offering any of the Stable Value Funds and the participants in such plans at all relevant times.

29.     Defendant J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management ("JPMAM") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. J.P. Morgan Asset Management is the marketing

name for the asset management business of JPM and its subsidiaries worldwide, including

JPMAM. JPMAM is the entity that managed the Stable Value Funds. JPMAM was a fiduciary

with respect to the plans offering any of the Stable Value Funds and their participants at all

relevant times.

### JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over this matter pursuant to ERISA

§ 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

31.     Venue is proper in this District because Defendants reside in this District,

Defendants conduct business in this District, and the harm complained of herein emanated from

this District.

### FACTUAL ALLEGATIONS

### The 401(k) Plans

32.     At all times relevant to this Complaint, the 401(k) plans involved in this matter

were employee benefit plans within the meaning of ERISA.

33.     At all times relevant to this Complaint, the plans were "defined contribution" or

"individual account" plans within the meaning of ERISA because, among other reasons, the

plans provided for individual accounts for each participant and for benefits based solely upon the

amount contributed to the participant's account, as well as any income, expenses, gains and

losses, and forfeitures of accounts of other participants that could be allocated to such

participant's accounts.

34.     At all times relevant to this Complaint, these plans provided the Plaintiffs and

members of the proposed Class with various options for investment, and they could direct the

plans to purchase investments from among these options and allocate them to their individual accounts. The Stable Value Funds were among these options.

35.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, and Newell at all relevant times were and/or are participants in the Hospira, Caterpillar, Mitsubishi, or Titan Retirement 401(k) Plans. At all relevant times, each of these Plans have offered one of the Stable Value Funds as an investment option that Plaintiffs invested in, and at those times, one or more of the JPM entities served as trustee for each of these Plans.

36.     The Hospira, Caterpillar, Mitsubishi, and Titan Plans are typical of such plans, and Plaintiffs are typical and representative of participants in such plans who have chosen to invest a portion of their 401(k) holdings in a Stable Value Fund. The Hospira, Caterpillar, Mitsubishi, and Titan Plans are typical of the plans involved in this matter in that each at all relevant times has offered a Stable Value Fund as an investment option, and one or more of the JPM entities served as fiduciary, administrator and trustee for each. Although the Stable Value Funds are nominally separate, they are linked together by their common and substantial investments in other JPM funds, such as the Intermediate Bond Fund and the Pension Trust Funds.

37.     At all relevant times, one or more of the JPM entities served as Investment Advisor, Investment Manager, Administrator, Trustee and/or Custodian of these plans' Stable Value Funds.

38.     ERISA defines a fiduciary as someone who "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of

such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). People and entities are fiduciaries pursuant to ERISA not only when they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when they perform such fiduciary functions.

39. Investment managers are also ERISA fiduciaries. ERISA defines in relevant part an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset of a plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

40. The JPM entities are fiduciaries with respect to the Stable Value Funds and thus of the plans that offer the Stable Value Funds and the participants in those plans who allocate retirement funds to one of the Stable Value Funds because, among other reasons, they possess investment discretion as to the Stable Value Funds. Neither plans nor plan participants possess the ability to direct the manner in which JPM invest or allocate the Stable Value Funds' assets. Moreover, one or more of the JPM entities are trustees and custodians with respect to the Stable Value Funds pursuant to ERISA § 403(a), and are also investment managers with respect to the Stable Value Funds.

41. At all times relevant to this Complaint, JPM unilaterally calculated the Stable Value Funds' respective Net Asset Value ("NAV") as Administrator of the Stable Value Funds. "The NAV's unit price is quoted on a private market that is not active."[5]

---

[5]Hospira's 401(k) Plan 2009 Form 5500 Filing Note B - Summary of Significant Accounting Policies: Investment Valuation Collective Trust Funds.

42.     At all times relevant to this Complaint, independent Certified Public Accountants performing the ERISA-required annual plan audits have relied on JPM's reporting of NAV and valuations of the Stable Value Funds (as was standard in the industry).

## Stable Value Funds

43.     A stable value fund is usually invested in a high-quality, diversified, fixed-income portfolio designed to preserve the capital of those who buy into the fund while providing steady positive returns. Stable value funds are marketed as conservative investment options due to their ostensible safety and stability.

44.     Stable value funds are a popular investment option in 401(k) plans. Offered as an option in approximately half of all defined contribution plans, stable value funds are usually the largest conservative investment option available in such plans.

45.     Stable value funds are typically affected far less than most other investment options in periods of market distress. Because they are generally comprised of well-diversified portfolios of high credit quality fixed-income securities, they were one of the few 401(k) investment options to provide positive returns throughout the market upheaval of the late 2000s.

## JPM's Stable Value Funds

46.     JPM sponsors a collection of stable value funds that is one of the largest and most utilized in the country. Between 2003 and 2009, JPM more than doubled the amount that 401(k) plan participants invested in its Stable Value Funds, growing this amount from less than $10 billion to more than $22 billion over that timeframe.

47.     The Stable Value Funds are managed by JPM and offered as investment options to numerous ERISA defined contribution 401(k) plans in the United States. As noted above, JPM

caused its Stable Value Funds to invest heavily in mortgage assets through its Intermediate Bond and Pension Trust Funds, including the Mortgage Private Placement Fund.

48.     At all relevant times, the JPM entities have served as Investment Advisors, Fully Discretionary Investment Managers, Plan Administrators, Trustees and/or Custodians (per ERISA § 403(a)) of the Hospira, Caterpillar, Mitsubishi and Titan 401(k) Plans and all the numerous other defined contribution 401(k) plans that offered one of the JPM Stable Value Funds as an investment option. As such, at all relevant times JPM has been a fiduciary of the defined contribution 401(k) plans under ERISA.

49.     JPM has frequently and consistently stated publicly that its Stable Value Funds are typical stable value funds, as described above. For instance, in the 2009 Solutions Stable Value Strategy document, JPM described the investment objective of the Stable Value Funds as "seek[ing] to preserve the value of money invested, perform better than the average money market fund, and earn consistent, reliable returns." This document then identified JPM's investment strategy for the Stable Value Funds:

> The fund invests in a high quality fixed income portfolio combined with investment contracts called "benefit responsive wraps," issued by AIG (A-), Monumental Ins. Co. (AA-), and ING (AA-).
>
> The wrap contracts which are issued by insurance companies and banks provide principal preservation of participant balances, regardless of market conditions.
>
> The wraps also help to stabilize the returns of the fund, even when markets are volatile.
>
> The fixed income portfolio consists of investment grade fixed income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed, asset-backed, and privately placed mortgage debt.

50.     In addition, JPM emphasized that the Stable Value Funds were typical stable value funds, not only by calling them "Stable Value," "Stable Asset," or "Stable Income" in their very names, but also by its characterization of their risk level. On a scale of 1-5, with 1 being the most conservative and 5 being the most aggressive, the Solutions Stable Value Strategy and other similar documents stated that the Stable Value Funds were a 1 (most conservative). As set forth above, Ms. Paradis has stated publicly that the Stable Value Funds are among the "most conservative" investments possible in a defined contribution plan.

51.     JPM has also internally established the Stable Value Funds' investment objectives. In JPMAM Investment Guidelines, JPM stated that the goals of the Funds were to:

a.     "protect the principal balance of participant accounts," [and]

b.     "generate stable, positive book value returns that exceed those of alternative principal protection vehicles, such as money market funds, during normal market conditions."

### Performance of the JPM Stable Value Funds

52.     JPM drew investors to the Stable Value Funds by emphasizing their above-market performance compared to non-JPM stable value funds.

53.     JPM also reported that its Stable Value Funds consistently outperformed applicable benchmarks. For example, JPM compared the Stable Value Funds' composite book-value return performance favorably with the Citigroup three-month Treasury Bill Index, which JPM held out as a relevant benchmark.

54.     As set forth above, JPM caused its Intermediate Bond and Pension Trust Funds to hold substantial amounts of risky and often illiquid and unrated (except as self-rated by JPM) mortgage assets. Because the Stable Value Funds invested in those funds, a substantial portion of the Stable Value Funds' assets were in turn invested in these risky mortgage assets.

16

55.     During the period from 2007 to 2010, the market value of the mortgage assets

held in the Stable Value Funds' (through the Intermediate Bond Fund and Pension Trust Funds)

declined dramatically. This caused a decline in the reported book value or yield of the Stable

Value Funds (although the reported book values were manipulated to hide the full extent of the

investment losses, as set forth below). As a result, even with the manipulated book values,

competitor stable value funds and even the Stable Value Funds' own benchmarks markedly

outperformed the Stable Value Funds beginning in late 2008. The disparity in the reported

performance between the Stable Value Funds and their competitors arose because the Stable

Value Funds were heavily invested in unduly risky mortgage assets that suffered a severe decline

in market value.

56.     As a result, the Stable Value Funds produced returns to Plaintiffs and the

proposed Class that were substantially lower than if their retirement funds had been invested in

assets consistent with the announced purpose and description of the Stable Value Funds and

consistent with JPM's duties to Plaintiffs and the proposed Class under ERISA.

57.     These losses to the Stable Value Funds' investors are significant. For the years

2008 to 2011, the reduction in yielded returns of the Stable Value Funds due to JPM's wrongful

conduct as alleged in this Complaint is estimated to be no less than $1 billion. There is therefore

a direct relationship between the injurious actions complained of herein and economic loss to the

Plaintiffs and the proposed Class. *Cf. In re State Street Bank & Trust Co. Fixed Income Funds

Inv. Litig.*, 842 F. Supp. 2d 614, 655 (S.D.N.Y.2012).

### JPM Surreptitiously Exposed Plaintiffs and the Proposed Class to Unduly Risky Mortgage Assets

58.     As set forth above, throughout the class period, JPM stated that the Stable Value

Funds' portfolio of investments consisted of "fixed-income securities, primarily U.S. Treasury,

agency, corporate, mortgage-backed, asset-backed, and privately-placed mortgage debt" that were "investment grade."[6] Plaintiffs and the proposed Class had no way to verify these representations since the holdings of the Intermediate Bond Fund and Pension Trust Funds are confidential and are not publicly available.

59.     JPM's representations in fact were untrue, as confirmed by a confidential witness ("CW") close to this situation.[7] Contrary to JPM's aforementioned representations, during the class period, it caused the Stable Value Funds to invest in private placement mortgages that JPM had itself originated and other mortgage-backed assets that were *not* investment-grade and did not meet the criteria for stable value fund investments, as measured both by JPM's own representations and industry practice with respect to stable value funds. JPM invested Plaintiffs and the proposed Class's retirement savings in these risky mortgage assets through a fairly complex layering scheme, as set forth above and further detailed below.

60.     JPM used the Stable Value Funds' assets to invest in several layers of other JPM-sponsored Funds. Defined contribution 401(k) plan participants, such as Plaintiffs', invested in JPM's Stable Value Funds, which then invested in the JPM Intermediate Bond Fund, which in turn invested in the Pension Trust Funds, including the Mortgage Private Placement Fund. This layering strategy allowed JPM to mask the magnitude of the Stable Value Funds' exposure to risky mortgage assets and prevented Plaintiffs and the proposed Class from being able to ascertain the underlying holdings of their Stable Value Funds.

---

[6]*See, e.g.,* Solutions JPMorgan Stable Value, June 30, 2009.

[7]The CW is the source of some of the information alleged in this Complaint. That witness works on structuring retirement plans, such as 401(k) plans, and components of such plans, such as stable value funds. The CW is a former employee of a company that worked with Defendants regarding their Stable Value Funds. That engagement gave him firsthand access to materials that form the basis for his personal knowledge and understanding as alleged herein.

61.     Through such inappropriate investments, JPM profited in a number of ways: it grew the Stable Value Funds and related fees and generated handsome origination and underwriting fees on the mortgage assets it caused the Funds to buy through the Intermediate Bond and Pension Trust Funds, including the Mortgage Private Placement Fund. And through the concealment of these investments, it prevented plan sponsors, participants, and the market from fully understanding the risks to which JPM's Stable Value Funds were exposed.

62.     This layering scheme resembles a strategy adopted by State Street Bank and Trust, another large and well-noted custodial bank that sponsors a leading conservative stable value fund.

63.     State Street Bank and Trust concealed similar investment activities inside its fund and was forced to make a $700 million cash infusion to prevent its stable value fund from collapsing under the weight of such risky investments. In February 2012, as detailed below in paragraphs 84-87, this Court held that State Street Bank and Trust's actions (similar to those challenged here) violated ERISA. *In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614 (S.D.N.Y. 2012).

64.     The result of recent litigation and related arbitration between JPM and one of its business partners is also indicative of the problematic nature of JPM's Stable Value Funds. One of JPM's erstwhile stable value sector business partners, American Century Investments, recently won a $373 million arbitration judgment against one of the JPM entities because, among other things, that entity misrepresented the risk profile of the investment funds at issue in that case including the JPM Stable Value Funds at issue here.[8]

---

[8]*See* http://www.bizjournals.com/kansascity/news/2012/03/22/american-century-wins-373m-judgment.html?page=all (last viewed March 27, 2012).

**JPM's Manipulation of Credit and Liquidity Ratings, its Investment Guidelines and the
Wrap Process**

65.     JPM originated many of the mortgage assets held indirectly by the Stable Value

funds. According to the CW, some or all of the mortgage assets indirectly owned by the Stable

Value Funds were not anywhere close to "investment grade." Nor were many of these assets,

specifically the private placement mortgages, rated by a third party credit rating agency, who

would have produced an objective credit rating for the mortgage assets. Instead, many of the

mortgage assets were "self-rated" by JPM.

66.     This is corroborated by the JPMAM Investment Guidelines quoted above. In these

internal guidelines, JPM admitted that it made up its own credit ratings for such mortgage assets

and adopted a policy to pass off the ratings conferred onto them as "those of a nationally

recognized rating agency." To wit, JPM stated that:

> [t]he Portfolio may invest in unrated securities which, in the
> opinion of the Investment Manager, meet the quality standards
> specified above. In the case of unrated securities, the Investment
> Manager will assign such unrated securities a rating determined by
> it in its sole discretion in accordance with the Investment
> Manager's internal rating system, in which case such ratings will
> be deemed to be those of a nationally recognized rating agency.

67.     At the same time, JPM, according to these same Investment Guidelines,

prohibited the purchase of "issues rated below investment grade (below BBB- and/or Baa3)."

This exclusion prevented JPM from investing in, for example, "high yield corporate and below

investment grade emerging market sovereign debt." Since JPM maintained unilateral and self-

interested control over the rating of many of the mortgage assets, however, it could

surreptitiously ensure that investment in such assets never appeared to violate the Stable Value

Fund investment guidelines regardless of their objective risk profile.

68.     In addition JPM made unilateral and inappropriate determinations of the liquidity of many of the mortgage assets held in the Intermediate Bond and Pension Trust Funds. With these determinations, JPM concealed the illiquidity and unsuitability of many of the mortgage assets in these Funds.

69.     Because JPM rated many of the mortgage assets itself for both value and liquidity, JPM was able to conceal for a considerable time the actual (imprudently low) quality and value of the assets held by its Stable Value Funds. Furthermore, because all investments by participants in the Stable Value Funds were made at book value, participants paid far above market value for the bundle of assets that the Stable Value Funds owned.

70.     An additional consequence of the fact that JPM itself originated many of the private placement mortgages and other mortgage assets held by the Stable Value Funds is that JPM knew or should have known of the risks inherent in such assets.

71.     To make matters worse, JPM itself compounded these risks by lowering its loan underwriting standards between 2005 and 2007. Thus, in testimony before the Financial Crisis Inquiry Commission on January 13, 2010, JPM CEO Jamie Dimon acknowledged that the standards were lowered during this period and admitted that "the underwriting standards in our mortgage business . . . should have been higher."

72.     Indeed, JPM's own conduct establishes that it was aware that risky mortgages and mortgage-related assets were unsuitable for ostensibly conservative retirement funds such as the Stable Value Funds. As detailed above, JPM's CEO recognized the toxicity of such assets no later than 2006 when he announced that JPM would sell approximately $12 billion in assets of this kind that it owned directly. And according to internal JPM correspondence in March 2007, a "[b]lowout of the subprime market resulted in … a [m]ajority of investors globally stopping

taking direct and indirect subprime exposure." Concerning JPM's need to rid themselves of their exposure to mortgage-related risk, one JPM salesperson emphasized in a March 22, 2007, email, "we are soooo pregnant on this deal, we need a wheel-barrow to move. … Let's schedule the cesarean, please!"

73.     Despite taking steps to reduce its own exposure to real-estate related assets, JPM maintained the Stable Value Funds' holdings in highly risky mortgage assets far longer than was prudent.

74.     Furthermore, the Stable Value Funds' previously-described performance indicates that JPM failed to hedge and diversify the Stable Value Funds to protect Plaintiffs and the proposed Class from the riskiness of the real estate market, or otherwise to take similar available risk management precautions to protect their retirement savings.

75.     JPM's failure to diversify and/or hedge or otherwise properly risk-manage the retirement plan assets in question is all the more shocking in light of the fact that, as set forth above, it knew of the significant risks that the mortgage assets in the Stable Value Funds posed. If substantial holdings in such mortgage assets were too risky for a financial behemoth like JPM to itself own in late 2006 and beyond, surely they were too risky for inclusion—especially without prudent risk management bulwarks emplaced to protect against downturns in those holdings—in the Stable Value Funds.

76.     JPM engaged in further manipulations with respect to the "wrap providers," who insure the principal of the Stable Value Funds. Starting in 2008, JPM worked with these wrap providers to conceal the actual performance of the Stable Value Funds by generating monthly "crediting rates" (essentially the adjusted book value of the Stable Value Funds based on fund inflows, fund outflows, changes in the market value of the fund's investments, and the yield from

those investments) through negotiation rather than calculating the crediting rates in accordance with the formulas required by the contracts with the wrap providers and industry standards—formulas for which changes in market value of a fund's investments are a key input. The purpose of this manipulation was to "smooth" the Stable Value Funds' losses over a longer period of time (*i.e.* disguise the magnitude of such losses) with the purpose of: (1) dissuading participants for as long as possible from investing their retirement funds elsewhere and (2) concealing investment losses with the hope that over time the losses would be reversed and thus would not need to be disclosed. In effect, the reported yields were the result of JPM and the wrap provider's fiat rather than the market value of the underlying investments. If JPM had disclosed the actual rate of return earned on these assets under the contractually mandated wrap formulas, participants in the Stable Value Funds would have been aware sooner of the severe loss of their Stable Value Funds' investments due to the decline in market value of the mortgage assets. But JPM did not do so.

77.     At no time did JPM disclose the precipitous decline in market value of the assets in the Stable Value Funds. Nor did JPM disclose that there was a link (albeit an intentionally imprecise and obscured one) between the losses from the inappropriate investments and the Stable Value Funds' reported yields.

78.     To the contrary, the aforementioned Ms. Paradis publicly attempted to pass the buck to retirement plan sponsors in order to get JPM off the hook for its inadequate Fund disclosures and efforts to conceal the holdings and performance of the Stable Value Funds. As she recently—and strikingly—acknowledged in an article on JPM's website, JPM had apparently withheld materially important information from retirement plan sponsors concerning its risky

stable value investment strategies: "In short, plan sponsors simply haven't had adequate tools to support their fiduciary responsibilities with respect to these [stable value] funds."[9]

79.     In other words, Ms. Paradis, the then-head of JPM's stable value management group, has acknowledged that an ERISA-violative fiduciary breach or breaches appear to have occurred here, as JPM alone held the critically important information about the risks and valuations of the Stable Value Funds. Ms. Paradis's statement further underscores JPM's awareness of its wrongful conduct and its transparent attempt to divert responsibility for same.

80.     JPM was well aware that the actions complained of herein—both prior to and during the class period—were improper. On separate occasions, at least two individuals who worked in the investment industry were aware of JPM's misconduct with respect to its Stable Value Funds. The CW had a conversation with high-ranking employees of JPM, including Ms. Paradis, regarding the precarious state of the Stable Value Funds' investments and the divergence between the book value and market value of the investments held in those funds. The other individual, an acquaintance of the CW active in the stable value fund industry, disclosed to the CW that he had similarly apprised JPM of its suspect practices with regard to its Stable Value Funds.

81.     Unfortunately, even after being confronted by the CW and another regarding the impropriety of this conduct, JPM still has not meaningfully disclosed the consequences of its placing the mortgage assets in its Stable Value Funds through the Intermediate Bond and Pension Trust Funds.

---

[9]*See* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065 (last viewed March 27, 2012).

82.     Only on April 3, 2012, in an article by Reuters written in part in reaction to the public announcement of Plaintiffs' initial Complaint, JPM's current head of its stable value business, Peter Chappelear, admitted that JPM had recently reduced the Stable Value Funds' private mortgage debt allocation to four percent and that JPM would eventually cause the Stable Value Funds to exit from such assets completely.

83.     Because of JPM's course of wrongful conduct, Plaintiffs and the proposed Class invested in Stable Value Funds that contained imprudently risky investments, overpaid for investments in the Stable Value Funds, received a lower rate of return than the Stable Value Funds would have yielded if they had contained *only* proper and prudent investments, and in the end collectively put billions of their supposedly "stable" retirement savings assets at risk. Furthermore, JPM concealed all this from Plaintiffs and the proposed Class. Thus, there is a direct relation between the losses to Plaintiffs and the proposed Class and JPM's unlawful conduct, which proximately caused the Plaintiffs' and the proposed Class's injury.

### *In re State Street Bank and Trust* Litigation

84.     The instant lawsuit bears striking similarities to *In re State Street Bank and Trust Co. Fixed Income Funds Investment Litigation* ("*SSBT*"), 842 F. Supp. 2d 614 (S.D.N.Y. 2012). In that case, Judge Holwell recently found after trial that State Street Bank and Trust violated ERISA, and held that the class's damages, exclusive of interest and attorneys' fees, equaled approximately $77 million. *Id.* at 659.

85.     *SSBT* was an action filed by an ERISA fiduciary on behalf of a class of retirement plans for which it served as trustee. *Id.* at 616. The Plaintiff alleged that State Street Bank and Trust impermissibly invested certain bond funds characterized as conservative enhanced index funds (similar in many important ways to a stable value fund) in unduly risky mortgage assets

(similar for present purposes to the mortgage assets at issue here). These unduly risky investments violated ERISA, Plaintiff alleged, because State Street Bank and Trust, an ERISA fiduciary of the plans at issue, did not manage the funds prudently, did not manage the funds solely in the interest of the plans, and did not adequately diversify the funds' assets.

86.     This Court in that matter conducted a bench trial and subsequently issued a 44-page opinion that held, *inter alia*, that State Street Bank and Trust's investing of its purportedly conservative enhanced bond funds in unduly risky mortgage assets violated its ERISA duties of care, skill, prudence, and diligence, *id.* at 645-49, as well as its ERISA duty of diversification, *id.* at 650-52. The same is true in the matter at bar, where JPM's self-interested and objectively imprudent decisions to cause the Stable Value Funds to invest indirectly in the mortgage assets violated these well-established ERISA duties.

87.     In *SSBT*, this Court ultimately held that State Street Bank and Trust's ERISA violations injured the class in the amount of nearly $77 million, *id.* at 659, exclusive of interest and fees, *id.* at 660. Because JPM's Stable Value Funds are one of the largest collection of such funds in the world, and the extent of JPM's ERISA breaches are even more clear and significant than those in *SSBT*, the damages to the class here likely are far greater than those in *SSBT*.

**ERISA Requirements**

88.     ERISA §§ 404(a)(1)(A), (B), and (C) provide, in relevant part, that "a fiduciary shall discharge its duties with respect to a plan solely in the interests of the participants and beneficiaries" and must (A) act "for the exclusive purpose of providing benefits to participants and their beneficiaries"; (B) act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"; and

26

(3) "diversify[] the investments of the plan so as to minimize the risk of large losses unless under

the circumstances it is clearly prudent not to do so."

89.     These fiduciary duties are the "highest known to the law." *Donovan v. Bierwirth*,

680 F.2d 263, 272 n.2 (2d Cir. 1982).

90.     Fiduciary duties under ERISA § 404 include, among others:

(A)     The duty to act *exclusively* in the best interest of the plans, their
        participants, and their beneficiaries. A fiduciary must always administer a
        plan with an "eye single" to the interests of the participants and
        beneficiaries, regardless of the interests of the fiduciaries themselves or
        the plan sponsor.

(B)     The duty to disclose and inform, which encompasses a negative duty not
        to misinform; an affirmative duty to inform when the fiduciary knows or
        should know that silence might be harmful; and an affirmative duty to
        convey complete and accurate information material to the circumstances
        of participants and beneficiaries.

(C)     The duty to avoid conflicts of interest; and should such conflicts occur, the
        duty to resolve them promptly. A fiduciary must always administer a plan
        with an "eye single" to the interests of the participants and beneficiaries,
        regardless of the interests of the fiduciaries themselves or the plan
        sponsor.

(D)     The duty to conduct an independent, thorough, and honest investigation
        into, and to continually monitor, the merits of all the investments of a plan.

(E)     The duty to diversify sufficiently the investment portfolio of the plan.

91.     ERISA §§ 406(a) and (b) in relevant part prohibit a fiduciary both directly as a

party in interest from participation in certain identified transactions with a plan for which it

serves as a fiduciary. Thus, § 406(a) provides that a fiduciary shall not cause a plan to engage in

a transaction if he knew or should have known that such transaction was directly or indirectly a

sale or exchange between the plan and the fiduciary, or a transfer to or use by a fiduciary of any

assets of the plan, or furnishing any goods or services to the plan. Similarly, section 406(b)

prohibits a fiduciary from dealing with any assets of the plan in his own interest or account, or

from acting for any person whose interests are adverse to the plan or receiving any consideration

for his own account from any person dealing with the plan.

92.     As discussed above and below, JPM disregarded and violated these duties. Its

wrongful conduct directly and substantially harmed Plaintiffs and the proposed Class. Had JPM:

(1) invested the Stable Value Funds' assets only in prudent investments that were properly

managed and properly diversified those investments; (2) complied with its duty of loyalty and

candor and disclosed the true risks and outcomes of its investment strategies; and (3) refrained

from prohibited transactions, Plaintiffs and the proposed Class would have not have seen their

investment returns crater under the weight of its imprudent mortgage assets, and Plaintiffs and

the proposed Class would have far more money available to help them achieve their retirement

dreams than they do today.

## CLASS ALLEGATIONS

93.     *Class Definition*. Plaintiffs brings this matter as a class action pursuant to Federal

Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3). Plaintiffs file this

case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were
> invested directly or indirectly in any of the JPM Stable Value Funds between July
> 1, 2007 and December 31, 2010 Excluded from the Class are the jurists to whom
> this case is assigned, as well as their respective staffs; counsel who appear in this
> case, as well as their respective staffs, including experts they employ; the
> Defendants in this matter, as well as their officers and directors; any person, firm,
> trust, corporation, officer, director, or other individual or entity in which a
> Defendant has a controlling interest or that is related to or affiliated with any of
> the Defendants; and the legal representatives, agents, affiliates, heirs, successors-
> in-interest, or assigns of any such excluded party.

94.     *Numerosity*. The members of this Class are so numerous that joinder of all

members is impracticable. While the exact number of Class members is unknown to Plaintiffs at

this time, and can be ascertained only through discovery, Plaintiffs reasonably believe that more

than 100 ERISA plans throughout the country offered one of the Stable Value Funds during the Class Period. These Plans collectively have more than one million participants and beneficiaries, and plaintiffs believe that a substantial number of these persons had invested in one of JPM's Stable Value Funds.

95.    ***Commonality***. The claims of Plaintiffs and the proposed Class have a common origin and share a common basis. All Class members suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA that form the basis of this lawsuit. Proceeding as a class is particularly appropriate here because the Stable Value Funds' assets are held in one or more collective trusts managed by JPM, each of which held invested substantial assets in JPM's Intermediate Bond Fund and Pension Trust Funds. Furthermore, common questions of law and fact exist as to all members of the class. The many questions of law and fact common to the Class include, but are not limited to:

a.    whether the JPM entities are fiduciaries under ERISA;

b.    whether JPM breached its fiduciary duties under ERISA;

c.    whether JPM deviated from the proper and/or stated purpose of Stable Value Funds when it caused them to invest in the highly risky mortgage assets;

d.    whether JPM failed to provide complete and accurate information when it caused the Stable Value Funds to invest in the highly risky mortgage assets and maintained these investments as the value of the assets fell;

e.    whether any of the transactions by JPM with regard to the Stable Value Fund, Intermediate Bond Fund and Pension Trust Funds were prohibited transactions; and

f.    whether JPM's actions complained of herein injured plan participants and their beneficiaries who had invested in one of the Stable Value Funds.

96.     *Typicality*. Plaintiffs' claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the class Members. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

97.     *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the Class members. Plaintiffs will vigorously protect the interests of the members of the Class.

98.     Moreover, Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters. Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits. The undersigned counsel will devote the time and other resources necessary to litigate this case as effectively as possible.

99.     *Rule 23(b)(1)(A) and (B) requirements*. Class certification in this ERISA action is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

100.     *Rule 23(b)(2) requirements*. Class certification under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally

applicable to the Class, thereby making appropriate final injunctive, declaratory, or other

equitable relief with respect to the Class as a whole.

101. **Rule 23(b)(3) requirements**. In the alternative, certification under Federal Rule of

Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members

of the Class predominate over any questions (if any) affecting only individual Class members.

Moreover, a class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

### COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
### BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION

102. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs

as if set forth fully herein.

103. The JPM entities were fiduciaries, as discussed above, for the plans and their

participants, including Plaintiffs and the proposed Class.

104. A fiduciary must comply with the duty of prudence, which includes the duty to

diversify. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and

diligence of a prudent person under the circumstances then prevailing.

105. The U.S. Department of Labor ("DOL") and case law have interpreted this duty.

In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to

those facts and circumstances that, given the scope of such fiduciary's investment duties, the

fiduciary knows or should know are relevant to the particular investment or investment course of

action involved, including the role that the investment or investment course of action plays in

that portion of the plan's investment portfolio with respect to which the fiduciary has investment

duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL

regulations, includes but is not necessarily limited to: "(i)[a] determination by the fiduciary that

the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

106.    JPM's conduct with respect to the Stable Value Funds violated—in numerous ways—its fiduciary duties of prudence and to diversify:

- JPM inappropriately invested the Stable Value Funds in mortgage assets that were far too risky for the stated and/or reasonable objectives of such funds. The mortgage assets were significantly more risky than investments that should be contained in a fund of like character and like aims.

- JPM unlawfully failed to properly diversify the asset base of the Stable Value Funds when it invested through the Intermediate Bond Fund and Pension Trust Funds, including the Private Placement Mortgage Fund, a substantial percentage of their assets in the mortgage assets. After receiving repeated warnings about the weakness of the mortgage market and acting on such warnings when its own funds were at stake, JPM continued to hold vast amounts of mortgage assets known to it to be risky and illiquid in the Stable Value Funds. Without meaningful hedging or use of other available loss-avoidance and risk management strategies that could have otherwise protected the retirement investors in the Class from the financial harms complained of herein, JPM violated the duty to diversify. *Cf. In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d at 650-51.

- JPM unlawfully disguised and failed to disclose to plan participants the true loss in value of the mortgage assets that it had wrongfully and unlawfully sold to the Stable Value Funds and the impact of those positions on their yield.

107.     Indeed, JPM failed to follow its own Investment Guidelines with regard to the Stable Value Funds.

108.     JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

## COUNT II: VIOLATION OF ERISA § 404(a)(1)(A)
## EXCLUSIVE BENEFIT

109.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

110.     The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

111.     ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

112.     Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), the JPM entities, while fiduciaries, caused the Stable Value Funds to purchase and hold overly risky and later substantially overvalued mortgage assets through the Intermediate Bond Fund and Pension Trust Funds, including the Mortgage Private Placement Fund.

113.     JPM's aforementioned actions were not in the best interest of the Stable Value Funds' participants and beneficiaries. Rather, JPM sought to inflate the yields for its Stable Value Funds while at the same time disguising the corresponding risks with the goal of increasing its market share in the stable value retirement investing market segment and causing

more retirement funds to be invested in its Stable Value Funds as compared to those offered by its competitors.

114.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

**COUNT III: VIOLATION OF ERISA § 404(a)(1)(B)**
**DUTY OF LOYALTY AND CANDOR**

115.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

116.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

117.    A fiduciary has a duty of candor under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

118.    JPM breached its duty of candor to Plaintiffs and the proposed Class by failing to disclose and inform them of complete and accurate information material to the circumstances of participants and beneficiaries where JPM knew or should have known that silence about material information about their investments was harmful, including the following:

a.      That the Stable Value Funds account balance and performance information JPM caused to be distributed to Plaintiffs and the proposed Class did not accurately reflect the market value of the Stable Value Funds' investments and the performance of the Stable Value Funds;

b.      That, as a result, the book value of the Stable Value Funds was far above the market value of the assets that these funds owned, causing participants to pay far above market value for them; and

c.      That during relevant time periods JPM was working with the wrap providers to hide the loss of market value of the investments held in the

34

> Stable Value Funds by setting crediting rates by negotiation rather than the formulas required by the wrap contracts and consistent with industry practice.

119.　JPM's breach of its fiduciary duty of candor caused Plaintiffs and the proposed Class to invest in the Stable Value Funds and to pay too much money for their interest in the Stable Funds as compared to the market value of the investments held in such funds.

120.　JPM's omissions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies made through wrongful use of the plans' assets.

## COUNT IV: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED TRANSACTIONS

121.　Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

122.　The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

123.　ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

124.　The JPM entities were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, the JPM entities were parties in interest because, as discussed above, they were both fiduciaries and persons who provided services to the plans.

125.    Despite the clear prohibition of Section 406(a)(1)(A), the JPM entities, while fiduciaries and parties in interest, caused the JPM Stable Value Funds to purchase and hold private placement mortgages that they themselves originated.

126.    In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), the JPM entities while fiduciaries and parties in interest, used the assets of the Stable Value Funds for their benefit.

127.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies made through wrongful use of the plans' assets.

## COUNT V: VIOLATION OF ERISA §§ 406(b)(1) AND (b)(3) PROHIBITED TRANSCATIONS

128.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

129.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

130.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

131.    Despite the clear prohibition of Section 406(b)(1), JPM used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, *i.e.* mortgages that were originated, underwritten, and/or brokered by JPM.

132.    In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C.

§ 1106(b)(3), JPM received consideration for its own personal account in connection with

causing the Stable Funds to acquire the mortgage assets at issue.

133.    JPM's actions directly and proximately caused substantial financial harm to

Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting

loss and damage. JPM must also disgorge all monies made through wrongful use of the plans'

assets.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully prays for judgment as follows:

A.    A determination that this action is a proper class action and certification of the

proposed Class, with Plaintiffs as class representative and its counsel as Class Counsel, pursuant

to Federal Rule of Civil Procedure 23.

B.    A declaration that the Defendants, and each of them, have breached their ERISA

duties to the Plaintiffs and the Class.

C.    An order compelling the Defendants to make good to the Plaintiffs, the Class, and

their plans the losses resulting from Defendants' breaches of their fiduciary duties; and to

disgorge to the Plaintiffs and the Class all monies the Defendants made through their wrongful

use of the Plaintiffs and the Class's assets;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was

unjustly enriched at the expense of the Plaintiffs, the Class and their plans as a result of the

aforementioned ERISA violations;

E.    An order requiring Defendants to appoint one or more independent fiduciaries to

participate in the management of the relevant ERISA plans' funds;

F.      An amount equal to the amount of any losses to the Plaintiffs, the Class, and the ERISA plans included in the Class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

G.      An award of costs pursuant to 29 U.S.C. § 1132(g);

H.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and other law;

I.      An award for equitable restitution and other appropriate equitable and injunctive relief against the Defendants;

J.      An award of such other and further relief as the Court deems just and proper.


Dated: September 21, 2012                    Respectfully submitted,

                                             /s/ Michael M. Mulder

Kevin Madonna (Bar No. KM5595)               Thomas R. Meites, Esq.
KENNEDY & MADONNA, LLP                       Michael M. Mulder, Esq.
48 Dewitt Mills Rd.                          MEITES MULDER
Hurley, NY 12443                             321 S. Plymouth Ct., Ste. 1250
Tel: 845-481-2622                            Chicago, Ill.  60604
Fax: 845-230-3111                            Tel: 312-263-0272
                                             Fax: 312-263-2942
                                             trmeites@mmmglaw.com
                                             mmmulder@mmmglaw.com
                                             *Appearing pro hac vice*

Garrett W. Wotkyns, Esq.                     Jason Kim
SCHNEIDER WALLACE COTTRELL                   SCHNEIDER WALLACE COTTRELL
  BRAYTON KONECKY LLP                          BRAYTON KONECKY LLP
8501 N. Scottsdale Road, Suite 270           180 Montgomery Street, Suite 2000
Scottsdale, Arizona  85253                   San Francisco, California  94104
Tel: (480) 428-0144                          Tel: (415) 421-7100
Fax: (866) 505-8036                          Fax: (415) 421-7105
gwotkyns@schneiderwallace.com                jkim@schneiderwallace.com
*Appearing pro hac vice*                     *Appearing pro hac vice*

Joseph Peiffer, Esq.
FISHMAN HAYGOOD PHELPS
  WALMSLEY WILLIS & SWANSON, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana  70170
Tel: (504) 586-5252
Fax: (504) 586-5250
jpeiffer@fishmanhaygood.com
*Appearing pro hac vice*

Peter Mougey, Esq.
James Kauffman, Esq.
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 So. Baylen Street, Suite 600
Pensacola, FL  32502
pmougey@levinlaw.com
jkauffman@levinlaw.com
*Appearing pro hac vice*

ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS