# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICHARD WHITLEY, CAROLETA M. DURAN,   )
TERRY J. KOCH, MARK D. GRANDY, JOHN   )
M. GATES, and SCOTT NEWELL, on behalf of   )
themselves and those similarly situated,   )
  )
           *Plaintiffs*,   )
  )
           v.   )
  )
J.P. MORGAN CHASE & CO.; JPMORGAN   )
CHASE BANK N.A.; J.P. MORGAN   )
INVESTMENT MANAGEMENT INC., aka J.P.   )
MORGAN ASSET MANAGEMENT; and   )
JPMORGAN RETIREMENT PLAN SERVICES   )
LLC,   )
  )
           *Defendants*.   )
  )

Case No. 12-cv-2548
The Honorable John G. Koeltl

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS FIRST AMENDED
COMPLAINT**

## TABLE OF CONTENTS

I.      INTRODUCTION…………………………………………………………….   1

II.     SUMMARY OF ALLEGATIONS IN THE FIRST AMENDED COMPLAINT….   2

        A.      Stable Value Funds……………………………………………………….   2

        B.      JPM's Risky Investments in Mortgage-Related Assets…………………….   2

        C.      JPM's Concealment of the Losses at Issue…………………………………   5

III.    ARGUMENT………………………………………………………………...   6

        A.      Standard of Review……………………………………………………….   6

        B.      Plaintiffs Have Alleged a Plausible Claim for Breach of the Duties of
                Prudence and Diversification……………………………………………..   7

        C.      JPM's Arguments that Plaintiffs' Claims are Implausible Lack Merit……...   11

        D.      Plaintiffs Have Stated a Plausible Claim that JPM Breached Its Duties of
                Loyalty and Candor………………………………………………………   16

        E.      Plaintiffs' Allegations that JPM Obtained Fees by Using Plan Assets to
                Fund Mortgages State Claims for ERISA Prohibited Transactions…………   21

        F.      Plaintiffs Have Standing to Assert Class Claims on Behalf of Plan
                Participants in Plans in Which They Did Not Participate…………………..   23

        G.      The Martin Settlement Does Not Bar Any of the Claims Alleged in the
                Amended Complaint………………………………………………………...   26

        H.      Plaintiffs Have Alleged that JPMC and JRPS are ERISA Fiduciaries ……..   28

IV.     CONCLUSION………………………………………………………………...   28

## TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal*
  556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................................ 6

*Ballone v. Eastman Kodak Co.*
  109 F.3d 117 (2d Cir. 1997) ................................................................................... 17

*Board of Trustees of the Operating Engineers Pension Trust v. JPMorgan Chase Bank, N.A.*
  No. 09 Civ. 9333 (BSJ)(DCF), 2012 WL 1382274 (S.D.N.Y. Apr. 20, 2012) ......................... 14

*Braden v. Wal-Mart Stores, Inc.*
  588 F.3d 585 (8th Cir. 2009) .................................................................................. 19

*Buccino v. Continental Assurance Co.*
  578 F. Supp. 1518 (S.D.N.Y. 1983) ............................................................................ 9

*California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*
  259 F.3d 1036 (9th Cir. 2001) ........................................................................ 9, 13, 16

*City of Roseville Employees' Retirement System v. Energysolutions, Inc.*
  814 F. Supp. 395 (S.D.N.Y. 2011) ............................................................................. 15

*Cress v. Wilson*
  No. 06-cv-2717, 2007 WL 1686687 (S.D.N.Y. June 6, 2007) .................................................. 25

*Crowell v. Credit Suisse Group*
  689 F. Supp. 2d 629 (S.D.N.Y. 2010) .......................................................................... 15

*Culpepper v. Inland Mtge. Corp.*
  132 F.3d 692 (11th Cir. 1998) ................................................................................ 22

*Donovan v. Bierwirth*
  754 F. 2d 1049 (2d Cir. 1985) ........................................................................... 12, 16

*Fallick v. Nationwide Mutual Ins. Co.*
  162 F.3d 410 (6th Cir. 1998) ............................................................................. 24, 25

*Fitch v. Chase Manhattan Bank, N.A.*
  64 F. Supp. 2d 212 (W.D.N.Y. 1999) ........................................................................... 20

*Flanigan v. General Eletric Co.*
  242 F.3d 78 (2d Cir. 2001) ................................................................................... 18

*Frulla v. CRA Holdings Inc.*
  596 F. Supp. 2d 275 (D. Conn. 2009) .......................................................................... 18

*Grannucci v. Wells Fargo Bank*
  2010 WL 5475613 E.D.N.Y. Dec. 17, 2010) ..................................................................... 22

*Greenblatt v. Prescription Plan Services Corp.*
  783 F. Supp. 814 (S.D.N.Y. 1992) ............................................................................. 19

*Hesse v. Sprint Corp.*
  598 F.3d 581 (9th Cir. 2010) ................................................................................. 27

*In re Cardinal Health, Inc. ERISA Litigation*
  424 F. Supp. 2d 1002 (S. D. Ohio 2006) ....................................................................... 20

*In re Citigroup ERISA Litigation*
  662 F.3d 128 (2d Cir. 2011) .............................................................................. 14, 17

*In re Lehman Brothers Securities & ERISA Litigation*
  No. 08 Civ. 5598 (LAK), 2011 WL 4632885 (S.D.N.Y. Oct. 5, 2011) .......................................... 14, 17

*In re Morgan Stanley ERISA Litigation*
  696 F. Supp. 2d 345 (S.D.N.Y. 2009)................................................................ 6, 19
*In re SLM Corp. ERISA Litigation*
  2010 WL 3910566 (S.D.N.Y. Sept. 24, 2010)......................................................... 25
*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*
  842 F. Supp. 2d 614 (S.D.N.Y. 2012)............................................................. passim
*In re Unisys Savings Plan Litigation*
  74 F.3d 420 (3d Cir. 1996)........................................................................ 7, 19
*Kenney v. State Street Corp.*
  694 F. Supp. 2d 67 (D. Mass. 2010) ............................................................ 20, 28
*LaScala v. Scrufari*
  479 F.3d 213 (2d Cir. 2007)........................................................................ 22
*Levine v. Columbia Laboratories, Inc.*
  2004 WL 1392372 (S.D.N.Y. June 22, 2004) ....................................................... 26
*Lowthen v. Tower Asset Management, Inc.*
  829 F.2d 1209 (2d Cir. 1987)....................................................................... 22
*Martin v. Consultants & Administrators, Inc.*
  966 F.2d 1078 (7th Cir. 1992) ....................................................................... 9
*Martin v. National Bank of Alaska*
  828 F. Supp. 1427 (D. Alaska 1993) ................................................................ 22
*Mills v. Polar Molecular Corp.*
  12 F.3d 1170 (2d Cir. 1993)......................................................................... 6
*Moench v. Robertson*
  62 F.3d 553 (3d Cir. 1995).......................................................................... 14
*Morrisey v. Curran*
  567 F.2d 546 (2d Cir. 1977)......................................................................... 9
*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*
  693 F.3d 145 (2d Cir. 2012)..................................................................... 23, 24
*Pegram v. Herdrich*
  530 U.S. 211, 120 S. Ct. 2143 (2000).......................................................... 19, 20
*Taylor v. Vermont Dep't of Education*
  313 F.3d 768 (2d Cir. 2002).......................................................................... 3
*TBK Partners, Ltd. v. Western Union Corp.*
  675 F.2d 456 (2d Cir. 1982)......................................................................... 27
*Trombetta v. Cragin Federal Savings & Loan*
  102 F.3d 1435 (7th Cir. 1997) ...................................................................... 22
*Varity Corp. v. Howe*
  516 U.S. 489, 116 S. Ct. 1065 (1996) ............................................................. 17
*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*
  396 F.3d 96 (2d Cir. 2005).......................................................................... 27

**Federal Statutes and Regulations**

29 C.F.R. § 2550.404a-1(b)(i) ........................................................................ 7
29 U.S.C. § 1002(14)(A) & (B) ..................................................................... 23
29 U.S.C. § 1002(38) .............................................................................. 20
29 U.S.C. § 1104(a)(1)(A)(i) ................................................................... 16, 21

## I.       INTRODUCTION

Plaintiffs' Amended Complaint alleges that Defendants (referred to collectively here as "JPM") breached their duty of prudence under ERISA by exposing their Stable Value Funds, in which Plaintiffs and other 401(k) plan participants invested their retirement savings, to risky mortgage-backed securities and private placement mortgages.  Plaintiffs' allegations set forth in detail how JPM irresponsibly chased yield in the Stable Value Funds in order to grow its investment management business, even though it touted those funds as the "most conservative investment option[s]" available to plan participants.  As a result, Plaintiffs achieved lower returns than they would have obtained had JPM invested their funds properly.

Plaintiffs' prudence claims mirror those asserted in *In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*, 842 F. Supp. 2d 614 (S.D.N.Y. 2012) ("*State Street*").  Like this case, *State Street* involved allegations that an ERISA fiduciary failed to prudently manage pooled investment funds when it invested those funds in unduly risky mortgage-backed securities.  The *State Street* case ultimately went to trial and resulted in a $77 million judgment against the defendants.  Given the result in *State Street*, and its similarity to this case, it is frankly difficult to understand how JPM can now argue that Plaintiffs' claims are not sufficiently "plausible" as to meet the *Twombly*/*Iqbal* standard.

Plaintiffs have also asserted viable claims that JPM breached its duty of loyalty and candor to Plaintiffs and engaged in prohibited transactions.  Specifically, Plaintiffs allege that JPM affirmatively misrepresented the performance of the Stable Value Funds in order to hide its risky investment strategies and the losses those strategies caused, and that JPM improperly profited from origination and other fees it received in connection with the Stable Value Funds' investments in mortgages originated by JPM.

The allegations in Plaintiffs' Amended Complaint are sufficient to establish "plausible" claims for each of these alleged ERISA violations, as required by *Twombly/Iqbal*, and JPM's Motion to Dismiss should therefore be denied.

## II.   SUMMARY OF ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

### A.   Stable Value Funds

JPM offered a number of investment funds to 401(k) plan participants, including certain "Stable Value Funds." Am. Compl. ¶ 1.  JPM described the Stable Value Funds as being "your most conservative investment option."  In fact, Victoria Paradis, the then-head of JPM's stable value fund management group, described these funds as "among the most conservative in the DC [defined contribution] plan line-up."  *Id.* ¶ 3.  Nevertheless, the Stable Value Funds were not merely a vehicle for principal preservation.  Rather, they were designed to "perform better than the average money market fund, and earn consistent, reliable returns."  *Id.*  JPM stated that it would achieve those results by investing only in a "high quality fixed income portfolio" that "consists of investment-grade fixed income securities."  *Id.* ¶ 8.

Other companies also offer stable value funds as conservative investments options. Unlike the JPM Stable Value Funds, however, these funds typically are invested only in a high-quality, diversified, fixed-income portfolio.  Am. Compl. ¶ 45.  When properly managed, stable value funds are able to perform well even in periods of market distress, and many stable value funds provided steady, positive returns throughout the financial crisis that began in 2008.  *Id.*

### B.   JPM's Risky Investments in Mortgage-Related Assets

Contrary to industry practice and JPM's own stated strategy, JPM caused its Stable Value Funds to invest in imprudently risky and undiversified real estate-related investments, many of

which were illiquid and lacked objective quality ratings.  Am. Compl. ¶ 5.[1]  Specifically, JPM caused the Stable Value Funds to make substantial investments in mortgage-backed securities and private placement mortgages through a fund-layering system by which the Stable Value Funds invested, directly or indirectly, in combined funds managed by JPM, such as its Intermediate Bond Fund and its Mortgage Private Placement Fund.  *Id.* ¶ 7.  This layering strategy allowed JPM to mask the magnitude of the Stable Value Funds' exposure to risky mortgage-related assets, and prevented Plaintiffs from being able to ascertain the actual holdings of the Stable Value Funds.  *Id.* ¶ 60.

Indeed, JPM has admitted that it knowingly withheld critically important information from ERISA retirement plan sponsors (and thus investors like Plaintiffs) about its Stable Value Funds, information that prevented those sponsors from carrying out their own fiduciary duties. In an article posted on JPM's website, Ms. Paradis admitted that, because of JPM's practice of withholding information related to stable value fund asset valuation, "plan sponsors simply haven't had adequate tools to support their fiduciary responsibilities with respect to these [stable value] funds."  Am. Compl. ¶ 78.

JPM knew well before the class period that investing so heavily in mortgage-related assets was dangerous.  JPM decided as early as ***October 2006*** to dump investment positions in mortgage assets it held ***for its own account***, and it eventually sold $12 billion worth of those investments.  Am. Compl. ¶¶ 13-14.  This matter was such an urgent concern to JPM in October of 2006 that its CEO, Jamie Dimon, called his then-head of JPM's securitized funds division,

---

[1] *See also* "JPMorgan stable value fund exiting private mortgages," Reuters, Apr. 3, 2012 (available at uk.reuters.com/article/2012/04/03/jpmorgan-stablevalue-idUKL2E8EU6J320120403, last accessed November 21, 2012), attached as Exhibit "A" (JPM caused the Stable Asset Income Fund to "invest as much as 13 percent in private placement mortgage debt underwritten and rated by the bank itself," compared to an industry average of about half a percent in mortgage and privately placed securities).  In deciding a motion to dismiss, the Court may consider documents referenced in a complaint.  *See Taylor v. Vermont Dep't of Education*, 313 F.3d 768, 776 (2d Cir. 2002).  Plaintiffs referenced this article, in addition to the *Fortune* article attached as Exhibit "B," in the Amended Complaint. Am. Compl. ¶¶ 82 & 13.

William King, while the latter was in Africa, "to fire a red alert. 'Billy, I really want you to watch out for subprime!' …. 'We need to sell a lot of our positions. I've seen it before. This stuff could go up in smoke!'"  *Id.* ¶ 13.[2]

The investments in private placement mortgages are legally problematic for JPM for additional reasons.  First, JPM originated, arranged, and rated many of these mortgages itself.  Am. Compl. ¶ 7.  Thus, there was never any neutral, objective measure of the quality of these mortgages.  Further, as the originator of these mortgages, JPM was in a unique position to appreciate the risk that they posed.  Second, these risks were compounded by the fact that JPM lowered its mortgage underwriting standards between 2005 and 2007.  Am. Compl ¶¶ 15 & 69-71.  In testimony before the Financial Crisis Inquiry Commission on January 13, 2010, Mr. Dimon admitted that JPM had lowered underwriting standards between 2005 and 2007 and that "the underwriting standards in our mortgage business … should have been higher."  *Id.* ¶ 71.  Third, JPM earned fees for originating and funding these mortgages with the Stable Value Funds' money.  This enmeshed JPM in a conflict of interest and caused it to obtain an improper benefit from its management of the Stable Value Funds.  Am. Compl. ¶ 61.

When the financial crisis hit, the market value of the assets held in the Stable Value Funds (through the combined funds) declined precipitously.  Am. Compl. ¶ 9.  This led to diminished returns for investors in those funds.  Nevertheless, despite JPM's contentions to the contrary, Plaintiffs' claims ***do not arise from losses attributable to general market conditions***.  Rather, their claims are based on the fact that JPM mismanagement exposed Plaintiffs to precisely the risk and volatility that they sought to avoid by placing their retirement savings in purportedly conservative Stable Value Funds.  *Id.*  Indeed, beginning in late 2008 (when JPM

---

[2] "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch," Fortune, September 2, 2008 (available at http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune (last viewed on November 21, 2012), attached as Exhibit "B."

could no longer hide the effects of its risky yield-chasing strategy), JPM's Stable Value Funds performed markedly worse than competitor funds, which faced all of the same market stresses. This is because those funds actually adhered to the conservative investment strategies that JPM should have pursued. *Id.* ¶ 55.[3]

C.     **JPM's Concealment of the Losses at Issue**

JPM contracted with wrap providers to insure the principal of the Stable Value Funds. As part of these contracts, JPM and the wrap providers agreed to a formula to determine the "crediting rate" (*i.e.*, the rate of return actually paid to investors) for the Stable Value Funds. Am. Compl. ¶ 76.  The market value of the underlying investments held by the funds was a key factor in that formula.  *Id.*  Beginning in late 2008, however, JPM and the wrap providers abandoned this objective formula and began setting the Funds' crediting rates by negotiation.  *Id.* This manipulation was designed to conceal the Funds' losses and poor performance, so as to: (1) dissuade investors from withdrawing their investments, and (2) buy time in the hope that the losses would eventually be reversed (and thus potentially never disclosed).  *Id.*  But despite this manipulation, JPM was eventually forced to recognize significant investment losses, which depressed the returns of the Stable Value Funds as compared to competitor funds.  *Id.* ¶ 55.

Eventually, under pressure from these same wrap providers, JPM was forced to discontinue its risky investment strategy.  In April 2012, JPM admitted that it had reduced the Stable Value Funds' private mortgage debt allocation to four percent and would eventually cause the Stable Value Funds to eliminate all such assets completely.  Am. Compl. ¶ 82; Ex. "A." There would be no reason to do this, of course, if as JPM insists these assets are prudent for inclusion in a stable value fund portfolio.

---

[3] *See also* Ex. "A" (according to industry data, "the JP Morgan stable value fund has trailed its peers each year since 2008").

As well as engaging in this intentional misinformation campaign, JPM has acknowledged, as noted above, that it has knowingly omitted to furnish plan sponsors with the information they needed to meaningfully evaluate JPM's Stable Value Funds and their related valuation defects.  On that point it bears noting that JPM's Stable Value Funds are not like mutual funds with detailed prospectuses and freely accessible information accessible to investors about fund holdings.  Thus, JPM was in a position to conceal its misconduct from plan sponsors and participants alike if it chose so to do, and it did so.

## III.    ARGUMENT

### A.    Standard of Review

"On a motion to dismiss pursuant to Rule 12, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader."  *In re Morgan Stanley ERISA Litigation*, 696 F. Supp. 2d 345, 353 (S.D.N.Y. 2009), *citing Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  A complaint must merely state sufficient facts to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Claims for breach of fiduciary duty need only meet the notice pleading standard of F.R.C.P. Rule 8(a) and not the heightened pleading standard of Rule 9(b), even where the claims are based on conduct that could also be characterized as fraud.  *In re Morgan Stanley ERISA Litigation*, 696 F. Supp. 2d at 364.  For ERISA breach of fiduciary duty claims, Rule 8 does not require that "Plaintiffs limn the specific circumstances by which each Defendant acquired knowledge of the alleged misconduct."  *Id.* (quotation omitted).  This is because "plaintiffs often will not, at the time they file their complaint, be in a position to describe with particularity the events constituting the alleged misconduct."  *Id.* (quotation and alterations omitted).  This observation is particularly apt in this case because, as set forth above, very limited information

about the operation and holdings of the Stable Value Funds are available.  Indeed, as noted above, JPM itself has admitted publicly that it did not provide plan sponsors adequate information to evaluate the opaque workings of its Stable Value Funds.  Am. Compl. ¶ 78.

**B.    Plaintiffs Have Alleged a Plausible Claim for Breach of the Duties of Prudence and Diversification.**

The facts alleged in the Amended Complaint state a plausible, and indeed compelling, case that JPM breached its duties to invest Plaintiffs' retirement funds prudently, especially in light of two aspects of the duty of prudence that are especially salient here.  Although JPM asserts that the duty of prudence requires nothing more than adequate due diligence at the time of the initial investment, Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint ("Memo.") at 6-8 , ERISA requires far more.

First, under ERISA, a fiduciary's investment decisions must be prudent not in the abstract but with reference to the ***specific goals*** of a particular investment fund.  A fiduciary must give "appropriate consideration" to facts and circumstances relevant to "the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties."  29 C.F.R. § 2550.404a-1(b)(i).  In other words, a fiduciary's investment decisions are evaluated under ERISA "in light of the ***character and aims*** of the particular type of plan he serves."  *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Cir. 1996) (emphasis added and quotation omitted).  *See also State Street*, 842 F. Supp. 2d at 646 (fiduciaries must evaluate investments "in light of the composition and aims of a fund's portfolio") (quotation omitted).

Here, Plaintiffs have alleged in detail the "character and aims" of JPM's Stable Value Funds, both with reference to JPM's own representations and industry practice.  Am. Compl. ¶¶ 1-3, 8, & 43.  The "character and aims" of the Stable Value Funds were, in JPM's own words,

to invest in a conservative, high-quality, diversified fixed-income portfolio, similar to (but offering higher returns than) a money market fund.  Am. Compl. ¶¶ 3, 8, & 43. [4]

Plaintiffs have also alleged in detail that causing the Stable Value Funds to invest heavily in mortgage-backed securities and private placement mortgages was inconsistent with these "character and aims" and thus violative of ERISA.  Mortgage-backed securities like the ones at issue in this case carry various inherent risks, such as the risk of default or prepayment in the underlying mortgages.  They are also exposed to more systematic risk based on real estate values generally.  Indeed, JPM itself acknowledged the magnitude of these risks as early as 2006, when it dumped billions of dollars of mortgage assets from its own accounts.  Am. Compl. ¶¶ 13-14.

The private placement mortgages were also inappropriately risky holdings for funds like the Stable Value Funds.[6]  They were illiquid, many were originated based on unduly lax JPM underwriting standards, and all were rated by JPM itself and thus lacked any objective indicia of quality.  Am Compl. ¶¶ 5, 7, & 71.  For these and other reasons, these mortgages were nowhere near "investment grade," as JPM represented they would be.  Am. Comp. ¶¶ 59, 61, & 65.  That JPM's very own insurance wrap providers complained about the excessive risk in this aspect of JPM's investment strategy and eventually forced JPM to change course is further evidence that the investment strategy of which Plaintiffs complain was objectively imprudent, in violation of ERISA.  Am. Compl. ¶ 82.

As noted above, the allegations in this case are strikingly similar to the allegations proven at trial in *State Street*, 842 F. Supp. 2d 614.  There, the court found that the funds at issue

---

[4] *See also* Ex. "A" (stable value funds are "normally regarded as a super-safe haven for retirement savings" and "meant to be the most conservative choice for employees – liquid, plain vanilla and backed by insurance").
[6] The fact that the Stable Value Fund investment guidelines permit investments in privately placed mortgages, Memo. at 4, does not render such investments prudent.  *See California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044-45 (9th Cir. 2001) (affirming finding that investment in "inverse floaters" violated ERISA's duty of prudence despite the fact that the investment guidelines for the plan at issue authorized such investments).

purported to be "enhanced index funds," *i.e.*, low-risk funds, and that State Street's investments

in subprime mortgage-backed securities were imprudent under ERISA because they were

inconsistent with the character and aims of such funds.  *Id.* at 646-47.  As the court reasoned:

> Thus, without disclosing its intention to do so, State Street managed the Bond
> Funds to accept risks significantly beyond those of "an enterprise of a like
> character and with like aims," 29 U.S.C. § 1104(a)(1)(B), and in doing so acted
> imprudently.  State Street did not make a sufficient determination that the Bond
> Funds were "reasonably designed … to further the purposes of the plan, taking
> into consideration the risk of loss and opportunity for gain," 29 C.F.R.
> § 2550.404a-1(b)(2), because State Street in large part ignored the fact that the
> Plans were seeking to own a strategy that incurred significantly less risk than the
> Bond Funds in fact accepted.

*Id.* at 647.  This is precisely the theory that Plaintiffs allege here and, as illustrated by the fact

that the plaintiff in that case proved damages of close to $77 million, that theory is more than

plausible.  *Id.* at 659.  *See also California Ironworkers Field Pension Trust v. Loomis Sayles &*

*Co.*, 259 F.3d 1036, 1044-45 (9th Cir. 2001) (affirming district court's finding that large

investments in "inverse floaters" violated ERISA's prudence rule as to a particular trust because

of that trust's "very conservative investment guidelines").

Second, the duty of prudence under ERISA extends not only to the initial investment

decision but also on the decision to ***maintain*** an investment position.  *See Morrisey v. Curran*,

567 F.2d 546, 548-49 (2d Cir. 1977) ("[U]nder the [ERISA] prudent man rule … the trustees

here had a duty within a reasonable time after ERISA took effect to dispose of any part of the

trust estate which would be improper to keep."); *Buccino v. Continental Assurance Co.*, 578 F.

Supp. 1518, 1521 (S.D.N.Y. 1983) ("Under the 'prudent investor' rule, a fiduciary has the duty

from time to time to examine the state of the investments to see whether any of them have

become such that it is no longer proper to retain them.") (quotation omitted); *Martin v.*

*Consultants & Administrators, Inc.*, 966 F.2d 1078, 1087-89 (7th Cir. 1992) (ERISA imposes a

"continuing fiduciary duty" to "review plan investments and liquidate improvident

investments").  By 2006, it was clear that maintaining the Stable Value Funds' investments in the mortgage-related assets posed substantial risks — risks that JPM itself appreciated when it divested itself of billions of dollars of similar assets.  Am. Comp. ¶¶ 13-14.  Accordingly, JPM should have diversified, hedged, or eliminated these assets altogether from the Stable Funds, and its failure to do so makes it liable as an ERISA fiduciary for the losses that occurred as a result.

Relatedly, Plaintiffs have properly alleged that JPM breached its ERISA-imposed duty to diversify the investments at issue here.  *See State Street*, 842 F. Supp. 2d at 651 (fiduciary breached its duty to diversify when it invested excessively in subprime mortgages).  Both those investments, mortgage backed securities and private placement mortgages, are in the real estate sector and thus exposed to a general downturn in that sector.  Further, there is no indication that JPM properly hedged these risks.  Am. Compl. ¶¶ 74-75.  There were ample means by which it could have done so, such as through collateral default swaps.  *See State Street*, 842 F. Supp. 2d at 651 (finding fiduciary's hedging strategy inadequate to satisfy duty to diversify).

### C.     JPM's Arguments that Plaintiffs' Claims are Implausible Lack Merit.

JPM argues that Plaintiffs have failed to allege viable claims that JPM breached its duty of prudence under ERISA.  In advancing that argument, however, JPM: (1) mischaracterizes or ignores the allegations in the Amended Complaint; (2) asks the Court to view Plaintiffs' allegations in the light most favorable to the Defendants; and (3) misstates or fails to cite the operative legal standards.

First, JPM disingenuously claims that the Amended Complaint is "predicated on nothing more than the generic hindsight allegation that Defendants caused their funds to purchase too many 'risky' mortgage loans before the global financial crises."  Memo. at 1.  Everything about this statement is incorrect or incomplete and contradicted by the actual allegations in the

Amended Complaint.  Plaintiffs' allegations do not turn on hindsight.  Rather, Plaintiffs allege that JPM's strategy of making risky investments to chase yield was inconsistent with the character and aims of the Stable Value Funds.  Am. Compl. ¶¶ 3-5.  Further, the Amended Complaint is not predicated solely on JPM's investment in privately-placed mortgage loans.  It also alleges that JPM caused the funds to invest heavily in mortgage-backed *securities*.  *Id.* ¶ 7.  Such securities were the type of investment of which JPM divested itself in 2006.  Moreover, Plaintiffs do not seek to hold JPM responsible for losses caused by the financial crisis that crested in 2008.  Rather, Plaintiffs invested in JPM's Stable Value Funds to insulate themselves from market fluctuations like that crisis, and JPM's Stable Value Funds performed substantially worse than its competitors' funds, which faced the exact same market conditions.  *Id.* ¶¶ 9 & 55.

JPM also provides a misleading description of the relationship between the book value of the funds and the market value of the underlying investments.[7]  Memo. at 5.  According to the documents JPM attached as exhibits to its Motion, the market value of the underlying assets at issue is a key input into the formula that determines a stable value fund's "crediting rate" (*i.e.*, return to investors).  In the "Investment Management Agreement" (Exhibit "H" to Exhibit "A" to the Declaration of Melissa D. Hill, DE 51), JPM explains that "[f]uture crediting rates generally reflect the prevailing yield to maturity of the underlying asset(s) plus (minus) an adjustment to amortize the surplus (deficit) of the ***market value of the underlying assets*** to the prevailing contract value."  (Emphasis added.)  In that same document, JPM also lists as a "Risk Factor" for the Stable Value Funds that "[s]ignificant underperformance of underlying bond portfolios relative to benchmarks … may cause crediting rates … to lag market yields, and/or decline relative to the general level of interest rates."  Thus, a decline in the market value of the

---

[7] In this description, JPM relies on materials published on the Internet by the Stable Value Industry Association. This is not admissible evidence, much less matter that can be considered to support a motion to dismiss.

investments held by the Stable Value Funds eventually leads to lower returns to the investors in those funds.

While it is true that the crediting rate for the Stable Value Funds cannot ordinarily be zero or negative, this fact is irrelevant to Plaintiffs' claims because out-of-pocket loss is not the measure of damages under ERISA for breach of fiduciary duty.   Rather, such damages are measured by comparing what returns were generated on the investments made in violation of fiduciary duty with the return those plan assets would have earned had they been invested prudently, consistent with ERISA duties.  *Donovan v. Bierwirth*, 754 F. 2d 1049, 1056 (2d Cir. 1985).  Indeed, in *Donovan*, the challenged investment (the purchase of Grunman stock) actually ***increased*** in value by the time the stock was sold.  The Second Circuit nonetheless found there would be an actionable "loss" within the meaning of ERISA if prudent alternative investments would have yielded a greater return.  *Id.* at 1056.  Not only does JPM fail to address the principle applied in *Donovan*, but, contrary to that uncontroverted precedent, it suggests that Plaintiffs' theory of damages is ridiculous.  Memo. at 6 ("Plaintiffs' only complaint, therefore, is that they should have received *even* greater returns than they did during the worst market downturn since the Great Depression.").  JPM's rhetorical excess on this point is diversionary and underscores the legal infirmity of its position.

JPM further argues that Plaintiffs have failed to allege that it "failed to perform adequate due diligence before investing the Stable Value Funds' assets."  Memo. at 7.  First, this is not true.  And second, it ignores the operative law.  Plaintiffs have adequately alleged that JPM "knew well the risks inherent in such assets held by the Stable Value Funds" and "knew or should have known that they were inappropriate for inclusion in a stable value fund portfolio under the market conditions prevailing during the period of time at issue in this case."  Am.

Comp. ¶ 15.  This knowledge was based upon, among other things, the fact that they originated and self-rated many of the mortgages in the Stable Value Funds' holdings.  *Id.*

Further, as set forth above, ERISA's duty of prudence requires that a fiduciary do more than just use due diligence in making initial investment decisions with plan assets.  It also requires that: (1) investments be suitable given the "character and aims" of a particular fund; and (2) the fiduciary continue to evaluate the fund's investments in light of new information.  Indeed, in *State Street*, this Court determined that the defendant breached its duty of prudence ***despite*** also finding that "[i]t cannot be said that State Street simply failed to conduct an independent investigation into the basis … for its decision to concentrate the Bond Funds' off-index investments in securities backed by subprime mortgages."  842 F. Supp. 2d at 657 (internal quotation omitted).  As the court noted, the "problem for State Street … was that it largely ignored the results of its own investigation."  *Id; see also California Ironworkers Field Pension Trust*, 259 F.3d at 1044-45 (finding breach of ERISA's duty of prudence despite also finding that the fiduciary complied with industry standards in its investigation of the investment).  Similarly, here Plaintiffs do not allege that JPM was completely ignorant of the risks posed by over-exposure to mortgage assets.  To the contrary, Plaintiffs allege that JPM understood those risks well but chose to disregard them in order to grow its business.  Am. Compl. ¶¶ 13-14.

Plaintiffs' allegations on this point are in no way illogical or contradictory.  Memo. at 8.  Plaintiffs do not allege that JPM "knew" that the mortgage-related assets would collapse in value.  Rather, Plaintiffs allege that JPM was aware of the substantial risks from excessive exposure to real-estate related assets.  Plaintiffs further allege that JPM chose to mitigate those risks when its own money was at stake, but was not so prudent in managing the assets of the Stable Value Fund investors.  Because JPM would not lose its own money if those risks

materialized, it was perfectly rational (albeit incompatible with its fiduciary duties under ERISA) for JPM to keep gambling with Plaintiffs' money, all the while continuing to reap ever-increasing management fees, until its scheme ultimately was exposed.  Am. Compl. ¶¶ 9 & 11.  This is especially true because JPM was able to hide the losses to the Stable Value Fund investments for a considerable period of time while its management fees continued to accrue.  *Id*.  At any rate, JPM's focus on short-term gain and disregard for long-term, systematic risk was all too common during the lead-up to the financial crises.

In support of its arguments that Plaintiffs have failed to sufficiently allege a breach of the duty of prudence, JPM also relies on inapposite cases such as *Board of Trustees of the Operating Engineers Pension Trust v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 9333 (BSJ)(DCF), 2012 WL 1382274 (S.D.N.Y. Apr. 20, 2012), and *In re Lehman Brothers Securities & ERISA Litigation*, No. 08 Civ. 5598 (LAK), 2011 WL 4632885 (S.D.N.Y. Oct. 5, 2011).  Neither of these cases involved allegations that investments were imprudent in light of the stated goals of a particular investment fund.  Further, there was no allegation in either case that the ERISA fiduciary acted on knowledge of a risk for its own account while failing to take the same action for the accounts for which it served as a fiduciary.  And while it is true as a general matter that a fiduciary's conduct cannot be viewed "from the vantage point of hindsight," *In re Citigroup ERISA Litigation*, 662 F.3d 128, 140 (2d Cir. 2011), that principle provides no refuge for JPM here because Plaintiffs' allegations do not turn on hindsight, as set forth above.  Also, that case and the *Lehman* case involved the presumption established by *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995), that a fiduciary that invests in plan sponsor's own stock acted consistent with its fiduciary duties.  There is no *Moench* presumption of prudence under Second Circuit law (or the law of any other Circuit, for that matter) applicable to this case.

JPM also attempts to minimize the significance of the *Fortune* article (attached here as Ex. "B") that reported JPM's divestment of billions of dollars of real-estate related assets.  JPM contends that the facts recited in that article are irrelevant because they relate only to subprime residential mortgages and residential mortgage-backed securities, and such investments are purportedly unconnected with the Stable Value Funds' investments.  Memo. at 10-11.  Plaintiffs clearly allege, however, that the imprudent investments are both: (1) private placement mortgages ***and (2) mortgage-backed securities***.  Thus, the *Fortune* article is directly relevant.  Moreover, contrary to the standards for a motion to dismiss, JPM asks the Court to interpret the facts in that article in the way most favorable to its position.  It is reasonable to infer from the article that JPM was aware of risks in real estate-related investments, whether residential or commercial, subprime or prime.  Real estate investments do not fluctuate in value in complete isolation from one another, and JPM's argument on this point is sophistry.

Finally, JPM launches a misplaced attack on the credibility of the Confidential Witness referenced in the Amended Complaint. Am. Compl. ¶¶ 59, 65, 80, &81.  As this Court well knows, credibility determinations are not to be made when deciding a motion to dismiss.  This Court has previously recognized that, even under the heightened standards of Rule 9(b) and the Private Securities Litigation Reform Act, which do not apply here, a court should not discount or disregard allegations from a confidential witness in deciding a motion to dismiss, so long as the witness is "'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  *City of Roseville Employees' Retirement System v. Energysolutions, Inc.*, 814 F. Supp. 395, 419-20 (S.D.N.Y. 2011), *quoting Crowell v. Credit Suisse Group*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010).  Plaintiffs have satisfied that standard by stating that the confidential witness is a former

employee of a company that worked with JPM on its Stable Value Funds and had a direct conversation with high-ranking employees of JPM regarding the matters alleged in the Amended Complaint.  Am. Compl. fn. 7 & ¶ 80.

In summary, Plaintiffs have alleged not only "plausible" but compelling claims that JPM breached its ERISA duty of prudence by causing the Stable Value Funds to invest heavily in real estate-related investments that were too risky given the "character and aims" of those funds. Plaintiffs' allegations are factually plausible because they are supported by JPM's own statements, industry-wide norms, and credible information from an informant, and they are legally plausible because they are supported by the principles applied in *Donovan*, 754 F. 2d 1049, *State Street*, 842 F. Supp. 2d 614, and *California Ironworkers Field Pension Trust*, 259 F.3d 1036.

> ### D.   Plaintiffs Have Stated a Plausible Claim that JPM Breached its Duties of Loyalty and Candor.

In Count III of the Amended Complaint (¶¶ 118-119), Plaintiffs allege that JPM has managed and administered the Funds in violation of the obligations of loyalty and candor imposed by 29 U.S.C. § 1104(a)(1)(A)(i).  This claim arises from JPM's manipulation of the reported crediting rate for the Stable Value Funds.  As discussed above, the crediting rate (*i.e.*, return to investors) is a compiled figure generated by a formula set forth in each fund's wrap agreement.  A significant factor in that formula is the ratio between the fund's book value and market value.  Thus, the return to investors declines as the market value of the assets decline.

Plaintiffs allege that JPM caused the Stable Value Funds to invest in risky private placement mortgages and mortgage-backed securities to attract and maintain investments in the Funds and thereby increase its fees.  Am. Compl. ¶¶ 9 & 111.  As the market value of these assets declined, the crediting rate also should have declined.  In order to avoid (or postpone) this

16

result and maintain (or increase) its Stable Value Funds-related fees, however, JPM caused the crediting rate to be reported at inflated values.  Am. Compl. ¶¶ 75-76.  As a result, JPM misled retirement plan participants such as Plaintiffs about the performance of the Funds' mortgage assets.  *Id*. ¶ 10.  When the decline in market value could no longer be concealed and the crediting rate for the Stable Value Funds declined correspondingly, JPM blamed the decline on general market conditions, rather than to the excessive riskiness of JPM's investment strategy. *Id*. ¶ 78.

In the face of these allegations that JPM purposely deceived Plaintiffs about the performance of their investments, JPM first argues that it had no duty of candor because it had no obligation to disclose investment information.  Memo. at 13-14.  But the duty at issue is one of candor, not only disclosure, and that duty requires that, when a fiduciary speaks, it speak truthfully.  Thus, the duty of candor includes a prohibition against lying. *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S. Ct. 1065, 1074-75 (1996) ("[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA").  Following *Varity*, the Second Circuit has held that fiduciaries may not "actively misinform" a beneficiary in any material respect.  *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 124 (2d Cir. 1997).

In fact, the case JPM cites for the proposition that it had no duty to disclose investment information, *In re Citigroup ERISA Litigation*, 662 F.3d at 144-45, explicitly recognizes an ERISA fiduciary's duty to speak honestly when the fiduciary speaks.  In that case, the Second Circuit again recognized that a fiduciary is liable for false or misleading statements if a fiduciary "knows those statements are false or lack a reasonable basis in fact." *In re Citigroup*, 662 F.3d at 144-45.  *See also In re Lehman Bros. Securities and ERISA Litigation*, 2011 WL 4632885, *6 ("Of course, to the extent that a fiduciary actively provides financial information to a plan

participant, the fiduciary must do so accurately and completely.").

To "actively misinform" in this context, a statement must either (1) be known as false or (2) have no reasonable basis in fact (*i.e.* be made with reckless disregard as to its truth or falsity). *See Flanigan v. General Electric Co*., 242 F.3d 78, 84 (2d Cir. 2001) (citation omitted). Plaintiffs allege such affirmative misrepresentations in Count III: simply put, JPM caused false account balance and performance information regarding the Stable Value Funds to be distributed to Plaintiffs.  Am. Comp. ¶ 118(a.).  And JPM knew that this information was false since it provided that information by "…hid[ing] the loss of market value of the investments held in the Stable Value Funds by setting crediting rates by negotiation rather than the formulas required by the wrap contracts and consistent with industry practice."  *Id*. ¶¶ 118(a.) and (c.).

Taking these allegations as true, as is required, Plaintiffs have satisfied *Flanigan*'s requirement of showing that JPM either knew that it was misrepresenting the performance and yield of the investments at issue or provided this information in reckless disregard of its truth or falsity.  *See also Frulla v. CRA Holdings Inc.*, 596 F. Supp. 2d 275, 285 (D. Conn. 2009) (applying false and misleading information principles of *Flanigan* and *Ballone* "where the deterioration of a plan's financial condition is concealed from participants through the issuance of erroneous statements and Form 5500 filings").

Next, JPM argues that because participants always bought and sold their interests in the Stable Value Funds at book value, its misrepresentations about the performance of the Stable Value Funds' investments caused no harm.  Memo. at 14.  That argument is not properly considered on a motion to dismiss, as it concerns the materiality of JPM's misrepresentations and omissions, and "[w]hether the communications constituted misrepresentations and whether they were material … are questions of fact that are properly left for trial." *In re Unisys Savings Plan*

*Litigation*, 74 F.3d at 443; *Braden v. Wal-Mart Stores, Inc*. 588 F.3d 585, 599 (8th Cir. 2009) ("Materiality is a fact intensive issue which can be decided as a matter of law only if no reasonable trier of fact could disagree."); *In re Morgan Stanley ERISA Litigation*, 696 F. Supp. 2d at 363 (same).  It is therefore premature to make such a determination here.  In any event, JPM's argument ignores the reality that information about the Stable Value Funds' performance was important to investors not only because it would inform them of their balance as of a particular date, but also because it would inform them about the ongoing performance of the funds so they could decide whether to continue to invest in those funds.  *See* Am. Compl. ¶ 118(a-c).

Finally, JPM argues that Plaintiffs have failed to allege any facts sufficient to establish that any Defendant was a fiduciary with regard to communications to plan participants.  Memo. at 14-15.  But, as JPM admits, a person who "exercises discretionary authority or control respecting plan management or plan assets…" is a fiduciary.  Memo. at 14.

*Pegram v. Herdrich*, 530 U.S. 211, 120 S. Ct. 2143 (2000), on which JPM relies, holds that a threshold question in cases alleging breach of an ERISA fiduciary duty is "whether [the defendant] was acting as a fiduciary … when taking the action subject to complaint."  *Id.* at 266, 120 S. Ct. at 2153.  Further, "[c]ourts have generally applied a liberal interpretation to 'fiduciary' within the ERISA context, since applying a restrictive judicial gloss to the term 'fiduciary' would, in effect, enable trustees to transfer important responsibilities to a largely immunized 'administrative' entity." *Greenblatt v. Prescription Plan Services Corp.*, 783 F. Supp. 814, 820 (S.D.N.Y. 1992) (quotation omitted).  Under the rules of notice pleading, plaintiffs need only allege that defendant acted in his fiduciary capacity, and in so doing, breached the duty owed to the Plan.  Such allegations are sufficient on a motion to dismiss because the question of fiduciary

status "is a fact-bound inquiry and should be resolved on summary judgment." *Kenney v. State Street Corp.*, 694 F. Supp. 2d 67, 79 (D. Mass. 2010). *See also In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1030 (S. D. Ohio 2006) (same).[8]

The allegations in the Amended Complaint easily meet the *Pegram* test, especially given the mandated liberal application of that test when adjudicating motions to dismiss, because Plaintiffs have sufficiently alleged that JPM's "actions taken or duties breached [were] in the performance of ERISA obligations." *In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003), *citing Pegram*, 530 U.S. at 225-26, 120 S. Ct. at 2152-53 (2000). The Amended Complaint alleges that JPM, among other roles, served as investment manager of the Funds. Am. Comp. ¶¶ 39-40. The investment management contract confirms that J. P. Morgan Investment Management Inc. was an ERISA fiduciary in its role as "investment manager" as that term is defined by ERISA § 3(38), 29 U.S.C. § 1002(38). *See* Ex. "A" to Decl. of Melissa D. Hill, DE 51, at p. 2, ¶ 4a. As such, there can be no doubt that JPM assumed the obligation of informing the ERISA plans about the performance of the funds. Among the obligations of the "Investment Advisor" under the Investment Management Agreement was to furnish quarterly statements about the property in a particular plan's stable value fund account and transactions in that account. *Id.* at p. 4, ¶ 9. There was no way plan participants would have known the purported value of their investments in the Stable Value Funds unless JPM provided it, either directly to participants or through the plans. This information was completely in JPM's control.

In addition, the Amended Complaint alleges that JPM was responsible for generating

---

[8] Here JPM was acting in its capacity as the Stable Value Funds' financial advisor when it manipulated the account balance and performance information that it caused to be distributed to the Plaintiffs and fund participants, and that manipulation involved a complex calculation and a scheme involving the wrap providers. These allegations serve to distinguish cases like *Fitch v. Chase Manhattan Bank, N.A.*, 64 F. Supp. 2d 212, 229 (W.D.N.Y. 1999) where, at the summary judgment phase, the court found that calculating benefit estimates based on the terms of the plan was a merely ministerial act that did not give rise to a finding of fiduciary status. Determining a defendant's level of discretion is a fact-specific inquiry not suited for a motion to dismiss.

"market values" for purposes of determining the crediting rate, and that it generated such values so as to conceal from participants the Funds' actual performance.  *See, e.g.,* Am. Comp. ¶¶ 4, 10, & 76.  These market values are communicated to plan participants because they are a key component of the crediting rate reported to them.  Moreover, JPM is obligated to make available to Plan Sponsors "the Investment Advisors records of securities transactions, holdings and *valuations* of the Account, including all listing and appraisals of securities with respect to such transactions, holdings, or valuations."  *See* Ex. "A" to Decl. of Melissa D. Hill, DE 51, at p. 4, ¶ 9 (emphasis added).  Valuation is no ministerial task, but rather a complex calculation, as set forth above.  Thus, the alleged misstatements and omissions about the Stable Value Funds' performance were made by JPM in the course of performing its duties as trustee fiduciary in exercising authority and discretion and, in manipulating that information, JPM breached its duties of loyalty and candor in violation of 29 U.S.C. § 1104(a)1)(A)(i).

      **E.**    **Plaintiffs' Allegations that JPM Obtained Fees by Using Plan Assets to Fund Mortgages State Claims for ERISA Prohibited Transactions.**

In Counts IV and V of the First Amended Complaint (¶¶ 121 to 133), Plaintiffs allege that JPM violated ERISA's prohibited transaction provisions by causing the Stable Value Funds to fund loans for which JPM received origination fees.  JPM ignores these allegations in its Motion and certainly does not challenge their sufficiency.  Instead, its sole argument is that Plaintiffs have stipulated that they "are *not* alleging the [SVF] funds acquired mortgage loans from Defendants." (Emphasis in original.)  Memo. at 15-16.  But the alleged violations here are not that JPM caused the Stable Value Funds to purchase loans from itself.  Rather, Plaintiffs allege that JPM engaged in prohibited transactions by using plan assets to fund mortgages that

JPM originated and arranged, and for which JPM received substantial fees.[9]

These allegations are in no way inconsistent with the Joint Stipulation. There, Plaintiffs agreed that "the First Amended Complaint does not contain the 'dumping' allegations from the Complaint, as JPM uses that term, and does not allege that the challenged investments were held on Defendants' or their affiliates' balance sheets before being acquired by the stable value funds directly or indirectly." DE 46 at pp. 1-2. Counts IV and V, however, do not allege that JPM or its affiliates ever owned these mortgage loans. Rather, they allege that JPM violated ERISA's prohibited transaction provisions by originating and arranging these loans and receiving substantial fees for doing so.

This conduct violates two ERISA provisions. First, section 406(b) prohibits a trustee from profiting from the trust through self-dealing. As observed by the Second Circuit in *Lowthen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1214 (2d Cir. 1987), section 406(b) "protect[s] beneficiaries by prohibiting transactions tainted by self-interest…." *See, e.g., Lowthen,* 829 F.2d at 1217 (payment of fees by companies in which a plan's assets are invested violate section 406(a)); *LaScala v. Scrufari,* 479 F.3d 213, 220 (2d Cir. 2007) (trustee's payments to himself for services violates section 406(b)). In the context of loan origination fees, as stated by the court in *Martin v. National Bank of Alaska,* 828 F. Supp. 1427, 1438 (D. Alaska 1993), "the receipt of origination fees involv[ing] the use of the plan assets" violates ERISA

---

[9] Fees are paid to originators by both borrowers and lenders. For fees paid by borrowers, *see Martin v. National Bank of Alaska,* 828 F. Supp. 1427, 1429-30 (D. Alaska 1993)(borrower pays fees for "a range of services, including not limited to, helping borrowers fill out mortgage applications, doing credit checks to ensure borrowers could meet payments, obtain appraisal of the real estate…."); and for fees paid by a lender, *see Culpepper v. Inland Mtge. Corp.,* 132 F.3d 692 (11th Cir. 1998) and *Grannucci v. Wells Fargo Bank,* 2010 WL 5475613 at n.2 (E.D.N.Y. Dec. 17, 2010)(originator compensated by lender through yield spread premium). For services provided by loan originators, *see Trombetta v. Cragin Federal Savings & Loan,* 102 F.3d 1435, 1436 (7th Cir. 1997)(loan originator "solicited, procured, prepared and submitted mortgage applications"). In her affidavit submitted in support of defendants' motion for summary judgment, Judith Bryngil asserts (at ¶ 17) that the Mortgage Private Placement Fund "originated" as well as funded the mortgage loans in question. If this is meant to convey that the MPPF itself as opposed to JPM or one of its affiliates did the actual work of originating the loan, this is implausible because the MPPF is merely a passive investment trust and so would not be expected to have, for example, loan officers. In any event, Ms. Brygnil's characterization cannot be taken as true for purposes of this motion.

sections 406(b).  In addition, collecting these fees violates section 406(a)'s prohibition on a fiduciary causing a plan to deal with a "party in interest."  "Party in interest" includes other fiduciary entities and entities providing services to a plan.  29 U.S. § 1002(14)(A) & (B).  Here, the various JPM entities, as fiduciaries, caused other JPM entities to provide loan origination services to the Stable Value Funds for substantial fees in violation of ERISA section 406(a)(1)(A) and (D).

Plaintiffs' stipulation that there are no "dumping" allegations are in no way preclusive of any of Plaintiffs' wholly distinct allegations that JPM's use of plan assets to fund mortgages for which they had served as loan originators and arrangers violates ERISA sections 406(a) and 406(b).  The motion to dismiss should be denied as to Counts IV and V.

F.   **Plaintiffs Have Standing to Assert Class Claims on Behalf of Plan Participants in Plans in Which They Did Not Participate.**

The Amended Complaint proposes to bring Plaintiffs' claims as a class action on behalf of "[a]ll participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in any of the JPM Stable Value Funds between July 1, 2007 and December 31, 2010."  Am. Compl. ¶ 93.  This is because, among other things, "the Stable Value Funds' assets are held in one or more collective trusts managed by JPM, each of which held … substantial assets in JPM's Intermediate Bond Fund and Pension Trusts."  *Id.* ¶ 95.

JPM asserts that under ERISA Plaintiffs do not have standing to represent a class of members of other plans of which they themselves are not members.  Memo. at 17.  This argument is premature.  It may be properly put forth when Plaintiffs move for class certification in this matter, but it is not properly the subject of a motion to dismiss.  The Second Circuit recently made this distinction clear in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165 (2d Cir. 2012), a highly relevant case that JPM does not address.

In that case, the district court granted the defendants' motion to dismiss to the extent that the plaintiff there sought to represent a class consisting of all persons who had purchased certain mortgage-backed securities through 17 different trusts and 17 separate offerings, when the plaintiff had bought securities in only two of the offerings.  The basis of its ruling was that plaintiff lacked Article III standing to represent investors in other trusts, despite allegations that the offering circulars for all the trusts suffered from the same misrepresentations and omissions. The Second Circuit reversed in part, holding that the district court was confusing class standing with statutory and Constitutional Article III standing.

> But whether NECA has 'class standing'—that is, standing to assert claims on behalf of purchasers of Certificates from other Offerings, or from different tranches of the same Offering—does not turn on whether NECA would have statutory or Article III standing to seek recovery for misleading statements in those Certificates' Offering Documents.

693 F.3d at 158.  Once at least one named plaintiff establishes statutory and Article III standing against each of the defendants, the inquiry shifts to class action standing.  *Id*. at 159.  And a plaintiff has class standing where "he has personally suffered some actual injury as a result of the putative conduct of the defendant … and (2) … such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *Id.* at 162 (quotation omitted).

This rule applies fully to ERISA claims.  In *Fallick v. Nationwide Mutual Ins. Co.*, 162 F.3d 410, 422-23 (6th Cir. 1998), *cited by NECA-IBEW Health & Welfare Fund*, 693 F.3d at 159 fn. 10, the Sixth Circuit reversed the district court's conclusion that plaintiff lacked constitutional standing to represent participants in benefit plans other than his own.  It held that once ERISA statutory and Article III standing have been established, "whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is

able to meet additional criteria encompassed in [Fed. R. Civ. P. 23(a)]." 162 F.3d at 422-23.  As

a matter of class standing, "an individual in one ERISA benefit plan can represent a class of

participants in numerous plans other than his own, *if the gravamen of the plaintiff's challenge is*

*to the general practices which affect all of the plans*" (emphasis added).

Here, Plaintiffs meet the standard set forth by *NECA-IBEW Health & Welfare Fund and*

*Fallick*.  They allege: (1) they have suffered injury as a result of JPM's ERISA fiduciary breach

and (2) this conduct implicates "the same set of concerns" as JPM's conduct that injured other

members of the putative class.  The "gravamen" of Plaintiffs' allegations is a challenge to the

"general practices" by JPM "which affect all the plans" that offer any of its Stable Value Funds.

Whether a putative class of this type should be certified pursuant to Rule 23 raises a separate

issue that can be evaluated on a motion for class certification.

JPM attempts in vain to distinguish *Fallick.* Memo. at 21-22.  It relies on *In re SLM*

*Corp. ERISA Litigation*, 2010 WL 3910566 at *12 (S.D.N.Y. Sept. 24, 2010), which found no

standing.[10]  But, as JPM acknowledges, Memo. at 21, this Court, relying on *Fallick*, has held that

a participant's ability to sue on behalf of ERISA plans in which he does not participate is limited

only by Rule 23.  *Cress v. Wilson*, No. 06-cv-2717, 2007 WL 1686687 (S.D.N.Y. June 6, 2007)

(Koeltl J.)[11]  Given that *NECA* also cited *Fallick* with approval, there should now be no doubt

that this Court's *Cress* decision is still good law.[12]  Further, this Court's decision in *Cress* is

---

[10] JPM's reliance upon *In re SLM Corp. ERISA Litigation*, is misplaced because the named plaintiffs there could not make out the requisite injury-in-fact because they "neither participated in nor were beneficiaries of the Retirement Plan," unlike Plaintiffs here.  2010 WL 3910566 at *12. J PM's reliance (Opp. at 19) on several other authorities is similarly misguided because in *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005), *Connecticut v. Physicians Health Services of CT, Inc.*, 287 F.3d 110 (2d Cir. 2002) and *Simon v. Gen. Elec. Co.*, 263 F.3d 176 (2d Cir. 2001) the plaintiffs were not participants of any relevant plan.

[11] JPM seeks to distinguish *Cress* on the grounds that it involved three plans sponsored by a single company. Memo. at 21.  But, as set forth above, this argument following *NECA-IBEW* goes to issues of typicality and commonality that in turn go to the scope of the class to be certified, not whether plaintiffs have standing.

[12] Furthermore, JPM's counsel fail to mention that this same standing ERISA statutory argument was rejected in a case they litigated before the United States District Court in the Southern District of Iowa.  That case involved a

consistent with several other cases addressing this same issue.[13]

### G.    The *Martin* Settlement Does Not Bar Any of the Claims Alleged in the Amended Complaint.

JPM also contends that the claims of Plaintiffs Koch and Duran arising before September 10, 2009, are barred by the release in a settlement entered in *Martin v. Caterpillar, Inc.,* 07-CV-1009 (C.D. Ill. Dkt. 152-1) (the "Caterpillar Settlement").  Memo. at 24.  JPM's argument is procedurally improper, defies any reasonable understanding of what claims were asserted in the *Martin* action and released by the Settlement, and ignores the operative legal standards.

First, JPM's invocation of the Caterpillar Settlement is an affirmative defense not properly considered in a motion to dismiss.  *Levine v. Columbia Laboratories, Inc.*, 2004 WL 1392372 (S.D.N.Y. June 22, 2004) ("While an affirmative defense properly may be raised by a motion to dismiss, that is so only where the defense appears on the face of the pleading and the documents incorporated therein. That is not the case here.").  Nor is it the case here.

Next, even if this Court were to consider JPM's argument, Plaintiffs' claims in this action were not released under the Caterpillar Settlement because the claims in *Martin* concerned alleged misconduct by certain Caterpillar entities in selecting certain "investment options" for the Caterpillar Plan, while Plaintiffs' claims concern specific investments made by JPM in the Stable Value Funds, not the "options" offered in the Caterpillar Plan.

---

putative class action brought on behalf of nine named plaintiffs who were participants in ERISA employee benefit plans offered by nine different employers, but which all had invested in an "open-ended, commingled, insurance company separate account invested primarily in commercial real estate holdings."  The Iowa court sets forth a persuasive rationale why the defendants' same standing argument should be rejected here.  *In Re Principal U.S. Property Account ERISA Litigation*, 274 F.R.D. 649 (S.D. Iowa 2011).

[13] *See Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101 (5th Cir. 1993);; *Wu v. MAMSI Life & Health Ins. Co.*, 256 F.R.D. 158, 166-67 (D. Md. 2008); *In re RadioShack Corp. ERISA Litigation*, 547 F.Supp.2d 606, 611 (N.D. Tex. 2008); *Buus v. WAMU Pension Plan*, No. 07-0903, 2007 WL 4510311, at *3 (W.D. Wash. Dec. 18, 2007); *Cress v. Wilson*, No. 06-2717, 2007 WL 1686687, at *10 (S.D.N.Y. June 6, 2007); *Charters v. John Hancock Life Ins. Co.*, 534 F.Supp.2d 168, 172 (D. Mass. 2007); *Alves v. Harvard Pilgrim Healthcare, Inc.*, 204 F.Supp.2d 198, 205 (D. Mass. 2002); *Misch v. Community Mutual Ins. Co.*, No. 94-428, 1995 WL 1055171 (S.D. Ohio Feb. 15, 1995); *Sutton v. Medical Service Assoc. of Penn.*, No. 92-4787, 1993 WL 273429 (E.D. Pa. July 20, 1993).

More importantly, even if the Court were to read the release language in the Caterpillar Settlement as broadly as JPM would like, the Second Circuit has consistently held that, in determining whether a claim is barred by a class action settlement, courts must apply the "identical factual predicate" and "adequate representation" doctrines.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107-10 (2d Cir. 2005).

The "identical factual predicate" test requires that a party attempting to apply a class settlement to bar a subsequent claim must demonstrate that the challenged claim arises out of the "identical factual predicate" as the claims actually asserted in the settled action.  *Id.* at 107.  This is true regardless of the purported breadth of the release language in the settlement agreement. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("[A] settlement agreement's bare assertion that a party will not be liable for a broad swath of potential claims does not necessarily make it so.")  A settled claim arises from the "identical factual predicate" as a class claim when the claim "depend[s] upon the *very same set of facts*"; or when the claim is based on a "variation" of the class theory that "hinge[s] on the *same operative factual predicate*." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (internal quotation omitted and emphasis added).  Here, JPM cannot even make a colorable argument that Plaintiffs' claims share an "identical factual predicate" with the claims asserted in *Martin*.

Further, even if this Court were to somehow perceive an "identical factual predicate" for the claims in *Martin* and the claims asserted by Plaintiffs here, the Second Circuit has made clear that "[a] determination that all of the settled claims arose from the same factual predicate does not necessarily end the inquiry."  *Wal-Mart Stores, Inc.*, 396 F.3d at 109.  "Claims arising from a shared set of facts will not be precluded where class plaintiffs have not adequately represented the interests of class members" asserting such claims.  *Id.*  Here, the claims asserted by Plaintiffs

27

against JPM were not adequately represented – or represented at all – by the lead plaintiffs in the *Martin* action, as they made no allegations whatsoever regarding JPM or the Stable Value Funds. The lead plaintiffs and class counsel in the *Martin* case did not, and could not, represent the interests of class members in recovering for JPM's alleged wrongdoing with respect to those funds. For these reasons, this Court should reject JPM's misguided attempt apply the Caterpillar Settlement as bar to Plaintiffs Koch and Duran's wholly unrelated claims in this action.

### H.   Plaintiffs Have Alleged that JPMC and JRPS are ERISA Fiduciaries.

As set forth above, the standard for alleging fiduciary status under ERISA is liberal at the pleading stage. *Kenney v. State Street Corp.*, 694 F. Supp. 2d at 79. With respect to JRPS, Plaintiffs have alleged that that entity provided account balance and performance information to plan participants. Am. Compl. ¶ 28. As set forth above, this function was ***not*** ministerial, involved considerable discretion, and was intertwined with JPM's role as investment advisor with respect to the Stable Value Funds. And JPMC is at this stage a proper defendant because it is the parent company of those JPM entities that are indisputably properly named here. Discovery is necessary to determine the extent to which JPMC exercises control over those entities in their capacity as ERISA fiduciaries.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the First Amended Complaint should be denied in its entirety.

Dated:   November 21, 2012

Respectfully submitted,

/s/ Jason Kim

_____

Kevin Madonna (Bar No. KM5595)
KENNEDY & MADONNA, LLP
48 Dewitt Mills Rd.
Hurley, NY 12443
Tel: 845-481-2622
Fax: 845-230-3111

Jason Kim
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, California  94104
Tel: (415) 421-7100
Fax: (415) 421-7105
jkim@schneiderwallace.com
*Appearing pro hac vice*

Garrett W. Wotkyns, Esq.
SCHNEIDER WALLACE COTTRELL
   BRAYTON KONECKY LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Tel: (480) 428-0144
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com
*Appearing pro hac vice*

Thomas R. Meites, Esq.
Michael M. Mulder, Esq.
MEITES MULDER
321 S. Plymouth Ct., Ste. 1250
Chicago, Ill.  60604
Tel: 312-263-0272
Fax: 312-263-2942
trmeites@mmmglaw.com
mmmulder@mmmglaw.com
*Appearing pro hac vice*

Joseph Peiffer, Esq.
FISHMAN HAYGOOD PHELPS
   WALMSLEY WILLIS & SWANSON, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana  70170
Tel: (504) 586-5252
Fax: (504) 586-5250
jpeiffer@fishmanhaygood.com
*Appearing pro hac vice*

Peter Mougey, Esq.
James Kauffman, Esq.
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 So. Baylen Street, Suite 600
Pensacola, FL  32502
pmougey@levinlaw.com
jkauffman@levinlaw.com
*Appearing pro hac vice*

ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD WHITLEY, CAROLETA M. DURAN, TERRY J. KOCH, MARK D. GRANDY, JOHN M. GATES, and SCOTT NEWELL, on behalf of themselves and those similarly situated, )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>J.P. MORGAN CHASE & CO.; JPMORGAN CHASE BANK N.A.; J.P. MORGAN INVESTMENT MANAGEMENT INC., aka J.P. MORGAN ASSET MANAGEMENT; and JPMORGAN RETIREMENT PLAN SERVICES LLC, )<br><br>*Defendants*. ) | Case No. 12-cv-2548<br>The Honorable John G. Koeltl<br><br><br>**CERTIFICATE OF SERVICE** |

I, Jason Kim, hereby certify that on this 21st day of November, 2012, I electronically

filed: (1) Plaintiffs' Opposition to Defendants' Motion to Dismiss First Amended Complaint; and

(2) Declaration of Jason H. Kim and attached Exhibits "A" & "B" using the United States

District Court for the Southern District of New York's CM/ECF system, which is service of such

filings via email to all counsel of record in this action.

/s/ Jason H. Kim
Jason H. Kim