# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD WHITLEY, CAROLETA M. DURAN, TERRY J. KOCH, MARK D. GRANDY, JOHN M. GATES, and SCOTT NEWELL, on behalf of themselves and those similarly situated,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>J.P. MORGAN CHASE & CO.; JPMORGAN CHASE BANK N.A.; and J.P. MORGAN INVESTMENT MANAGEMENT INC., aka J.P. MORGAN ASSET MANAGEMENT<br><br>    *Defendants*. | Case No. 12-cv-2548<br>The Honorable John G. Koeltl<br><br><br>**[REDACTED]**<br>**SECOND AMENDED**<br>**COMPLAINT** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................1

PARTIES ......................................................................7

JURISDICTION AND VENUE ...............................................9

FACTUAL ALLEGATIONS ..................................................9

    The 401(k) Plans and JPM's Role as Fiduciary....................9

    Stable Value Funds ...............................................12

    JPM's Stable Value Funds ......................................14

    JPM's Stable Value Funds' Investments in Commingled Pension Trust Funds .......15

    JPM's Inappropriate Use of Leverage in its Stable Value Funds ..............18

    JPM Adopts Investment Strategies That Radically Differ from its Purported Benchmark ....................................21

    JPM's Exposure to Real Estate Risk................................28

    JPM's Investment in Risky Mortgage-Backed Securities ...........32

    JPM's Unique Investment in Private Placement Commercial Mortgages................38

    The Causal Connection Between the Risky Investment Strategies Described Above and the Catastrophic Decline in the Market Value of JPM's Stable Fund's Investments ...................................43

    The Causal Connection Between the IBF's Market Value Loss and Injury to Plaintiffs................................................45

    JPM Acted For Its Own Interests and Not the Interests of Stable Value Fund Investors ...................................................50

CLASS ALLEGATIONS ...................................................51

COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C) BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION ...................................53

i

COUNT II: VIOLATION OF ERISA § 404(a)(1)(A) EXCLUSIVE BENEFIT .................55

COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED TRANSACTIONS ....................................................................................................56

COUNT IV: VIOLATION OF ERISA §§ 406(b)(1) AND (b)(3) PROHIBITED TRANSACTIONS ....................................................................................................57

PRAYER FOR RELIEF .........................................................................................58

Richard Whitley, Caroleta M. Duran, Terry J. Koch, Mark D. Grandy, John M. Gates and Scott Newell (collectively, "Plaintiffs") bring this action against J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management, and JPMorgan Retirement Plan Services LLC (collectively, "JPM" or the "JPM entities"), on behalf of themselves and similarly situated 401(k) plan participants.  Based on personal knowledge and information obtained from investigation by counsel and discovery in this matter, Plaintiffs allege as follows:

## INTRODUCTION

1.      Defendants are J.P. Morgan Chase & Co. and various of its wholly owned subsidiaries (referred to collectively herein as "JPM"). JPM sold and currently sells a number of investment funds that are offered to 401(k) plan participants and are represented as being stable in value (collectively referred to in this Complaint as the "Stable Value Funds"). These funds are called, among other things, the Stable Value Fund, the Stable Asset Fund, Stable Value, Stable Principal Fund, Short-Term Investment Fund, and Stable Asset Income Fund. All of these Stable Value Funds are advertised as being stable in value, and thus all were presented as conservative investment options.

2.      Plaintiffs and members of the proposed Class are investors who elected to invest their retirement funds via their Defined Contribution and Profit Sharing 401(k) plans into JPM's Stable Value Funds which in turn were invested by JPM in its Intermediate Bond Fund and in underlying funds as discussed in detail below.

3.      The main investment objective of stable value funds is preserving the invested principal and accumulated returns while yielding returns slightly higher than a money market account. The longer duration of investments in a stable value fund as compared to a money

1

market fund generally should result in higher yields. It is inherent in this objective that stable value funds must be managed to minimize the risk to the invested principal and to minimize volatility in the face of changing market conditions.[1]

4.      JPM understood well the purpose of stable value funds. 

Consistent with this stated strategy, JPM represented to retirement investors that its Stable Value Funds are "your most conservative investment option."[3] The then-head of JPM's stable value fund management group, Victoria Paradis, described JPM's stable value asset class as "among the most conservative in the DC [defined contribution retirement] plan line-up."[4] However, this sales ploy is a ruse, and has been for some time.

5.      While JPM touted the conservative nature of the Stable Value Funds, for the sake of its own financial interests, it caused the Stable Value Funds to invest heavily in highly-leveraged mortgage-related assets. As set forth below, this strategy was not prudent given the "character and aims" of stable value funds for several reasons.

---

[1] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, describing objectives of stable value funds.

[3]*See* http://www.jpmorgan.com/pages/stablevalue (last viewed Oct. 3, 2013).

[4]*See Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis,* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true      (last viewed Oct. 3, 2013).

6.     First, the high degree of leverage employed by JPM in its Stable Value Funds is both contrary to industry standards and inherently risky, as leverage increases the magnitude of gains and losses.

7.     Second, although JPM claimed to be managing against a particular benchmark – the Lehman Aggregate Intermediate Index – JPM's actual investment strategy differed fundamentally from this index both in terms of leverage and composition. Thus, JPM vastly exceeded the risk parameters indicated by this benchmark.

8.     Third, JPM's Stable Value Funds due to their leverage were inadequately diversified and highly concentrated in mortgage-related investments – a problem that was exacerbated by JPM's failure prudently to hedge against the Stable Value Funds' enormous exposure to the real estate market.

9.     Fourth, the Stable Value Funds invested in low quality mortgage-backed securities, such as those backed by subprime and option-ARM mortgages, those backed by inadequate documentation of the underlying borrowers' ability to pay back the mortgages, and those that took exotic forms such as interest-only mortgage derivatives and inverse floaters. These investments were not suitable for a stable value fund when they were made and were eventually prohibited by the fund.

10.    Fifth, JPM (unique among its competitors) invested in commercial private placement mortgages, some of which JPM itself originated, which had liquidity problems and were otherwise supported by no objective rating criteria. These investments too were not suitable for a stable value fund when they were made and were eventually prohibited by the fund.

11.    JPM undertook this strategy to, as they say on Wall Street, "reach for yield" – *i.e.*, increase returns for stable value fund investors so as to attract more investors and increase its

market share and management fees. This was a goal fundamentally at odds with the capital preservation function that, according to industry standards and JPM itself, was the primary purpose of stable value funds.

12.    Furthermore, documents and previous deposition testimony produced in this case – and not hindsight-based general market indicators – show beyond any doubt that JPM was well aware or should have been aware of the outsized risks its unique investment strategies posed to Plaintiffs and other investors in its Stable Value Funds at the times when JPM made and maintained these investments. This evidence is adduced in detail throughout this Complaint. ■

Mercer LLC, a leading investment consulting company, also commented during the class period that the Stable Value Funds' "private mortgage holding was and remains an inappropriate holding for the [JPM] stable value offering."[7] Furthermore, Victoria Paradis, Managing Director of JPM Morgan Asset Management and then-manager of the Stable Value Funds, herself acknowledged in a trade

[7] Mitsubishi 00010.

publication that "[d]irectly placed [commercial mortgage] loans *are not appropriate within any portfolio with liquidity demands*."[8] Nonetheless, as explained further below, the Stable Value Funds – which faced liquidity demands during much of the class period – invested heavily in such loans.

13.     So this case is not one that turns on hindsight allegations based on general market indicators. Rather, at the times it made and maintained the highly-leveraged mortgage-related investments at issue here, JPM disregarded the stated purposes of its Stable Value Funds, ignored important Stable Value Funds-related management advice from its own consultants and managers, and instead intentionally adopted a high risk, leveraged strategy to reach for yield and increase its market share and management fees. Accordingly, JPM had actual, contemporaneous knowledge that it was pursuing an investment strategy that was imprudent given the "character and aims" of stable value fund investing.

14.     When the financial crisis hit, the effects of the foregoing on JPM's Stable Value Funds were as dramatic as they were predictable given JPM's high risk, leveraged strategy. Within a year, JPM's Stable Value Funds erased the gains they had made in the past ten.

15.     This loss was caused by JPM's unique and imprudent investment strategies and not by prevailing market conditions. Competing stable value funds continued to perform well during the financial crisis, as would be expected of investment vehicles that by design are intended to preserve principal above all and to be insulated from market fluctuations.

16.     As set forth below, JPM breached its ERISA duty of prudence and duty to diversify owed to participants in its Stable Value Funds. In addition, JPM breached its duty of

---

[8]  *Stable Times*, First Quarter 2007, "Private Mortgages – A Compelling Stable Value Investment" (emphasis added).

loyalty and engaged in a conflict of interest by causing Stable Value Funds to engage in prohibited transactions with JPM itself.

17.     JPM's breaches of duty caused cognizable injury to Plaintiffs and the members of the proposed Class. Although, as explained below, the recognition of these losses in participant accounts was "smoothed" (*i.e.*, amortized over time), the "crediting rate" (*i.e.*, rate of return) to participants was substantially lower during the relevant times than it would have been had JPM engaged in a prudent stable value investment strategy. JPM should now be held fully liable for this reduction in the yielded returns of the Stable Value Funds.

18.     Plaintiffs are not the only parties complaining about JPM's management of its stable value fund business. ███████████████████████████████████████

████████████████████████████████████████████

19.     The result of recent litigation and related arbitration between JPM and one of its business partners also shows that JPM habitually mischaracterized its Stable Value Funds. One of JPM's erstwhile stable value sector business partners, American Century Investments, recently won a large arbitration judgment against one of the JPM entities here because, among other things, that entity misrepresented the risk profile of the investment funds at issue in that case including the JPM Stable Value Funds at issue here.[9] That decision exposed how JPM used risky investments that were unsuitable for a stable value fund to temporarily achieve high yield and thereby attract additional fees by increasing the amount of assets under its management.[10]

---

[9] *Am. Century Inv. Mgmt., Inc. v. J.P. Morgan Invest Holdings LLC,* No. 58 148 Y 00220 9 (Am. Arb. Ass'n).

[10] *Id.*

6

## PARTIES

20.     Plaintiff Richard Whitley has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Hospira, Inc. 401(k) Retirement Plan ("the Hospira Plan"). The Hospira Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Whitley, prior to withdrawing from the Hospira Plan on or about July 27, 2012, had 401(k) funds allocated to JPM's Hospira Stable Value Fund, which is one of the Stable Value Funds described above.

21.     Plaintiff Terry J. Koch has been, and continues to be, a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The Caterpillar Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Koch has had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

22.     Plaintiff Caroleta M. Duran has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The Caterpillar Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, prior to withdrawing from Caterpillar's Retirement Plan on or about, August 1, 2012, Ms. Duran had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

23.     Plaintiff Mark D. Grandy has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mitsubishi Motors North America, Inc. Manufacturing Division 401(k) Savings Plan (the "Mitsubishi Plan"). The Mitsubishi Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Grandy has had 401(k) funds allocated to JPM's Stable Value Fund, which is one of the Stable Value Funds described above.

24.     Plaintiff John M. Gates has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan International, Inc., Employees' Retirement Savings Plan (the "Titan Plan"). The Titan Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Gates has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

25.     Plaintiff Scott Newell has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan Plan. The Titan Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Newell has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

26.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, and Newell sue on their own behalf and, as specified below, on behalf of participants in 401(k) plans in which any of the Stable Value Funds is or has been offered as an investment option and who have allocated monies to any of the Stable Value Funds during the class period.

27.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a financial services provider whose headquarters is in New York, New York. JPMC was a fiduciary with respect to the plans offering any of the Stable Value Funds and the participants in such plans at all relevant times.

28.     JPMorgan Chase, N.A. ("JPMC, NA") is a bank operating in the United States and abroad with a registered address of 270 Park Avenue, New York, New York 10017-2014. JPMC, NA acts as trustee and fiduciary (either directly or through one or more wholly-owned subsidiaries) of the Stable Value Funds. For example, the Commingled Pension Trust (Stable Asset Income) of JP Morgan Chase, N.A. is a collective trust fund established and maintained by JPMC, NA under a declaration of trust. JPMC, NA was a fiduciary with respect to the plans offering any of the Stable Value Funds and the participants in such plans at all relevant times.

29.     Defendant J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management ("JPMAM") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. J.P. Morgan Asset Management is the marketing name for the asset management business of JPM and its subsidiaries worldwide. JPMAM is the entity that managed the Stable Value Funds. JPMAM was a fiduciary with respect to the plans offering any of the Stable Value Funds and their participants at all relevant times.

## JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over this matter pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

31.     Venue is proper in this District because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

## FACTUAL ALLEGATIONS

### The 401(k) Plans and JPM's Role as Fiduciary

32.     At all times relevant to this Complaint, the 401(k) plans involved in this matter were employee benefit plans within the meaning of ERISA.

33.     At all times relevant to this Complaint, the plans were "defined contribution" or "individual account" plans within the meaning of ERISA because, among other reasons, the plans provided for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, as well as any income, expenses, gains and losses, and forfeitures of accounts of other participants that could be allocated to such participant's accounts.

9

34.     At all times relevant to this Complaint, these plans provided the Plaintiffs and members of the proposed Class with various options for investment, and they could direct the plans to purchase investments from among these options and allocate them to their individual accounts. The Stable Value Funds were among these options.

35.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, and Newell were and/or are participants in the Hospira, Caterpillar, Mitsubishi, or Titan Retirement 401(k) Plans at times relevant to this action. At all relevant times, each of these Plans have offered one of the Stable Value Funds as an investment option that Plaintiffs invested in, and at those times, one or more of the JPM entities served as trustee for each of these Plans.

36.     The Hospira, Caterpillar, Mitsubishi, and Titan Plans are typical of such plans, and Plaintiffs are typical and representative of participants in such plans who have chosen to invest a portion of their 401(k) holdings in a Stable Value Fund. The Hospira, Caterpillar, Mitsubishi, and Titan Plans are typical of the plans involved in this matter in that each at all relevant times has offered a Stable Value Fund as an investment option, and one or more of the JPM entities served as fiduciary, administrator and trustee for each. Although the Stable Value Funds are nominally separate, they are linked together by their common and substantial investments in other JPM funds, such as the Intermediate Bond Fund and the other underlying co-mingled Pension Trust Funds as described below.

37.     At all relevant times, one or more of the JPM entities served as Investment Advisor, Investment Manager, Administrator, Trustee and/or Custodian of these plans' Stable Value Funds.

38.     ERISA defines a fiduciary as someone who "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority

10

or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). People and entities are fiduciaries pursuant to ERISA not only when they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when they perform such fiduciary functions.

39.     Investment managers are also ERISA fiduciaries. ERISA defines in relevant part an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset of a plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

40.     The JPM entities are fiduciaries with respect to the Stable Value Funds and thus of the plans that offer the Stable Value Funds and the participants in those plans who allocate retirement funds to one of the Stable Value Funds because, among other reasons, they possess investment discretion as to the Stable Value Funds. Neither plans nor plan participants possess the ability to direct the manner in which the JPM entities invest or allocate the Stable Value Funds' assets. Moreover, one or more of the JPM entities are trustees and custodians with respect to the Stable Value Funds pursuant to ERISA § 403(a), and are also investment managers with respect to the Stable Value Funds. In addition, they are investment advisors to the Plans in which plaintiffs are participants as well to other plans in which members of the proposed class were participants.

<u>Stable Value Funds</u>

41.     Under ERISA, a fiduciary's investment decisions must be prudent not in the abstract but with reference to the ***specific goals*** of a particular investment fund. A fiduciary must give "appropriate consideration" to facts and circumstances relevant to "the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(i). Thus, a fiduciary's investment decisions are evaluated under ERISA "in light of the ***character and aims*** of the particular type of plan he serves." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (4th Cir. 1996) (emphasis added and quotation omitted).

42.     The "character and aims" of stable value funds are well defined both by industry practice and ERISA regulations.

43.     According to the trade association for the industry, the Stable Value Investment Association ("SVIA") – of which JPM is a prominent member – a stable value fund should be invested in a "high-quality, diversified, fixed-income portfolio" that is "designed to preserve capital while providing steady positive returns."[11] "Stable value funds are considered a conservative and low risk investment compared to other investments offered in 401(k) plans."[12]

44.     Under ERISA, employers that offer defined contribution retirement plans are required to offer at least three options for investment, each with "materially different risk and return characteristics." One of these investment options must be a safe option: an "income

---

[11] Stable Value Investment Association, "Stable Value FAQ", http://stablevalue.org/knowledge/faqs/question/what-is-a-stable-value-fund (last viewed Oct. 3, 2013).

[12] *Id.*

producing, **_low risk, liquid_** fund, subfund, or account." 29 C.F.R. § 2550.404c-1 (emphasis added).

45.     Stable value funds are a popular investment option in 401(k) plans. Offered as an option in approximately half of all defined contribution plans, stable value funds are usually the largest conservative investment option available in such plans and, when offered, are the "low risk, liquid" investment option required by ERISA regulations.

46.     Historically, stable value funds invested in guaranteed investment contracts ("GICs"), contracts offered by insurance companies that guaranteed a fixed return over a set duration. GICs allowed investors to participate in an insurer's investment portfolio, which is required by state solvency regulations to consist of conservative, well-diversified, and liquid investments.

47.     Beginning in the early 1990s, stable value fund managers began to offer stable value products designed as "synthetic GICs." A synthetic GIC consists of a fixed-income portfolio "wrapped" with a contract with an insurer or other large financial institution that, subject to various conditions and restrictions, guarantees the "book" value of the fund and allows for "benefit responsiveness," which means that participants can terminate their investments in the fund at book value rather than market value under certain conditions. The JPM Stable Value Funds were designed as synthetic GICs.

48.     The shift from actual GICs to synthetic GICs was not intended to change the basic risk profile of stable value funds. "Consistent with the role of stable value as the 'safe' option in most defined benefit contribution plans today, the overriding objective in managing [the portfolios underlying the synthetic GIC] is preservation of principal. Liquidity to meet

participant withdrawals is an additional factor, as is earning a fairly stable return which exceeds that of shorter maturity alternatives."[13]

49.    More specifically, even though a synthetic GIC invests in a partially-insured fixed income portfolio, that portfolio itself must be managed in accordance with the purposes of a stable value fund: "[t]he benchmark for these bonds, as well as the philosophy and strategies of the fixed income manager, should be consistent with the goals of a stable value fund. Since the stable value fund is typically offered as a low-risk alternative for investors in defined contribution plans, a relatively low-risk profile is in order."[14]

50.    Stable value funds are typically affected far less than most other investment options in periods of market distress. Because they are generally comprised of well-diversified portfolios of high credit quality fixed-income securities, they were one of the few 401(k) investment options to provide positive returns throughout the market upheaval of the late 2000s, as set forth below.

<u>JPM's Stable Value Funds</u>

51.    JPM sponsors a collection of stable value funds that is one of the largest and most utilized in the country. Between 2003 and 2009, JPM grew the amount that 401(k) participants invested in its Stable Value Funds from less than $10 billion to more than $15 billion.

52.    The Stable Value Funds are managed by JPM and offered as investment options to numerous ERISA defined contribution 401(k) plans in the United States.

53.    At all relevant times, the JPM entities have served as Investment Advisors, Fully Discretionary Investment Managers, Plan Administrators, Trustees and/or Custodians (per

---

[13] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 83.

[14] *Id.,* 120.

ERISA § 403(a)) of the Hospira, Caterpillar, Mitsubishi and Titan 401(k) Plans and all the numerous other defined contribution 401(k) plans that offered one of the JPM Stable Value Funds as an investment option. As such, at all relevant times, JPM has been a fiduciary of the defined contribution 401(k) plans under ERISA.

54.     JPM has frequently and consistently stated publicly that its Stable Value Funds are typical stable value funds, as described above. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

55.     In addition, JPM emphasized that the Stable Value Funds were typical stable value funds, not only by calling them "Stable Value," "Stable Asset," or "Stable Income" in their very names, but also by its characterization of their risk level. █████████████████

███████████████████████████████████████████████████████████████

███████████████████     As set forth above, Ms. Paradis has stated publicly that the Stable Value Funds are among the "most conservative" investments possible in a defined contribution plan. Furthermore, as JPM understood well, plan sponsors offered its Stable Value Funds as the "low risk, liquid" investment option required by ERISA.

### JPM's Stable Value Funds' Investments in Commingled Pension Trust Funds

56.     JPMorgan Chase Bank, N.A. ("JPMCB") has established and operated a number of Commingled Pension Trust Funds for the collective investment of pension trusts, profit

███████████████████████████████████████████████████████████████

███████████████████████

sharing trusts, other employee benefit trusts or funds and other commingled funds. The funds are referred to as "commingled" because they invest the monies of many different ERISA plans and thus the participants in those plans.

57.     Among these Commingled Pension Trust Funds is the Intermediate Bond Fund ("IBF").

58.     ***JPM caused each of the Stable Value Funds to invest a substantial portion of its assets in the IBF***. As a result, all the Stable Value Funds have the same returns on their portion of investments in the IBF.

59.



60.     In investing the Stable Value Funds assets, JPM employed a fund of funds investment strategy. Thus, the IBF takes the Stable Value Fund assets and in turn invests in other JPM Commingled Pension Trust Funds including the JPMCB Mortgage Private Placement Fund, JPMCB Public Mortgages Fund, JPMCB Intermediate Credit Fund, JPMCB Liquidity Fund, and the JPMCB Enhanced Cash Fund. The IBF also invests in directly held securities similar to those in many of the other Commingled Pension Trust Funds. The IBF's allocation in

---

17

those funds and in direct investments from 2006 through 2010 and the investments of three of the commingled funds in which the IBF invested (the Public Mortgage Fund, the Private Placement Mortgage Fund, and the Enhanced Cash Fund) on an annual basis is set forth in the attached Appendix A. In addition, Appendix B shows the percentage of the assets of the IBF that were invested in the underlying funds which constituted private mortgages - meaning non-conforming mortgages which do not comply with Freddie Mac and Fannie Mae standards.  These private mortgages are riskier than and not as liquid as conforming mortgages because of their credit risk.

61.     Although the IBF was the main investment vehicle for JPM's Stable Value Funds, management of the IBF was completely divorced from the stated objectives of JPM's Stable Value Funds.

62.

███████████████████████████████████████

███████████████████████████████████████

███ Mr. Candelmo's testimony establishes that JPM acted contrary to accepted principles for managing fixed income portfolios for stable value funds, which require the investment manager to act in a manner "consistent with the goals of a stable value fund" and to adopt a "relatively low-risk profile."[21]

### JPM's Inappropriate Use of Leverage in its Stable Value Funds

63.     Consistent with their conservative nature, stable value funds typically do not use leverage. In an April 7, 2006 letter to the U.S. Department of Labor, the SVIA opined that a particular failed stable value fund, the Circle Trust Stable Value Fund, did not invest in a way "consistent with the objectives of stable value investing" because, among other things, it invested in vehicles that "depend upon financial leverage to achieve their stated return objectives."[22] And in a more recent letter to the Commodities Futures Trading Commission, the SVIA stated that "stable value funds themselves are generally non-leveraged investment vehicles."[23] Consistent with the SVIA's view, a leading authority on stable value investing states that "[a]ll wrappers strongly restrict the use of leverage."[24]

---

[20]


[21]*Id.*, 120 (1998).

[22] SVIA 000676.

[23] SVIA 000221.

[24] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 127.

64.     BlackRock, a worldwide leader in investment management, describes the risks of leverage: "Funds that utilize leverage tend to exhibit greater volatility in yield, market price and net asset value than non-leveraged funds. Due to their sensitivity to changes in interest rates, leveraged funds may experience larger drops in net asset value compared to similar non-levered fixed income closed-end funds. In addition, any narrowing of spreads between short- and long-term rates may diminish potential profit margins for the fund and potentially lower the dividend paid by the fund."[25]

65.     Although data about the extent to which stable value funds use leverage is not readily available, leverage is exceedingly rare in similar types of investment vehicles for which such data is available. Money market funds – to which stable funds are often compared – employ little to no leverage.[26] Similarly, leverage is rare in mutual funds. Of nearly 30,000 mutual funds, barely 2% have leverage of over 5% and less than 0.5% have leverage over 45% (a level exceeded by the IBF in 2006 and 2007, as set forth below). Those mutual funds that do use substantial leverage typically invest in equities rather than in fixed income securities and are expressly marketed as aggressive funds. Money market and most mutual funds are hesitant to use leverage for good reason: such funds are typically risk averse (as stable value funds also should be) and do not want the value of their holdings to fall below their initial cost.

66.     The use of substantial leverage in stable value funds increases risk in at least three ways. First, as a matter of basic finance theory, funds that use leverage exhibit greater volatility

---

[25] http://www2.blackrock.com/us/individual-investors/insight-education/investing-basics/a-look-at-leverage.

[26] Investment Company Institute, "Money Market Funds in 2012: Money Market Fund Are Not Banks," Feb. 14, 2012, *available at* http://www.ici.org/pdf/12_mmf_mmfs_are_not_banks.pdf.

in net asset value and return than those that do not because leverage magnifies both investment gains and losses.

67.     Second, leverage requires payment of interest. Thus, the investment return must account for interest expense before it creates a net positive return to the fund. To put it another way, the fund's participants are paying the interest for the leverage in the Stable Value Fund and this interest thus here acts as an additional fee charged by JPM to Plaintiffs incident to JPM's management of the Stable Value Funds.

68.     Third, as credit conditions tighten, a leveraged fund may be required to de-leverage, which may require liquidating fund assets at a non-optimal time.

69.     The use of substantial leverage is inconsistent with the "character and aims" of stable value funds because, compared to a non-leveraged strategy, it: (1) places the principal at greater risk; (2) increases volatility of returns; and (3) reduces liquidity.[27]

70.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

71.     This use of leverage was by itself imprudent and inconsistent with well-established standards and principles of stable value investing. Worse still, as set forth in detail below, JPM used this imprudent amount of leverage to decrease rather than increase the level of

---

[27] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments*, (1998), 186, detailing the investment objectives of stable value funds.

diversification in its Stable Value Funds and to invest in high risk assets. JPM thus "doubled down" on its already risky leveraging strategy in JPM's Stable Value Funds.

<u>JPM Adopts Investment Strategies That Radically Differ from its Purported Benchmark</u>

72.    JPM consistently represented that its investment strategy for the IBF – which at all times material hereto was a core asset of JPM's Stable Value Funds – tracked the Lehman Intermediate Aggregate Index (later known as the Barclays Intermediate Aggregate Index). The Lehman Intermediate Aggregate Index is a non-leveraged portfolio consisting of investment grade bonds including U.S. Treasury securities, U.S. government agency bonds, pass-through mortgage-backed bonds issued by government agencies, and corporate bonds. The investments have an average maturity of around 4.5 years.

73.    

Thus, JPM should have adopted an investment strategy that allowed for a small amount of tracking error for the IBF and thus JPM's Stable Value Funds as compared to the Lehman Intermediate Aggregate Index, and it represented that it would do so.



74.     In fact, JPM adopted an investment strategy that differed radically from that of the Lehman Intermediate Aggregate Index in at least two ways, contrary to its representation that the IBF's risk profile would be similar to that of the benchmark; this was contrary to the "character and aims" of stable value funds.

75.     First, the Lehman Intermediate Aggregate Index does not use any leverage. As set forth above, JPM's substantial use of leverage should have caused JPM to predict *ex ante* that its investment returns would be more volatile than those of the benchmark. As set forth above, avoiding volatility is one of the main purposes of a stable value fund.

76.     ███████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████

77.     ███████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████









78.     While some deviation from this benchmark might be acceptable, as shown in the above tables, the IBF was so different from the benchmark that JPM could not reasonably have believed – despite its representations to the contrary – that the IBF's risk profile would be in any way similar to that of the benchmark and thus that JPM's IBF would be a prudent asset for JPM's Stable Value Funds to hold in large amounts given the stated aims of JPM's Stable Value Funds.

79.     In late 2007 through 2008, the observed tracking error for the IBF far surpassed a level that could be described as reflecting a "total target risk" that is "similar" to the benchmark, exceeding 400 basis points in late 2008:[31]

---

[31] This is based on reported data for the JP Morgan Intermediate Aggregate Index, which consists of the IBF and other similar JPM funds.  Data isolating the tracking error of the IBF was not available but it is expected that such data will show a similar tracking error since, by definition, this JPM aggregate may only combine like funds.

**TABLE 5**:



80.     Indeed, the seeds for this extreme variance should have been apparent far before it materialized. Beginning in 2004 and continuing until 2007, the IBF consistently performed much better than the benchmark:

**TABLE 6:**



81.   This consistently high level of performance against the benchmark before the class period would have been extraordinarily unlikely had JPM not adopted a much more aggressive (that is, risky) strategy than that reflected in the benchmark. Indeed, over a five-year period beginning in 2001, JPM achieved an "information ratio" of 1.8,[32] a level which can rarely be sustained for such a long time. JPM knew or should have known by 2006 that its high returns in the IBF and thus in JPM's Stable Value Funds were not sustainable and in fact were indicative of the fact that JPM had accepted excessive risk in the IBF and thus in JPM's Stable Value Funds as compared to the benchmark.

82.   ████████████████████████████████████████████████████████

████████   Beating the benchmark, however, is no good accomplishment where the manager accepts inordinate risk relative to the benchmark to do so. That is precisely what happened here, and accepting such excess risk was wholly inconsistent with: (1) the "character and aims" of stable value funds; (2) industry standards; and (3) JPM's own representations.

JPM's Exposure to Real Estate Risk

83.   One critical aspect of ERISA's duty of prudence is the duty to diversify. ERISA requires that a fiduciary "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). The duty to diversify requires, among other things, diversity as to industries or sectors. *In re Unisys Savings Plan Litig.*, 74 F.3d at 438.

84.   Prudent investment management requires that securities portfolios be diversified because diversification reduces risk without reducing expected returns. JPM agrees: ". . . a

---

[32] "Information ratio" is a measure of alpha over tracking error. It indicates how much of the performance of a fund is attributable to risk-neutral (relative to the benchmark) decision-making.

diversified portfolio that includes several categories of fixed income securities should have a relatively stable return portfolio."[33]

85.    Principles of diversification enable an investment portfolio to take maximum advantage of market conditions in specific sectors and to protect against downturns in one particular sector.

86.    When a portfolio is concentrated in a specific sector, the value of the portfolio can drop sharply if that sector experiences a general downturn.

87.    If the portfolio, however, were comprised of multiple sectors, some may go down in value while others may remain stable or go up.  Different types of fixed income categories will generally not lose value at the same rate or at the same time.

88.    Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of a portfolio of securities that do not move in unison. Two securities that are perfectly correlated is a 1. Two securities that are perfectly inversely correlated is -1. Two securities that have no correlation is 0 – often referred to as low correlation.

89.    According to JPM, "correlation of excess returns among the major fixed income categories is relatively low." Active managers of different fixed income categories, like Mortgage Backed Securities, Core Fixed Income, and Corporates, according to JPM, add value through excess returns at times when active managers of other categories cannot.

---

[33] Mark Huamani and Karl Mergenthaler, *Building a Diversified Fixed Income Portfolio: An Analysis of the Availability and Correlation of Excess Returns,* http://www.jpmorgan.com/tss/General/Building_a_Diversified_Fixed_Income_Portfolio/115932 1128719.

90.     Modern Portfolio Theory ("MPT"), the industry standard for prudent portfolio management for over twenty years, employs the use of correlations for identifying categories and sectors that are loosely correlated and do not move in tandem. Creating a diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and multiple categories, which have low correlations, is the foundation of MPT.

91.     In 2007 JPM, concluded Mortgage Backed Securities ("MBS") were one category of a well-diversified portfolio. The correlation of excess returns for MBS had correlation of .26 to Core Fixed Income and .09 as compared to Corporates. This means JPM was well aware the excess returns of all three fixed income categories were loosely correlated and a mix of the three was necessary for a well-diversified portfolio of fixed income securities.

92.     ████████████████████████████████████████
██████████████████████████████████ ██

93.     ████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████

94.     Because the purpose of ERISA's diversification requirement expressly is to avoid large losses, this total exposure analysis is an appropriate measure for diversification under ERISA because exposure more accurately reflects the potential for a large loss.

─────────────────────────

████  ██████

30

95. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

96.     JPM of course knew at the time it made these investments how poorly diversified

they were as a whole. ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

97. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

---

██████████████████████████

31

98.     JPM's high exposure to real estate losses, in addition to violating ERISA's diversification requirement, was inconsistent with the "character and aims" of stable value funds, which emphasize proper diversification as a means to protect principal and ensure steady, positive returns and was thus a violation of its ERISA duty of prudence.

JPM's Investment in Risky Mortgage-Backed Securities

99.     The sheer quantity of real estate-related investments held by the IBF and thus by JPM's Stable Value Funds was not the only problem with such investments. JPM also chose to invest a large part of the IBF and thus JPM's Stable Value Funds in high risk, leveraged, derivative mortgage-backed securities (and private placement mortgages, discussed in the next section) rather than the conventional mortgage-backed securities more typically found in stable value funds.[37]

100.    During the relevant times, the only mortgage-backed securities in the Lehman Intermediate Aggregate Index were pass-through mortgage-backed securities insured by government agencies such as Fannie Mae and Freddie Mac (referred to in the industry as "agency MBS"). Such securities are relatively safe because the agencies ensure against default and require the mortgages to conform to stringent standards.

101.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[37] For example, the DuPont Fixed Income Fund, which was at the time the largest single-entity stable value fund in the United States, prohibited that fund as early as 1998 from investing in what it deemed to be "risky" mortgage derivatives including IOs, POs, and inverse floaters. Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 197.

   Certain types of agency CMOs are riskier than agency MBS because the former have greater exposure to interest rate, prepayment, and default risk.

102. ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

103.    Given the conservative nature of stable value funds, it was incumbent on JPM to select only high quality investments for the IBF with stable cash flows, since the IBF constituted such a large percentage of the investment holdings in JPM's Stable Value Funds. "Substantial resources and analytics are required to properly select investments within [the mortgage-backed and asset-backed] sectors, particularly where cash flow volatility could impact returns and crediting rate behavior."[38]

---

[38] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 180.

104.



105.    As early as 2006, JPM was aware that subprime mortgages were excessively risky and acted on that knowledge to reduce its own exposure to such mortgages. In October 2006,



34

JPM decided to sell investment positions in subprime mortgage assets it held for its own account, and it eventually sold $12 billion worth of those investments.[41]

106.    This matter was of such urgent concern to JPM that its CEO, Jamie Dimon, called his then-head of JPM's securitized funds division, William King, while the latter was in Africa, "to fire a red alert. 'Billy, I really want you to watch out for subprime!' . . . 'We need to sell a lot of our positions. I've seen this before. This stuff could go up in smoke.'"[42]

107.    One reason for this concern was that, based on data from JPM's mortgage servicing business, "late payments on subprime loans were rising at an alarming rate."[43] Although the IBF and thus JPM's Stable Value Funds did not invest in any mortgage-backed securities involving JPM mortgages, this problem was not limited to JPM's own mortgages. To the contrary, JPM knew that "loans originated by competitors like First Franklin and American Home were performing three times worse than J.P. Morgan's subprime mortgages."[44] Indeed, JPM concluded that "underwriting standards were deteriorating *across the industry*."[45]

108.    This information about the increasing risks from subprime mortgages was – or should have been – shared with the managers of the IBF because JPM purportedly "mine[s] every part of the business for detailed information – especially data that point to trouble – then

---

[41] "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch," Fortune, September 2, 2008, *available at* http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* (emphasis added).

share it at warp speed throughout the corporation."[46] According to the *Fortune* article, "[t]o Dimon the rich flow of information from different corners of the bank, like the signal from servicing that warned him about subprime, is a major advantage. 'We have a gold mine of knowledge, but you have to manage it well,' he says, so every one of our businesses benefits from it."[47]

109.    Despite this, the IBF and thus JPM's Stable Value Funds continued to hold a substantial amount of mortgage-backed securities backed by subprime mortgages. If in October 2006, JPM had concluded that subprime mortgages were too risky to hold for its own account, such mortgages (or CMOs based on such mortgages) were *a fortiori* too risky for a conservative investment vehicle like JPM's Stable Value Funds.

110.    As Mr. Dimon testified before Congress, JPM did not itself offer Option ARM mortgages because, in his view, "we did not think they were appropriate products for consumers."[48] ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

111.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[46] *Id.*

[47] *Id.*

[48] Testimony of Jamie Dimon Before the Financial Crisis Inquiry Commission, Jan. 13, 2010, p.2.



112.

113. ███████████████████████████████████████

███████████████████████████████████████ As the court held in *California*

*Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044-45 (9th Cir.

2001), investment in inverse floaters violated ERISA's prudence rule as to a trust with "very

conservative investment guidelines" such as those of a stable value fund.

114. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████ █

115.    JPM's investment of JPM's Stable Value Funds in the types of poorly

collateralized and/or exotic mortgage derivatives described above was inconsistent with the

"character and aims" of a stable value fund when made and was thus a violation of its ERISA

duty of prudence.

<u>JPM's Unique Investment in Private Placement Commercial Mortgages</u>

116.    One of the Commingled Pension Trust Funds in which the IBF invested was the

Mortgage Private Placement Fund. That Fund invests in, among other things, directly-placed

mortgages on multi-family dwellings, shopping centers, office buildings, co-ops, and other

---

49 ███████████████████████████████████████████████████

commercial real estate projects. The Fund through JPM originates its own commercial mortgages.

117.   As ████████████████████████████████████████████████

████████████████████████████████████ ▪

118.   These private placement mortgages were not public securities. ████████████

████████████████████████████████████████████████████████████

████████ ▪

119.   Relatedly, the valuation of these private placement mortgages was determined solely by JPM. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ▪

120.   This lack of objective valuation data allowed JPM to hide losses in the private placement mortgages during the financial crises.

121.   ████████████████████████████████████████████████

████████████████████████ ▪ ████████████████████████████████

████████████████████████ ▪



50 ██████████████████████

51 ████████████

52 ██████████████

53 ████████████

54 ████████████

122.    Ms. Paradis also knew that the private placement mortgages increased liquidity risk. In a 2007 industry publication, she stated that "[d]irectly placed loans are not appropriate within any portfolio with liquidity demands."[55]

123.



124.

125.    Although these mortgage loans were funded by the Mortgage Private Placement Fund, on information and belief, as explained below, at least some were originated, arranged and underwritten by affiliated JPM entities who in turn received substantial fees for these services from the borrowers.[56] These fees variously were called application, originating, placement, and underwriting fees.

126.



---

[55] *Stable Times,* First Quarter 2007, "Private Mortgages – A Compelling Stable Value Investment."

[56]

[57]

████████████████████████████████████████████████

████████████████ Such payments and commissions were and are made to entities that arrange, broker and underwrite commercial mortgage loans, bringing loans to the lender, and customarily were paid by the borrower to the arranger. When the loan is arranged, originated, underwritten and/or with the MPPF by a JPM affiliated, the charges paid by the borrower go to the JPM affiliate.

127.   In addition, the affiliated JPM entities arranged for appraisals, forced placed insurance and other ancillary third party charges which generated additional fees paid by the borrower to the JPM affiliates.

128.   Pursuant to this Court's direction that the parties attempt to ascertain whether there is a factual basis for the prohibited transaction claims and in specifically referencing the September 4, 2008 loan closing statement discussed above, Plaintiffs, by letter on September 19, 2013, asked JPM to state that during the relevant period none of its affiliates received any payments from any borrower for any loans to the borrower funded by the Mortgage Private Placement Fund (and thus by JPM's Stable Value Funds). JPM has declined to so state, and given the industry practice of making such payments and commissions to entities that arranged, originated, placed and/or underwrote such loans, on information and belief, Plaintiffs allege that JPM affiliates regularly received such payment for loans from borrowers on loans they underwrote, arranged and/or brokered and which were funded by the Mortgage Private Placement Fund (and thus by JPM's Stable Value Funds).

129.   Because JPM was also the originator of these private placement mortgages, it thus had unique knowledge of the risks inherent in such assets and knew or should have known that

they were inappropriate for inclusion in a stable value fund portfolio under the market conditions prevailing during the relevant time period.

130.    As early as 2007, JPM was aware of the liquidity and default risks of these private placement mortgages. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████ ██

131.    One of the plans that offered JPM's Stable Value Funds, through its experienced consultant (Mercer LLC), questioned why the Stable Value Funds invested in private placement mortgages: "what was the rationale to have 16% in private mortgages *in the first place* in this type of portfolio."[59]

132.    Mercer also stated that a "[c]apital preservation option shouldn't be seeking excessive yield. Purpose is to preserve capital. Mercer prefers more conservatively positioned stable value funds that are not overly exposed to spread sectors."[60]

133.    Mercer concluded that "private mortgage holding *was* and remains an inappropriate holding for the [JPM] stable value offering."[61]

---

[58] ███████████████████████████

[59] Mitsubishi 000011.

[60] *Id.*

[61] Mitsubishi 000010 (emphasis added).

134.    As is clear from Mercer's statements, it was not exercising hindsight.  Rather, its view was that the private placement mortgages had *always* been an inappropriate investment given the conservative nature of stable value funds.

135.    Ultimately, JPM's wrap providers agreed. ████████████████████



136.    JPM's investment in billions of dollars of illiquid and arbitrarily-valued private placement mortgages was contrary to the "character and aims" of a stable value fund, was thus a violation of its ERISA duty of prudence, and caused damages to Plaintiffs and the proposed class for which they seek relief here.[63]

The Causal Connection Between the Risky Investment Strategies Described Above and the Catastrophic Decline in the Market Value of JPM's Stable Fund's Investments

137.    ████████████████████████████████

████

---

[62] ████████████████

[63] Not only were Plaintiffs damaged by JPM's leveraged investment in and holding of illiquid private placement mortgages in the Stable Value Funds, but they were further damaged when JPM later needed to unload these mortgages because of their excessive risk.  *See* http://www.reuters.com/article/2012/04/03/us-jpmorgan-stablevalue-idUSBRE83216820120403 (last viewed October 6, 2013) ("Meanwhile, the JPMorgan stable value fund has trailed its peers each year since 2008, according to data provided by JPMorgan and Hueler, which tracks an index of 17 stable value collective trusts with $104.6 billion in assets.  Some experts have suggested that the drop in performance is due to JPMorgan's exit from private mortgages.").

[64] ████████████████████████

138.     Based on industry standard performance attribution techniques, the cumulative loss to the IBF's portfolio can be decomposed into specific losses from the Commingled Pension Trust Funds in which it invested.



139.

140.                                                    The allocation of investments in the Public Mortgage Fund is shown in Appendix A.

141.

███████████████████████████████████████████████████████

The allocation of investments in the Private Placement Mortgage Fund is shown in Appendix A.

142.   █████████████████████████████████████████████████████

██████████████   █████   ███████████████████████████████████████

███████████████████████████████████████████████████████

████████████   The allocation of investments in the Enhanced Cash Fund is shown in Appendix A.

### The Causal Connection Between the IBF's Market Value Loss and Injury to Plaintiffs

143.   As a result of the rapid decline in the market value of the IBF's investments, the ratio of market value to book value of the Stable Value Funds declined to dangerous levels as of the end of 2008:



---

[65] ████████████████████████████████████████████████████████

███████████████████████████████████████████

144.    By this measure, JPM's Stable Value Fund performed far worse than its competitor funds. According to the SVIA, as of the end of 2008 (the height of the financial crises), the average ratio of market value to book value for stable value funds was about 95 per cent.[66]

145.    Table 11 also shows that JPM failed in the most basic objective of stable fund investing: to protect the principal of the fund.

146.    It further shows the risky nature of JPM's stable value strategy. As Ms. Paradis herself admitted, the relationship between the market value and book value of a stable value fund over time "is the best summary risk measure for a stable value strategy."[67]

147.    Although the wrap agreements for the Stable Value funds allow participants to transact with the funds at market value, over the long term the market value and book value of the funds must converge. This is accomplished by, among other things, reducing the crediting rate (essentially the interest rate) paid on a periodic basis to participants.

148.    Indeed, the financial condition of JPM's Stable Value Funds grew so dire that, as set forth below, JPM began to set its crediting rates through negotiation with the wrap insurers rather than complying with the formula for setting such rates in its contracts with the plans and the wrappers – formulas in which the market value of the funds' investments was as key input.

149.    In further effort to prevent plan participants from discovering the basis for the declining crediting rate, JPM insisted, both in their agreements with the wrap providers and JPM

---

[66] SVIA 000221.

[67] *Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis,* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true    (last viewed Oct. 3, 2013).

as investment manager, that plan sponsors not provide information on market value and book value to plan participants.

150.     If armed with market and book values of the plans, plan participants could understand the negative impact on crediting rate which accordingly could affect their decision to maintain their investment in the funds in the future. Among other effects, the suppression agreement has the designed effect of keeping plan participants in a poorly performing fund, thereby maintaining the asset base on which JPM's fees are based. JPM was thus acting in its own interest and not the interest of the participants in order to keep more funds under management than would have been the case if this material information had not been suppressed. Only once market value began to catch up with book value did JPM more openly begin to provide market value and book value information to plan sponsors.

151.     Throughout the class period, JPM could have allowed plan participants to receive information on the market and book value and an explanation as to the effect of a negative divergence on the crediting rate.  However JPM did not allow this information to be divulged until 2011, by which time the two values had converged and so the information which it allowed to be provided to plan participants was positive.  JPM during the class period continued to refuse to permit plan sponsors to divulge this information, during a period in which the market value had precipitously declined.   Nor did it explain to plan participations the impact of a negative divergence on the crediting rate, which given the wrap agreements would inevitably be and was severely depressed in 2009 and thereafter because of this divergence.  As a result, during the class period JPM's conduct deprived the class of vitally important information which would have permitted it to make an informed decision whether to move their 401(k) funds out of the JPM

Stable Value Funds and so avoid the severely depressed crediting rates that inevitably were going to follow.

152.    

153.    Ms. Paradis had previously commented on the relationship between market value and book value that over time, it is the "best summary risk measure for a stable value fund." As such, the information that JPM's risky mortgage investments caused the market value of the Stable Value Funds to fall substantially below book value, including "MV/BV data" was material to plan participants and should not have been kept from them.

154.    Beginning in 2009, JPM paid a substantially lower crediting rate to participants than the industry average:[68]

---

[68] The Heuler index is an industry composite that is based on a survey of 30 stable value funds.



155.   *In other words, had JPM followed an investment strategy for its Stable Value Fund that was similar to the appropriately conservative strategies employed by most of its competitors, participants in JPM's Stable Value Funds would have obtained substantially higher returns from their investments*.

156.   JPM will doubtless argue that it was not at fault for these lower returns to plan participants because the poor returns were solely attributable to the putatively unforeseeable financial crisis. What this argument ignores, however, is that one of the key tenets of stable value fund investing is to insulate investments from sharp market fluctuations.[69] For the most part, JPM's competitors were able to achieve this goal. JPM did not because, as set forth above, it implemented an investment strategy that was in several ways inconsistent with the "character and aims" of stable value funds.

---

[69] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186.

<u>JPM Acted For Its Own Interests and Not the Interests of Stable Value Fund Investors</u>

157.    JPM's behavior here was diametrically opposed to ERISA's mandate that fiduciaries operate with an "eye single" to the interests of plan participants and beneficiaries. *See, e.g.*, *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994). ERISA's fiduciary duties are, of course, "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

158.    JPM's motive for its risky investment strategies was simple: greed. While times were good, this strategy allowed JPM's Stable Value Funds to offer ostensibly higher returns than competing funds and thus attract new participants. This inured to JPM's financial benefit through the generation of additional asset volume-based management fees and otherwise inured to the benefit of the JPM executives who received substantial bonuses tied to the growth of JPM's stable value fund business.

159.    And even when the Stable Value Funds began to perform poorly relative to its competitors, many plans invested in JPM's Stable Value Funds were locked in to their investments in JPM Stable Value Funds ███████████████████████████████ ████████████████████████ – and yet JPM still received management fees from those plans.

160.    While this strategy was likely doomed to fail over the long term, as the recent financial crisis has shown, executives of financial institutions are often motivated by the prospect of short term gain while disregarding long term, systematic risk – especially when they are in essence gambling with the money of others.

## CLASS ALLEGATIONS

161.    *Class Definition*. Plaintiffs brings this matter as a class action pursuant to Federal

Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3). Plaintiffs file this

case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were
> invested directly or indirectly in any of the JPM Stable Value Funds that invested
> in the JPM Intermediate Bond Fund between July 1, 2007 and December 31,
> 2010. Excluded from the Class are the jurists to whom this case is assigned, as
> well as their respective staffs; counsel who appear in this case, as well as their
> respective staffs, including experts they employ; the Defendants in this matter, as
> well as their officers and directors; any person, firm, trust, corporation, officer,
> director, or other individual or entity in which a Defendant has a controlling
> interest or that is related to or affiliated with any of the Defendants; and the legal
> representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any
> such excluded party.

162.    *Numerosity*. The members of this Class are so numerous that joinder of all

members is impracticable. While the exact number of members is unknown to Plaintiffs at this

time, and can be ascertained only through discovery, Plaintiffs reasonably believe that more than

100 ERISA plans throughout the country offered one of the Stable Value Funds during the Class

Period. These Plans collectively have more than one million participants and beneficiaries, and

plaintiffs believe that a substantial number of these persons had invested in one of JPM's Stable

Value Funds.

163.    *Commonality*. The claims of Plaintiffs and the proposed Class have a common

origin and share a common basis. All Class members suffered from the same misconduct

complained of herein, and they all suffered injury as a result of the breaches of duties and

violations of ERISA that form the basis of this lawsuit. Proceeding as a class is particularly

appropriate here because the Stable Value Funds' assets are held in one or more collective trusts

managed by JPM, each of which held invested substantial assets in JPM's Intermediate Bond

Fund and Commingled Pension Trust Funds. Furthermore, common questions of law and fact

exist as to all members of the class. The many questions of law and fact common to the Class include, but are not limited to:

     a.     whether the JPM entities are fiduciaries under ERISA;

     b.     whether JPM breached its fiduciary duties under ERISA;

     c.     whether JPM deviated from the proper and/or stated purpose of Stable Value Funds when it adopted a high risk, leveraged investment strategy for such funds;

     d.     whether any of the transactions by JPM with regard to the Stable Value Fund, Intermediate Bond Fund and Pension Trust Funds were prohibited transactions; and

     e.     whether JPM's actions complained of herein injured plan participants and their beneficiaries who had invested in one of the Stable Value Funds.

164.     ***Typicality***. Plaintiffs' claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the class Members. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

165.     ***Adequacy***. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the Class members. Plaintiffs will vigorously protect the interests of the members of the Class.

166.     Moreover, Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters. Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits. The undersigned counsel have and will devote the time and other resources necessary to litigate this case as effectively as possible.

167.     ***Rule 23(b)(1)(A) and (B) requirements***. Class certification in this ERISA action is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

168.     ***Rule 23(b)(2) requirements***. Class certification under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.

169.     ***Rule 23(b)(3) requirements***. In the alternative, certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Class predominate over any questions (if any) affecting only individual Class members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION**

170.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

171.     The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

172.    A fiduciary must comply with the duty of prudence, which includes the duty to diversity. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

173.    The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

174.    JPM's conduct with respect to the Stable Value Funds violated – in numerous ways – its fiduciary duties of prudence and to diversify as alleged above.

175.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

## COUNT II: VIOLATION OF ERISA § 404(a)(1)(A)
## EXCLUSIVE BENEFIT

176.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

177.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

178.    ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

179.    Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), the JPM entities, while fiduciaries, caused the Stable Value Funds to engage in a high risk, leveraged investment strategy as alleged above.

180.    JPM's aforementioned actions were not in the best interest of the Stable Value Funds' participants and beneficiaries. Rather, JPM sought to inflate the yields for its Stable Value Funds while at the same time disguising the corresponding risks with the goal of increasing its market share in the stable value retirement investing market segment and causing more retirement funds to be invested in its Stable Value Funds as compared to those offered by its competitors.

181.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting

loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

## COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED TRANSACTIONS

182.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

183.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

184.    ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

185.    The JPM entities were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, the JPM entities were parties in interest because they were fiduciaries.

186.    Despite the clear prohibition of Section 406(a)(1)(A), the JPM entities, while fiduciaries and parties in interest, caused the JPM Stable Value Funds to purchase and hold private placement mortgages that they themselves had arranged, originated, placed and/or underwrote, and the transfer of this lending opportunity was in violation of this section.

187.    In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), the JPM entities while fiduciaries and parties in interest, used the assets of the Stable Value Funds for their benefit through the receipt of fees by JPM affiliates for their services relating to the origination, arrangement and underwriting of the mortgages.

188.    JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

## COUNT IV: VIOLATION OF ERISA §§ 406(b) PROHIBITED TRANSCATIONS

189.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

190.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

191.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

192.    Despite the clear prohibition of Section 406(b)(1), JPM used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, *i.e.* mortgages that were originated, underwritten, and/or brokered by JPM affiliates.

193.    JPM's efforts on behalf of the borrowers also violates section 406(b)(2)'s ban on acting on behalf of a party whose interests are adverse to the plan—here acting on behalf of the borrower in its dealing with the Mortgage Private Placement Fund.

194.    In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C. § 1106(b)(3), JPM received consideration  for its own personal account in connection with causing the Stable Funds to acquire the mortgage assets at issue. This consideration included without limitation application, originating, placement, and underwriting fees and yield spread premiums.

195.    JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A.    A determination that this action is a proper class action and certification of the proposed Class, with Plaintiffs as class representative and its counsel as Class Counsel, pursuant to Federal Rule of Civil Procedure 23.

B.    A declaration that the Defendants, and each of them, have breached their ERISA duties to the Plaintiffs and the Class.

C.    An order compelling the Defendants to make good to the Plaintiffs, the Class, and their plans the losses resulting from Defendants' breaches of their fiduciary duties; and to disgorge to the Plaintiffs and the Class all monies the Defendants made through their wrongful use of the Plaintiffs and the Class's assets;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plaintiffs, the Class and their plans as a result of the aforementioned ERISA violations;

E.    An order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the relevant ERISA plans' funds;

F.    An amount equal to the amount of any losses to the Plaintiffs, the Class, and the ERISA plans included in the Class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

58

G.      An award of costs pursuant to 29 U.S.C. § 1132(g);

H.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and other law;

I.       An award for equitable restitution and other appropriate equitable and injunctive

relief against the Defendants; and

J.       An award of such other and further relief as the Court deems just and proper.

Dated: October 10, 2013                              Respectfully submitted,


Kevin Madonna (Bar No. KM5595)              Thomas R. Meites, Esq.
KENNEDY & MADONNA, LLP                      Michael M. Mulder, Esq.
48 Dewitt Mills Rd.                                     MEITES MULDER
Hurley, NY 12443                                       321 S. Plymouth Ct., Ste. 1250
Tel: 845-481-2622                                       Chicago, Ill. 60604
Fax: 845-230-3111                                       Tel: 312-263-0272
                                                        Fax: 312-263-2942
                                                        trmeites@mmmglaw.com
                                                        mmmulder@mmmglaw.com
                                                        *Appearing pro hac vice*


Garrett W. Wotkyns, Esq.                         Jason Kim
SCHNEIDER WALLACE COTTRELL               SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP                         BRAYTON KONECKY LLP
8501 N. Scottsdale Road, Suite 270              180 Montgomery Street, Suite 2000
Scottsdale, Arizona 85253                        San Francisco, California 94104
Tel: (480) 428-0144                              Tel: (415) 421-7100
Fax: (866) 505-8036                              Fax: (415) 421-7105
gwotkyns@schneiderwallace.com               jkim@schneiderwallace.com
*Appearing pro hac vice*                           *Appearing pro hac vice*

Joseph Peiffer, Esq.                             Peter Mougey, Esq.
PEIFFER ROSCA ABDULLAH & CARR,            James Kauffman, Esq.
LLC                                             LEVIN PAPANTONIO THOMAS
201 St. Charles Ave, Suite 4610                 MITCHELL RAFFERTY & PROCTOR, P.A.
New Orleans, Louisiana 70170                    316 So. Baylen Street, Suite 600
Tel: (504) 523-2434                              Pensacola, FL 32502
jpeiffer@fishmanhaygood.com                    pmougey@levinlaw.com
*Appearing pro hac vice*                           jkauffman@levinlaw.com
                                                *Appearing pro hac vice*


ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 10, 2013, I caused the foregoing

PLAINTIFFS' [REDACTED] SECOND AMENDED COMPLAINT to be filed with the Clerk

of the Court by hand delivery, and notification of such filing will be sent electronically to the

parties below.

Greg Braden
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
gbraden@morganlewis.com

Melissa Hill
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
mhill@morganlewis.com

Azeez Hayne
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
ahayne@morganlewis.com

*One of the attorneys for Plaintiffs and the Proposed Class*

# APPENDIX A

# REDACTED

# APPENDIX B

# REDACTED