**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

RICHARD WHITLEY, CAROLETA M. DURAN, )
TERRY J. KOCH, MARK D. GRANDY, JOHN )
M. GATES, and SCOTT NEWELL, on behalf of )
themselves and those similarly situated, )
         )
        *Plaintiffs,* )
         )
        v. )    Case No. 12-cv-2548
         )    The Honorable John G. Koeltl
J.P. MORGAN CHASE & CO.; JP MORGAN )
CHASE BANK N.A.; and J.P. MORGAN )
INVESTMENT MANAGEMENT INC., aka J.P. )    **[REDACTED]**
MORGAN ASSET MANAGEMENT )    <u>**ANSWER TO SECOND**</u>
         )    <u>**AMENDED COMPLAINT**</u>
        *Defendants.* )
_____ )

JPMorgan Chase & Co. ("JPMC"), JPMorgan Chase Bank , N.A. ("JPMC Bank"), J.P.

Morgan Investment Management Inc., ("JPMIM"), and JPMorgan Retirement Plan Services

LLC ("RPS") (collectively the "Defendants") hereby answer Plaintiffs' Second Amended

Complaint and assert their affirmative defenses.

<u>**INTRODUCTION**</u>

1.      Defendants are J.P. Morgan Chase & Co. and various of its wholly owned
subsidiaries (referred to collectively herein as "JPM"). JPM sold and currently sells a number of
investment funds that are offered to 401(k) plan participants and are represented as being stable
in value (collectively referred to in this Complaint as the "Stable Value Funds"). These funds are
called, among other things, the Stable Value Fund, the Stable Asset Fund, Stable Value, Stable
Principal Fund, Short-Term Investment Fund, and Stable Asset Income Fund. All of these Stable
Value Funds are advertised as being stable in value, and thus all were presented as conservative
investment options.

<u>**ANSWER:**</u>    Defendants admit that JPMC and some of its subsidiaries have been named as

defendants in this action.  Defendants deny that JPMIM is also known as JPMorgan Asset

Management.  Defendants admit that JPMC Bank maintains the Stable Asset Income Fund

("SAIF") and the Stable Value Fund (the "SVF"), which are commingled stable value investment

options, and that JPMIM acts an investment manager for certain separate account stable value

funds pursuant to investment management agreements ("IMAs").  Because they are vague,

Defendants lack information sufficient to form a belief as to the truth of the allegations of the

second sentence of Paragraph 1.  Defendants deny the remaining allegations in Paragraph 1.

2.     Plaintiffs and members of the proposed Class are investors who elected to invest their retirement funds via their Defined Contribution and Profit Sharing 401(k) plans into JPM's Stable Value Funds which in turn were invested by JPM in its Intermediate Bond Fund and in underlying funds as discussed in detail below.

**ANSWER:**     Defendants admit only that Plaintiffs purport to sue on behalf of a putative class

of individuals who invested in stable value products that invested in JPMC Bank's Intermediate

Bond Fund.  Defendants deny any remaining allegations in Paragraph 2.

3.     The main investment objective of stable value funds is preserving the invested principal and accumulated returns while yielding returns slightly higher than a money market account. The longer duration of investments in a stable value fund as compared to a money market fund generally should result in higher yields. It is inherent in this objective that stable value funds must be managed to minimize the risk to the invested principal and to minimize volatility in the face of changing market conditions.[1]

**ANSWER:**     Defendants admit only that the investment objectives of SAIF, SVF, and separate

account stable value products managed by JPMIM (the "Stable Value Funds") are set forth in

written documents which speak for themselves.  Defendants note that investors in the Stable

Value Funds maintained their principal and accumulated interest and, during the Class Period,

received returns higher than those available from money market funds.  The allegations of the

last sentence of paragraph 3 purport to characterize selected terms of a written document, which

speaks for itself, and thus are denied.  Defendants deny any remaining allegations in Paragraph 3.

4.     JPM understood well the purpose of stable value funds. In the Investment Guidelines attached to its contracts with plan sponsors, JPM described its ███████████

███████████████████████████████████████████████████████████

_____

[1]     *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, describing objectives of stable value funds.

██████████████████████████████████████████████ Consistent with this stated strategy, JPM represented to retirement investors that its Stable Value Funds are "your most conservative investment option."[3] The then-head of JPM's stable value fund management group, Victoria Paradis, described JPM's stable value asset class as "among the most conservative in the DC [defined contribution retirement] plan line-up."[4] However, this sales ploy is a ruse, and has been for some time.

**ANSWER:**   The allegations in the first sentence reflect Plaintiffs' purported opinion of what Defendants "understood" regarding an unidentified "purpose" of stable value funds and require no response.  The allegations in the second through fourth sentences of Paragraph 4 purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.  Defendants deny the remaining allegations in Paragraph 4.  Footnotes 2 through 4 contain no allegations and require no response.

5.      While JPM touted the conservative nature of the Stable Value Funds, for the sake of its own financial interests, it caused the Stable Value Funds to invest heavily in highly-leveraged mortgage-related assets. As set forth below, this strategy was not prudent given the "character and aims" of stable value funds for several reasons.

**ANSWER:**   Defendants deny the allegations in Paragraph 5.

6.      First, the high degree of leverage employed by JPM in its Stable Value Funds is both contrary to industry standards and inherently risky, as leverage increases the magnitude of gains and losses.

**ANSWER:**   Defendants deny the allegations in Paragraph 6.

7.      Second, although JPM claimed to be managing against a particular benchmark – the Lehman Aggregate Intermediate Index – JPM's actual investment strategy differed fundamentally from this index both in terms of leverage and composition. Thus, JPM vastly exceeded the risk parameters indicated by this benchmark.

**ANSWER:**   Defendants deny the allegations in Paragraph 7.

---

[2]      ████████████████████████████████████████████████████████

[3]      *See* http://www.jpmorgan.com/pages/stablevalue (last viewed Oct. 3, 2013).

[4]      *See Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis*, http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2 Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed Oct. 3, 2013).

8.     Third, JPM's Stable Value Funds due to their leverage were inadequately diversified and highly concentrated in mortgage-related investments – a problem that was exacerbated by JPM's failure prudently to hedge against the Stable Value Funds' enormous exposure to the real estate market.

**ANSWER:**     Defendants deny the allegations in Paragraph 8.

9.     Fourth, the Stable Value Funds invested in low quality mortgage-backed securities, such as those backed by subprime and option-ARM mortgages, those backed by inadequate documentation of the underlying borrowers' ability to pay back the mortgages, and those that took exotic forms such as interest-only mortgage derivatives and inverse floaters. These investments were not suitable for a stable value fund when they were made and were eventually prohibited by the fund.

**ANSWER:**     Defendants admit that certain of the underlying collective investment funds held

mortgage-backed securities.  Defendants deny the remaining allegations in Paragraph 9.

10.     Fifth, JPM (unique among its competitors) invested in commercial private placement mortgages, some of which JPM itself originated, which had liquidity problems and were otherwise supported by no objective rating criteria. These investments too were not suitable for a stable value fund when they were made and were eventually prohibited by the fund.

**ANSWER:**     Defendants admit that the Funds invested in the Mortgage Private Placement

Fund ("MPPF"), a collective investment fund that invested in private mortgages that are not

valued or rated by a third party.  Defendants deny the remaining allegations in Paragraph 10.

11.     JPM undertook this strategy to, as they say on Wall Street, "reach for yield" – *i.e.*, increase returns for stable value fund investors so as to attract more investors and increase its market share and management fees. This was a goal fundamentally at odds with the capital preservation function that, according to industry standards and JPM itself, was the primary purpose of stable value funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 11.

12.     Furthermore, documents and previous deposition testimony produced in this case – and not hindsight-based general market indicators – show beyond any doubt that JPM was well aware or should have been aware of the outsized risks its unique investment strategies posed to Plaintiffs and other investors in its Stable Value Funds at the times when JPM made and maintained these investments. This evidence is adduced in detail throughout this Complaint. █

█████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[black redaction bar] Mercer LLC, a leading investment consulting company, also commented during the class period that the Stable Value Funds' "private mortgage holding was and remains an inappropriate holding for the [JPM] stable value offering."[7] Furthermore, Victoria Paradis, Managing Director of JPM Morgan Asset Management and then-manager of the Stable Value Funds, herself acknowledged in a trade publication that "[d]irectly placed [commercial mortgage] loans *are not appropriate within any portfolio with liquidity demands*."[8] Nonetheless, as explained further below, the Stable Value Funds – which faced liquidity demands during much of the class period – invested heavily in such loans.

**ANSWER:**     The allegations in the fourth, seventh and eighth sentences purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied. The remaining allegations in Paragraph 12 are denied.  Footnotes 5 through 8 contain no allegations and require no response.

13.     So this case is not one that turns on hindsight allegations based on general market indicators. Rather, at the times it made and maintained the highly-leveraged mortgage-related investments at issue here, JPM disregarded the stated purposes of its Stable Value Funds, ignored important Stable Value Funds-related management advice from its own consultants and managers, and instead intentionally adopted a high risk, leveraged strategy to reach for yield and increase its market share and management fees. Accordingly, JPM had actual, contemporaneous knowledge that it was pursuing an investment strategy that was imprudent given the "character and aims" of stable value fund investing.

**ANSWER:**     Defendants deny the allegations in Paragraph 13.

14.     When the financial crisis hit, the effects of the foregoing on JPM's Stable Value Funds were as dramatic as they were predictable given JPM's high risk, leveraged strategy. Within a year, JPM's Stable Value Funds erased the gains they had made in the past ten.

**ANSWER:**     Defendants deny the allegations in Paragraph 14.  By way of further answer, Defendants state that no investor in the Stable Value Funds lost any principal or accumulated interest.

---

[6] [black redaction bar]
[7] Mitsubishi 00010.
[8] *Stable Times*, First Quarter 2007, "Private Mortgages – A Compelling Stable Value Investment" (emphasis added).

15.     This loss was caused by JPM's unique and imprudent investment strategies and not by prevailing market conditions. Competing stable value funds continued to perform well during the financial crisis, as would be expected of investment vehicles that by design are intended to preserve principal above all and to be insulated from market fluctuations.

**ANSWER:**     Defendants deny the allegations in Paragraph 15.

16.     As set forth below, JPM breached its ERISA duty of prudence and duty to diversify owed to participants in its Stable Value Funds. In addition, JPM breached its duty of loyalty and engaged in a conflict of interest by causing Stable Value Funds to engage in prohibited transactions with JPM itself.

**ANSWER:**     Defendants deny the allegations in Paragraph 16.

17.     JPM's breaches of duty caused cognizable injury to Plaintiffs and the members of the proposed Class. Although, as explained below, the recognition of these losses in participant accounts was "smoothed" (*i.e.*, amortized over time), the "crediting rate" (*i.e.*, rate of return) to participants was substantially lower during the relevant times than it would have been had JPM engaged in a prudent stable value investment strategy. JPM should now be held fully liable for this reduction in the yielded returns of the Stable Value Funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 17.

18.     Plaintiffs are not the only parties complaining about JPM's management of its stable value fund business. ███████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

19.     The result of recent litigation and related arbitration between JPM and one of its business partners also shows that JPM habitually mischaracterized its Stable Value Funds. One of JPM's erstwhile stable value sector business partners, American Century Investments, recently won a large arbitration judgment against one of the JPM entities here because, among other things, that entity misrepresented the risk profile of the investment funds at issue in that case including the JPM Stable Value Funds at issue here.[9] That decision exposed how JPM used risky investments that were unsuitable for a stable value fund to temporarily achieve high yield and thereby attract additional fees by increasing the amount of assets under its management.[10]

---

[9]     *Am. Century Inv. Mgmt., Inc. v. J.P. Morgan Invest Holdings LLC*, No. 58 148 Y 00220 9 (Am. Arb. Ass'n).
[10]     *Id.*

**ANSWER:**     The allegations of paragraph 19 purport to characterize the terms of the

Arbitration award which is a written document that speaks for itself, and thus are denied.

Footnotes 9 and 10 contain no allegations and require no response.

## PARTIES

20.     Plaintiff Richard Whitley has been a participant, as defined in ERISA § 3(7), 29
U.S.C. § 1002(7), in the Hospira, Inc. 401(k) Retirement Plan ("the Hospira Plan"). The Hospira
Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr.
Whitley, prior to withdrawing from the Hospira Plan on or about July 27, 2012, had 401(k) funds
allocated to JPM's Hospira Stable Value Fund, which is one of the Stable Value Funds described
above.

**ANSWER:**     Defendants admit only that Mr. Whitley was a participant in the Hospira Plan,

that the Hospira Plan is a defined contribution plan, that JPMIM managed a separate account

stable value portfolio for Hospira pursuant to an investment management agreement ("IMA"),

and that Mr. Whitley invested in the Hospira stable value fund before July 27, 2012.  The

remaining allegations in the first and second sentence of Paragraph 20 state legal conclusions to

which no response is required.  Defendants deny any remaining allegations in Paragraph 20.

21.     Plaintiff Terry J. Koch has been, and continues to be, a participant, as defined in
ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar
Plan"). The Caterpillar Plan is a defined contribution retirement plan that is subject to ERISA. At
all relevant times, Mr. Koch has had 401(k) funds allocated to JPM's Caterpillar Stable Principal
Fund, which is one of the Stable Value Funds described above.

**ANSWER:**     Defendants admit only that Mr. Koch was a participant in the Caterpillar Plan,

that the plan is a defined contribution plan, that JPMIM managed a separate account stable value

portfolio for Caterpillar pursuant to an IMA, and that Mr. Koch invested in the Caterpillar stable

value fund.  The remaining allegations in the first and second sentence of Paragraph 21 state

legal conclusions to which no response is required.  Defendants deny any remaining allegations

in Paragraph 21.

22.     Plaintiff Caroleta M. Duran has been a participant, as defined in ERISA § 3(7), 29
U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The

Caterpillar Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, prior to withdrawing from Caterpillar's Retirement Plan on or about, August 1, 2012, Ms. Duran had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

**ANSWER:**     Defendants admit only that Ms. Duran was a participant in the Caterpillar Plan,

that the plan is a defined contribution plan, that JPMIM managed a separate account stable value

portfolio for Caterpillar pursuant to an IMA, and that Ms. Duran invested in the Caterpillar stable

value fund before August 1, 2012.  The remaining allegations in the first and second sentence of

Paragraph 22 state legal conclusions to which no response is required.  Defendants deny any

remaining allegations in Paragraph 22.

23.     Plaintiff Mark D. Grandy has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mitsubishi Motors North America, Inc. Manufacturing Division 401(k) Savings Plan (the "Mitsubishi Plan"). The Mitsubishi Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Grandy has had 401(k) funds allocated to JPM's Stable Value Fund, which is one of the Stable Value Funds described above.

**ANSWER:**     Defendants admit only that Mr. Grandy was a participant in the Mitsubishi Plan,

that the plan is a defined contribution plan, that JPMIM managed a separate account stable value

portfolio for Mitsubishi pursuant to an IMA, and that Mr. Grandy invested in the Mitsubishi

stable value fund.  The remaining allegations in the first and second sentence of Paragraph 23

state legal conclusions to which no response is required.  Defendants deny any remaining

allegations in Paragraph 23.

24.     Plaintiff John M. Gates has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan International, Inc., Employees' Retirement Savings Plan (the "Titan Plan"). The Titan Plan is a defined contribution retirement plan that is subject to ERISA. At all relevant times, Mr. Gates has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

**ANSWER:**     Defendants admit only that Mr. Gates was a participant in the Titan Plan, that the

plan is a defined contribution plan, that the Titan Plan offered participants the opportunity to

invest in SAIF, and that Mr. Gates invested in SAIF.  The remaining allegations in the first and

second sentence of Paragraph 24 state legal conclusions to which no response is required.

Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any

remaining allegations in Paragraph 24.

25.     Plaintiff Scott Newell has been a participant, as defined in ERISA § 3(7), 29
U.S.C. § 1002(7), in the Titan Plan. The Titan Plan is a defined contribution retirement plan that
is subject to ERISA. At all relevant times, Mr. Newell has had 401(k) funds allocated to JPM's
Stable Asset Income Fund, which is one of the Stable Value Funds described above.

**ANSWER:**     Defendants admit only that Mr. Newell was a participant in the Titan Plan, that

the plan is a defined contribution plan, that the Titan Plan offered participants the opportunity to

invest in SAIF, and that Mr. Newell invested in SAIF.  The remaining allegations in the first and

second sentence of Paragraph 25 state legal conclusions to which no response is required.

Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any

remaining allegations in Paragraph 25.

26.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, and Newell sue on their own
behalf and, as specified below, on behalf of participants in 401(k) plans in which any of the
Stable Value Funds is or has been offered as an investment option and who have allocated
monies to any of the Stable Value Funds during the class period.

**ANSWER:**     Defendants admit only that Plaintiffs purport to sue on behalf of a putative class

but deny that class certification is appropriate.  Defendants deny any remaining allegations in

Paragraph 26.

27.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a financial services provider
whose headquarters is in New York, New York. JPMC was a fiduciary with respect to the plans
offering any of the Stable Value Funds and the participants in such plans at all relevant times.

**ANSWER:**     Defendants admit the allegations in the first sentence.  Defendants deny the

remaining allegations in Paragraph 27.

28.     JPMorgan Chase, N.A. ("JPMC, NA") is a bank operating in the United States
and abroad with a registered address of 270 Park Avenue, New York, New York 10017-2014.
JPMC, NA acts as trustee and fiduciary (either directly or through one or more wholly-owned
subsidiaries) of the Stable Value Funds. For example, the Commingled Pension Trust (Stable
Asset Income) of JP Morgan Chase, N.A. is a collective trust fund established and maintained by

JPMC, NA under a declaration of trust. JPMC, NA was a fiduciary with respect to the plans offering any of the Stable Value Funds and the participants in such plans at all relevant times.

**ANSWER:**   Because there is no such entity, Defendants interpret Paragraph 28's reference to

"JPMorgan Chase, N.A." as a reference to JPMC Bank.  Defendants admit that JPMC Bank is a

bank operating in the United States with its principal place of business located in New York.

Defendants further admit that JPMC Bank is the trustee and an ERISA fiduciary for certain

purposes for SAIF and the commingled trust funds in which it and the other Stable Value Funds

invested.  Defendants also admit that "the Commingled Pension Trust (Stable Asset Income)"

(i.e. SAIF) is a collective trust fund established and maintained by JPMC Bank under a

declaration of trust.  Defendants admit that JPMC Bank is an ERISA fiduciary with respect to the

management of SAIF and certain commingled trust funds sponsored by JPMC Bank.  Defendants

deny the remaining allegations in Paragraph 28.

29.    Defendant J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management ("JPMAM") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. J.P. Morgan Asset Management is the marketing name for the asset management business of JPM and its subsidiaries worldwide. JPMAM is the entity that managed the Stable Value Funds. JPMAM was a fiduciary with respect to the plans offering any of the Stable Value Funds and their participants at all relevant times.

**ANSWER:**    Defendants admit that J.P. Morgan Investment Management Inc. is a Delaware

corporation with its principal place of business at 270 Park Ave., New York, New York 10017.

Defendants further admit that J.P. Morgan Asset Management is the marketing name for certain

of JPMorgan Chase & Co.'s asset management businesses.  Defendants admit that JPMIM acted

as an investment manager under ERISA for certain separate accounts pursuant to IMAs during

certain times.  Defendants deny the remaining allegations in Paragraph 29.

## JURISDICTION AND VENUE

30.    The Court has subject matter jurisdiction over this matter pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

**ANSWER:**    The allegations in Paragraph 30 state a legal conclusion requiring no response.

To the extent a response is required those allegations are admitted.  Defendants further state, on

information and belief, that this Court has subject matter jurisdiction over this matter pursuant to

28 U.S.C. § 1332.

      31.     Venue is proper in this District because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

**ANSWER:**    The allegations in Paragraph 31 state a legal conclusion requiring no response.

To the extent a response is required, and assuming the truth of Plaintiffs' allegations for these

purposes only, Defendants admit venue is proper in this District.

## FACTUAL ALLEGATIONS

### The 401(k) Plans and JPM's Role as Fiduciary

      32.     At all times relevant to this Complaint, the 401(k) plans involved in this matter were employee benefit plans within the meaning of ERISA.

**ANSWER:**    Defendants admit only on information and belief that the plans in which the

Plaintiffs participated were employee benefit plans within the meaning of ERISA.

      33.     At all times relevant to this Complaint, the plans were "defined contribution" or "individual account" plans within the meaning of ERISA because, among other reasons, the plans provided for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, as well as any income, expenses, gains and losses, and forfeitures of accounts of other participants that could be allocated to such participant's accounts.

**ANSWER:**    Defendants admit only on information and belief that the plans in which the

Plaintiffs participated were defined contribution individual account plans.

      34.     At all times relevant to this Complaint, these plans provided the Plaintiffs and members of the proposed Class with various options for investment, and they could direct the plans to purchase investments from among these options and allocate them to their individual accounts. The Stable Value Funds were among these options.

**ANSWER:**    Defendants admit only that the plan sponsors for the plans in which the Plaintiffs participated chose to offer various options for investment, that Plaintiffs could direct the investment of their plan accounts among the choices made by the plan sponsors, and that SAIF, SVF, or a separate account stable value fund managed by JPMIM were among these options, depending on the plan.  Defendants deny the remaining allegations of paragraph 32.

35.    Plaintiffs Whitley, Koch, Duran, Grandy, Gates, and Newell were and/or are participants in the Hospira, Caterpillar, Mitsubishi, or Titan Retirement 401(k) Plans at times relevant to this action. At all relevant times, each of these Plans have offered one of the Stable Value Funds as an investment option that Plaintiffs invested in, and at those times, one or more of the JPM entities served as trustee for each of these Plans.

**ANSWER:**    Defendants admit that Plaintiffs were and/or are participants in the Hospira, Caterpillar, Mitsubishi, or Titan 401(k) plans, that these plans offered SAIF or a separate account stable value fund managed by JPMIM as an investment option, and that JPMC Bank has acted as trustee with respect to SAIF and the JPMC Bank commingled trust funds in which it and these plans' separate account stable value funds invested.  Defendants deny the remaining allegations in Paragraph 35.

36.    The Hospira, Caterpillar, Mitsubishi, and Titan Plans are typical of such plans, and Plaintiffs are typical and representative of participants in such plans who have chosen to invest a portion of their 401(k) holdings in a Stable Value Fund. The Hospira, Caterpillar, Mitsubishi, and Titan Plans are typical of the plans involved in this matter in that each at all relevant times has offered a Stable Value Fund as an investment option, and one or more of the JPM entities served as fiduciary, administrator and trustee for each. Although the Stable Value Funds are nominally separate, they are linked together by their common and substantial investments in other JPM funds, such as the Intermediate Bond Fund and the other underlying co-mingled Pension Trust Funds as described below.

**ANSWER:**    Defendants deny the allegations in Paragraph 36.

37.    At all relevant times, one or more of the JPM entities served as Investment Advisor, Investment Manager, Administrator, Trustee and/or Custodian of these plans' Stable Value Funds.

**ANSWER:**    Defendants admit that JPMC Bank served as trustee of SAIF and the other commingled trust funds it established and maintained, that at certain times JPMIM served as

Investment Manager for the separate account stable value funds of Hospira, Caterpillar, and

Mitsubishi, and that at certain times RPS served as recordkeeper for some of the plans in which

the named Plaintiffs invested.  Defendants deny the remaining allegations in Paragraph 37.

38.     ERISA defines a fiduciary as someone who "(i) exercises any discretionary
authority or discretionary control respecting management of such plan or exercises any authority
or control respecting management or disposition of its assets, (ii) renders investment advice for a
fee or other compensation, direct or indirect, with respect to any moneys or other property of
such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority
or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29
U.S.C. § 1002(21)(A)(i). People and entities are fiduciaries pursuant to ERISA not only when
they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when
they perform such fiduciary functions.

**ANSWER:**     The allegations in the first sentence purport to quote selections from or paraphrase

ERISA, which speaks for itself, and thus are denied.  The remaining allegations in Paragraph 38

state a legal conclusion requiring no response.  To the extent a response is required those

allegations are denied.

39.     Investment managers are also ERISA fiduciaries. ERISA defines in relevant part
an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset
of a plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing
that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

**ANSWER:**     The allegations in the second sentence purport to quote selections from or

paraphrase ERISA, which speaks for itself, and thus are denied.  The remaining allegations in

Paragraph 39 state a legal conclusion requiring no response.  To the extent a response is required

those allegations are denied

40.     The JPM entities are fiduciaries with respect to the Stable Value Funds and thus
of the plans that offer the Stable Value Funds and the participants in those plans who allocate
retirement funds to one of the Stable Value Funds because, among other reasons, they possess
investment discretion as to the Stable Value Funds. Neither plans nor plan participants possess
the ability to direct the manner in which the JPM entities invest or allocate the Stable Value
Funds' assets. Moreover, one or more of the JPM entities are trustees and custodians with respect
to the Stable Value Funds pursuant to ERISA § 403(a), and are also investment managers with
respect to the Stable Value Funds. In addition, they are investment advisors to the Plans in which
plaintiffs are participants as well to other plans in which members of the proposed class were
participants.

**ANSWER:**    Defendants admit that JPMC Bank is an ERISA fiduciary with respect to the

management of SAIF and the JPMC Bank commingled trust funds in which it invested, and that

JPMIM is an ERISA fiduciary with respect to the management of the Hospira, Mitsubishi, and

Caterpillar separate account stable value funds.  Defendants deny the remaining allegations in

Paragraph 40.

Stable Value Funds

41.    Under ERISA, a fiduciary's investment decisions must be prudent not in the
abstract but with reference to the ***specific goals*** of a particular investment fund. A fiduciary must
give "appropriate consideration" to facts and circumstances relevant to "the role the investment
or investment course of action plays in that portion of the plan's investment portfolio with
respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(i). Thus, a
fiduciary's investment decisions are evaluated under ERISA "in light of the ***character and aims***
of the particular type of plan he serves." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (4th
Cir. 1996) (emphasis added and quotation omitted).

**ANSWER:**    The allegations in the second and third sentences purport to quote selections from

or paraphrase written documents that speak for themselves, and thus are denied.  The remaining

allegations in Paragraph 41 represent Plaintiffs' interpretation of the law and require no response.

To the extent a response is required, Defendants deny that Plaintiffs fully or accurately state the

law.

42.    The "character and aims" of stable value funds are well defined both by industry
practice and ERISA regulations.

**ANSWER:**    The allegations in Paragraph 42 are vague and ambiguous and thus denied.

43.    According to the trade association for the industry, the Stable Value Investment
Association ("SVIA") – of which JPM is a prominent member – a stable value fund should be
invested in a "high-quality, diversified, fixed-income portfolio" that is "designed to preserve
capital while providing steady positive returns."[11] "Stable value funds are considered a
conservative and low risk investment compared to other investments offered in 401(k) plans."[12]

---

[11]    Stable Value Investment Association, "Stable Value FAQ",
        http://stablevalue.org/knowledge/faqs/question/what-is-a-stable-value-fund (last viewed Oct. 3, 2013).
[12]    *Id.*

**ANSWER:**   The allegations in Paragraph 43 purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.

44.   Under ERISA, employers that offer defined contribution retirement plans are required to offer at least three options for investment, each with "materially different risk and return characteristics." One of these investment options must be a safe option: an "income producing, *low risk, liquid* fund, subfund, or account." 29 C.F.R. § 2550.404c-1 (emphasis added).

**ANSWER:**   The allegations in Paragraph 44 are legal conclusions to which no response is required.  To the extent a response is required, the allegations of paragraph 44 purport to quote selections from or paraphrase the terms of a written document which speaks for itsel, anf thus are denied.

45.   Stable value funds are a popular investment option in 401(k) plans. Offered as an option in approximately half of all defined contribution plans, stable value funds are usually the largest conservative investment option available in such plans and, when offered, are the "low risk, liquid" investment option required by ERISA regulations.

**ANSWER:**   Defendants admit that certain plan sponsors choose to offer stable value products as an option for participants in certain 401(k) plans.  Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the remaining allegations of paragraph 45.

46.   Historically, stable value funds invested in guaranteed investment contracts ("GICs"), contracts offered by insurance companies that guaranteed a fixed return over a set duration. GICs allowed investors to participate in an insurer's investment portfolio, which is required by state solvency regulations to consist of conservative, well-diversified, and liquid investments.

**ANSWER:**   Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the first clause of the first sentence and the first clause of the second sentence of paragraph 46.  The second clause of the second sentence of Paragraph 46 is a legal conclusion to which no response is required.  Defendants deny any remaining allegations in Paragraph 46.

47.   Beginning in the early 1990s, stable value fund managers began to offer stable value products designed as "synthetic GICs." A synthetic GIC consists of a fixed-income

portfolio "wrapped" with a contract with an insurer or other large financial institution that, subject to various conditions and restrictions, guarantees the "book" value of the fund and allows for "benefit responsiveness," which means that participants can terminate their investments in the fund at book value rather than market value under certain conditions. The JPM Stable Value Funds were designed as synthetic GICs.

**ANSWER:**   Defendants admit the first sentence of Paragraph 47.  Defendants further admit

that a synthetic GIC can consist of one or more fixed-income portfolios wrapped by one or more

contracts with an insurer or other financial institution which guarantee the book value of some or

all of the stable value fund's investments, allowing participants to transact at book value rather

than market value under conditions set forth in the wrap contract.  Defendants further admit that

SAIF and the Hospira, Caterpillar, and Mitsubishi separate accounts were designed this way.

Defendants deny any remaining allegations of paragraph 47.

48.    The shift from actual GICs to synthetic GICs was not intended to change the basic risk profile of stable value funds. "Consistent with the role of stable value as the 'safe' option in most defined benefit contribution plans today, the overriding objective in managing [the portfolios underlying the synthetic GIC] is preservation of principal. Liquidity to meet participant withdrawals is an additional factor, as is earning a fairly stable return which exceeds that of shorter maturity alternatives."[13]

**ANSWER:**   Defendants lack information sufficient to form a belief as to the purported intent

behind an unspecified "shift from actual GICs to synthetic GICs" and therefore deny any

allegations regarding the same.  The remaining allegations in Paragraph 48 purport to quote

selections from or paraphrase written documents that speak for themselves, and thus are denied.

Footnote 13 contains no allegations and requires no response.

49.    More specifically, even though a synthetic GIC invests in a partially-insured fixed income portfolio, that portfolio itself must be managed in accordance with the purposes of a stable value fund: "[t]he benchmark for these bonds, as well as the philosophy and strategies of the fixed income manager, should be consistent with the goals of a stable value fund. Since the stable value fund is typically offered as a low-risk alternative for investors in defined contribution plans, a relatively low-risk profile is in order."[14]

---

[13]    Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 83.
[14]    *Id.,* 120.

**ANSWER:**    The allegations following the colon purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.  The remaining allegations in Paragraph 49 are denied.  Footnote 14 contains no allegations and requires no response.

50.    Stable value funds are typically affected far less than most other investment options in periods of market distress. Because they are generally comprised of well-diversified portfolios of high credit quality fixed-income securities, they were one of the few 401(k) investment options to provide positive returns throughout the market upheaval of the late 2000s, as set forth below.

**ANSWER:**    Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 50, but note that, apparently consistent with Plaintiffs' allegations, the Stable Value Funds did indeed provide positive returns to Plaintiffs and other investors throughout the late 2000s.

<u>JPM's Stable Value Funds</u>

51.    JPM sponsors a collection of stable value funds that is one of the largest and most utilized in the country. Between 2003 and 2009, JPM grew the amount that 401(k) participants invested in its Stable Value Funds from less than $10 billion to more than $15 billion.

**ANSWER:**    Defendants admit that (1) JPMC Bank established and maintains SAIF and SVF, (2) that JPMIM acts as investment manager for stable value separate accounts pursuant to IMAs, and (3) that the assets under management in SAIF, SVF, and the separate account stable value funds managed by JPMIM grew from less than $10 billion to more than $15 billion between 2003 and 2009.  Defendants deny the remaining allegations in Paragraph 51.

52.    The Stable Value Funds are managed by JPM and offered as investment options to numerous ERISA defined contribution 401(k) plans in the United States.

**ANSWER:**    Defendants admit that JPMC Bank manages SAIF and SVF, and that JPMIM acts as investment manager for certain separate account stable value funds pursuant to IMAs. Defendants deny any remaining allegations in Paragraph 52.

53.    At all relevant times, the JPM entities have served as Investment Advisors, Fully Discretionary Investment Managers, Plan Administrators, Trustees and/or Custodians (per

ERISA § 403(a)) of the Hospira, Caterpillar, Mitsubishi and Titan 401(k) Plans and all the numerous other defined contribution 401(k) plans that offered one of the JPM Stable Value Funds as an investment option. As such, at all relevant times, JPM has been a fiduciary of the defined contribution 401(k) plans under ERISA.

**ANSWER:**     Defendants admit that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SAIF, SVF, and certain of its commingled trust funds.  Defendants

further admit that JPMIM acted as an investment manager with respect to stable value separate

accounts for Hospira, Caterpillar, and Mitsubishi.  Defendants deny the remaining allegations in

Paragraph 53.

    54.     JPM has frequently and consistently stated publicly that its Stable Value Funds are typical stable value funds, as described above.



**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the allegations in the first sentence of paragraph 54.  The remaining allegations in

Paragraph 54 purport to quote selections from or paraphrase written documents that speak for

themselves, and thus are denied.  Defendants note that, during the alleged Class Period, investors

in the Stable Value Funds maintained their principal and accumulated interest and received

returns higher than those available from money market funds.  Footnote 15 contains no

allegations and requires no response.

    55.     In addition, JPM emphasized that the Stable Value Funds were typical stable value funds, not only by calling them "Stable Value," "Stable Asset," or "Stable Income" in their very names, but also by its characterization of their risk level.



As set forth above, Ms. Paradis has stated publicly that the Stable Value Funds are among the "most conservative" investments possible in a defined contribution

---

15 

plan. Furthermore, as JPM understood well, plan sponsors offered its Stable Value Funds as the "low risk, liquid" investment option required by ERISA.

**ANSWER:**   Defendants admit only that the names of SAIF and SVF contain the phrases "Stable Value" and "Stable Asset", that the Stable Value Funds may have been referred to at times by various descriptions, and that plan sponsors may have used the phrases "Stable Value," Stable Asset," or "Stable Income" in the names of their separate account stable value funds. Defendants deny the remaining allegations of the first sentence of paragraph 55.  The allegations in the second and third sentences of Paragraph 55 purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.  Defendants deny the remaining allegations in Paragraph 55.

### JPM's Stable Value Funds' Investments in Commingled Pension Trust Funds

56.   JPMorgan Chase Bank, N.A. ("JPMCB") has established and operated a number of Commingled Pension Trust Funds for the collective investment of pension trusts, profit sharing trusts, other employee benefit trusts or funds and other commingled funds. The funds are referred to as "commingled" because they invest the monies of many different ERISA plans and thus the participants in those plans.

**ANSWER:**   Defendants admit that JPMC Bank established and maintains certain Commingled Pension Trust Funds in which specified types of plans, including ERISA defined contribution plans, may invest, and that they are called "commingled" funds because they manage money invested by multiple plans rather than a single plan.  Defendants deny the remaining allegations in Paragraph 56.

57.   Among these Commingled Pension Trust Funds is the Intermediate Bond Fund ("IBF").

**ANSWER:**   Defendants admit that the IBF is a collective investment fund maintained by JPMC Bank.  Defendants deny any remaining allegations in Paragraph 57.

58.   ***JPM caused each of the Stable Value Funds to invest a substantial portion of its assets in the IBF***. As a result, all the Stable Value Funds have the same returns on their portion of investments in the IBF.

**ANSWER:**    Defendants admit that JPMC Bank caused SAIF to invest in the IBF and that the separate account stable value funds JPMIM managed for Hospira, Caterpillar, and Mitsubishi were invested in the IBF.  The allegation that a "substantial" portion of assets were invested in the IBF purports to characterize the terms of written documents which speak for themselves, and thus are denied.  Defendants deny the remaining allegations in Paragraph 58.

59.



**ANSWER:**    The allegations in Paragraph 59 purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.  Footnote 17 contains no allegations and requires no response.

60.    In investing the Stable Value Funds assets, JPM employed a fund of funds investment strategy. Thus, the IBF takes the Stable Value Fund assets and in turn invests in other JPM Commingled Pension Trust Funds including the JPMCB Mortgage Private Placement Fund, JPMCB Public Mortgages Fund, JPMCB Intermediate Credit Fund, JPMCB Liquidity Fund, and the JPMCB Enhanced Cash Fund. The IBF also invests in directly held securities similar to those in many of the other Commingled Pension Trust Funds. The IBF's allocation in those funds and in direct investments from 2006 through 2010 and the investments of three of the commingled funds in which the IBF invested (the Public Mortgage Fund, the Private Placement Mortgage Fund, and the Enhanced Cash Fund) on an annual basis is set forth in the attached Appendix A. In addition, Appendix B shows the percentage of the assets of the IBF that were invested in the underlying funds which constituted private mortgages - meaning non-conforming mortgages which do not comply with Freddie Mac and Fannie Mae standards. These private mortgages are riskier than and not as liquid as conforming mortgages because of their credit risk.

---

17

**ANSWER:**     Defendants admit only that SAIF and the Hospira, Caterpillar, and Mitsubishi separate accounts employ a strategy in which the IBF makes both direct investments and investments in other JPMC Bank commingled trust funds.  The second through penultimate sentences of Paragraph 60 purport to characterize the terms of written documents which speak for themselves, and thus are denied.  Defendants admit only that private mortgages may have different risk and return characteristics than agency mortgages.  Defendants deny any remaining allegations in Paragraph 60.

61.



**ANSWER:**     Defendants deny the first and third sentences of Paragraph 61.

Defendants deny the remaining allegations in Paragraph 61.  Footnotes 18 and 19 contain no allegations and require no response.

62.



---

18

20    *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, which defines as a "primary investment objective" of stable value funds "Stability: Ensuring that valuation of investment and accrued

██████████████████████████████████████████

**ANSWER:**     Defendants deny the allegations in Paragraph 62.  The allegations of footnote 20

purport to quote selections from or paraphrase a written document that speaks for itself, and thus

are denied.  Footnote 21 contains no allegations and requires no response.

<u>JPM's Inappropriate Use of Leverage in its Stable Value Funds</u>

63.     Consistent with their conservative nature, stable value funds typically do not use
leverage. In an April 7, 2006 letter to the U.S. Department of Labor, the SVIA opined that a
particular failed stable value fund, the Circle Trust Stable Value Fund, did not invest in a way
"consistent with the objectives of stable value investing" because, among other things, it invested
in vehicles that "depend upon financial leverage to achieve their stated return objectives."[22] And
in a more recent letter to the Commodities Futures Trading Commission, the SVIA stated that
"stable value funds themselves are generally non-leveraged investment vehicles."[23] Consistent
with the SVIA's view, a leading authority on stable value investing states that "[a]ll wrappers
strongly restrict the use of leverage."[24]

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the first sentence of Paragraph 63.  The remaining allegations in Paragraph 63

purport to quote selections from or paraphrase written documents that speak for themselves, and

thus are denied.  Footnotes 22 through 24 contain no allegations and require no response.

64.     BlackRock, a worldwide leader in investment management, describes the risks of
leverage: "Funds that utilize leverage tend to exhibit greater volatility in yield, market price and
net asset value than non-leveraged funds. Due to their sensitivity to changes in interest rates,
leveraged funds may experience larger drops in net asset value compared to similar non-levered
fixed income closed-end funds. In addition, any narrowing of spreads between short- and long-
term rates may diminish potential profit margins for the fund and potentially lower the dividend
paid by the fund."[25]

---

income are protected from the volatility of the financial markets and that future returns remain relatively stable
from year to year."
[21]   *Id.*, 120 (1998).
[22]   SVIA 000676.
[23]   SVIA 000221.
[24]   Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 127.
[25]   http://www2.blackrock.com/us/individual-investors/insight-education/investing-basics/a-look-at-leverage.

**ANSWER:**    The allegations in Paragraph 64 purport to quote selections from or paraphrase a website that speaks for itself, and thus are denied.  Footnote 25 contains no allegations and requires no response

65.    Although data about the extent to which stable value funds use leverage is not readily available, leverage is exceedingly rare in similar types of investment vehicles for which such data is available. Money market funds – to which stable funds are often compared – employ little to no leverage.[26] Similarly, leverage is rare in mutual funds. Of nearly 30,000 mutual funds, barely 2% have leverage of over 5% and less than 0.5% have leverage over 45% (a level exceeded by the IBF in 2006 and 2007, as set forth below). Those mutual funds that do use substantial leverage typically invest in equities rather than in fixed income securities and are expressly marketed as aggressive funds. Money market and most mutual funds are hesitant to use leverage for good reason: such funds are typically risk averse (as stable value funds also should be) and do not want the value of their holdings to fall below their initial cost.

**ANSWER:**    Defendants deny that the IBF used leverage over 45% in 2006 and 2007.  Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 65. Footnote 26 contains no allegations and requires no response.

66.    The use of substantial leverage in stable value funds increases risk in at least three ways. First, as a matter of basic finance theory, funds that use leverage exhibit greater volatility in net asset value and return than those that do not because leverage magnifies both investment gains and losses.

**ANSWER:**    Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 66.  Defendants deny the remaining allegations of paragraph 66.

67.    Second, leverage requires payment of interest. Thus, the investment return must account for interest expense before it creates a net positive return to the fund. To put it another way, the fund's participants are paying the interest for the leverage in the Stable Value Fund and this interest thus here acts as an additional fee charged by JPM to Plaintiffs incident to JPM's management of the Stable Value Funds.

---

[26]    Investment Company Institute, "Money Market Funds in 2012: Money Market Fund Are Not Banks," Feb. 14, 2012, *available at* http://www.ici.org/pdf/12_mmf_mmfs_are_not_banks.pdf.

**ANSWER:**    Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the first sentence of paragraph 67.  Defendants admit that a fund's gross return

must exceed its expenses to result in a positive net return.  Defendants deny the remaining

allegations in Paragraph 67.

68.    Third, as credit conditions tighten, a leveraged fund may be required to de-leverage, which may require liquidating fund assets at a non-optimal time.

**ANSWER:**    Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the allegations in Paragraph 68.

69.    The use of substantial leverage is inconsistent with the "character and aims" of stable value funds because, compared to a non-leveraged strategy, it: (1) places the principal at greater risk; (2) increases volatility of returns; and (3) reduces liquidity.[27]

**ANSWER:**    Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the allegations in Paragraph 69.  The allegations in Footnote 27 purport to quote

selections from or paraphrase a written document that speaks for itself, and thus are denied.

70.    

**ANSWER:**    Defendants deny the allegations in Paragraph 70.

71.    This use of leverage was by itself imprudent and inconsistent with well-established standards and principles of stable value investing. Worse still, as set forth in detail below, JPM used this imprudent amount of leverage to decrease rather than increase the level of diversification in its Stable Value Funds and to invest in high risk assets. JPM thus "doubled down" on its already risky leveraging strategy in JPM's Stable Value Funds.

**ANSWER:**    Defendants deny the allegations in Paragraph 71.

---

[27]    *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments*, (1998), 186, detailing the investment objectives of stable value funds.

<u>JPM Adopts Investment Strategies That Radically Differ from its Purported Benchmark</u>

72.     JPM consistently represented that its investment strategy for the IBF – which at all times material hereto was a core asset of JPM's Stable Value Funds – tracked the Lehman Intermediate Aggregate Index (later known as the Barclays Intermediate Aggregate Index). The Lehman Intermediate Aggregate Index is a non-leveraged portfolio consisting of investment grade bonds including U.S. Treasury securities, U.S. government agency bonds, pass-through mortgage-backed bonds issued by government agencies, and corporate bonds. The investments have an average maturity of around 4.5 years.

**ANSWER:**     Defendants admit only that the IBF was benchmarked to the Lehman Intermediate

Aggregate Index (later called the Barclays Capital Intermediate Aggregate Index) (henceforth the

"Intermediate Aggregate Index"), and deny the remaining allegations of the first sentence of

paragraph 72.  By way of further response, the IBF was actively managed and was not designed

as an index fund to track its benchmark exactly.  Defendants admit only that the Intermediate

Aggregate Index is a benchmark that measures the investment grade, U.S. dollar denominated,

fixed rate taxable bond market, including Treasuries, government-related and corporate

securities, mortgage-backed securities ("MBS"), asset-backed securities ("ABS"), and

commercial mortgage-backed securities ("CMBS").  Defendants deny the remaining allegations

of paragraph 72.

73.





28

**ANSWER:**    The allegations of the first sentence of paragraph 73 purport to characterize selected terms of a document that speaks for itself, and thus are denied.  Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 73.  Defendants deny the remaining allegations in Paragraph 73.

Footnotes 28 and 30 contain no allegations and require no response. ████████████████

██████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████

74.    In fact, JPM adopted an investment strategy that differed radically from that of the Lehman Intermediate Aggregate Index in at least two ways, contrary to its representation that the IBF's risk profile would be similar to that of the benchmark; this was contrary to the "character and aims" of stable value funds.

**ANSWER:**    Defendants deny the allegations in Paragraph 74.

75.    First, the Lehman Intermediate Aggregate Index does not use any leverage. As set forth above, JPM's substantial use of leverage should have caused JPM to predict *ex ante* that its investment returns would be more volatile than those of the benchmark. As set forth above, avoiding volatility is one of the main purposes of a stable value fund.

**ANSWER:**    Defendants deny the allegations in Paragraph 75.



76.

**ANSWER:**

Defendants deny the remaining allegations in Paragraph 76.

77.



**ANSWER:**    Defendants deny the allegations in Paragraph 77.

78.    While some deviation from this benchmark might be acceptable, as shown in the above tables, the IBF was so different from the benchmark that JPM could not reasonably have believed – despite its representations to the contrary – that the IBF's risk profile would be in any way similar to that of the benchmark and thus that JPM's IBF would be a prudent asset for JPM's Stable Value Funds to hold in large amounts given the stated aims of JPM's Stable Value Funds.

**ANSWER:**    Defendants deny the allegations in Paragraph 78.

79.    In late 2007 through 2008, the observed tracking error for the IBF far surpassed a level that could be described as reflecting a "total target risk" that is "similar" to the benchmark, exceeding 400 basis points in late 2008:[31]

**ANSWER:**    Defendants deny the allegations in Paragraph 79.  Defendants lack information

sufficient to form a belief as to the truth of the allegations in Footnote 31 and therefore deny the

same.

80.    Indeed, the seeds for this extreme variance should have been apparent far before it materialized. Beginning in 2004 and continuing until 2007, the IBF consistently performed much better than the benchmark:

**ANSWER:**    Defendants admit that from 2004 to 2007 the IBF outperformed its benchmark.

Defendants deny the remaining allegations in Paragraph 80.

81.    This consistently high level of performance against the benchmark before the class period would have been extraordinarily unlikely had JPM not adopted a much more aggressive (that is, risky) strategy than that reflected in the benchmark. Indeed, over a five-year

---

[31]    This is based on reported data for the JP Morgan Intermediate Aggregate Index, which consists of the IBF and other similar JPM funds. Data isolating the tracking error of the IBF was not available but it is expected that such data will show a similar tracking error since, by definition, this JPM aggregate may only combine like funds.

period beginning in 2001, JPM achieved an "information ratio" of 1.8,[32] a level which can rarely be sustained for such a long time. JPM knew or should have known by 2006 that its high returns in the IBF and thus in JPM's Stable Value Funds were not sustainable and in fact were indicative of the fact that JPM had accepted excessive risk in the IBF and thus in JPM's Stable Value Funds as compared to the benchmark.

**ANSWER:**   Defendants admit that the IBF generally has had a consistently high level of

performance against the benchmark.  Defendants deny the remaining allegations in Paragraph 81.

82. ███████████████████████████████████████

███████ Beating the benchmark, however, is no good accomplishment where the manager accepts inordinate risk relative to the benchmark to do so. That is precisely what happened here, and accepting such excess risk was wholly inconsistent with: (1) the "character and aims" of stable value funds; (2) industry standards; and (3) JPM's own representations.

**ANSWER:**   Defendants deny the allegations in Paragraph 82.

JPM's Exposure to Real Estate Risk

83. One critical aspect of ERISA's duty of prudence is the duty to diversify. ERISA requires that a fiduciary "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). The duty to diversify requires, among other things, diversity as to industries or sectors. *In re Unisys Savings Plan Litig.*, 74 F.3d at 438.

**ANSWER:**   The allegations in Paragraph 83 are conclusions of law and require no response.

To the extent a response is required Defendants deny that Plaintiffs fully or accurately state the

law.

84. Prudent investment management requires that securities portfolios be diversified because diversification reduces risk without reducing expected returns. JPM agrees: ". . . a diversified portfolio that includes several categories of fixed income securities should have a relatively stable return portfolio."[33]

**ANSWER:**   Defendants admit only that prudent investment management may require

diversification depending on the facts and circumstances.  The allegations in the second sentence

purport to quote selections from or paraphrase a written document that speaks for itself, and thus

---

[32]   "Information ratio" is a measure of alpha over tracking error. It indicates how much of the performance of a fund is attributable to risk-neutral (relative to the benchmark) decision-making.

[33]   Mark Huamani and Karl Mergenthaler, *Building a Diversified Fixed Income Portfolio: An Analysis of the Availability and Correlation of Excess Returns*,
http://www.jpmorgan.com/tss/General/Building_a_Diversified_Fixed_Income_Portfolio/115932 1128719.

are denied.  Defendants deny any remaining allegations in Paragraph 84.  Footnote 33 contains

no allegations and requires no response.

85.     Principles of diversification enable an investment portfolio to take maximum advantage of market conditions in specific sectors and to protect against downturns in one particular sector.

**ANSWER:**     Defendants admit only that prudent investment management may require

diversification depending on the facts and circumstances.  Because they are vague, Defendants

lack information sufficient to form a belief as to the truth of the remaining averments of

paragraph 85.

86.     When a portfolio is concentrated in a specific sector, the value of the portfolio can drop sharply if that sector experiences a general downturn.

**ANSWER:**     Admitted.

87.     If the portfolio, however, were comprised of multiple sectors, some may go down in value while others may remain stable or go up. Different types of fixed income categories will generally not lose value at the same rate or at the same time.

**ANSWER:**     Defendants admit only that, under normal market conditions, depending on the

sector, some may go down in value while others may remain stable or go up and that the

investment performance of different types of fixed income investments may not be correlated.

Defendants deny the remaining allegations of paragraph 87.

88.     Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of a portfolio of securities that do not move in unison. Two securities that are perfectly correlated is a 1. Two securities that are perfectly inversely correlated is -1. Two securities that have no correlation is 0 – often referred to as low correlation.

**ANSWER:**     Defendants admit that correlation measures the relationship between changes in

two or more financial variables in time and that, in certain measures of correlation, a correlation

of 1 represents perfect correlation, a value of -1 represents perfectly inverse correlation, and a

value of 0 represents no correlation. Defendants deny the remaining allegations in Paragraph 88.

89.     According to JPM, "correlation of excess returns among the major fixed income categories is relatively low." Active managers of different fixed income categories, like Mortgage Backed Securities, Core Fixed Income, and Corporates, according to JPM, add value through excess returns at times when active managers of other categories cannot.

**ANSWER:**     The allegations in Paragraph 89 purport to characterize selected terms of

unspecified written documents which speak for themselves, and thus are denied.

90.     Modern Portfolio Theory ("MPT"), the industry standard for prudent portfolio management for over twenty years, employs the use of correlations for identifying categories and sectors that are loosely correlated and do not move in tandem. Creating a diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and multiple categories, which have low correlations, is the foundation of MPT.

**ANSWER:**     Defendants admit that Modern Portfolio Theory is a theory of finance that

attempts to maximize portfolio return for a given level of risk, or to minimize risk at an expected

level of return, based on certain assumptions.  Defendants further admit that Modern Portfolio

Theory is based on diversification.  Defendants deny the remaining allegations in Paragraph 90.

91.     In 2007 JPM, concluded Mortgage Backed Securities ("MBS") were one category of a well-diversified portfolio. The correlation of excess returns for MBS had correlation of .26 to Core Fixed Income and .09 as compared to Corporates. This means JPM was well aware the excess returns of all three fixed income categories were loosely correlated and a mix of the three was necessary for a well-diversified portfolio of fixed income securities.

**ANSWER:**     The allegations of paragraph 91 purport to characterize selected terms of

unspecified written documents that speak for themselves, and thus are denied.

92.     █████████████████████████████████

**ANSWER:**     The allegations of paragraph 92 purport to characterize selected terms of written

documents that speak for themselves, and thus are denied.  Footnote 34 contains no allegations

and requires no response.

93.     █████████████████████████████████

---



[34] ████████████.



**ANSWER:**      Defendants deny the allegations in Paragraph 93.

94.      Because the purpose of ERISA's diversification requirement expressly is to avoid large losses, this total exposure analysis is an appropriate measure for diversification under ERISA because exposure more accurately reflects the potential for a large loss.

**ANSWER:**      Defendants deny the allegations in Paragraph 94.

95.

**ANSWER:**      Defendants deny the allegations of paragraph 95.

96.      JPM of course knew at the time it made these investments how poorly diversified they were as a whole.



**ANSWER:**      Defendants deny the allegations in the first two sentences.  The remaining

allegations in Paragraph 96 purport to quote selections from or paraphrase a written document

that speaks for itself, and thus are denied.  Footnote 35 contains no allegations and requires no

response.

97.

---

35 

**ANSWER:**   Defendants deny the allegations in Paragraph 97.  Footnote 36 contains no

allegations and requires no response.

98.     JPM's high exposure to real estate losses, in addition to violating ERISA's
diversification requirement, was inconsistent with the "character and aims" of stable value funds,
which emphasize proper diversification as a means to protect principal and ensure steady,
positive returns and was thus a violation of its ERISA duty of prudence.

**ANSWER:**   Defendants deny the allegations in Paragraph 98.

<u>JPM's Investment in Risky Mortgage-Backed Securities</u>

99.     The sheer quantity of real estate-related investments held by the IBF and thus by
JPM's Stable Value Funds was not the only problem with such investments. JPM also chose to
invest a large part of the IBF and thus JPM's Stable Value Funds in high risk, leveraged,
derivative mortgage-backed securities (and private placement mortgages, discussed in the next
section) rather than the conventional mortgage-backed securities more typically found in stable
value funds.[37]

**ANSWER:**   Defendants admit only that the IBF invested in mortgage backed securities and

indirectly in private placement mortgages.  Defendants deny the remaining allegations in

Paragraph 99.  The allegations in Footnote 37 purport to quote selections from or paraphrase a

written document that speaks for itself, and thus are denied.

100.     During the relevant times, the only mortgage-backed securities in the Lehman
Intermediate Aggregate Index were pass-through mortgage-backed securities insured by
government agencies such as Fannie Mae and Freddie Mac (referred to in the industry as
"agency MBS"). Such securities are relatively safe because the agencies ensure against default
and require the mortgages to conform to stringent standards.

**ANSWER:**   Defendants admit only that the Intermediate Aggregate Index includes ABS,

CMBS, and agency fixed-rate and hybrid ARM pass-through MBS.  Defendants deny the

remaining allegations in the first sentence of paragraph 100.  Because they are vague, Defendants

lack information sufficient to form a belief as to the truth of the allegations of the second

sentence of paragraph 100.

---

[37]   For example, the DuPont Fixed Income Fund, which was at the time the largest single-entity stable value fund
in the United States, prohibited that fund as early as 1998 from investing in what it deemed to be "risky"
mortgage derivatives including IOs, POs, and inverse floaters. Frank J. Fabozzi, *The Handbook of Stable Value
Investments* (1998), 197.

101.    Certain types of agency CMOs are riskier than agency MBS because the former have greater exposure to interest rate, prepayment, and default risk.

**ANSWER:** ███████████████████████████████████████

████████████████████████████. The remaining allegations of the first

sentence purport to characterize selected terms of written documents that speak for themselves,

and thus are denied. Because they are vague, Defendants lack information sufficient to form a

belief as to the truth of the allegations of the second sentence of paragraph 101.

102.   ████████████████████████████████████████

███████████████████████████████████

**ANSWER:** Defendants deny the allegations in Paragraph 102.

103.   Given the conservative nature of stable value funds, it was incumbent on JPM to select only high quality investments for the IBF with stable cash flows, since the IBF constituted such a large percentage of the investment holdings in JPM's Stable Value Funds. "Substantial resources and analytics are required to properly select investments within [the mortgage-backed and asset-backed] sectors, particularly where cash flow volatility could impact returns and crediting rate behavior."[38]

**ANSWER:** The allegations of paragraph 103 purport to characterize the terms of investment

guidelines for the Stable Value Funds that speak for themselves and thus are denied. The

allegations of the second sentence of paragraph 103 purport to quote selections from or

paraphrase a written document that speaks for itself and thus are denied. Footnote 38 contains

no allegations and requires no response.

---

[38]   Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 180.

104.    

**ANSWER:**    Defendants deny the allegations of paragraph 104. Defendants lack information

sufficient to form a belief as to the truth of the allegations of footnote 39, which purports to

explain Plaintiffs' methodology.  Footnote 40 appears to reflect Plaintiffs' definition ███

███████████  Defendants admit only that ███████████████

███████████████████████.

Defendants deny the remaining allegations of footnote 40.

105.    As early as 2006, JPM was aware that subprime mortgages were excessively risky and acted on that knowledge to reduce its own exposure to such mortgages. In October 2006, JPM decided to sell investment positions in subprime mortgage assets it held for its own account, and it eventually sold $12 billion worth of those investments.[41]

**ANSWER:**    Defendants deny the allegations of the first sentence of paragraph 105.  The

allegations of the second sentence of paragraph 105 purport to characterize selected terms of a

written document that speaks for itself and thus are denied.  Defendants deny any remaining

allegations in Paragraph 105.  Footnote 41 contains no allegations and requires no response.

106.    This matter was of such urgent concern to JPM that its CEO, Jamie Dimon, called his then-head of JPM's securitized funds division, William King, while the latter was in Africa,

---

[39] 

[41]    "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch," Fortune, September 2, 2008, *available at* http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune.

"to fire a red alert. 'Billy, I really want you to watch out for subprime!' . . . 'We need to sell a lot of our positions. I've seen this before. This stuff could go up in smoke.'"[42]

**ANSWER:**     The allegations of paragraph 106 purport to characterize selected terms of a

written document that speaks for itself and thus are denied.  Footnote 42 contains no allegations

and requires no response.

    107.     One reason for this concern was that, based on data from JPM's mortgage servicing business, "late payments on subprime loans were rising at an alarming rate."[43] Although the IBF and thus JPM's Stable Value Funds did not invest in any mortgage-backed securities involving JPM mortgages, this problem was not limited to JPM's own mortgages. To the contrary, JPM knew that "loans originated by competitors like First Franklin and American Home were performing three times worse than J.P. Morgan's subprime mortgages."[44] Indeed, JPM concluded that "underwriting standards were deteriorating ***across the industry***."[45]

**ANSWER:**     The allegations of paragraph 107 purport to characterize selected terms of a

document that speaks for itself and thus are denied.  Footnotes 43 through 45 contain no

allegations and require no response.

    108.     This information about the increasing risks from subprime mortgages was – or should have been – shared with the managers of the IBF because JPM purportedly "mine[s] every part of the business for detailed information – especially data that point to trouble – then share it at warp speed throughout the corporation."[46] According to the Fortune article, "[t]o Dimon the rich flow of information from different corners of the bank, like the signal from servicing that warned him about subprime, is a major advantage. 'We have a gold mine of knowledge, but you have to manage it well,' he says, so every one of our businesses benefits from it."[47]

**ANSWER:**     The allegations in Paragraph 108 purport to quote selections from or paraphrase a

written document that speaks for itself, and thus are denied.  Footnotes 46 and 47 contain no

allegations and require no response.

    109.     Despite this, the IBF and thus JPM's Stable Value Funds continued to hold a substantial amount of mortgage-backed securities backed by subprime mortgages. If in October 2006, JPM had concluded that subprime mortgages were too risky to hold for its own account,

---

[42]   *Id.*
[43]   *Id.*
[44]   *Id.*
[45]   *Id.* (emphasis added).
[46]   *Id.*
[47]   *Id.*

such mortgages (or CMOs based on such mortgages) were a *fortiori* too risky for a conservative investment vehicle like JPM's Stable Value Funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 109.

110.   As Mr. Dimon testified before Congress, JPM did not itself offer Option ARM mortgages because, in his view, "we did not think they were appropriate products for consumers."[48]



**ANSWER:**   The allegations in the first sentence of Paragraph 110 purport to quote selections from or paraphrase the testimony of Mr. Jamie Dimon in an unrelated matter, which speaks for itself, and thus are denied.  Defendants deny the remaining allegations in Paragraph 110. Footnote 48 contains no allegations and requires no response.

111.   

**ANSWER:**

. Defendants deny the remaining allegations in Paragraph 111.

112.

---

[48]   Testimony of Jamie Dimon Before the Financial Crisis Inquiry Commission, Jan. 13, 2010, p.2.

**ANSWER:**     Defendants deny the allegations of the first sentence of paragraph 112.  Because

they are vague, Defendants lack information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 112.

113.   As the court held in *California
Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044-45 (9th Cir.
2001), investment in inverse floaters violated ERISA's prudence rule as to a trust with "very
conservative investment guidelines" such as those of a stable value fund.

**ANSWER:**     Defendants deny the allegations in the first sentence of Paragraph 113.  The

allegations in the second sentence purport to quote selections from or paraphrase a written

document that speaks for itself, and thus are denied.  Defendants deny any remaining allegations

in Paragraph 113.

114.

**ANSWER:**     Defendants deny the allegations in the first sentence.  The allegations in the

second sentence purport to characterize the terms of written documents that speak for

themselves, and thus are denied.  Footnote 49 contains no allegations and requires no response.

115.     JPM's investment of JPM's Stable Value Funds in the types of poorly
collateralized and/or exotic mortgage derivatives described above was inconsistent with the
"character and aims" of a stable value fund when made and was thus a violation of its ERISA
duty of prudence.

**ANSWER:**     Defendants deny the allegations in Paragraph 115.

<u>JPM's Unique Investment in Private Placement Commercial Mortgages</u>

116.     One of the Commingled Pension Trust Funds in which the IBF invested was the
Mortgage Private Placement Fund. That Fund invests in, among other things, directly-placed

---

49

mortgages on multi-family dwellings, shopping centers, office buildings, co-ops, and other commercial real estate projects. The Fund through JPM originates its own commercial mortgages.

**ANSWER:**     Defendants admit only that the IBF invested in the MPPF, that the MPPF's

investments include direct loans secured by commercial real estate, and that the MPPF originated

commercial mortgages.  Defendants deny the remaining allegations of paragraph 116.



117.   ████████████████████████████████████████████████
████████████████████████████████████

**ANSWER:**    ████████████████████████████████████████████

████████████████████████████████.  Footnote 50

contains no allegations and requires no response.

118.    These private placement mortgages were not public securities. ████████████
███████████

**ANSWER:**     Defendants admit that the MPPF invested in private mortgages ████████

███████████.  Defendants deny any remaining allegations in Paragraph 118.  Footnote

51 contains no allegations and requires no response.

119.    Relatedly, the valuation of these private placement mortgages was determined solely by JPM. ████████████████████████████████████
█████████████

**ANSWER:**     Defendants admit that the MPPF invested in private mortgages ████████

███████████.  The allegations in quotation marks in Paragraph 119 purport to quote

selections from or paraphrase a written document that speaks for itself, and thus are denied.

Defendants deny any remaining allegations in Paragraph 119.  Footnote 52 contains no

allegations and requires no response.

---

50 ██████████████████████████████
████████████

120.    This lack of objective valuation data allowed JPM to hide losses in the private placement mortgages during the financial crises.

**ANSWER:**    Defendants deny the allegations in Paragraph 120.

121.    ███████████████████████████████████████████████
██████████████████████████████████

**ANSWER:**    ████████████████████████████████████████

██████████████████████████████. Defendants deny the remaining

allegations of the first sentence of paragraph 121. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████.

122.    Ms. Paradis also knew that the private placement mortgages increased liquidity risk. In a 2007 industry publication, she stated that "[d]irectly placed loans are not appropriate within any portfolio with liquidity demands."[55]

**ANSWER:**    The allegations in Paragraph 122 purport to quote selections from or paraphrase a

written document that speaks for itself, and thus are denied.

123.    ████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████   Defendants deny the remaining allegations of paragraph 123.

---

[53] ████████████████████████

[55]    *Stable Times*, First Quarter 2007, "Private Mortgages – A Compelling Stable Value Investment."

124. ███████████████████████████████████
████████████████████████████████████████████

**ANSWER:**   Defendants deny the allegations in paragraph 124.

125.   Although these mortgage loans were funded by the Mortgage Private Placement Fund, on information and belief, as explained below, at least some were originated, arranged and underwritten by affiliated JPM entities who in turn received substantial fees for these services from the borrowers.[56] These fees variously were called application, originating, placement, and underwriting fees.

**ANSWER:**   Defendants deny the allegations in Paragraph 125.

126. ███████████████████████████████████
████████████████████████████████████████████
████████████████  Such payments and commissions were and are made to entities that arrange, broker and underwrite commercial mortgage loans, bringing loans to the lender, and customarily were paid by the borrower to the arranger. When the loan is arranged, originated, underwritten and/or with the MPPF by a JPM affiliated, the charges paid by the borrower go to the JPM affiliate.

**ANSWER:**   The first two sentences of paragraph 126 purport to characterize the terms of a

written document that speaks for itself, and thus are denied.  Defendants deny the remaining

allegations in Paragraph 126.  Footnote 57 contains no allegations and requires no response.

127.   In addition, the affiliated JPM entities arranged for appraisals, forced placed insurance and other ancillary third party charges which generated additional fees paid by the borrower to the JPM affiliates.

**ANSWER:**   Defendants deny the allegations in Paragraph 127.

128.   Pursuant to this Court's direction that the parties attempt to ascertain whether there is a factual basis for the prohibited transaction claims and in specifically referencing the September 4, 2008 loan closing statement discussed above, Plaintiffs, by letter on September 19, 2013, asked JPM to state that during the relevant period none of its affiliates received any payments from any borrower for any loans to the borrower funded by the Mortgage Private Placement Fund (and thus by JPM's Stable Value Funds). JPM has declined to so state, and given the industry practice of making such payments and commissions to entities that arranged,

---

[56] ████████████████████████████████████████████████████████



[57] ████████████████████

originated, placed and/or underwrote such loans, on information and belief, Plaintiffs allege that JPM affiliates regularly received such payment for loans from borrowers on loans they underwrote, arranged and/or brokered and which were funded by the Mortgage Private Placement Fund (and thus by JPM's Stable Value Funds).

**ANSWER:**     Defendants deny the allegations in Paragraph 128.

129.    Because JPM was also the originator of these private placement mortgages, it thus had unique knowledge of the risks inherent in such assets and knew or should have known that they were inappropriate for inclusion in a stable value fund portfolio under the market conditions prevailing during the relevant time period.

**ANSWER:**     Defendants deny the allegations in Paragraph 129.

130.    As early as 2007, JPM was aware of the liquidity and default risks of these private placement mortgages. ██████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

**ANSWER:**     Defendants deny the allegations in the first sentence of paragraph 130. ██████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████. Footnote 58

contains no allegations and requires no response.

131.    One of the plans that offered JPM's Stable Value Funds, through its experienced consultant (Mercer LLC), questioned why the Stable Value Funds invested in private placement mortgages: "what was the rationale to have 16% in private mortgages *in the first place* in this type of portfolio."[59]

**ANSWER:**     The allegations in Paragraph 131 purport to characterize selected terms of a

written document that speaks for itself, and thus are denied.  Footnote 59 contains no allegations

and requires no response.

132.    Mercer also stated that a "[c]apital preservation option shouldn't be seeking excessive yield. Purpose is to preserve capital. Mercer prefers more conservatively positioned stable value funds that are not overly exposed to spread sectors."[60]

---

[58]    █████████████████

[59]    Mitsubishi 0011

[60]    *Id.*

DB1/ 76148943.6

**ANSWER:**   The allegations in Paragraph 132 purport to characterize selected terms of a written document that speaks for itself, and thus are denied. Footnote 60 contains no allegations and requires no response.

133.   Mercer concluded that "private mortgage holding was and remains an inappropriate holding for the [JPM] stable value offering."[61]

**ANSWER:**   The allegations in Paragraph 133 purport to characterize selected terms of a written document that speaks for itself, and thus are denied. Footnote 61 contains no allegations and requires no response.

134.   As is clear from Mercer's statements, it was not exercising hindsight. Rather, its view was that the private placement mortgages had *always* been an inappropriate investment given the conservative nature of stable value funds.

**ANSWER:**   The allegations in Paragraph 134 purport to characterize selected terms of a written document that speaks for itself, and thus are denied.

135.   Ultimately, JPM's wrap providers agreed. ████████████████
████████████████████████████████████
███████████████████████

**ANSWER:**   Defendants deny the allegations in the first sentence of paragraph 135. The allegations in the second and third sentences purport to characterize the terms of a written document that speaks for itself, and thus are denied. Defendants deny any remaining allegations in Paragraph 135. Footnote 62 contains no allegations and requires no response.

136.   JPM's investment in billions of dollars of illiquid and arbitrarily-valued private placement mortgages was contrary to the "character and aims" of a stable value fund, was thus a violation of its ERISA duty of prudence, and caused damages to Plaintiffs and the proposed class for which they seek relief here.[63]

---

[61]   Mitsubishi 000010 (emphasis added).

[62]   ████████████

[63]   Not only were Plaintiffs damaged by JPM's leveraged investment in and holding of illiquid private placement mortgages in the Stable Value Funds, but they were further damaged when JPM later needed to unload these mortgages because of their excessive risk. See http://www.reuters.com/article/2012/04/03/us-jpmorgan-stablevalue-idUSBRE83216820120403 (last viewed October 6, 2013) ("Meanwhile, the JPMorgan stable value

**ANSWER:**     Defendants deny the allegations in Paragraph 136 and Footnote 63.

**The Causal Connection Between the Risky Investment Strategies Described Above and the Catastrophic Decline in the Market Value of JPM's Stable Fund's Investments**

137. ████████████████████████████████████████████████████

**ANSWER:**     Defendants deny the allegations in Paragraph 137 and Footnote 64.

138.     Based on industry standard performance attribution techniques, the cumulative loss to the IBF's portfolio can be decomposed into specific losses from the Commingled Pension Trust Funds in which it invested.

**ANSWER:**     Defendants deny that any plan participant suffered a "loss;" investors in the Stable Value Funds maintained their principal and accumulated interest and, during the Class Period, received returns higher than those available from money market funds.  Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 138.

139. ████████████████████████████████████████████████████

**ANSWER:**     Defendants deny the allegations in Paragraph 139.

140. ████████████████████████████ The allocation of investments in the Public Mortgage Fund is shown in Appendix A.

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in paragraph 140.

---

fund has trailed its peers each year since 2008, according to data provided by JPMorgan and Hueler, which tracks an index of 17 stable value collective trusts with $104.6 billion in assets. Some experts have suggested that the drop in performance is due to JPMorgan's exit from private mortgages.").

64



141. 

**ANSWER:**

. Defendants deny the remaining allegations of paragraph 141.

142.

**ANSWER:**     Defendants deny the allegations in Paragraph 142.  Defendants lack information

sufficient to form a belief as to the truth of the allegations in Footnote 65 regarding how

Plaintiffs constructed their table.

<u>The Causal Connection Between the IBF's Market Value Loss and Injury to Plaintiffs</u>

143.     As a result of the rapid decline in the market value of the IBF's investments, the
ratio of market value to book value of the Stable Value Funds declined to dangerous levels as of
the end of 2008:

**ANSWER:**     Defendants admit only that the market to book value ratios of SAIF, SVF, and the

Hospira, Mitsubishi, and Caterpillar separate account stable value funds had declined and were

below 100% as of the end of 2008.  Defendants deny the remaining allegations in Paragraph 143.

144.     By this measure, JPM's Stable Value Fund performed far worse than its
competitor funds. According to the SVIA, as of the end of 2008 (the height of the financial
crises), the average ratio of market value to book value for stable value funds was about 95 per
cent.[66]

---

[65] 

[66]   SVIA 000221.

**ANSWER:**   Defendants deny the allegations in the first sentence of paragraph 144.  The

allegations in the second sentence purport to characterize selected terms of a written document

that speaks for itself, and thus are denied.  Footnote 66 contains no allegations and requires no

response

145.   Table 11 also shows that JPM failed in the most basic objective of stable fund investing: to protect the principal of the fund.

**ANSWER:**   Defendants deny the allegations in Paragraph 145, and further state that no

investor in the Stable Value Funds at any time lost any principal or accumulated interest.

146.   It further shows the risky nature of JPM's stable value strategy. As Ms. Paradis herself admitted, the relationship between the market value and book value of a stable value fund over time "is the best summary risk measure for a stable value strategy."[67]

**ANSWER:**   Defendants deny the allegations in the first sentence of paragraph 146.  The

allegations in the second sentence purport to paraphrase or quote a selection from a written

document which speaks for itself, and thus are denied.  Footnote 67 contains no allegations and

requires no response.

147.   Although the wrap agreements for the Stable Value funds allow participants to transact with the funds at market value, over the long term the market value and book value of the funds must converge. This is accomplished by, among other things, reducing the crediting rate (essentially the interest rate) paid on a periodic basis to participants.

**ANSWER:**   Defendants admit that the wrap agreements for the Stable Value Funds guaranteed

investors (1) the ability to transact at book value – that is, their principal plus accumulated

interest (their account balance or book value) is always guaranteed, and (2) a positive "interest

crediting rate."  The remaining allegations in Paragraph 147 purport to characterize the crediting

rate formulas which speak for themselves, and thus are denied.

---

[67]   *Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis*, http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2 Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed Oct. 3, 2013).

148.    Indeed, the financial condition of JPM's Stable Value Funds grew so dire that, as set forth below, JPM began to set its crediting rates through negotiation with the wrap insurers rather than complying with the formula for setting such rates in its contracts with the plans and the wrappers – formulas in which the market value of the funds' investments was as key input.

**ANSWER:**    Defendants deny the allegations in Paragraph 148.

149.    In further effort to prevent plan participants from discovering the basis for the declining crediting rate, JPM insisted, both in their agreements with the wrap providers and JPM as investment manager, that plan sponsors not provide information on market value and book value to plan participants.

**ANSWER:**    Defendants deny the allegations in Paragraph 149.

150.    If armed with market and book values of the plans, plan participants could understand the negative impact on crediting rate which accordingly could affect their decision to maintain their investment in the funds in the future. Among other effects, the suppression agreement has the designed effect of keeping plan participants in a poorly performing fund, thereby maintaining the asset base on which JPM's fees are based. JPM was thus acting in its own interest and not the interest of the participants in order to keep more funds under management than would have been the case if this material information had not been suppressed. Only once market value began to catch up with book value did JPM more openly begin to provide market value and book value information to plan sponsors.

**ANSWER:**    Defendants deny the allegations in Paragraph 150.

151.    Throughout the class period, JPM could have allowed plan participants to receive information on the market and book value and an explanation as to the effect of a negative divergence on the crediting rate. However JPM did not allow this information to be divulged until 2011, by which time the two values had converged and so the information which it allowed to be provided to plan participants was positive. JPM during the class period continued to refuse to permit plan sponsors to divulge this information, during a period in which the market value had precipitously declined. Nor did it explain to plan participations the impact of a negative divergence on the crediting rate, which given the wrap agreements would inevitably be and was severely depressed in 2009 and thereafter because of this divergence. As a result, during the class period JPM's conduct deprived the class of vitally important information which would have permitted it to make an informed decision whether to move their 401(k) funds out of the JPM Stable Value Funds and so avoid the severely depressed crediting rates that inevitably were going to follow.

**ANSWER:**    Defendants deny the allegations in Paragraph 151.

152.    

███████████████████

**ANSWER:**    The allegations in paragraph 152 purport to paraphrase or quote a selection from a written document which speaks for itself, and thus are denied.

153.    Ms. Paradis had previously commented on the relationship between market value and book value that over time, it is the "best summary risk measure for a stable value fund." As such, the information that JPM's risky mortgage investments caused the market value of the Stable Value Funds to fall substantially below book value, including "MV/BV data" was material to plan participants and should not have been kept from them.

**ANSWER:**    The allegations in the first sentence of paragraph 153 purport to paraphrase or quote a selection from a written document which speaks for itself, and thus are denied. Defendants deny the remaining allegations in Paragraph 153.

154.    Beginning in 2009, JPM paid a substantially lower crediting rate to participants than the industry average:[68]

**ANSWER:**    Defendants admit only that, in 2009, SAIF's crediting rate was below the average of the Hueler pooled fund index, and that the Hueler pooled fund index is a composite based on a survey of pooled stable value funds.  Defendants deny the remaining allegations in Paragraph 154.

155.    In other words, had JPM followed an investment strategy for its Stable Value Fund that was similar to the appropriately conservative strategies employed by most of its competitors, participants in JPM's Stable Value Funds would have obtained substantially higher returns from their investments.

**ANSWER:**    Defendants deny the allegations of paragraph 155.

156.    JPM will doubtless argue that it was not at fault for these lower returns to plan participants because the poor returns were solely attributable to the putatively unforeseeable financial crisis. What this argument ignores, however, is that one of the key tenets of stable value fund investing is to insulate investments from sharp market fluctuations.[69] For the most part, JPM's competitors were able to achieve this goal. JPM did not because, as set forth above, it implemented an investment strategy that was in several ways inconsistent with the "character and aims" of stable value funds.

---

[68]    The Heuler index is an industry composite that is based on a survey of 30 stable value funds.
[69]    Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186.

**ANSWER:**    Defendants deny the allegations of paragraph 156.  Footnote 69 contains no

allegations and requires no response.

<u>JPM Acted For Its Own Interests and Not the Interests of Stable Value Fund Investors</u>

157.    JPM's behavior here was diametrically opposed to ERISA's mandate that
fiduciaries operate with an "eye single" to the interests of plan participants and beneficiaries.
*See, e.g., John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit
Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994). ERISA's fiduciary duties are, of course, "the
highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

**ANSWER:**    Defendants deny the allegations in the first sentence.  The allegations in the

second sentence purport to quote selections from or paraphrase a written document that speaks

for itself, and thus are denied.

158.    JPM's motive for its risky investment strategies was simple: greed. While times
were good, this strategy allowed JPM's Stable Value Funds to offer ostensibly higher returns
than competing funds and thus attract new participants. This inured to JPM's financial benefit
through the generation of additional asset volume-based management fees and otherwise inured
to the benefit of the JPM executives who received substantial bonuses tied to the growth of
JPM's stable value fund business.

**ANSWER:**    Defendants deny the allegations in Paragraph 158.

159.    And even when the Stable Value Funds began to perform poorly relative to its
competitors, many plans invested in JPM's Stable Value Funds were locked in to their
investments in JPM Stable Value Funds ███████████████████████████
████████████████████ – and yet JPM still received management fees from those
plans.

**ANSWER:**    Defendants admit only that plans and/or participants that were invested in the

Stable Value Funds paid the fees that were disclosed to investors during the timeframe in which

they invested.  Defendants deny the remaining allegations in Paragraph 159.

160.    While this strategy was likely doomed to fail over the long term, as the recent
financial crisis has shown, executives of financial institutions are often motivated by the prospect
of short term gain while disregarding long term, systematic risk – especially when they are in
essence gambling with the money of others.

**ANSWER:**    Defendants deny the allegations of paragraph 160.

## CLASS ALLEGATIONS

161.   *Class Definition*. Plaintiffs brings this matter as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3). Plaintiffs file this case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in any of the JPM Stable Value Funds that invested in the JPM Intermediate Bond Fund between July 1, 2007 and December 31, 2010. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

**ANSWER:**   Defendants admit that Plaintiffs purport to represent the putative class defined in

Paragraph 161 but deny that a class should be certified.  Defendants deny any remaining

allegations in Paragraph 161.

162.   *Numerosity*. The members of this Class are so numerous that joinder of all members is impracticable. While the exact number of members is unknown to Plaintiffs at this time, and can be ascertained only through discovery, Plaintiffs reasonably believe that more than 100 ERISA plans throughout the country offered one of the Stable Value Funds during the Class Period. These Plans collectively have more than one million participants and beneficiaries, and plaintiffs believe that a substantial number of these persons had invested in one of JPM's Stable Value Funds.

**ANSWER:**   Defendants admit only that the number of putative class members is sufficiently

large that joinder of all members would be impracticable.  Defendants lack information sufficient

to form a belief as to what Plaintiffs reasonably believe regarding the number of potential class

members.

163.   *Commonality*. The claims of Plaintiffs and the proposed Class have a common origin and share a common basis. All Class members suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA that form the basis of this lawsuit. Proceeding as a class is particularly appropriate here because the Stable Value Funds' assets are held in one or more collective trusts managed by JPM, each of which held invested substantial assets in JPM's Intermediate Bond Fund and Commingled Pension Trust Funds. Furthermore, common questions of law and fact

exist as to all members of the class. The many questions of law and fact common to the Class include, but are not limited to:

      a.      whether the JPM entities are fiduciaries under ERISA;

      b.      whether JPM breached its fiduciary duties under ERISA;

      c.      whether JPM deviated from the proper and/or stated purpose of Stable Value Funds when it adopted a high risk, leveraged investment strategy for such funds;

      d.      whether any of the transactions by JPM with regard to the Stable Value Fund, Intermediate Bond Fund and Pension Trust Funds were prohibited transactions; and

      e.      whether JPM's actions complained of herein injured plan participants and their beneficiaries who had invested in one of the Stable Value Funds.

**ANSWER:**    Defendants deny the allegations in Paragraph 163.

164.    *Typicality*. Plaintiffs' claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the class Members. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

**ANSWER:**    Defendants deny the allegations in Paragraph 164

165.    *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the Class members. Plaintiffs will vigorously protect the interests of the members of the Class.

**ANSWER:**    Defendants lack information sufficient to form a belief as to the truth of the

allegations in Paragraph 165 and therefore deny the same.

166.    Moreover, Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters. Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits. The undersigned counsel have and will devote the time and other resources necessary to litigate this case as effectively as possible.

**ANSWER:**    Defendants lack information sufficient to form a belief as to the truth of the

allegations in Paragraph 166 and therefore deny the same.

167.    *Rule 23(b)(1)(A) and (B) requirements*. Class certification in this ERISA action is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure

23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

**ANSWER:**     Defendants deny the allegations in Paragraph 167 and deny that a class should be

certified.

168.     ***Rule 23(b)(2) requirements***. Class certification under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.

**ANSWER:**     Defendants deny the allegations in Paragraph 168 and deny that a class should be

certified.

169.     ***Rule 23(b)(3) requirements***. In the alternative, certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Class predominate over any questions (if any) affecting only individual Class members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**ANSWER:**     Defendants deny the allegations in Paragraph 169 and deny that a class should be

certified.

## COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
## BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION

170.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**     Defendants incorporate by reference their answer to each of the preceding

paragraphs.

171.     The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

**ANSWER:**     Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC

Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes

pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value

funds.  Defendants deny the remaining allegations in Paragraph 171.

172.    A fiduciary must comply with the duty of prudence, which includes the duty to diversify. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

**ANSWER:**    The allegations in Paragraph 172 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

173.    The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors ...: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

**ANSWER:**    The allegations in Paragraph 173 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

174.    JPM's conduct with respect to the Stable Value Funds violated – in numerous ways – its fiduciary duties of prudence and to diversify as alleged above.

**ANSWER:**    Defendants deny the allegations in Paragraph 174.

175.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 175 and further deny that any

named Plaintiff or other plan participant suffered a "loss;" investors in the Stable Value Funds

maintained their principal and accumulated interest and, during the Class Period, received returns higher than those available from money market funds.

<u>COUNT II: VIOLATION OF ERISA § 404(a)(1)(A)</u><br><u>EXCLUSIVE BENEFIT</u>

176.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**   Defendants incorporate by reference their answers to each of the preceding paragraphs.

177.   The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

**ANSWER:**   Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value funds.  Defendants deny the remaining allegations in Paragraph 177.

178.   ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

**ANSWER:**   The allegations in Paragraph 178 state a legal conclusion to which no response is required.  To the extent a response is required those allegations are denied.

179.   Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), the JPM entities, while fiduciaries, caused the Stable Value Funds to engage in a high risk, leveraged investment strategy as alleged above.

**ANSWER:**   Defendants deny the allegations in Paragraph 179.

180.   JPM's aforementioned actions were not in the best interest of the Stable Value Funds' participants and beneficiaries. Rather, JPM sought to inflate the yields for its Stable Value Funds while at the same time disguising the corresponding risks with the goal of increasing its market share in the stable value retirement investing market segment and causing more retirement funds to be invested in its Stable Value Funds as compared to those offered by its competitors.

**ANSWER:**   Defendants deny the allegations in Paragraph 180.

181.   JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

**ANSWER:**   Defendants deny the allegations in Paragraph 181.  Investors in the Stable Value Funds maintained their principal and accumulated interest and, during the Class Period, received returns higher than those available from money market funds.

## COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED TRANSACTIONS

182.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**   Defendants incorporate by reference their answers to each of the preceding paragraphs.

183.   The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

**ANSWER:**   Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value funds.  Defendants deny the remaining allegations in Paragraph 183.  Defendants deny the remaining allegations in Paragraph 183.

184.   ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

**ANSWER:**   The allegations in Paragraph 184 state a legal conclusion to which no response is required.  To the extent a response is required those allegations are denied.

185.   The JPM entities were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, the JPM entities were parties in interest because they were fiduciaries.

**ANSWER:**   The allegations in Paragraph 185 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

186.   Despite the clear prohibition of Section 406(a)(1)(A), the JPM entities, while fiduciaries and parties in interest, caused the JPM Stable Value Funds to purchase and hold private placement mortgages that they themselves had arranged, originated, placed and/or underwrote, and the transfer of this lending opportunity was in violation of this section.

**ANSWER:**   Defendants deny the allegations in Paragraph 186.

187.   In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), the JPM entities while fiduciaries and parties in interest, used the assets of the Stable Value Funds for their benefit through the receipt of fees by JPM affiliates for their services relating to the origination, arrangement and underwriting of the mortgages.

**ANSWER:**   Defendants deny the allegations in Paragraph 187.

188.   JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

**ANSWER:**   Defendants deny the allegations in Paragraph 188.

### COUNT IV: VIOLATION OF ERISA §§ 406(b)
### PROHIBITED TRANSACTIONS

189.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**   Defendants incorporate by reference their answers to each of the preceding

paragraphs.

190.   The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class.

**ANSWER:**   Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC

Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value funds.  Defendants deny the remaining allegations in Paragraph 171.  Defendants deny the remaining allegations in Paragraph 190.

191.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

**ANSWER:**    The allegations in Paragraph 191 state a legal conclusion to which no response is required.  To the extent a response is required those allegations are denied.

192.    Despite the clear prohibition of Section 406(b)(1), JPM used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, i.e. mortgages that were originated, underwritten, and/or brokered by JPM affiliates.

**ANSWER:**    Defendants deny the allegations in Paragraph 192.

193.    JPM's efforts on behalf of the borrowers also violates section 406(b)(2)'s ban on acting on behalf of a party whose interests are adverse to the plan—here acting on behalf of the borrower in its dealing with the Mortgage Private Placement Fund.

**ANSWER:**    Defendants deny the allegations in Paragraph 193.

194.    In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C. § 1106(b)(3), JPM received consideration for its own personal account in connection with causing the Stable Funds to acquire the mortgage assets at issue. This consideration included without limitation application, originating, placement, and underwriting fees and yield spread premiums.

**ANSWER:**    Defendants deny the allegations in Paragraph 194.

195.    JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 195.

## PRAYER FOR RELIEF

Answering Plaintiffs' "Prayer for Relief" and the subparts thereto, Defendants deny that a class should be certified, any law was violated or that Plaintiffs are entitled to any relief whatsoever.

## **AFFIRMATIVE DEFENSES**

A.       Plaintiffs' claims are barred in whole or in part by the applicable statute of

limitations, including ERISA Section 413, 29 U.S.C. § 1113, and/or the doctrines of laches.

B.       Any alleged breach and/or any purported losses suffered by Plaintiffs resulted

from their exercise of control over the assets in their accounts, and therefore Defendants cannot

be liable for any loss, or by reason of any breach, under ERISA 404(c), 29 U.S.C. § 1104(c).

C.       Plaintiffs have failed to mitigate their damages, if any.

D.       To the extent Plaintiffs can establish any transaction prohibited by ERISA Section

406, 29 U.S.C. § 1106, those claims are barred because those transactions are exempted by

ERISA Section 408, 29 U.S.C. § 1108, and/or class or individual exemptions promulgated by the

Department of Labor.

E.       The claims of the Caterpillar Plaintiffs are barred in whole or in part by the

release and waiver incorporated in the class action settlement agreement in *Martin v. Caterpillar*

*Inc.,* 07-CV-1009 (C.D. Ill. Dkt. 152-1).

F.       The claims of the Caterpillar Plaintiffs are barred in whole or in part by collateral

estoppel and/or the res judicata effect of the final judgment in *Martin v. Caterpillar Inc.*

G.       Defendants reserve the right to assert, and hereby give notice that they intend to

rely upon, any other defense that may become available or appear during the discovery

proceedings or otherwise in this case and hereby reserve the right to amend the Answer to assert

any such defense.

WHEREFORE, Defendants respectfully request that judgment be entered in their favor,

that Plaintiffs' Second Amended Complaint be dismissed with prejudice, that Plaintiffs be denied

any remedy or relief, and that Defendants be awarded any costs of this action, their attorneys'

fees, and such other relief as the Court deems appropriate.

Dated: November 12, 2013

Respectfully Submitted,

Melissa D. Hill
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212-309-6318
Fax: 212-309-6001
melissa.hill@morganlewis.com

Gregory C. Braden (admitted pro hac vice)
Sean K. McMahan (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: 202.739.5217
Fax: 202.739.3001
gbraden@morganlewis.com
smcmahan@morganlewis.com

Azeez Hayne (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel.: 215-963-5426
Fax: 215-963-6001
ahayne@morganlewis.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 12, 2013, a true and correct copy of

the **Defendants' Redacted Answer to Plaintiffs' Second Amended Complaint** was filed

electronically and is available for viewing and downloading from the ECF system of the U.S.

District Court for the Southern District of New York, and that I served the same via electronic

filing on November 12, 2013.  I certify that I served the unredacted version via email upon the

following:

Barrett W. Wotkyns
Schneider Wallace Cottrell Brayton Konecky LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, AZ 85253
480-428-0144

James L. Kauffman
Peter J. Mougey
Laura S. Dunning
Levin, Papantonio, Thomas, Mitchell, Rafferty &
Proctor, P.A
316 S. Baylen Street, Suite 600
Pensacola, FL 32507
850-435-7147

Michael M. Mulder
Thomas R. Meites
Elena N. Liveris
Meites, Mulder & Glink
321 S. Plymouth CT., Suite 1250
Chicago, IL 60604
312-263-0272

Daniel J. Carr
Joseph C. Peiffer
Pfeiffer Rosca Abdulla & Carr, LLC
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170-4600
504-523-2434

Kevin Joseph Madonna
Kennedy & Madonna, LLP
48 Dewitt Mills Rd
Hurley, NY 12443
845-331-7514

*ATTORNEYS FOR PLAINTIFFS*

Melissa D. Hill