## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICHARD WHITLEY, CAROLETA M. DURAN, )
TERRY J. KOCH, MARK D. GRANDY, JOHN )
M. GATES, SCOTT NEWELL, MICHAEL KNEE, )
ERIC M. MURPHY,  NANCY DYE, JOHN )
STOLWYK, CLAY HEDGES, and ROSEMARY )
DOTSON, on behalf of themselves and those )
similarly situated )
)
    *Plaintiffs,* )
)
        v. )
)
J.P. MORGAN CHASE & CO.; JPMORGAN )
CHASE BANK N.A.; J.P. MORGAN )
INVESTMENT MANAGEMENT INC., aka J.P. )
MORGAN ASSET MANAGEMENT; J.P., )
MORGAN RETIREMENT PLAN SERVICES, )
LLC, and JPMAC HOLDINGS, INC. )
)
    *Defendants.* )
)
_____ )

Case No. 12-cv-2548
The Honorable Vernon S. Broderick


**CONSOLIDATED AND**
**AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PARTIES ..............................................................................................................8

JURISDICTION AND VENUE ............................................................................13

FACTUAL ALLEGATIONS ................................................................................13

    The 401(k) Plans and JPM's Role as Fiduciary.........................................13

    Stable Value Funds ....................................................................................15

    The JPM Stable Value Funds......................................................................18

    The JPM Stable Value Funds' Investments in Commingled Pension Trust Funds...20

    JPM's Inappropriate Use of Leverage in its Stable Value Funds ...............22

    JPM's Investment Strategy is Radically Different from the Purported
    Benchmarks...............................................................................................26

    JPM's Exposure to Real Estate Risk..........................................................36

    JPM's Investment in Risky Mortgage-Backed Securities ...........................39

    JPM's Unique Investment in Private Placement Commercial Mortgages.................47

    The Causal Connection Between the Risky Investment Strategies Described Above
    and the Catastrophic Decline in the Market Value of JPM's Stable Fund's
    Investments ...............................................................................................52

    The Causal Connection Between the IBF's Market Value Loss and Injury to
    Plaintiffs...................................................................................................55

    JPM Acted For Its Own Interests and Not the Interests of Stable Value Fund
    Investors ...................................................................................................59

    Allegations Specific to JPM's Pooled Stable Value Funds ........................60

CLASS ALLEGATIONS ....................................................................................73

COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C) BREACH OF DUTIES
OF PRUDENCE AND DIVERSIFICATION ........................................................82

COUNT II: VIOLATION OF ERISA § 404(a)(1)(A) EXCLUSIVE BENEFIT ................. 83

COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED
TRANSACTIONS ............................................................................................................. 84

COUNT IV: VIOLATION OF ERISA §§ 406(b)(1),  (b)(2)  AND (b)(3)
PROHIBITED TRANSACTIONS............................................................................. 85

COUNT V: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (a)(1)(D)  PROHIBITED
TRANSCATIONS................................................................................................. 86

COUNT VI: VIOLATION OF ERISA §§ 406(b)(1) AND (b)(3) PROHIBITED
TRANSACTIONS................................................................................................. 87

COUNT VII: KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY
(*PLED IN THE ALTERNATIVE*)........................................................................ 89

PRAYER FOR RELIEF ................................................................................................. 89

Richard Whitley, Caroleta M. Duran, Terry J. Koch, Mark D. Grandy, John M. Gates, Scott Newell, Michael Knee, Eric M. Murphy, Nancy Dye, John Stolwyk, Clay Hedges, and Rosemary Dotson (collectively "Plaintiffs") bring this action against J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management (collectively "JPM"), JPMAC Holdings, Inc. ("JPMAC"), and JPMorgan Retirement Plan Services LLC ("JPMRPS") on behalf of themselves and similarly situated 401(k) plan participants. Based on personal knowledge and information obtained from investigation by counsel and discovery in this matter, Plaintiffs allege as follows:

## INTRODUCTION

1.     Defendants are J.P. Morgan Chase & Co. and various of its wholly-owned subsidiaries, including JPMAC and JPMRPS, which are defendants only as to some of the claims alleged herein. JPM sold and currently sells a number of investment funds offered to 401(k) plan participants and represented to be stable in value (collectively referred to in this Complaint as the "JPM Stable Value Funds"). These funds are called, among other things, the Stable Value Fund, the Stable Asset Fund, Stable Value, Stable Principal Fund, Short-Term Investment Fund, the Stable Asset Income Fund, and the JPMorgan Stable Value Fund. All of the JPM Stable Value Funds are advertised as being stable in value, and thus all were presented as conservative investment options.

2.     For purposes relevant to this Complaint, the JPM Stable Value Funds are divided into two basic categories: (1) separate stable value funds that are established for a single employer group and (2) pooled stable value funds that combine retirement funds for multiple, usually smaller, employer groups. The Stable Asset Income Fund ("SAIF") and the JPMorgan Stable Value Fund (referred to in this Complaint as the "ACSAF/JPM Stable Value Fund") are

1

pooled stable value funds. The allegations in this Complaint apply to both JPM's separate stable value funds and JPM's pooled stable value funds unless otherwise stated.

    3.    Plaintiffs and members of the proposed Class are investors who invested their retirement funds via their defined contribution 401(k) plans into the JPM Stable Value Funds, which in turn were invested by JPM in its Intermediate Bond Fund ("IBF") or in its Intermediate Public Bond Fund ("IPBF") and in underlying JPM funds as discussed in detail below.

    4.    The main investment objective of stable value funds is preserving the invested principal and accumulated returns while yielding returns slightly higher than a money market account. The longer duration of investments in a stable value fund as compared to a money market fund should generally result in higher yields. It is inherent in this objective that stable value funds must be managed to minimize the risk to the invested principal and to minimize volatility in the face of changing market conditions.[1]

    5.    JPM understood well the purpose of stable value funds.



Consistent with this stated strategy, JPM represented to retirement investors that the JPM Stable Value Funds are "your most conservative investment option."[3] The then-head of JPM's stable

---

[1] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, describing objectives of stable value funds.

[3] *See* http://www.jpmorgan.com/pages/stablevalue (last viewed Oct. 3, 2013).

value fund management group, Victoria Paradis, described JPM's stable value asset class as "among the most conservative in the DC [defined contribution retirement] plan line-up."[4] However, this sales ploy is a ruse, and has been for some time.

6.    While JPM touted the conservative nature of the JPM Stable Value Funds, for the sake of its own financial interests, it caused the JPM Stable Value Funds to invest heavily in highly-leveraged mortgage-related assets, illiquid assets such as private mortgages, "out-of-index" securities, and other investments not suitable for a stable value product. As set forth below, this strategy was not prudent given the "character and aims" of stable value funds for several reasons.

7.    First, the high degree of leverage employed in the JPM Stable Value Funds is both contrary to industry standards and inherently risky, as leverage increases the magnitude of volatility and thus gains and losses.

8.    Second, although JPM claimed to be managing against a particular benchmark -- the Lehman Aggregate Intermediate Index -- JPM's actual investment strategy differed fundamentally from this index both in terms of leverage and composition. Thus, JPM vastly exceeded the risk parameters indicated by this benchmark.

9.    Third, the JPM Stable Value Funds due to their leverage were inadequately diversified and highly concentrated in mortgage-related investments – a problem that was exacerbated by JPM's failure to prudently hedge against the JPM Stable Value Funds' enormous exposure to the real estate market.

---

[4] *See Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis,* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2 Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true   (last viewed Oct. 3, 2013).

10.     Fourth, the JPM Stable Value Funds invested in low quality mortgage-backed securities, such as those backed by subprime and option-ARM mortgages, those backed by inadequate documentation of the underlying borrowers' ability to pay back the mortgages, and those that took exotic forms such as interest-only mortgage derivatives and inverse floaters. These investments were not suitable for a stable value fund when they were made and were eventually prohibited by the fund.

11.     Fifth, JPM (unique among its competitors) invested in commercial private placement mortgages, some of which JPM itself originated, which had liquidity problems and were otherwise supported by no objective rating criteria. These investments too were not suitable for a stable value fund when they were made and were eventually prohibited by the fund. This allegation does not apply at all times to the ACSAF/JPM Stable Value Fund which, although imprudently managed in other ways, as of 2008 did not invest in the Private Placement Mortgage Fund – the fund that housed the private placement mortgages.

12.     JPM undertook this risky strategy to, as they say on Wall Street, "reach for yield" – i.e., increase returns for stable value fund investors so as to attract more investors and increase its market share and management fees, which were based on the total amount under management ("AUM"). This was a goal fundamentally at odds with the capital preservation function that, according to industry standards and JPM itself, was the primary purpose of stable value funds.

13.     Furthermore, documents and previous deposition testimony produced in this case – and not hindsight-based general market indicators – show beyond any doubt that JPM was well aware or should have been aware of the outsized risks its unique investment strategies posed to Plaintiffs and other investors in the JPM Stable Value Funds at the times when JPM made and maintained these investments. This evidence is adduced in detail throughout this Complaint. As



As set forth below, this observation was surely accurate and, if anything, an understatement. Yet even confronted with this striking piece of information, JPM refused to rethink, much less modify, its risky mortgage-related investment strategy for the JPM Stable Value Funds.

Furthermore, Victoria Paradis, Managing Director of JPM Morgan Asset Management and then-manager of the Stable Value Funds, herself acknowledged in a trade publication that "[d]irectly placed [commercial mortgage] loans *are not appropriate within any portfolio with liquidity demands*."[8] Nonetheless, as explained further below, the JPM Stable Value Funds (with the exception of the ACSAF/JPM Stable Value Fund after 2008) – which faced liquidity demands during much of the class period – invested heavily in such loans.

14.     So this case is not one that turns on hindsight allegations based on general market indicators. Rather, at the times it made and maintained the highly-leveraged mortgage-related investments at issue here, JPM disregarded the stated purposes of the JPM Stable Value Funds,

---

[8] *Stable Times*, First Quarter 2007, "Private Mortgages – A Compelling Stable Value Investment" (emphasis added).

ignored important stable value fund-related management advice from its own consultants and managers, and intentionally adopted a high risk, leveraged strategy to reach for yield and increase its market share and thus management fees. Accordingly, JPM had actual, contemporaneous knowledge that it was pursuing an investment strategy that was imprudent given the "character and aims" of stable value fund investing.

15.    When the financial crisis hit, the JPM Stable Value Funds sustained catastrophic – but predictable – losses directly related to JPM's inappropriate high risk, leveraged strategy.

16.    This loss was caused by JPM's unique and inappropriate investment strategies and not by unforeseeable market conditions. Competing stable value funds continued to perform well during the financial crisis, as would be expected of investment vehicles that by design are intended to preserve principal above all by limiting volatility from market fluctuations.

17.    As set forth below, JPM breached its ERISA duty of prudence and duty to diversify owed to investors in the JPM Stable Value Funds. In addition, JPM breached its duty of loyalty and engaged in a conflict of interest by causing the JPM Stable Value Funds to engage in prohibited transactions with JPM itself.

18.    As set forth below, JPM committed additional breaches of ERISA with respect to the pooled Stable Value Funds. JPM acted in its own interests and not in the interests of the participants and beneficiaries of the plans which invested in the pooled Stable Value Funds by "reaching for yield" solely in an effort to rapidly increase its market share in stable value products as compared to competitors and even its own erstwhile partner, American Century Investments. JPM's breaches of the duties of prudence and loyalty with respect to the JPM Stable Value Funds generally were magnified and exacerbated in the context of its pooled Stable Value Funds due to the well-known and unique features of such funds as explained below.

6

19.     JPM's breaches of duty caused cognizable injury to Plaintiffs and the members of the proposed Class. Although, as explained below, the recognition of these massive losses in Plaintiffs' accounts was "smoothed" (*i.e.*, amortized over time), the losses were nevertheless sustained in full. The investors paid for their losses through a substantially lower crediting rate during the relevant time period than they would have realized had JPM engaged in a prudent stable value investment strategy. JPM should now be held fully liable for this reduction in the yielded returns of the JPM Stable Value Funds.

20.     JPM is also liable for disgorging management fees and other consideration received in connection with its management of the JPM Stable Value Funds.

21.     Plaintiffs are not the only parties complaining about JPM's management of its stable value fund business. ████████████████████████

████████████████████████████████████████

22.     The result of litigation and related arbitration between JPM and one of its business partners (American Century Investments, as referenced above) also shows that JPM habitually mischaracterized the performance and investment strategy of its Stable Value Funds. American Century Investments won a large arbitration judgment against one of the JPM entities here because, among other things, that entity misrepresented the risk profile of the investment funds at issue in that case including the JPM Stable Value Funds at issue here.[9] That decision exposed how JPM used risky investments that were unsuitable for a stable value fund to

---

[9] *Am. Century Inv. Mgmt., Inc. v. J.P. Morgan Invest Holdings LLC*, No. 58 148 Y 00220 9 (Am. Arb. Ass'n).

temporarily achieve high yield and thereby attract additional fees by increasing the amount of assets under its management.[10]

23.     In addition, JPM along with Defendants JPMRPS and JPMAC intentionally caused a run on the more conservatively-managed pooled stable value fund offered by American Century Investments, which American Century was forced to surrender to JPM to avoid catastrophic damage to the fund. JPM's actions caused harm to those investors left behind in that fund (who eventually were invested in the risky ACSAF/JPM Stable Value Fund after American Century ceded control of the fund to JPM). JPM also harmed those investors who it caused to be switched into its own, more risky pooled stable value fund (the Stable Asset Income Fund or "SAIF").

## PARTIES

24.     Plaintiff Richard Whitley has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Hospira, Inc. 401(k) Retirement Plan ("the Hospira Plan"). The Hospira Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Whitley, prior to withdrawing from the Hospira Plan on or about July 27, 2012, had 401(k) funds allocated to JPM's Hospira Stable Value Fund, which is one of the Stable Value Funds described above.

25.     Plaintiff Terry J. Koch has been, and continues to be, a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The Caterpillar Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Koch has had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

---

[10] *Id.*

26.     Plaintiff Caroleta M. Duran has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar Plan. At all relevant times, prior to withdrawing from the Caterpillar Plan on or about, August 22, 2011, Ms. Duran had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund.

27.     Plaintiff Mark D. Grandy has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mitsubishi Motors North America, Inc. Manufacturing Division 401(k) Savings Plan (the "Mitsubishi Plan"). The Mitsubishi Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Grandy has had 401(k) funds allocated to JPM's Stable Value Fund, which is one of the Stable Value Funds described above.

28.     Plaintiff John M. Gates has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan International, Inc., Employees' Retirement Savings Plan (the "Titan Plan"). The Titan Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Gates has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

29.     Plaintiff Scott Newell has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan Plan. At all relevant times, Mr. Newell has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

30.     Plaintiff Michael Knee has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Modern Drop Forge Company Employees' Retirement Benefit Plan (the "Modern Drop Forge Plan"). The Modern Drop Forge Plan is a defined contribution retirement plan subject to ERISA. Mr. Knee had 401(k) funds allocated to the American Century Stable Asset Fund ("ACSAF") at the time JPM executed the agreement to transfer those funds to the ACSAF/JPM Stable Value Fund on September 10, 2007, at the time those

9

funds were actually received into the ACSAF/JPM Stable Value Fund on September 17, 2007, when the fund commenced operations, and continuing thereafter in the successor fund, the ACSAF/JPM Stable Value Fund, until withdrawing from the Modern Drop Forge Plan on or about June 11, 2014. Prior to September 17, 2007, none of Plaintiff Knee's 401(k) funds were invested in the ACSAF/JPM Stable Value Fund.

31.     Plaintiff Eric M. Murphy has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mayer Electric Supply Co., Inc. Capital Accumulation Plan (the "Mayer Electric Plan"). The Mayer Electric Plan is a defined contribution retirement plan subject to ERISA. Mr. Murphy had 401(k) funds allocated to the ACSAF at the time JPM executed the agreement to transfer those funds to the ACSAF/JPM Stable Value Fund on September 10, 2007, at the time those funds were actually received into the ACSAF/JPM Stable Value Fund on September 17, 2007, when the fund commenced operations, and continuing thereafter in the ACSAF/JPM Stable Value Fund. Prior to September 17, 2007, none of Plaintiff Murphy's 401(k) funds were invested in the ACSAF/JPM Stable Value Fund.

32.     Plaintiff Nancy Dye has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Government Employees Health Association ("GEHA") 401(k) Retirement Plan ("GEHA Plan"). The GEHA Plan is a defined contribution retirement plan subject to ERISA. Ms. Dye has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

33.     Plaintiff John Stolwyk has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Kansas City Power and Light 401(k) Retirement Plan ("the KCPL Plan"). The KCPL Plan is a defined contribution retirement plan subject to ERISA. Mr. Stolwyck has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

34.     Plaintiff Clay Hedges has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Ferrell Gas 401(k) Retirement Plan ("Ferrell Gas Plan"). The Ferrell Gas Plan is a defined contribution retirement plan subject to ERISA. Mr. Hedges had 401(k) funds allocated to the ACSAF at the time JPM executed the agreement to transfer those funds to the ACSAF/JPM Stable Value Fund on September 10, 2007, at the time those funds were actually received into the ACSAF/JPM Stable Value Fund on September 17, 2007, when the fund commenced operations, and continuing thereafter in the ACSAF/JPM Stable Value Fund. Prior to September 17, 2007, none of Plaintiff Hedges' 401(k) funds were invested in the ACSAF/JPM Stable Value Fund.

35.     Plaintiff Rosemary Dotson has been and is a participant, as defined in § 3(7), 29 U.S.C. § 1002(7), in the GEHA Plan. Ms. Dotson has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

36.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, Newell, Knee, Murphy, Dye, Stolwyk, Hedges, and Dotson sue on their own behalf and, as specified below, on behalf of participants in 401(k) plans in which any of the JPM Stable Value Funds is or has been offered as an investment option and who have allocated monies to any of the JPM Stable Value Funds during the class period.

37.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a financial services provider whose headquarters is in New York, New York. JPMC was a fiduciary with respect to the plans offering any of the JPM Stable Value Funds and the participants in and beneficiaries of such plans at all relevant times.

38.     JPMorgan Chase, N.A. ("JPMC, NA") is a bank operating in the United States and abroad with a registered address of 270 Park Avenue, New York, New York 10017-2014.

11

JPMC, NA acts as trustee and fiduciary (either directly or through one or more wholly-owned subsidiaries) of the JPM Stable Value Funds. For example, the Commingled Pension Trust (Stable Asset Income) of JP Morgan Chase, N.A. is a collective trust fund established and maintained by JPMC, NA under a declaration of trust. JPMC, NA was a fiduciary with respect to the plans offering any of JPM's Stable Value Funds and the participants in and beneficiaries of such plans at all relevant times.

39.     Through defendant JPMAC Holdings Inc. ("JPMAC"), JPMC owned at all relevant times between 40% and 48% interest in American Century Companies, Inc. ("ACC"). Throughout the period of its ownership, JPMC and/or JPMAC had the right to appoint and did appoint at least one board member to the ACC Board of Directors, who thus served as a fiduciary of ACC. The basis of JPMAC's liability as to some of the claims alleged in this Complaint is set forth below under "Allegations Specific to JPM's Pooled Separate Value Funds."

40.     Defendant J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management ("JPMAM") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. J.P. Morgan Asset Management is the marketing name for the asset management business of JPM and its subsidiaries worldwide. JPMAM is the entity that managed the JPM Stable Value Funds. JPMAM was a fiduciary with respect to the plans offering any of the JPM Stable Value Funds and the participants in and beneficiaries of such plans at all relevant times.

41.     Defendant J.P. Morgan Retirement Plan Services LLC ("JPMRPS") is a wholly-owned subsidiary of JPMC. The basis of JPMRPS's liability as to some of the claims alleged in this Complaint is set forth below under "Allegations Specific to JPM's Pooled Separate Value Funds."

12

## JURISDICTION AND VENUE

42.   The Court has subject matter jurisdiction over this matter pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

43.   Venue is proper in this District because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

## FACTUAL ALLEGATIONS

### The 401(k) Plans and JPM's Role as Fiduciary

44.   At all times relevant to this Complaint, the 401(k) plans involved in this matter were employee benefit plans within the meaning of ERISA.

45.   At all times relevant to this Complaint, the plans were "defined contribution" or "individual account" plans within the meaning of ERISA because, among other reasons, the plans provided for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, as well as any income, expenses, gains and losses, and forfeitures of accounts of other participants that could be allocated to such participant's accounts.

46.   At all times relevant to this Complaint, these plans provided the Plaintiffs and members of the proposed Class with various options for investment, and they could direct the plans to purchase investments from among these options and allocate them to their individual accounts. The JPM Stable Value Funds are and were among these options.

47.   Plaintiffs Whitley, Koch, Duran, Grandy, Gates, Newell, Knee, Murphy, Dye, Stolwyk, Hedges, and Dotson were and/or are, respectively, participants in the Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell

13

Gas Plans at times relevant to this action. At all relevant times, each of these Plans offered one of the JPM Stable Value Funds as an investment option that Plaintiffs invested in, and at those times, one or more of the JPM entities served as trustee for each of these Plans.

48.     The Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell Gas Plans are typical of such plans, and Plaintiffs are typical and representative of participants in such plans who have chosen to invest a portion of their 401(k) holdings in one of the JPM Stable Value Funds. The Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell Gas Plans are typical of the plans involved in this matter in that each at the relevant times has offered one of the JPM Stable Value Funds as an investment option, and one or more of the JPM entities served as fiduciary, administrator and trustee for each.

49.     Although the JPM Stable Value Funds are nominally separate, they are linked together by their common and substantial investments in other commingled JPM funds, such as the Intermediate Bond Fund (or in the case of the ACSAF/JPM Stable Value Fund, the similar Intermediate Public Bond Fund) and other underlying comingled Pension Trust Funds as described below.

50.     At all relevant times, one or more of the JPM entities served as Investment Advisor, Investment Manager, Administrator, Trustee and/or Custodian of these plans' Stable Value Funds.

51.     ERISA defines a fiduciary as someone who "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of

14

such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). People and entities are fiduciaries pursuant to ERISA not only when they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when they perform such fiduciary functions.

52.    Investment managers are also ERISA fiduciaries. ERISA defines in relevant part an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset of a plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

53.    The JPM entities are fiduciaries with respect to the JPM Stable Value Funds and thus of the plans that offer the JPM Stable Value Funds and the participants in and beneficiaries of those plans who allocate retirement funds to one of the JPM Stable Value Funds because, among other reasons, they possess investment discretion as to the JPM Stable Value Funds. Neither plans nor plan participants possess the ability to direct the manner in which the JPM entities invest or allocate the JPM Stable Value Funds' assets. Moreover, one or more of the JPM entities are trustees and custodians with respect to the JPM Stable Value Funds pursuant to ERISA § 403(a) and are also investment managers with respect to the JPM Stable Value Funds. In addition, they are investment advisors to the plans in which plaintiffs are or were participants as well to other plans in which members of the proposed class are or were participants.

## Stable Value Funds

54.    Under ERISA, a fiduciary's investment decisions must be prudent not in the abstract but with reference to the *specific goals* of a particular investment fund. A fiduciary must give "appropriate consideration" to facts and circumstances relevant to "the role the investment

or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(i). Thus, a fiduciary's investment decisions are evaluated under ERISA "in light of the *character and aims* of the particular type of plan he serves." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (4th Cir. 1996) (emphasis added and quotation omitted).

55.     The "character and aims" of stable value funds are well defined both by industry practice and ERISA regulations.

56.     According to the trade association for the industry, the Stable Value Investment Association ("SVIA") – of which JPM is a prominent member – a stable value fund should be invested in a "high-quality, diversified, fixed-income portfolio" that is "designed to preserve capital while providing steady positive returns."[11] Thus, "[s]table value funds are considered a conservative and low risk investment compared to other investments offered in 401(k) plans."[12]

57.     Under ERISA, employers that offer defined contribution retirement plans are required to offer at least three options for investment, each with "materially different risk and return characteristics." One of these investment options must be a safe option: an "income producing, *low risk, liquid* fund, subfund, or account." 29 C.F.R. § 2550.404c-1 (emphasis added).

58.     Stable value funds are a popular investment option in 401(k) plans. Offered as an option in approximately half of all defined contribution plans, stable value funds are usually the

---

[11] Stable Value Investment Association, "Stable Value FAQ", http://stablevalue.org/knowledge/faqs/question/what-is-a-stable-value-fund (last viewed Oct. 3, 2013).

[12] *Id.*

16

largest conservative investment option available in such plans and, when offered, are the "low risk, liquid" investment option required by ERISA regulations.

59.    Historically, stable value funds invested in guaranteed investment contracts ("GICs"), contracts offered by insurance companies that guaranteed a fixed return over a set duration. GICs allowed investors to participate in an insurer's investment portfolio, which is required by state solvency regulations to consist of conservative, well-diversified, and liquid investments.

60.    Beginning in the early 1990s, stable value fund managers began to offer stable value products designed as "synthetic GICs." A synthetic GIC consists of a fixed-income portfolio "wrapped" with a contract with an insurer or other large financial institution that, subject to various conditions and restrictions, guarantees the "book" value of the fund and allows for "benefit responsiveness," which means that participants can terminate their investments in the fund at book value rather than market value under certain conditions. The JPM Stable Value Funds were designed as synthetic GICs.

61.    The shift from actual GICs to synthetic GICs was not intended to change the basic risk profile of stable value funds. "Consistent with the role of stable value as the 'safe' option in most defined benefit contribution plans today, the overriding objective in managing [the portfolios underlying the synthetic GIC] is preservation of principal. Liquidity to meet participant withdrawals is an additional factor, as is earning a fairly stable return which exceeds that of shorter maturity alternatives."[13]

62.    More specifically, even though a synthetic GIC invests in a partially-insured fixed income portfolio, that portfolio itself must be managed in accordance with the purposes of a

_____

[13] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 83.

stable value fund: "[t]he benchmark for these bonds, as well as the philosophy and strategies of the fixed income manager, should be consistent with the goals of a stable value fund. Since the stable value fund is typically offered as a low-risk alternative for investors in defined contribution plans, a relatively low-risk profile is in order."[14]

63.    Stable value funds are typically affected far less than most other investment options in periods of market distress. Because they are generally comprised of well-diversified portfolios of high credit quality fixed-income securities, they were one of the few 401(k) investment options to provide positive returns throughout the market upheaval of the late 2000s, as set forth below.

### The JPM Stable Value Funds

64.    JPM sponsors a collection of stable value funds that is one of the largest and most utilized in the country. Between 2003 and 2009, JPM grew the amount that 401(k) participants invested in the JPM Stable Value Funds from less than $10 billion to more than $15 billion.

65.    The JPM Stable Value Funds are managed by JPM and offered as investment options to numerous ERISA defined contribution 401(k) plans in the United States.

66.    At all relevant times, the JPM entities have served as Investment Advisors, Fully Discretionary Investment Managers, Plan Administrators, Trustees and/or Custodians (per ERISA § 403(a)) of the Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell Gas Plans and all the numerous other defined contribution 401(k) plans that offered one of the JPM Stable Value Funds as an investment option. As such, at all relevant times, JPM has been a fiduciary of such defined contribution 401(k) plans under ERISA.

---
[14] *Id.*, 120.

67.    JPM has two pooled stable value funds, the SAIF and ACSAF/JPM Stable Value Fund, ███████████████████████ Named plaintiffs represent six of those plan sponsors (Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL and Ferrell Gas plans). In addition, as of December 31, 2009, JPM has had approximately ███████████████████ Named plaintiffs invested in three of those separate stable value funds (Hospira, Caterpillar and Mitsubishi plans).

68.    JPM has frequently and consistently stated publicly that the JPM Stable Value Funds are typical stable value funds, as described above. ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

69.    In addition, JPM emphasized that the JPM Stable Value Funds were typical stable value funds, not only by calling them "Stable Value," "Stable Asset," or "Stable Income" in their very names, but also by its characterization of their risk level. ███████████████

███████████████████████████████████████████████████████

███████████████ As set forth above, Ms. Paradis has stated publicly that the JPM Stable Value Funds are among the "most conservative" investments possible in a defined contribution plan. Furthermore, as JPM understood well, plan sponsors offered the JPM Stable Value Funds as the "low risk, liquid" investment option required by ERISA.

───────────────────

██ ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██ ████████████████████

The JPM Stable Value Funds' Investments in Commingled Pension Trust Funds

70.    JPMorgan Chase Bank, N.A. ("JPMCB") has established and operated a number of Commingled Pension Trust Funds for the collective investment of pension trusts, profit sharing trusts, other employee benefit trusts or funds, and other commingled funds. The funds are referred to as "commingled" because they invest the monies of many different ERISA plans and thus the retirement investments of the participants in those plans.

71.    Among these Commingled Pension Trust Funds is the Intermediate Bond Fund ("IBF").

72.    JPM utilized the IBF for the actively managed portion of each of the Stable Value Funds with the exception of the ACSAF/JPM Stable Value Fund, which after 2008 utilized the Intermediate Public Bond Fund ("IPBF"), a fund very similar to the IBF. The primary difference between the IPBF and the IBF is that the IPBF did not invest in JPMCB's Private Placement Mortgage Fund.

73.    

74.    In investing the Stable Value Funds assets, JPM employed a fund of funds investment strategy. Thus, the IBF takes the JPM Stable Value Fund assets and in turn invests in

20

other JPM Commingled Pension Trust Funds including the JPMCB Mortgage Private Placement Fund, the JPMCB Public Mortgages Fund, the JPMCB Intermediate Credit Fund, the JPMCB Liquidity Fund, and the JPMCB Enhanced Cash Fund. The IBF also invests in directly held securities similar to those in many of the other Commingled Pension Trust Funds. The IBF's allocation in those funds and in direct investments from 2006 through 2010 and the investments of three of the commingled funds in which the IBF invested (the Public Mortgage Fund, the Private Placement Mortgage Fund, and the Enhanced Cash Fund) on an annual basis is set forth in the attached Appendix A. In addition, Appendix B shows the percentage of the assets of the IBF that were invested in the underlying funds which constituted private mortgages - meaning non-conforming mortgages which do not comply with Freddie Mac and Fannie Mae standards. These private mortgages are riskier than and less liquid than conforming mortgages because of their credit risk.

75.     Similarly, the IPBF takes the ACSAF/JPM Stable Value Fund assets and invests in other JPM Commingled Pension Trust Funds including the same JPMCB Public Mortgages Fund, JPMCB Intermediate Credit Fund, JPMCB Liquidity Fund, and JPMCB Enhanced Cash Fund.

76.     Although the IBF and IPBF were the main investment vehicles for the JPM Stable Value Funds, management of the IBF and IPBF was completely divorced from the stated objectives of JPM's Stable Value Funds. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



This is inconsistent with the basic purposes of a stable value fund, which are absolute (preserving principal and achieving consistent returns) rather than relative (performing better than a particular benchmark).

77.

which require the investment manager to act in a manner "consistent with the goals of a stable value fund" and to adopt a "relatively low-risk profile."[21]

### JPM's Inappropriate Use of Leverage in the JPM Stable Value Funds

78.    Consistent with their conservative nature, stable value funds typically do not use leverage. In an April 7, 2006 letter to the U.S. Department of Labor, the SVIA opined that a

---

[20] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, which defines as a "primary investment objective" of stable value funds "Stability: Ensuring that valuation of investment and accrued income are protected from the volatility of the financial markets and that future returns remain relatively stable from year to year."

[21] *Id.*, 120 (1998).

particular failed stable value fund, the Circle Trust Stable Value Fund, did not invest in a way "consistent with the objectives of stable value investing" because, among other things, it invested in vehicles that "depend upon financial leverage to achieve their stated return objectives."[22] And in a letter to the Commodities Futures Trading Commission, the SVIA stated that "stable value funds themselves are generally non-leveraged investment vehicles."[23] Consistent with the SVIA's view, a leading authority on stable value investing states that "[a]ll wrappers strongly restrict the use of leverage."[24]

79.     BlackRock, a worldwide leader in investment management, describes the risks of leverage: "Funds that utilize leverage tend to exhibit greater volatility in yield, market price and net asset value than non-leveraged funds. Due to their sensitivity to changes in interest rates, leveraged funds may experience larger drops in net asset value compared to similar non-levered fixed income closed-end funds. In addition, any narrowing of spreads between short- and long-term rates may diminish potential profit margins for the fund and potentially lower the dividend paid by the fund."[25]

80.     Although data about the extent to which stable value funds use leverage is not readily available, leverage is exceedingly rare in similar types of investment vehicles for which such data is available. For example, money market funds – to which stable funds are often

---

[22] SVIA 000676.

[23] SVIA 000221.

[24] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 127.

[25] http://www2.blackrock.com/us/individual-investors/insight-education/investing-basics/a-look-at-leverage.

compared – employ little to no leverage.[26] Similarly, leverage is rare in mutual funds. Of nearly 30,000 mutual funds, barely 2% have leverage of over 5% and less than 0.5% have leverage over 45% (a level exceeded by the IBF in 2006 and 2007, as set forth below). Those mutual funds that do use substantial leverage typically invest in equities rather than in fixed income securities and are expressly marketed as aggressive funds. Money market and most mutual funds are hesitant to use leverage for good reason: such funds are typically risk averse (as stable value funds also should be) and do not want the value of their holdings to fall below their initial cost.

81.    The use of substantial leverage in stable value funds increases risk in at least three ways. First, as a matter of basic finance theory, funds that use leverage exhibit greater volatility in net asset value and return than those that do not because leverage magnifies both investment gains and losses.

82.    Second, leverage requires payment of interest. Thus, the investment return must account for interest expense before it creates a net positive return to the fund. To put it another way, the fund's participants are paying the interest for the leverage in the Stable Value Fund and this interest thus acts here as an additional fee charged by JPM to Plaintiffs incident to JPM's management of the JPM Stable Value Funds.

83.    Third, as credit conditions tighten, a leveraged fund may be required to de-leverage, which may require liquidating fund assets at a non-optimal time.

[26] Investment Company Institute, "Money Market Funds in 2012: Money Market Fund Are Not Banks," Feb. 14, 2012, *available at* http://www.ici.org/pdf/12_mmf_mmfs_are_not_banks.pdf.

84.     The use of substantial leverage is inconsistent with the "character and aims" of stable value funds because, compared to a non-leveraged strategy, it: (1) places the principal at greater risk; (2) increases volatility of returns; and (3) reduces liquidity.[27]

85.     ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

86.     ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████

87.     This use of leverage was by itself imprudent and inconsistent with well-established standards and principles of stable value investing. Worse still, as set forth in detail below, JPM used this imprudent amount of leverage to decrease rather than increase the level of diversification in the JPM Stable Value Funds and to invest in high risk assets. JPM thus "doubled down" on its already risky leveraging strategy in the JPM Stable Value Funds.

---

[27] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments*, (1998), 186, detailing the investment objectives of stable value funds.

<u>JPM's Investment Strategy is Radically Different from the Purported Benchmarks</u>

88.     JPM consistently represented that its investment strategy for the IBF and IPBF –
which at all times material hereto were the core assets of the JPM Stable Value Funds – tracked
the Lehman Intermediate Aggregate Index (later known as the Barclays Intermediate Aggregate
Index). The Lehman Intermediate Aggregate Index is a non-leveraged portfolio consisting of
investment grade bonds including U.S. Treasury securities, U.S. government agency bonds, pass-
through mortgage-backed bonds issued by government agencies, and corporate bonds. The
investments have an average maturity of around 4.5 years.

89.



Thus, JPM should have adopted an investment strategy that allowed for a small amount of
tracking error for the IBF and IPBF and thus JPM's Stable Value Funds as compared to the
Lehman Intermediate Aggregate Index, and it represented it would do so.

90.     In fact, JPM adopted an investment strategy that differed radically from that of the
Lehman Intermediate Aggregate Index in at least two ways, contrary to its representation that the

---

[29] "Tracking error" is a commonly-used finance tool that measures how closely a portfolio
follows the index to which it is benchmarked. Tracking error when stated *ex ante* may be thought
of as a risk budget: it provides the target for how much the manager may deviate from the
benchmark and thus the risk that the manager's investment strategy will underperform the
benchmark.



IBF's risk profile would be similar to that of the benchmark. This was contrary to the "character and aims" of stable value funds.

91. First, the Lehman Intermediate Aggregate Index does not use any leverage. JPM's substantial use of leverage should have caused JPM to predict *ex ante* that its investment returns would be more volatile than those of the benchmark. As set forth above, avoiding volatility is one of the main purposes of a stable value fund.

92. ██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████

93. ██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████

27

TABLE 1:



TABLE 2:



**TABLE 3:**



**TABLE 4**



**TABLE 5**



**TABLE 6**



94.     While some deviation from this benchmark might be acceptable, as shown in the above tables, the IBF was so different from the benchmark that JPM should reasonably have known – despite its representations to the contrary – that the IBF's risk profile would differ substantially from that suggested by the benchmark and thus that JPM's IBF was an imprudent

asset for the JPM Stable Value Funds to hold in such large amounts given the stated aims of the JPM Stable Value Funds.

95.     The IPBF also deviated substantially from the Lehman Intermediate Aggregate Index, ███████████████████████████████ For the reasons set forth above, JPM should have known that the risk profile for the IPBF would differ substantially from that suggested by the benchmark and thus that JPM''s IBPF was an imprudent asset for the ACSAF / JPM Stable Value Fund to hold in such a large amount given the stated aims of that fund.

TABLE 7



31

**TABLE 8**



**TABLE 9**



TABLE 10



TABLE 11



96.

**TABLE 12:**



97.

---

[31] This is based on reported data for the JP Morgan Intermediate Aggregate Index, which consists of the IBF and other similar JPM funds.  Data isolating the tracking error of the IBF was not available but it is expected that such data will show a similar tracking error since, by definition, this JPM aggregate may only combine like funds.

**TABLE 13:**



98.     This consistently high level of performance against the benchmark before the class period would have been extraordinarily unlikely had JPM not adopted a much more aggressive (that is, risky) strategy than that reflected in the benchmark ███████████████ ████████████████████████████████████████████ a level which can rarely be sustained for such a long time. JPM knew or should have known by 2006 that its high returns in the IBF and thus in the JPM Stable Value Funds were not sustainable and in fact were indicative of the fact that JPM had accepted excessive risk in the IBF and thus in the JPM Stable Value Funds as compared to the benchmark.

99.     ██████████████████████████████████████████████████████████

██████████ Beating the benchmark, however, is no accomplishment when the risk profile of the IBF was significantly greater than the benchmark. That is precisely what happened here, and

---

[32] "Information ratio" is a measure of alpha over tracking error. It indicates how much of the performance of a fund is attributable to risk-neutral (relative to the benchmark) decision-making.

accepting such excess risk was wholly inconsistent with: (1) the "character and aims" of stable value funds; (2) industry standards; and (3) JPM's own representations.

### JPM's Exposure to Real Estate Risk

100.     One critical aspect of ERISA's duty of prudence is the duty to diversify. ERISA requires that a fiduciary "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). The duty to diversify requires, among other things, diversity as to industries or sectors. *In re Unisys Savings Plan Litig.*, 74 F.3d at 438.

101.     Prudent investment management requires that securities portfolios be diversified because diversification reduces risk without reducing expected returns. JPM agrees: ". . . a diversified portfolio that includes several categories of fixed income securities should have a relatively stable return portfolio."[33]

102.     Principles of diversification enable an investment portfolio to take maximum advantage of market conditions in specific sectors and to protect against downturns in one particular sector.

103.     When a portfolio is concentrated in a specific sector, the value of the portfolio can drop sharply if that sector experiences a general downturn.

104.     If the portfolio, however, is comprised of multiple sectors, some may go down in value while others may remain stable or go up. Different types of fixed income categories will generally not lose value at the same rate or at the same time.

---

[33] Mark Huamani and Karl Mergenthaler, *Building a Diversified Fixed Income Portfolio: An Analysis of the Availability and Correlation of Excess Returns*, http://www.jpmorgan.com/tss/General/Building_a_Diversified_Fixed_Income_Portfolio/115932 1128719.

105.    Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of a portfolio of securities that do not move in unison. Two securities that are perfectly correlated is a 1. Two securities that are perfectly inversely correlated is -1. Two securities that have no correlation is 0 – often referred to as low correlation.

106.    According to JPM, "correlation of excess returns among the major fixed income categories is relatively low." Active managers of different fixed income categories, like Mortgage Backed Securities, Core Fixed Income, and Corporates, according to JPM, add value through excess returns at times when active managers of other categories cannot.

107.    Modern Portfolio Theory ("MPT"), the industry standard for prudent portfolio management for over twenty years, employs the use of correlations for identifying categories and sectors that are loosely correlated and do not move in tandem. Creating a diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and multiple categories, which have low correlations, is the foundation of MPT.

108.    As early as 2006, JPM recognized that Mortgage-Backed Securities ("MBS") was just one category of a well-diversified portfolio. The correlation of excess returns for MBS to a Core Fixed Income investment was 0.26. Corporate excess returns had a relatively low correlation to Core of 0.40. As such, JPM was well aware that the excess returns of these fixed income categories, being loosely correlated, were all necessary to create a well-diversified portfolio of fixed income securities.

109.    Typically, mortgage-backed securities of all types average about 40% of the holdings of a stable value fund during the time period in question. [34]

---

[34]SVIA 0001259.

110. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

111. ████████████████████████████████████████████████████

████████████████████████████████

112.     Because the purpose of ERISA's diversification requirement expressly is to avoid large losses, this total exposure analysis is an appropriate measure for diversification under ERISA as exposure more accurately reflects the potential for a large loss.

113. ████████████████████████████████████████████████████

███████ ████████████████████████████████████████

████████████████████████████████████████████████████████

██████

114.     JPM further failed in its duty to diversify in its Intermediate Corporate Bond Fund. That fund was overweight the Finance subsector of the Corporate sector. The Finance subsector is positively correlated to the MBS sector, thus exacerbating the IBF's exposure to real estate.

115.     JPM of course knew at the time it made these investments how poorly diversified they were as a whole. JPM also knew as early as 2006 that it was a widely-held opinion in the stable value fund industry that it was investing too heavily in mortgages. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

116.

117.    JPM's high exposure to real estate losses, in addition to violating ERISA's diversification requirement, was inconsistent with the "character and aims" of stable value funds, which emphasize proper diversification as a means to protect principal and ensure steady, positive returns and was thus a violation of its ERISA duty of prudence.

### JPM's Investment in Risky Mortgage-Backed Securities

118.    The sheer quantity of real estate-related investments held by the IBF and IPBF and thus by the JPM Stable Value Funds was not the only problem with such investments. JPM also chose to invest a large part of the IBF and IPBF and thus of the JPM Stable Value Funds in high risk, leveraged, derivative mortgage-backed securities (and, in the case of the IBF, private



placement mortgages, discussed in the next section) rather than the conventional mortgage-backed securities more typically found in stable value funds.[37]

119.     During the relevant times, the only mortgage-backed securities in the Lehman Intermediate Aggregate Index were pass-through mortgage-backed securities insured by government agencies such as Fannie Mae and Freddie Mac (referred to in the industry as "agency MBS"). Such securities are relatively safe because the agencies ensure against default and require the mortgages to conform to stringent standards.

120.



Certain types of agency CMOs are riskier than agency MBS because the former have greater exposure to interest rate, prepayment, and default risk.

---

[37] For example, the DuPont Fixed Income Fund, which was at the time the largest single-entity stable value fund in the United States, prohibited that fund as early as 1998 from investing in what it deemed to be "risky" mortgage derivatives including IOs, POs, and inverse floaters. Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 197.

**TABLE 14 (IBF):**



121. 

122.   Given the conservative nature of stable value funds, it was incumbent on JPM to select only high quality investments for the IBF and IPBF with stable cash flows, since the IBF and IPBF constituted such a large percentage of the investment holdings in the JPM Stable Value Funds. "Substantial resources and analytics are required to properly select investments within [the mortgage-backed and asset-backed] sectors, particularly where cash flow volatility could impact returns and crediting rate behavior."[38]

---

[38] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 180.

123.



**TABLE 15 (IBF):**

124.    The IPBF was also invested in the types of mortgage-backed securities described

above, although to a lesser degree.



[40] An "option ARM" mortgage is one that: (1) like all ARM mortgages, periodically changes the interest rate; and (2) allows the borrower to choose from various payment options, one or more of which may be negative amortizing (i.e. the payment is insufficient to pay the interest then due so the portion of the interest that is not paid is added to the principal). Option ARMs allow borrowers to artificially qualify for higher loan amounts than they otherwise would qualify for, As interest payments increase and the principal grows, borrowers are faced with both a higher payment and a larger loan than expected, which in combination produces "payment shock" and contributes to default.

125.    As early as 2006, JPM was aware that subprime mortgages were excessively risky and acted on that knowledge to reduce its own exposure to such mortgages. In October 2006, JPM decided to sell investment positions in subprime mortgage assets it held for its own account, and it eventually sold $12 billion worth of those investments.[41]

126.    One reason for this concern was that, based on data from JPM's mortgage servicing business, "late payments on subprime loans were rising at an alarming rate."[42] Although the IBF and IPBF and thus the JPM Stable Value Funds did not invest in any mortgage-backed securities involving JPM mortgages, this problem was not limited to JPM's own mortgages. To the contrary, JPM knew that "loans originated by competitors like First Franklin and American Home were performing three times worse than J.P. Morgan's subprime mortgages."[43] Indeed, JPM concluded that "underwriting standards were deteriorating *across the industry*."[44]

127.    In his 2007 letter to JPM shareholders, Mr. Dimon admitted that subprime was a "high risk, high reward product." Such a product had no place in a stable value fund. Mr. Dimon also stated that JPM "saw subprime concerns first, then mortgage-related collateralized debt obligations, structured investment vehicles, Alt-A mortgages, [and] mortgage real estate

---

[41] "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch," Fortune, September 2, 2008, *available at* http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune.

[42] *Id.* 

[43] "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank beat the credit crunch," Fortune, September 2, 2008, *available at* http://money.cnn.com/2008/08/29/news/companies/tully_dimon.fortune.

[44] *Id.* (emphasis added).

investment trusts." Thus, JPM's knowledge that real estate-related investments were risky was not limited to subprime: it extended throughout the real estate sector.

128.    This information about the increasing risks from subprime mortgages was – or should have been – shared with the managers of the IBF and IPBF because JPM purportedly "mine[s] every part of the business for detailed information – especially data that point to trouble – then share it at warp speed throughout the corporation."[45] According to the *Fortune* article, "[t]o Dimon the rich flow of information from different corners of the bank, like the signal from servicing that warned him about subprime, is a major advantage. 'We have a gold mine of knowledge, but you have to manage it well,' he says, so every one of our businesses benefits from it."[46]

129.    Despite this, the IBF and IPBF and thus the JPM Stable Value Funds continued to hold a substantial amount of mortgage-backed securities backed by subprime mortgages. If in October 2006, JPM had concluded that subprime mortgages were too risky to hold for its own account, such mortgages (or CMOs based on such mortgages) were *a fortiori* too risky for conservative investment vehicles like the JPM Stable Value Funds.

130.    Furthermore, as Mr. Dimon testified before Congress, JPM did not itself offer Option ARM mortgages because, in his view, "we did not think they were appropriate products for consumers."[47] Similarly, in his 2006 letter to JPM shareholders, he stated that JPM "did not originate option ARMS or other negative amortization loans" because JPM "didn't think they were particularly consumer friendly or that safe." This did not prevent JPM from investing the

---

[45] *Id.*

[46] *Id.*

[47] Testimony of Jamie Dimon Before the Financial Crisis Inquiry Commission, Jan. 13, 2010, p.2.

JPM Stable Value Funds' assets in mortgage-backed securities backed by those same types of mortgages. ████████████████████████████████████████████

████████████████████

131.   ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

**TABLE 16 (IBF):**



132.   ████████████████████████████████████████████

████████████████ IO securities do not support steady cash flows because, when interest rates decline, prepayments accelerate and the stream of payments from such securities is drastically reduced. PO securities suffer from the opposite problem: cash flows are high only where principal is paid off relatively quickly. While in theory such securities may cancel each

other out if they are backed by the same underlying collateral, risks can be substantial if the collateral differs. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████

133.    ████████████████████████████████████████████████ Inverse floaters have rates of return that decline significantly if interest rates rise. As the court held in *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044-45 (9th Cir. 2001), investment in inverse floaters violated ERISA's prudence rule as to a trust with "very conservative investment guidelines" such as those of a stable value fund.

134.    The mortgage-backed securities held by the IPBF were similar to those held by the IBF, although the IPBF held a relatively smaller amount of such securities.

135.    ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████

136.    JPM's investment of the JPM Stable Value Funds in the types of poorly collateralized and/or exotic mortgage derivatives described above was inconsistent with the

_____

██████████████████████████████████████████

"character and aims" of a stable value fund when made and held and was thus a violation of its ERISA duty of prudence.

### JPM's Unique Investment in Private Placement Commercial Mortgages

137.    One of the Commingled Pension Trust Funds in which the IBF invested was the Mortgage Private Placement Fund ("MPPF"). The MPPF invests in, among other things, directly-placed mortgages on multi-family dwellings, shopping centers, office buildings, co-ops, and other commercial real estate projects. The MPPF through JPM originates its own commercial mortgages.

138.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

139.    These private placement mortgages were not public securities. ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮

140.    Relatedly, the valuation of these private placement mortgages was determined solely by JPM. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

141.    This lack of objective valuation data allowed JPM to hide losses in the private placement mortgages during the financial crises.



142. ███████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████

143.    Ms. Paradis also knew that the private placement mortgages increased liquidity risk. In a 2007 industry publication, she stated that "[d]irectly placed loans are not appropriate within any portfolio with liquidity demands."[54]

144. ███████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████

145. ███████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████

146.    Although these mortgage loans were funded by the MPPF, as explained below, it may be inferred from JPM documents and industry practice that at least some of the loans were originated, arranged and underwritten by affiliated JPM entities who in turn received substantial fees for these services from the borrowers.[55] These fees variously were called application, originating, placement, and underwriting fees.

───────────────────

▪ ████████████████████

▪ ████████████████████

[54] *Stable Times,* First Quarter 2007, "Private Mortgages -- A Compelling Stable Value Investment."

▪ ▪ ████████████████████████████████████████████
████████████████████████████

147. 

148.

149.   Pursuant to this Court's direction that the parties attempt to ascertain whether there is a factual basis for the prohibited transaction claims and in specifically referencing the September 4, 2008 loan closing statement discussed above, Plaintiffs, by letter dated September 19, 2013, asked JPM to state that during the relevant period that none of its affiliates received



any payments from any borrower for any loans to the borrower funded by the MPPF (and thus by the JPM Stable Value Funds). JPM has declined to so state, and given the Declaration of Trust allowing for this practice as well as the industry practice of making such payments and commissions to entities that arranged, originated, placed and/or underwrote such loans, Plaintiffs infer that JPM affiliates received such payment for loans from borrowers on loans they underwrote, arranged and/or brokered and which were funded by the MPPF (and thus by the JPM Stable Value Funds).

150.    Because JPM was also the originator of these private placement mortgages, it thus had unique knowledge of the risks inherent in such assets and knew or should have known that they were inappropriate for inclusion in a stable value fund portfolio under the market conditions prevailing during the relevant time period.

151.    As early as 2007, JPM was aware of the liquidity and default risks of these private placement mortgages. In 2007 JPM created the IBPF. ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████ As set forth above, however, the investment strategy of the IPBF was imprudent for several other reasons, even though it did not invest in the PPMF.

152.    ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

█████████████████████████



153.

154.

155. ████████████████████████████ Rather, its view was that the private placement mortgages had *always* been an inappropriate investment given the conservative nature of stable value funds.

156.

157.    JPM's investment in billions of dollars of illiquid and arbitrarily-valued private placement mortgages was contrary to the "character and aims" of a stable value fund, was thus a

violation of its ERISA duty of prudence, and caused damages to Plaintiffs and the proposed class for which they seek relief here.[63]

### The Causal Connection Between JPM's Risky Investment Strategies and the Catastrophic Decline in the Market Value of JPM's Stable Fund's Investments

158. ████████████████████████████████████████████████████████
████████████

159.     Based on industry standard performance attribution techniques, the cumulative loss to the IBF's portfolio can be decomposed into specific losses from the Commingled Pension Trust Funds in which it invested.

---

[63] Not only were Plaintiffs damaged by JPM's leveraged investment in and holding of illiquid private placement mortgages in its Stable Value Funds, they were further damaged when JPM later needed to unload these mortgages because of their excessive risk. *See* http://www.reuters.com/article/2012/04/03/us-jpmorgan-stablevalue-idUSBRE83216820120403 (last viewed October 6, 2013) ("Meanwhile, the JPMorgan stable value fund has trailed its peers each year since 2008, according to data provided by JPMorgan and Hueler, which tracks an index of 17 stable value collective trusts with $104.6 billion in assets. Some experts have suggested that the drop in performance is due to JPMorgan's exit from private mortgages.").
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

**TABLE 17 (IBF):**



160. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

161. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ The allocation of investments in the Public Mortgage Fund is shown

in Appendix A.

162. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The allocation of investments in the Private Placement Mortgage Fund is shown in Appendix A.

  
163. ███████████████████████████████████
████████████ ████████████████████████████
███████████████████████████████ The allocation of
investments in the Enhanced Cash Fund is shown in Appendix A.

164. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

**Table 18 (IBF)**



165.  Table 18 understates the role of the Enhanced Cash Fund in the total loss to
Plaintiffs.████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████



**Table 19 (IBF)**



The Causal Connection Between the IBF's Market Value Loss and Injury to Plaintiffs

166.   As a result of the rapid decline in the market value of the IBF's investments, the ratio of market value to book value of the JPM Stable Value Funds declined to dangerous levels as of the end of 2008:

55

TABLE 20:



167. By this measure, the JPM Stable Value Funds performed far worse than their competitor funds. According to the SVIA, as of the end of 2008 (the height of the financial crises), the average ratio of market value to book value for stable value funds was about 95 per cent.[66]

168. Table 20 also shows that JPM failed in the most basic objective of stable fund investing: to protect the principal of the fund.

169. It further shows the risky nature of JPM's stable value strategy. As Ms. Paradis herself admitted, the relationship between the market value and book value of a stable value fund over time "is the best summary risk measure for a stable value strategy."[67]

---

[66] SVIA 000221.

[67] *Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis,* http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2 Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true    (last viewed Oct. 3, 2013).

170. Although the wrap agreements for the Stable Value funds allow participants to transact with the funds at book value, over the long term the market value and book value of the funds must converge. This is accomplished by, among other things, reducing the crediting rate paid on a periodic basis to participants.

171. Indeed, the financial condition of the JPM Stable Value Funds grew so dire that JPM began to set its crediting rates through negotiation with the wrap insurers rather than complying with the formula for setting such rates in its contracts with the plans and the wrappers -- formulas in which the market value of the funds' investments was as key input.

172. Moreover, the investors in JPM Stable Value Funds were effectively trapped in these investments, and members of the class and subclasses sustained damages through 2012, past the end of the class and subclass periods, as a result of JPM's earlier actions. The pooled fund investors were denied access to the decimated market value of the funds █████████████

█████████████████████████████████████████

████████████ Plan Sponsors in pooled accounts were subject to up to a 1 year put requirement, effectively locking them into the fund for a period JPM would use to immunize the fund by reducing the crediting rate to 0 to rebuild the market value to book value during that 12 month period, effectively at the expense of the participants. Finally, a plan sponsor in a separate account could not exit at book value.

173. JPM made it clear these gates would be enforced. █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ ████████ ████ █ ████████ █ ████ ████ █ ████

174. Beginning in 2009, JPM paid a substantially lower crediting rate to participants than the industry average:[68]

TABLE 21:



175. *In other words, had JPM followed an investment strategy for its Stable Value Fund that was similar to the appropriately conservative strategies employed by most of its competitors, participants in JPM's Stable Value Funds would have obtained substantially higher returns from their investments.*

176. JPM will doubtless argue that it was not at fault for these lower returns to plan participants because the poor returns were solely attributable to the putatively unforeseeable financial crisis. What this argument ignores, however, is that one of the key tenets of stable value

---

[68] The Hueler Index is an industry composite that is based on a survey of 30 stable value funds.

fund investing is to insulate investments from sharp market fluctuations.[69] For the most part, JPM's competitors were able to achieve this goal. JPM did not because, as set forth above, it implemented an investment strategy that was in several ways inconsistent with the "character and aims" of stable value funds.

### JPM Acted For Its Own Interests and Not the Interests of Stable Value Fund Investors

177.    JPM's behavior here was diametrically opposed to ERISA's mandate that fiduciaries operate with an "eye single" to the interests of plan participants and beneficiaries. *See, e.g., John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994). ERISA's fiduciary duties are, of course, "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

178.    JPM's motive for its risky investment strategies was simple: greed. While times were good, this strategy allowed the JPM Stable Value Funds to offer what appeared to be higher returns than competing stable value funds at no additional risk, and thus attract new participants. This inured to JPM's financial benefit through the generation of additional AUM fees and otherwise inured to the benefit of the JPM executives who received substantial bonuses tied to the growth of JPM's stable value fund business. ████████████████████████████
████████████████████████████████████████████████████████████████
████████████

179.    Although this strategy was doomed to fail over the long term, while history demonstrates credit market dislocations occur periodically, executives of financial institutions are often motivated by the prospect of short term gain while disregarding long term, systematic risk – especially when they are in essence gambling with the money of others.

---

[69] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186.

Allegations Specific to JPM's Pooled Stable Value Funds

180.    Investors in JPM's pooled Stable Value Funds, the ACSAF / JPM Stable Value Fund and the SAIF, suffered from JPM's breaches of the duties of prudence and loyalty set forth above. In addition (1) the circumstances under which JPM caused certain members of the Plaintiff Class to be invested in those funds and (2) features unique to pooled stable value funds raise additional claims for breach of fiduciary duty that are specific to these pooled funds.

181.    Although JPM has offered separate stable value funds for several years, it is a relatively late entrant into the market for pooled stable value funds.

182.    JPMC or one of its affiliates held a significant minority interest in American Century Companies, Inc. ("ACC"), the parent company of American Century Investments ("ACI").

183.    Before JPMC acquired its interest in ACC, ACC had developed a wholly-owned retirement plan recordkeeping service business known as Retirement Plan Services, Inc. ("RPS"). ACI employed RPS to assist plan sponsors in determining the plan's investment alternatives as well as providing management services needed by employer retirement plan sponsors for their 401(k) retirement plans under ERISA. ACI used RPS as a significant distribution channel to sell its own investment funds in the retirement investment market. These ACI funds were in essence "house brands," known as "proprietary funds," and were given preferential placement by RPS in the investment lineups that RPS proposed to 401(k) sponsors.

184.    By 1998, JPM had acquired a 50 percent economic interest in RPS from ACC. Thereafter, JPM shared the cost of operating RPS with ACI/ACC. As part of this transaction, JPM obtained the opportunity to have its proprietary JPM funds marketed through RPS and

given the same preferential placement as ACI funds in investment lineups proposed to plan sponsors by RPS.

185.    As part of this 1998 agreement, JPM and ACI agreed that there would only be one stable value fund product offered by RPS to a plan sponsor. Per this agreement, the stable value fund product to be offered would be determined by the size of the plan. Thus, they agreed that RPS would offer only JPM's separate stable value funds to larger employer plans holding $50 million or more in assets and RPS would offer ACI's pooled stable value fund to plans holding less than $50 million in assets.

186.    The pooled stable value fund RPF offered to its client plans was known as the American Century Stable Asset Fund ("ACSAF"). The ACSAF was the "safe" investment option required by ERISA that RPS offered to its clients.

187.    Pursuant to an agreement dated June 1, 2003 between ACI and JPM (the "Revenue Sharing Agreement"), JPM acquired ACC's interest in RPS. (RPS is referred to as "JPMRPS," an entity that is a defendant in this action, with regard to the period after JPM's acquisition of 100% of RPS.) Under the Revenue Sharing Agreement and thereafter, JPMRPS continued to provide services to both JPM and ACI retirement investment product funds and the 401(k) plan sponsors and participants who invested in those funds.

188.    As detailed below, JPMRPS was at all relevant times an ERISA fiduciary to the 401(k) plan sponsors and participants invested in the ACSAF and its successor fund, the ACSAF/JPM Stable Value Fund. JPM by virtue of its ownership and control of every aspect of JPMRPS was and is also a fiduciary to participants in the ACSAF under ERISA at least from the date of the Revenue Sharing Agreement.

61

189.    JPM agreed in the Revenue Sharing Agreement that it would maintain the status quo as to existing ACI stable value fund sponsors and not attempt to lure them away from the ACSAF into any JPM stable value fund. In furtherance of this obligation, JPM was obliged both directly and through RPS to (a) offer the same preferential treatment to ACI investment products (including ACSAF) as RPS had previously offered, (b) provide the same level of marketing and sales support to ACI investment products as were offered to JPM products, and (c) establish a compensation structure substantially the same for both ACI and JPM stable value products. In return, JPM was permitted to offer its own stable value funds to plans with less than $50 million in assets that were not already invested in the ACSAF. In addition, JPM agreed to pay ACI a multi-year commission on sales of ACI products sold through RPS.

190.    Despite the Revenue Sharing Agreement, JPM embarked on a plan to use JPMRPS (now a wholly owned JPM subsidiary) to enfeeble the ACSAF so that it would not be able to compete with JPM's stable value funds and would not be able to survive at all as an independent, non-JPM entity.

191.    In support of this plan, and despite its contractual commitment to manage the ACSAF in such a manner as not to impair ACI's future revenues, JPMRPS embarked on a course of conduct by which it wrongfully lured and enticed ACSAF plan sponsors away from the ACSAF and into JPM's SAIF and/or JPM's separate Stable Value Funds. Throughout this course of conduct, JPM and JPMRPS knew full well that such conduct would damage the ACSAF and investors in it.

192.    At the time of the Revenue Sharing Agreement in 2003, JPM did not have a pooled stable value fund with which to compete with the ACSAF. In 2004, JPM, as part of its acquisition of Bank One, acquired Bank One's Stable Asset Income Fund. This fund, which

62

became the JPM Stable Asset Income Fund ("SAIF"), was a pooled stable value fund which like the ACSAF targeted 401(k) plans with less than $50 million in assets – in other words, the very same market on which the ACSAF was focused. This acquisition allowed JPM to offer a product through JPMRPS that competed directly with the ACSAF.

193.    With the acquisition of Bank One's SAIF, JPM actively pursued existing ACSAF sponsors to switch to its fund. Thus, in December 2004, JPMRPS' chief financial officer, Mary J. Block, stated that "JPM/ I want to replace all ACI with JPM Stable Value . . . ." As early as June 2004, JPMRPS employee Paul Shahrocki had written that the takeover of RPS and the availability of the Bank One SAIF would be the "end" of ACSAF.

194.    To further achieve this aim, JPM systematically used the newly acquired SAIF to steer current ACI plan sponsor clients away from ACSAF and into JPM's SAIF. Acknowledging this plan, the co-head of JPMRPS's Strategic Relationship wrote in late 2004 or early 2005 that "we are on officially the path to moving clients from ACI to JPM stable value, w/priority on larger accounts."

195.    Almost from the inception of the Revenue Sharing Agreement in September 2003, JPMRPS and JPM offered substantial rewards to JPMRPS employees for promoting JPM stable value funds to the detriment of ACSAF and participants who invested in it. For example, JPMRPS employees were informed that their compensation opportunities were greater for sales and promotion of JPM's stable value fund than ACSAF. Also, JPMRPS gave JPM's stable value funds the exclusive opportunity to compete with third party funds, a role previously occupied solely by ACI's funds.

196.    JPMRPS, through its actions, was able to influence, manage and control fund selection for 401(k) plans and participants invested in the ACSAF and move many plan sponsors

63

to JPM's SAIF and/or separate Stable Value Funds. Ultimately, the ACSAF was so totally decimated by JPM's conduct that it was no longer economically viable for the ACSAF to exist at all, and JPM caused what remained of that fund to be merged or otherwise become part of the ACSAF/JPM Stable Value Fund on September 17, 2007.

197.   The mass exodus of plan participants from the ACSAF caused by such conduct and the concomitant exodus of plan assets, which were recorded as required at book value, caused the market value of that fund to decrease so that as of September 17, 2007 it was further below book value than otherwise, to the loss and detriment of investors in the ACSAF. These investors were further injured by the loss and detriment associated with the poor performance of the ACSAF/JPM Stable Value Fund, which suffered from the same deficiencies alleged above with respect to all of JPM's Stable Value Funds, including improper leveraging and reaching for yield.

198.   In other words, if the ACSAF had remained in business, managed by ACI on the same principles as were in place prior to the transfer to JPM's fund, investors in the ACSAF would have fared far better than they actually did after the involuntary transfer to the ACSAF/JPM Stable Value Fund. JPM injured these investors by transferring the ACSAF funds into the ACSAF/JPM Stable Value Fund that JPM imprudently managed.

199.   RPS, both before and after JPM's acquisition of 100% ownership, and JPM by virtue of its ownership and control of JPMRPS, were and are fiduciaries to investors in the ACSAF and the plans in which they participated in that, among other things, they provided investment management services and discretionary administrative authority and responsibilities with regard to management of the ACSAF, both up to and after it became part of the ACSAF/JPM Stable Value Fund.

200. The status of RPS and JPMRPS as fiduciaries is shown by the fact that JPM worked through and in conjunction with RPS to acquire plan sponsors who were invested with ACSAF for JPM. JPM and RPS were able to attract a large number of plan sponsors to switch their investments to JPM's separate Stable Value Funds and/or the SAIF by use of the control that RPS had over the investment decisions made by its clients, the 401(k) plan sponsors. RPS was so successful at controlling its client's decisions on where to invest that it created a run on the bank at ACSAF that resulted in ACSAF agreeing to transition the fund to the ACSAF/JPM Stable Value Fund with no compensation to ACSAF. Again, the Arbitration Panel Findings point to evidence of admissions reflected in various internal documents among JPM representatives "that RPS personnel had significant power to influence and control selection of funds in 401(k) plans by sponsors" leading the Arbitration Panel to conclude "that RPS had substantial ability to and did impact, influence, manage, or control sponsor selection of products for inclusion in 401(k) plans." Arbitration Award at p. 29 (attached as Exhibit "I").

201. Moreover, one or more of the JPM entities were and are fiduciaries as trustees and custodians with respect to the ACSAF/JPM Stable Value Fund and other JPM stable value funds pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a), and are also fiduciaries as investment managers with respect to these funds in that they provided investment, trust and administrative services to these funds.

202. The actions of JPMRPS and the related JPM entities constitute a breach of fiduciary duty to investors in the ACSAF violation of ERISA sections 404 and 409, 29 U.S.C. §§ 1104 and 1109.

203. Through JPMAC Holdings Inc. ("JPMAC"), JPMC owned at all relevant times between 40% and 48% interest in ACC. Throughout the period of its ownership, JPMC and/or

JPMAC had the right to appoint and did appoint at least one board member to the ACC Board of Directors, who thus served as a fiduciary of ACC. In addition, by virtue of their ownership and control of JPRMS, JPMC and/or JPMAC, or both, have been ERISA fiduciaries with regard to the relevant 401(k) plans and plan participants.

204.    At the times relevant to this Complaint, as set forth above, JPM consistently "reached for yield" in its Stable Value Funds. JPM's motive to reach for yield was, among other things, to compete with ACSAF for stable value AUM for both SAIF and the separate stable value accounts JPM managed. By increasing yield, JPM was able to convince retirement fund sponsors to move their investments in ACSAF to JPM stable value products, including the SAIF. This in turn caused a "run on the bank" as to the ACSAF, causing ACI to surrender the ACSAF to JPM because of the ongoing damages to the fund.

205.    The allegations in this part of the Complaint are supported by findings of the arbitration panel in *Am. Century Inv. Mnmt., Inc. v. J.P. Morgan Investment Holdings, LLC*, No. 58 148 Y 00220 9 (Am. Arb. Ass'n) referenced above and attached as Exhibit "1." That panel issued a $373 Million breach of contract award against JPMRPS on August 10, 2011 for promotion of its proprietary products over ACI's products– over $130 Million of that Award was for JPM's promotion of SAIF over the prudently managed stable value product offered by ACI, such as the ACSAF.

206.    The way the various JPM entities named in this Consolidated Complaint acted in concert with each other with the intent to harm the ACSAF/JPM Stable Value Plaintiffs is set forth in the findings of the Arbitration Panel and is incorporated here by reference. *Id. See, e.g., id.* at pp. 51-53.

207.   Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Ex. 1, Arbitration Award ¶¶ 34-35, 38, 39, 42, 69, 73, 88. See also, ¶ 41("availability of [SAIF] … was the end for ACI's ACSAF").

   a.   Prior to setting up SAIF, JPM had never managed a pooled stable value fund. JPM acquired SAIF as a "competing fund" to the American Century Stable Value Fund ("ACSAF") traditionally marketed to JPMRPS clients like GEHA. Through JPMRPS's control of its retirement distribution channel it **"cannibalized"** American Century's clients within Plans administered by JPMRPS. Award ¶¶ 34-35▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮

   b.   Plaintiffs moving to the SAIF became collateral damage in the scheme to attract AUM by designing a bond fund that took on more risk than a fiduciary should take on in a pooled stable value product in order to temporarily produce a higher rate of return—in major part achievable solely because JPM invested in lower quality bonds that paid a higher yield than higher quality bonds paid out. Award ¶¶ 38-40. Historically, Defendants used this temporary high rate of return to cause a "run" on the ACSAF and, like GEHA, to cause it to insert SAIF into the line-up – not ACSAF. This enabled JP Morgan to capture the approximate $2 Billion AUM available in JPMRPS's administered Plans for the pooled stable value fund "slot" or line-up option.

   c.   JPM's "defense" in the arbitration was that SAIF was a "better" managed, higher yielding fund than ACSAF for JPMRPS clients like GEHA. Thus, Dr. Goetzmann was asked to address whether SAIF's higher yield was the result of prudent management. He found that JPM took on more risk than prudent in order to temporarily gain a higher yield. The arbitration panel awarded American Century $132.6 Million. Award ¶ 88.

208.   Thus, JPM inserted SAIF in the "line-up" of investment options – as the "default" option to represent the "safe-harbor" investment in JPMRPS's administered ERISA plans. To further promote the capture of the AUM, JPMRPS offered to accept a portion of the total fee



charged in connection with the SAIF investment as a "credit" or offset to the administrative fee that JPMRPS charged. SAIF participants - not the Plan Employers - paid JPMRPS's fee and, in return, received a mismanaged JPM Product.

209.   As set forth above, the SAIF – like all of JPM's Stable Value Funds including the ASCAF/JPM Stable Value Fund – used undisclosed and improper leverage to acquire a concentrated, non-diversified portfolio overweighed in non-agency mortgages and other real-estate backed debt instruments that had a higher risk (in terms of liquidity risk, non-diversification, prepayment risk, duration risk, and credit risks), and higher volatility than prudent for any stable value fund, but especially for a pooled stable value fund product.

210.   A pooled stable value fund requires even more prudent management than a separate stable value fund with respect to volatility of fixed income assets and the resulting differences between the market and book value of the fund. This is so for several reasons. First, a pooled fund is made up of multiple sponsors rather than a single sponsor and, therefore, is subject to large unanticipated negative cash flows if a plan sponsor or sponsors exits the fund.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ Withdrawals are made at book value. Withdrawals that occur at a point in time when the market value is less than the book value lower the remaining asset base, thus exacerbating the difference between the market and book value of the remaining assets, and further lowering the crediting rate to amortize the larger loss. As the crediting rate drops, additional withdrawals can occur because the fund appears to be underperforming relative to its peers. If that cycle continues a "run on the bank" can occur endangering the fund's very existence. Accordingly, pooled stable value funds must be managed to minimize volatility and the resulting dislocations between market and book value.

211.    JPM had historically used the IBF for separate accounts and continued that practice after starting the SAIF. In other words, JPM never managed the IBF as an investment designed for pooled stable value funds. By using an "all-purpose" IBF, JPM effectively never managed the ACSAF/JPM Stable Value Fund or the SAIF as a pooled stable value fund with its particularized, product specific investment management needs.

212.    JPM found it cheaper to simply tag on to the IBF for the SAIF's investment management as it added no additional investment fixed costs in a scalable fund and used the similar IPBF for the ACSAF/JPM Stable Value Fund for similar reasons. Rather than establish a new fund and design an investment approach suited for a pooled stable value product, JPM took the SAIF's assets and added them into the IBF. Thus, JPM's management fee charged to SAIF investors simply fell to the bottom line. For this reason, disgorgement of all fees is one of the appropriate remedies in this case. 29 U.S.C. § 1109. ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████

213.    JPM's motive was that by taking these risks with these higher yielding assets placed into the fund, that "high yield" would attract and keep more investments into the JPM stable value products, earning yet more management and administrative fees for JPM.

214.    JPM grew the SAIF by 100% in the year preceding September, 2008, increasing SAIF assets by $500 Million. These new monies would, within months, suffer the largest market value losses in the industry.

215.    In 2009, the market value of the investments in the SAIF fell to the mid-80% of book value, at the bottom of all stable value funds. This type of volatility was exactly what a stable value product should be designed to avoid.

216.    Thus, from 2009-2012, JPM sought new money flows to make up for its mismanagement. New contributions coming into the SAIF from 2009-2012 helped absorb the pain of the amortization of the ███████████████ market value losses the SAIF experienced before this time period.

217.    Although the market value of the misnamed "SAIF" had declined ███████████ ████████ s of dollars, JPM omitted and failed to keep SAIF participants advised of the deteriorating value of SAIF's underlying assets. JPM continued to market SAIF to the public as "stable value." SAIF participants in 2009 and the following years suffered an immediate loss by buying into the fund at above the market or true value of SAIF's assets. ██████████████

████████████████████████████████████████████████

██████████

218.    While this self-dealing benefited JPM in accumulating fees based upon ███ ████████████████████ n the SAIF and in the transfer of fees to JPMRPS coming from retirement accounts, it harmed SAIF participants, who were stuck with paying JPMRPS a "revenue share" (administrative fee) out of the SAIF and with amortizing the market losses via the impaired crediting rate.

219.    In short, JPM controlled and steered the SAIF investors away from safer and true stable value products, and also forced ACI to cede control of the ACSAF to JPM, for the purpose of getting the investors into JPM products from which JPM could earn multiple disclosed and undisclosed fees including a fee (sometimes called "revenue sharing") for JPMRPS. Ex. 1, Arbitration Award at 14-15, 21-23, 26-31; ██████████████████

220.    Investors in the ACSAF / JPM Stable Value Fund and the SAIF were collateral damage in JPM's scheme to enrich itself by capturing amount under management fees ("AUM")

in the $2 Billion "stable value slot" in JPMRPS's investment line-ups. The undisclosed and disguised higher risk (taken to temporarily gain a higher yield) predictably caused the ACSAF/JPM Stable Value Fund and the SAIF to perform poorly in terms of lost market value and reduced crediting rate during the financial downturn, starting in 2009 and continuing for several years.

221.    JPMRPS profited by receiving monies equal to 50% of the disclosed management fee and by earning or receiving other substantial JPM created internal incentive credits to promote JPM's product over non-proprietary products.

222.    JPM touted on a 2008 Fact Sheet available for months on the Internet that the "estimated annual return" for its SAIF investors would be between 4.25% and 5.25%.

223.

224.    JPM required investors in the ACSAF/JPM Stable Value Fund and the SAIF to make up the market value losses it caused by reducing the income credited to its investors' accounts. In other words, JPM did not pay out all the yield received from its stressed investments. Rather, it held back a portion of that yield (i.e. interest payments) to buy assets to insert into the fund to make up for its losses. Investors in the ACSAF/JPM Stable Value Fund and the SAIF would not have suffered the low-returns starting in 2009 if JPM had offered its investors, i.e. the JPMRPS Plans, a true stable value fund.

71

225.   The SAIF trailed its peers for each year since 2008 according to Hueler. From 2009-2012, the SAIF's crediting rate fell precipitously. At the same time, relevant benchmarks greatly exceeded the SAIF's yield, and competitors' stable value funds were consistently yielding much higher annual returns.  Had the SAIF been prudently managed and had JPM not required the 2009-2012 investors to take an industry low crediting rate in order to buy assets to make-up for losses in market value, the SAIF's yielded returns from 2009 through 2012 would have been substantially higher.



227.



228.

## CLASS ALLEGATIONS

229.  *Class Definition*. Plaintiffs brings this matter as a class action pursuant to Federal

Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3). Plaintiffs file this

case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were
> invested directly or indirectly in any of the JPM Stable Value Funds that invested
> in the JPM Intermediate Bond Fund and/or the JPM Intermediate Public Bond
> Fund between January 1, 2009 and December 31, 2010. Excluded from the Class
> are the jurists to whom this case is assigned, as well as their respective staffs;
> counsel who appear in this case, as well as their respective staffs, including
> experts they employ; the Defendants in this matter, as well as their officers and
> directors; any person, firm, trust, corporation, officer, director, or other individual
> or entity in which a Defendant has a controlling interest or that is related to or

73

affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.[71]

230.    *Numerosity*. The members of this Class are so numerous that joinder of all members is impracticable. While the exact number of members is unknown to Plaintiffs at this time, and can be ascertained only through discovery, Plaintiffs reasonably believe that more than 100 ERISA plans throughout the country offered one of the Stable Value Funds during the Class Period. These Plans collectively have more than one million participants and beneficiaries, and plaintiffs believe that a substantial number of these persons had invested in one of JPM's Stable Value Funds.

231.    *Commonality*. The claims of Plaintiffs and the proposed Class have a common origin and share a common basis. All Class members suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA that form the basis of this lawsuit. Proceeding as a class is particularly appropriate here because the Stable Value Funds' assets are held in one or more collective trusts managed by JPM, each of which held invested substantial assets in JPM's Intermediate Bond Fund and Commingled Pension Trust Funds. Furthermore, common questions of law and fact exist as to all members of the class. The many questions of law and fact common to the Class include, but are not limited to:

a.    whether the JPM entities are fiduciaries under ERISA;

b.    whether JPM breached its fiduciary duties under ERISA;

---

[71] This Class definition and the definitions for the two Subclasses below delineate membership in the Class, but are not intended to circumscribe the relevant time period for this action. The conduct about which Plaintiffs complain occurred largely before the class period but caused injury to class members during the class period. Furthermore, that injury to class members continued past the end of the class period.

      c.     whether JPM deviated from the proper and/or stated purpose of Stable Value Funds when it adopted a high risk, leveraged investment strategy for such funds;

      d.    whether any of the transactions by JPM with regard to the Stable Value Fund, Intermediate Bond Fund and Pension Trust Funds were prohibited transactions; and

      e.     whether JPM's actions complained of herein injured plan participants and their beneficiaries who had invested in one of the Stable Value Funds.

232.   *Typicality.* Plaintiffs' claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the class members. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

233.   *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the members of the Class or the SAIF Subclass or the ACSAF/JPM Stable Value Fund Subclass. Plaintiffs will vigorously protect the interests of the members of the Class. Moreover, Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters. Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits. The undersigned counsel have and will devote the time and other resources necessary to litigate this case as effectively as possible.

234.   *Rule 23(b)(1)(A) and (B) requirements.* Class certification in this ERISA action is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a

practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

235.   *Rule 23(b)(2) requirements.* Class certification under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.

236.   *Rule 23(b)(3) requirements.* In the alternative, certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Class predominate over any questions (if any) affecting only individual Class members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

237.   *The SAIF Subclass.* Plaintiffs Gates, Newell, Dye, Stolwyk, and Dotson (collectively the "SAIF Plaintiffs") also seek to represent a subclass of investors in JPM's pooled SAIF. As set forth above, although investors in the SAIF were injured by the same breaches of fiduciary duty that injured all members of the Class, members of the proposed SAIF Subclass advance theories of liability and damages and for the propriety of class certification based on features of pooled stable value funds.

238.   *Definition of the SAIF Subclass*

All participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in the JPM Stable Asset Income Fund from between January 1, 2009 and December 31, 2010. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

239.   *Numerosity of the SAIF Subclass.* Tens of thousands of investors, through over two hundred ERISA plans, invested in the SAIF during the relevant time period.

240.   *Typicality of the SAIF Plaintiffs.* The SAIF Plaintiffs' claims are typical of the claims of the members of the SAIF Subclass because they are substantively identical to the claims of the members of the SAIF Subclass. If each member of the SAIF Subclass were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

241.   *Adequacy of the SAIF Plaintiffs and Their Counsel.* The SAIF Plaintiffs will fairly and adequately protect the interests of the members of the SAIF Subclass. The SAIF Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the members of the SAIF Subclass or the Class or the ACSAF/JPM Stable Value Fund Subclass. The SAIF Plaintiffs will vigorously protect the interests of the members of the SAIF Subclass Moreover, the SAIF Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters, as set forth above.

242.   *Rule 23(b)(1)(A) and (B) requirements.* Certification of the SAIF Subclass is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate

actions by members of the SAIF Subclass would create a risk of establishing incompatible standards of conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual members of the SAIF Subclass would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

243. *Rule 23(b)(2) requirements.* Certification of the SAIF Subclass under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally applicable to that Subclass, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the SAIF Subclass as a whole.

244. *Rule 23(b)(3) requirements.* In the alternative, certification of the SAIF Subclass under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the SAIF Subclass predominate over any questions (if any) affecting only individual members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

245. *The ACSAF/JPM Stable Value Fund Subclass.* Plaintiffs Knee, Murphy, and Hedges (collectively the "ACSAF/JPM Stable Value Fund Plaintiffs") also seek to represent a subclass of individuals previously invested in the ACSAF who were made to be investors in the ACSAF/JPM Stable Value Fund. As set forth above, although investors in the ACSAF/JPM Stable Value Fund were injured by the same breaches of fiduciary duty that injured all members of the Class, members of the proposed ACSAF/JPM Stable Value Fund Subclass suffered additional injuries and bring additional claims based on the circumstances under which they became investors in the ACSAF/JPM Stable Value Fund. In addition, members of the

78

ACSAF/JPM Stable Value Fund Subclass advance theories of liability and damages and for the

propriety of class certification based on features of pooled stable value funds.

246.   ***Definition of the ACSAF/JPM Stable Value Fund Subclass.*** The proposed

ACSAF/JPMorgan Stable Value Fund Subclass is defined as follows:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were
> invested directly or indirectly in the American Century Stable Asset Fund
> immediately before JPMAM took over the Fund and received its assets in the
> ACSAF/JPM Stable Value Fund on or about September 17, 2007 and continuing
> to December 31, 2010. Excluded from the Class are the jurists to whom this case
> is assigned, as well as their respective staffs; counsel who appear in this case, as
> well as their respective staffs, including experts they employ; the Defendants in
> this matter, as well as their officers and directors; any person, firm, trust,
> corporation, officer, director, or other individual or entity in which a Defendant
> has a controlling interest or that is related to or affiliated with any of the
> Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-
> interest, or assigns of any such excluded party.

247.   ***Numerosity of the ACSAF/JPM Stable Value Fund Subclass.*** The members of

this ACSAF/JPM Stable Value Fund Subclass are so numerous that joinder of all members is

impracticable. While the exact number of Subclass members is unknown to Plaintiffs at this

time, and can be ascertained only through discovery, the ACSAF/JPM Stable Value Fund had

over 900 million in net assets as of September 30, 2007, with funds several dozen individual

ERISA plans with many thousands of participants and beneficiaries.

248.   ***Commonality.*** The claims of the ACSAF/JPM Stable Value Fund Plaintiffs and

the proposed Subclass have a common origin and share a common basis. All members of the

ACSAF/JPM Stable Value Fund Subclass suffered from the same misconduct complained of

herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA

that form the basis of the claims specific to the ACSAF/JPM Stable Value Fund Subclass.

Proceeding as a Subclass is particularly appropriate here because the ACSAF's assets were held

in a collective trust while at ACI and were subsequently transferred together when JPM took the

fund over in 2007. Furthermore, common questions of law and fact exist as to all members of the Subclass. The many questions of law and fact common to the Subclass include, but are not limited to:

    a.    whether JPMRPS and any of the other JPM affiliates are fiduciaries under ERISA with respect to the conduct alleged with respect to the ACSAF/JPM Stable Value Fund;

    b.    whether JPMRPS and any of the other JPM affiliates breached fiduciary duties under ERISA by virtue of this conduct;

    c.    whether any of the transactions by JPMRPS and other JPM defendants with respect to the ACSAF/JPM Stable Value Fund were prohibited transactions; and

    d.    whether JPM's actions complained of herein have injured plan participants and their beneficiaries who were invested in the ACSAF.

249.    *Typicality.* The claims of the ACSAF/JPM Stable Value Fund Plaintiffs are typical of the claims of the members of the Subclass because they are substantively identical to the claims of the members of the Subclass. All members of the ACSAF/JPM Stable Value Fund were investors in the same fund, the ACSAF, at the time its assets were acquired by JPM and all became investors in JPM's successor fund, the ACSAF/JPM Stable Value Fund. If each member of the Subclass were to bring and prosecute these claims individually, each member of the Subclass would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

250.    *Adequacy.* The ACSAF/JPM Stable Value Fund Plaintiffs will fairly and adequately protect the interests of the members of the Subclass. These Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the members of the ACSAF/JPM Stable Value Fund Subclass, the Class, or the SAIF Subclass. These Plaintiffs will vigorously protect the interests of the members of the Subclass. Moreover, the ACSAF/JPM

Stable Value Fund Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters, as set forth above.

251.    *Rule 23(b)(1)(A) and (B) requirements*. Certification of the ACSAF/JPM Stable Value Fund Subclass is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Subclass would create a risk of establishing incompatible standards of conduct for JPM. Certification of the Subclass is also warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual members of the Subclass would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

252.    *Rule 23(b)(2) requirements*. Certification of the ACSAF/JPM Stable Value Fund Subclass under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM and the other Defendants have acted or refused to act on grounds generally applicable to the Subclass, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Subclass as a whole.

253.    *Rule 23(b)(3) requirements*. In the alternative, certification of the ACSAF/ JPM Stable Value Fund Subclass under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Subclass predominate over any questions (if any) affecting only individual members of the Subclass. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
## BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

254.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

255.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

256.    A fiduciary must comply with the duty of prudence, which includes the duty to diversify. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

257.    The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors ...: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return

82

of the portfolio relative to the anticipated cash flow requirements of the plan; and (e) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

258.    JPM's conduct with respect to the JPM Stable Value Funds violated in numerous ways its fiduciary duties of prudence and to diversify as alleged above.

259.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class and Subclasses. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

## COUNT II: VIOLATION OF ERISA § 404(a)(1)(A)
## EXCLUSIVE BENEFIT

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

260.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

261.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

262.    ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

263.    Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), the JPM entities, while fiduciaries, caused the JPM Stable Value Funds to engage in a high risk, leveraged investment strategy as alleged above.

264.    JPM's aforementioned actions were not in the best interest of the JPM Stable Value Funds' participants and beneficiaries. Rather, JPM sought to inflate the yields for the JPM

83

Stable Value Funds while at the same time disguising the corresponding risks with the goal of increasing its market share in the stable value retirement investing market segment and causing more retirement funds to be invested in the JPM Stable Value Funds as compared to those offered by its competitors.

265. JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class and Subclasses. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

<u>COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D)</u>
<u>PROHIBITED TRANSACTIONS</u>

<u>(By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P.</u>
<u>Morgan Investment Management, Inc.)</u>

266. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

267. The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

268. ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

269. The JPM entities were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, the JPM entities were parties in interest because they were fiduciaries.

270.     Despite the clear prohibition of Section 406(a)(1)(A), the JPM entities, while fiduciaries and parties in interest, caused the JPM Stable Value Funds to purchase and hold private placement mortgages that they themselves had arranged, originated, placed and/or underwrote, and the transfer of this lending opportunity was in violation of this section.

271.     In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), the JPM entities while fiduciaries and parties in interest, used the assets of the JPM Stable Value Funds for their benefit through the receipt of fees by JPM affiliates for their services relating to the origination, arrangement and underwriting of the mortgages.

272.     JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

**COUNT IV: VIOLATION OF ERISA §§ 406(b)(1), (b)(2) AND (b)(3) PROHIBITED TRANSCATIONS**

**(By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)**

273.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

274.     The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

275.     ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

85

276.    Despite the clear prohibition of Section 406(b)(1), JPM used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, *i.e.* mortgages that were originated, underwritten, and/or brokered by JPM affiliates.

277.    JPM's efforts on behalf of the borrowers also violates section 406(b)(2)'s ban on acting on behalf of a party whose interests are adverse to the plan—here acting on behalf of the borrower in its dealing with the Mortgage Private Placement Fund.

278.    In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C. § 1106(b)(3), JPM received consideration  for its own personal account in connection with causing the Stable Funds to acquire the mortgage assets at issue. This consideration included without limitation application, originating, placement, and underwriting fees and yield spread premiums.

279.    JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

## COUNT V: VIOLATON OF ERISA §§ 406(a)(1)(A) AND (a)(1)(D) PROHIBITED TRANSACTIONS

### (By the ACSAF/JPM Stable Value Fund Plaintiffs Against All Defendants)

280.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

281.    JPMRPS, JPMC, JPMAC and other JPM entities were fiduciaries, as discussed above, for ACSAF and for the 401(k) plans and plans' sponsors and plan participants to whom they provided investment advice and services and to successor ACSAF / JPM Stable Value Fund

and their plan sponsors and participants, including Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.

282.   The Defendants other than JPMRPS and JPMC are parties in interest pursuant to ERISA section 3, 29 U.S.C. § 1002, in that they were either fiduciaries of the plans or provided services to the plans.

283.   In violation of section 406(a)(1)(A), JPMRPS and JPMC caused the plans to sell property to one or more of these parties in interest in that they caused the plans to transfer to these parties the assets of the plans invested in the ACSAF and caused the plans to transfer to these parties in interest the management of such assets.

284.   In addition, in violation of section 406(a)(1)(D), JPMRPS and JPMC caused the plans to transfer to or use by or for the benefit of one or more of these parties in interest assets of the plans.

285.   JPMRPS' and JPMC's actions caused substantial financial harm to Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.  As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage.  JPMRPS and JPMC must also disgorge all monies they wrongfully made through use of the plans' assets.

## COUNT VI: VIOLATION OF ERISA §§ 406(b)(1),  (b)(2)  AND (b)(3) PROHIBITED TRANSACTIONS

### (By the ACSAF/JPM Stable Value Fund Plaintiffs Against All Defendants)

286.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

287.   JPMRPS, JPMC, JPMAC and other JPM affiliates were fiduciaries, as discussed above, for ACSAF and successor ACSAF / JPM Stable Value Fund and their plan sponsors and participants, including Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.

87

288.    ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

289.    In violation of ERISA section 406(b)(1), 29 U.S.C § 1160(b) (1), JPMRPS and JPMC dealt with the assets of the plans in their own interest and for their own accounts by causing the plan assets to be transferred to another JPM Defendant, either a parent or co-subsidiary.

290.    In addition in violation of ERISA section 406(b)(2), they acted in transactions involving the plans on behalf of other JPM defendants whose interests were adverse to the interests of the plans and their participants in that they caused ACSAF no longer to be viable as an investment option for 401(k) plans so that its assets and participants would be transferred to JPM's successor ACSAF / JPM Stable Value Fund.

291.    In addition, in violation of ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3), JPMRPS and JPMC received consideration for their own personal accounts in connection with influencing, managing and controlling fund selection for ACSAF plans they represented to the detriment of the remaining plan participants in the successor fund, the ACSAF / JPM Stable Value Fund, and to increase their own revenues.

292.    The actions of JPMRPS and JPMC caused substantial financial harm to Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass. As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage to the plans, the plaintiffs and the subclass. JPMRPS and JPMC must also disgorge all monies made through wrongful use of the plans' assets.

## COUNT VII: KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY
### (PLED IN THE ALTERNATIVE)

293.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

294.    To the extent they are not otherwise fiduciaries with regard to the conduct here alleged, the JPM Defendants, other than JPMC, are liable under ERISA section 405(a), 29 U.S.C. § 1105(a), to Plaintiffs, the Class, the SAIF Subclass and the ACSAF/JPM Stable Value Fund Subclass for all recoverable damage and relief as non-fiduciaries that knowingly participated with fiduciary JPMC in their breaches of trust.

295.    The JPM Defendants', other than JPMC, acts and omissions proximately caused substantial harm to Plaintiffs and the proposed class and subclasses. As a result of their wrongdoing, each is liable for all resulting loss and damage. These defendants must also disgorge all monies made through wrongful use of the plans' assets.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A.    A determination that this action is a proper class action and certification of the proposed Class and Subclasses, with Plaintiffs as class representative and its counsel as Class Counsel, pursuant to Federal Rule of Civil Procedure 23.

B.    A declaration that the Defendants, and each of them, have breached their ERISA duties to the Plaintiffs and the Class.

C.    An order compelling the Defendants to make good to the Plaintiffs, the Class, and Subclasses their plans the losses resulting from Defendants' breaches of their fiduciary duties;

and to disgorge to the Plaintiff, the Class and Subclasses all monies the Defendants made through their wrongful use of the Plaintiffs and the Class's assets;

   D. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plaintiffs, the Class and Subclasses, and their plans as a result of the aforementioned ERISA violations;

   E. An order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the relevant ERISA plans' funds;

   F. An amount equal to the amount of any losses to the Plaintiffs, the Class and Subclasses, and the ERISA plans included in the Class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

   G. An award of costs pursuant to 29 U.S.C. § 1132(g);

   H. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and other law;

   I. An award for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

   J. An award of such other and further relief as the Court deems just and proper.


Dated: December 15, 2014     Respectfully submitted,


          /s/ Jason H. Kim

Kevin Madonna (Bar No. KM5595)
KENNEDY & MADONNA, LLP
48 Dewitt Mills Rd.
Hurley, NY 12443
Tel: 845-481-2622
Fax: 845-230-3111

Michael M. Mulder
Elena N. Liveris
LAW OFFICES OF
MICHAEL M. MULDER
321 S. Plymouth Ct., Ste. 1250
Chicago, Ill. 60604
Tel: 312-263-0272
Fax: 312-263-2942
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com
*Appearing pro hac vice*

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Tel: (480) 428-0144
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com
*Appearing pro hac vice*

Todd Schneider
Jason Kim
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
180 Montgomery Street, Suite 2000
San Francisco, California 94104
Tel: (415) 421-7100
Fax: (415) 421-7105
jkim@schneiderwallace.com
*Appearing pro hac vice*

Joseph Peiffer
PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE LLP
201 St. Charles Ave, Suite 4610
New Orleans, Louisiana 70170
Tel: (504) 523-2434
jpeiffer@fishmanhaygood.com
*Appearing pro hac vice*

Peter Mougey
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 So. Baylen Street, Suite 600
Pensacola, FL 32502
pmougey@levinlaw.com
jkauffman@levinlaw.com
*Appearing pro hac vice*

Randall E. Hendricks
Lawrence A. Rouse
Phillip G. Greenfield
ROUSE HENDRICKS GERMAN MAY PC
1201 Walnut, Suite 2000
Kansas City, MO 64106

ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS

## CERTIFICATE OF SERVICE

I, Jason H. Kim, hereby certify that on this 15th day of December, 2014, the document to which this certificate is attached was filed electronically with the Court. Notice of this filing will be sent to the following parties through the Court's ecf system:

Greg Braden
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
gbraden@morganlewis.com

Melissa Hill
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
mhill@morganlewis.com

Azeez Hayne
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
ahayne@morganlewis.com

/s/ Jason H. Kim

ACSAF/JPM Stable Value Fund Subclass advance theories of liability and damages and for the propriety of class certification based on features of pooled stable value funds.

246.   ***Definition of the ACSAF/JPM Stable Value Fund Subclass.*** The proposed ACSAF/JPMorgan Stable Value Fund Subclass is defined as follows:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in the American Century Stable Asset Fund immediately before JPMAM took over the Fund and received its assets in the ACSAF/JPM Stable Value Fund on or about September 17, 2007 and continuing to December 31, 2010. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

247.   ***Numerosity of the ACSAF/JPM Stable Value Fund Subclass.*** The members of this ACSAF/JPM Stable Value Fund Subclass are so numerous that joinder of all members is impracticable. While the exact number of Subclass members is unknown to Plaintiffs at this time, and can be ascertained only through discovery, the ACSAF/JPM Stable Value Fund had over 900 million in net assets as of September 30, 2007, with funds several dozen individual ERISA plans with many thousands of participants and beneficiaries.

248.   ***Commonality.*** The claims of the ACSAF/JPM Stable Value Fund Plaintiffs and the proposed Subclass have a common origin and share a common basis. All members of the ACSAF/JPM Stable Value Fund Subclass suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA that form the basis of the claims specific to the ACSAF/JPM Stable Value Fund Subclass. Proceeding as a Subclass is particularly appropriate here because the ACSAF's assets were held in a collective trust while at ACI and were subsequently transferred together when JPM took the

fund over in 2007. Furthermore, common questions of law and fact exist as to all members of the Subclass. The many questions of law and fact common to the Subclass include, but are not limited to:

a.  whether JPMRPS and any of the other JPM affiliates are fiduciaries under ERISA with respect to the conduct alleged with respect to the ACSAF/JPM Stable Value Fund;

b.  whether JPMRPS and any of the other JPM affiliates breached fiduciary duties under ERISA by virtue of this conduct;

c.  whether any of the transactions by JPMRPS and other JPM defendants with respect to the ACSAF/JPM Stable Value Fund were prohibited transactions; and

d.  whether JPM's actions complained of herein have injured plan participants and their beneficiaries who were invested in the ACSAF.

249.  *Typicality.* The claims of the ACSAF/JPM Stable Value Fund Plaintiffs are typical of the claims of the members of the Subclass because they are substantively identical to the claims of the members of the Subclass. All members of the ACSAF/JPM Stable Value Fund were investors in the same fund, the ACSAF, at the time its assets were acquired by JPM and all became investors in JPM's successor fund, the ACSAF/JPM Stable Value Fund. If each member of the Subclass were to bring and prosecute these claims individually, each member of the Subclass would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

250.  *Adequacy.* The ACSAF/JPM Stable Value Fund Plaintiffs will fairly and adequately protect the interests of the members of the Subclass. These Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the members of the ACSAF/JPM Stable Value Fund Subclass, the Class, or the SAIF Subclass. These Plaintiffs will vigorously protect the interests of the members of the Subclass. Moreover, the ACSAF/JPM

Stable Value Fund Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters, as set forth above.

251. **Rule 23(b)(1)(A) and (B) requirements.** Certification of the ACSAF/JPM Stable Value Fund Subclass is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Subclass would create a risk of establishing incompatible standards of conduct for JPM. Certification of the Subclass is also warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual members of the Subclass would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

252. **Rule 23(b)(2) requirements.** Certification of the ACSAF/JPM Stable Value Fund Subclass under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM and the other Defendants have acted or refused to act on grounds generally applicable to the Subclass, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Subclass as a whole.

253. **Rule 23(b)(3) requirements.** In the alternative, certification of the ACSAF/ JPM Stable Value Fund Subclass under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Subclass predominate over any questions (if any) affecting only individual members of the Subclass. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
## BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

254.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

255.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

256.    A fiduciary must comply with the duty of prudence, which includes the duty to diversify. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

257.    The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors ...: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return

82

of the portfolio relative to the anticipated cash flow requirements of the plan; and (e) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

258.    JPM's conduct with respect to the JPM Stable Value Funds violated in numerous ways its fiduciary duties of prudence and to diversify as alleged above.

259.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class and Subclasses. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

<u>COUNT II: VIOLATION OF ERISA § 404(a)(1)(A)</u>
<u>EXCLUSIVE BENEFIT</u>

<u>(By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)</u>

260.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

261.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

262.    ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

263.    Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), the JPM entities, while fiduciaries, caused the JPM Stable Value Funds to engage in a high risk, leveraged investment strategy as alleged above.

264.    JPM's aforementioned actions were not in the best interest of the JPM Stable Value Funds' participants and beneficiaries. Rather, JPM sought to inflate the yields for the JPM

Stable Value Funds while at the same time disguising the corresponding risks with the goal of increasing its market share in the stable value retirement investing market segment and causing more retirement funds to be invested in the JPM Stable Value Funds as compared to those offered by its competitors.

265.   JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class and Subclasses. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

### COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED TRANSACTIONS

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

266.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

267.   The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

268.   ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

269.   The JPM entities were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, the JPM entities were parties in interest because they were fiduciaries.

84

270.    Despite the clear prohibition of Section 406(a)(1)(A), the JPM entities, while fiduciaries and parties in interest, caused the JPM Stable Value Funds to purchase and hold private placement mortgages that they themselves had arranged, originated, placed and/or underwrote, and the transfer of this lending opportunity was in violation of this section.

271.    In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), the JPM entities while fiduciaries and parties in interest, used the assets of the JPM Stable Value Funds for their benefit through the receipt of fees by JPM affiliates for their services relating to the origination, arrangement and underwriting of the mortgages.

272.    JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

### COUNT IV: VIOLATION OF ERISA §§ 406(b)(1), (b)(2) AND (b)(3) PROHIBITED TRANSCATIONS

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

273.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

274.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

275.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

276.   Despite the clear prohibition of Section 406(b)(1), JPM used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, *i.e.* mortgages that were originated, underwritten, and/or brokered by JPM affiliates.

277.   JPM's efforts on behalf of the borrowers also violates section 406(b)(2)'s ban on acting on behalf of a party whose interests are adverse to the plan—here acting on behalf of the borrower in its dealing with the Mortgage Private Placement Fund.

278.   In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C. § 1106(b)(3), JPM received consideration  for its own personal account in connection with causing the Stable Funds to acquire the mortgage assets at issue. This consideration included without limitation application, originating, placement, and underwriting fees and yield spread premiums.

279.   JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

## COUNT V: VIOLATON OF ERISA §§ 406(a)(1)(A) AND (a)(1)(D) PROHIBITED TRANSACTIONS

### (By the ACSAF/JPM Stable Value Fund Plaintiffs Against All Defendants)

280.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

281.   JPMRPS, JPMC, JPMAC and other JPM entities were fiduciaries, as discussed above, for ACSAF and for the 401(k) plans and plans' sponsors and plan participants to whom they provided investment advice and services and to successor ACSAF / JPM Stable Value Fund

86

and their plan sponsors and participants, including Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.

282.    The Defendants other than JPMRPS and JPMC are parties in interest pursuant to ERISA section 3, 29 U.S.C. § 1002, in that they were either fiduciaries of the plans or provided services to the plans.

283.    In violation of section 406(a)(1)(A), JPMRPS and JPMC caused the plans to sell property to one or more of these parties in interest in that they caused the plans to transfer to these parties the assets of the plans invested in the ACSAF and caused the plans to transfer to these parties in interest the management of such assets.

284.    In addition, in violation of section 406(a)(1)(D), JPMRPS and JPMC caused the plans to transfer to or use by or for the benefit of one or more of these parties in interest assets of the plans.

285.    JPMRPS' and JPMC's actions caused substantial financial harm to Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.  As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage.  JPMRPS and JPMC must also disgorge all monies they wrongfully made through use of the plans' assets.

### COUNT VI: VIOLATION OF ERISA §§ 406(b)(1),  (b)(2)  AND (b)(3) PROHIBITED TRANSACTIONS

#### (By the ACSAF/JPM Stable Value Fund Plaintiffs Against All Defendants)

286.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

287.    JPMRPS, JPMC, JPMAC and other JPM affiliates were fiduciaries, as discussed above, for ACSAF and successor ACSAF / JPM Stable Value Fund and their plan sponsors and participants, including Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.

288.    ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

289.    In violation of ERISA section 406(b)(1), 29 U.S.C § 1160(b) (1), JPMRPS and JPMC dealt with the assets of the plans in their own interest and for their own accounts by causing the plan assets to be transferred to another JPM Defendant, either a parent or co-subsidiary.

290.    In addition in violation of ERISA section 406(b)(2), they acted in transactions involving the plans on behalf of other JPM defendants whose interests were adverse to the interests of the plans and their participants in that they caused ACSAF no longer to be viable as an investment option for 401(k) plans so that its assets and participants would be transferred to JPM's successor ACSAF / JPM Stable Value Fund.

291.    In addition, in violation of ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3), JPMRPS and JPMC received consideration for their own personal accounts in connection with influencing, managing and controlling fund selection for ACSAF plans they represented to the detriment of the remaining plan participants in the successor fund, the ACSAF / JPM Stable Value Fund, and to increase their own revenues.

292.    The actions of JPMRPS and JPMC caused substantial financial harm to Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass. As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage to the plans, the plaintiffs and the subclass. JPMRPS and JPMC must also disgorge all monies made through wrongful use of the plans' assets.

## COUNT VII: KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY
### (PLED IN THE ALTERNATIVE)

293.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

294.    To the extent they are not otherwise fiduciaries with regard to the conduct here alleged, the JPM Defendants, other than JPMC, are liable under ERISA section 405(a), 29 U.S.C. § 1105(a), to Plaintiffs, the Class, the SAIF Subclass and the ACSAF/JPM Stable Value Fund Subclass for all recoverable damage and relief as non-fiduciaries that knowingly participated with fiduciary JPMC in their breaches of trust.

295.    The JPM Defendants', other than JPMC, acts and omissions proximately caused substantial harm to Plaintiffs and the proposed class and subclasses. As a result of their wrongdoing, each is liable for all resulting loss and damage. These defendants must also disgorge all monies made through wrongful use of the plans' assets.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A.    A determination that this action is a proper class action and certification of the proposed Class and Subclasses, with Plaintiffs as class representative and its counsel as Class Counsel, pursuant to Federal Rule of Civil Procedure 23.

B.    A declaration that the Defendants, and each of them, have breached their ERISA duties to the Plaintiffs and the Class.

C.    An order compelling the Defendants to make good to the Plaintiffs, the Class, and Subclasses their plans the losses resulting from Defendants' breaches of their fiduciary duties;

and to disgorge to the Plaintiff, the Class and Subclasses all monies the Defendants made through their wrongful use of the Plaintiffs and the Class's assets;

     D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plaintiffs, the Class and Subclasses, and their plans as a result of the aforementioned ERISA violations;

     E.    An order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the relevant ERISA plans' funds;

     F.    An amount equal to the amount of any losses to the Plaintiffs, the Class and Subclasses, and the ERISA plans included in the Class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses;

     G.    An award of costs pursuant to 29 U.S.C. § 1132(g);

     H.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and other law;

     I.    An award for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

     J.    An award of such other and further relief as the Court deems just and proper.

Dated: December 15, 2014               Respectfully submitted,


                                    /s/ Jason H. Kim

90

Kevin Madonna (Bar No. KM5595)
KENNEDY & MADONNA, LLP
48 Dewitt Mills Rd.
Hurley, NY 12443
Tel: 845-481-2622
Fax: 845-230-3111

Michael M. Mulder
Elena N. Liveris
LAW OFFICES OF
MICHAEL M. MULDER
321 S. Plymouth Ct., Ste. 1250
Chicago, Ill.  60604
Tel: 312-263-0272
Fax: 312-263-2942
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com
*Appearing pro hac vice*

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Tel: (480) 428-0144
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com
*Appearing pro hac vice*

Todd Schneider
Jason Kim
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
180 Montgomery Street, Suite 2000
San Francisco, California  94104
Tel: (415) 421-7100
Fax: (415) 421-7105
jkim@schneiderwallace.com
*Appearing pro hac vice*

Joseph Peiffer
PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE LLP
201 St. Charles Ave, Suite 4610
New Orleans, Louisiana  70170
Tel: (504) 523-2434
jpeiffer@fishmanhaygood.com
*Appearing pro hac vice*

Peter Mougey
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 So. Baylen Street, Suite 600
Pensacola, FL  32502
pmougey@levinlaw.com
jkauffman@levinlaw.com
*Appearing pro hac vice*

Randall E. Hendricks
Lawrence A. Rouse
Phillip G. Greenfield
ROUSE HENDRICKS GERMAN MAY PC
1201 Walnut, Suite 2000
Kansas City, MO 64106

ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS

## CERTIFICATE OF SERVICE

I, Jason H. Kim, hereby certify that on this 15th day of December, 2014, the document to which this certificate is attached was filed electronically with the Court. Notice of this filing will be sent to the following parties through the Court's ecf system:

Greg Braden
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
gbraden@morganlewis.com

Melissa Hill
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
mhill@morganlewis.com

Azeez Hayne
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
ahayne@morganlewis.com

/s/ Jason H. Kim