# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| *In re J.P. Morgan Stable Value Fund ERISA Litigation* | ) ) ) | Master File No. 12-cv-2548-VSB |

## DEFENDANTS' REDACTED ANSWER TO PLAINTIFFS' CONSOLIDATED AND AMENDED COMPLAINT

JPMorgan Chase & Co. ("JPMC"), JPMorgan Chase Bank , N.A. ("JPMC Bank"), J.P.

Morgan Investment Management Inc. ("JPMIM"), JPMorgan Retirement Plan Services LLC

("RPS"),[*] and JPMAC Holdings ("JPMAC") (collectively the "Defendants") hereby answer

Plaintiffs' Consolidated and Amended Complaint and assert their affirmative defenses.

## INTRODUCTION

1.      Defendants are J.P. Morgan Chase & Co. and various of its wholly-owned subsidiaries, including JPMAC and JPMRPS, which are defendants only as to some of the claims alleged herein. JPM sold and currently sells a number of investment funds offered to 401(k) plan participants and represented to be stable in value (collectively referred to in this Complaint as the "JPM Stable Value Funds"). These funds are called, among other things, the Stable Value Fund, the Stable Asset Fund, Stable Value, Stable Principal Fund, Short-Term Investment Fund, the Stable Asset Income Fund, and the JPMorgan Stable Value Fund. All of the JPM Stable Value Funds are advertised as being stable in value, and thus all were presented as conservative investment options.

**ANSWER:**      Defendants admit that JPMC and some of its subsidiaries have been named as

defendants in this action.  Defendants admit that JPMC Bank maintains the Stable Asset Income

Fund ("SAIF") and the Stable Value Fund (the "SVF"), which are commingled stable value

investment options, and that JPMIM acts an investment manager for certain separate account

stable value funds pursuant to investment management agreements ("IMAs").  Because they are

---

[*] As of August 29, 2014, defendant JPMorgan Retirement Plan Services LLC was purchased by, and has henceforth become a wholly owned direct or indirect subsidiary of, Great-West Life & Annuity Insurance Company.  Accordingly, RPS is no longer a wholly owned direct or indirect subsidiary of Defendant JPMorgan Chase & Co.  Defendants will file a Supplemental Disclosure Statement pursuant to Rule of Civil Procedure 7.1 regarding this change in ownership.

vague, Defendants lack information sufficient to form a belief as to the truth of the allegations of the second sentence of Paragraph 1.  Defendants deny the remaining allegations in Paragraph 1.

2.       For purposes relevant to this Complaint, the JPM Stable Value Funds are divided into two basic categories: (1) separate stable value funds that are established for a single employer group and (2) pooled stable value funds that combine retirement funds for multiple, usually smaller, employer groups. The Stable Asset Income Fund ("SAIF") and the JPMorgan Stable Value Fund (referred to in this Complaint as the "ACSAF/JPM Stable Value Fund") are pooled stable value funds. The allegations in this Complaint apply to both JPM's separate stable value funds and JPM's pooled stable value funds unless otherwise stated.

**ANSWER:**    Defendants admit that Plaintiffs refer to these funds as (1) "separate stable value funds" and (2) "pooled stable value funds," and that Plaintiffs claim their allegations apply to both separate account and pooled stable value funds.  Defendants admit that SAIF and SVF are collective investment funds in which multiple plans invested.  Defendants deny the remaining allegations in Paragraph 2.

3.       Plaintiffs and members of the proposed Class are investors who invested their retirement funds via their defined contribution 401(k) plans into the JPM Stable Value Funds which in turn were invested by JPM in its Intermediate Bond Fund ("IBF") or in its Intermediate Public Bond Fund ("IPBF") and in underlying JPM funds as discussed in detail below.

**ANSWER:**    Defendants admit only that Plaintiffs purport to sue on behalf of a putative class of individuals who invested in stable value products that invested in JPMC Bank's Intermediate Bond Fund ("IBF") or its Intermediate Public Bond Fund ("IPBF").  Defendants deny any remaining allegations in Paragraph 3.

4.       The main investment objective of stable value funds is preserving the invested principal and accumulated returns while yielding returns slightly higher than a money market account. The longer duration of investments in a stable value fund as compared to a money market fund should generally result in higher yields. It is inherent in this objective that stable value funds must be managed to minimize the risk to the invested principal and to minimize volatility in the face of changing market conditions.[1]

---

[1] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, describing objectives of stable value funds.

**ANSWER:**    Defendants admit only that the investment objectives of SAIF, SVF, and separate account stable value products managed by JPMIM (the "Stable Value Funds") are set forth in written documents which speak for themselves.  Defendants note that investors in the Stable Value Funds maintained their principal and accumulated interest and, during the Class Period, received returns higher than those available from money market funds.  The allegations of the last sentence of Paragraph 4 purport to characterize selected terms of a written document, which speaks for itself, and thus are denied.  Defendants deny any remaining allegations in Paragraph 4. Footnote 1 contains no allegations and requires no response.

     5.     JPM understood well the purpose of stable value funds. ███████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████[2]
Consistent with this stated strategy, JPM represented to retirement investors that the JPM Stable Value Funds are "your most conservative investment option."[3] The then-head of JPM's stable value fund management group, Victoria Paradis, described JPM's stable value asset class as "among the most conservative in the DC [defined contribution retirement] plan line-up."[4] However, this sales ploy is a ruse, and has been for some time.

**ANSWER:**    The allegations in the first sentence reflect Plaintiffs' purported opinion of what Defendants "understood" regarding an unidentified "purpose" of stable value funds and require no response.  The allegations in the second through fourth sentences of Paragraph 4 purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.  Defendants note that investors in the Stable Value Funds maintained their principal and accumulated interest and, during the Class Period, received returns higher than those available

---

[2] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[3] *See* http://www.jpmorgan.com/pages/stablevalue (last viewed Oct. 3, 2013).

[4] *See Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis*, http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed Oct. 3, 2013).

from money market funds.  Defendants deny the remaining allegations in Paragraph 5.

Footnotes 2 through 4 contain no allegations and require no response.

6.      While JPM touted the conservative nature of the JPM Stable Value Funds, for the sake of its own financial interests, it caused the JPM Stable Value Funds to invest heavily in highly-leveraged mortgage-related assets, illiquid assets such as private mortgages, "out-of-index" securities, and other investments not suitable for a stable value product. As set forth below, this strategy was not prudent given the "character and aims" of stable value funds for several reasons.

**ANSWER:**      Defendants deny the allegations in Paragraph 6.

7.      First, the high degree of leverage employed in the JPM Stable Value Funds is both contrary to industry standards and inherently risky, as leverage increases the magnitude of volatility and thus gains and losses.

**ANSWER:**      Defendants deny the allegations in Paragraph 7.

8.      Second, although JPM claimed to be managing against a particular benchmark – the Lehman Aggregate Intermediate Index – JPM's actual investment strategy differed fundamentally from this index both in terms of leverage and composition. Thus, JPM vastly exceeded the risk parameters indicated by this benchmark.

**ANSWER:**      Defendants deny the allegations in Paragraph 8.

9.      Third, the JPM Stable Value Funds due to their leverage were inadequately diversified and highly concentrated in mortgage-related investments – a problem that was exacerbated by JPM's failure to prudently hedge against the JPM Stable Value Funds' enormous exposure to the real estate market.

**ANSWER:**      Defendants deny the allegations in Paragraph 9.

10.      Fourth, the JPM Stable Value Funds invested in low quality mortgage-backed securities, such as those backed by subprime and option-ARM mortgages, those backed by inadequate documentation of the underlying borrowers' ability to pay back the mortgages, and those that took exotic forms such as interest-only mortgage derivatives and inverse floaters. These investments were not suitable for a stable value fund when they were made and were eventually prohibited by the fund.

**ANSWER:**      Defendants admit that certain of the underlying collective investment funds held

mortgage-backed securities.  Defendants deny the remaining allegations in Paragraph 10.

11.      Fifth, JPM (unique among its competitors) invested in commercial private placement mortgages, some of which JPM itself originated, which had liquidity problems and were otherwise supported by no objective rating criteria. These investments too were not suitable

for a stable value fund when they were made and were eventually prohibited by the fund. This allegation does not apply at all times to the ACSAF/JPM Stable Value Fund which, although imprudently managed in other ways, as of 2008 did not invest in the Private Placement Mortgage Fund – the fund that housed the private placement mortgages

**ANSWER:**     Defendants admit that, with the exception of the SVF and the IPBF, one or more

of the Stable Value Funds invested in the Mortgage Private Placement Fund ("MPPF"), a

collective investment fund that invested in private mortgages that are not valued or rated by a

third party.  Defendants deny the remaining allegations in Paragraph 11.

12.     JPM undertook this risky strategy to, as they say on Wall Street, "reach for yield" – *i.e.*, increase returns for stable value fund investors so as to attract more investors and increase its market share and management fees, which were based on the total amount under management ("AUM"). This was a goal fundamentally at odds with the capital preservation function that, according to industry standards and JPM itself, was the primary purpose of stable value funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 12.

13.     Furthermore, documents and previous deposition testimony produced in this case – and not hindsight-based, general market indicators – show beyond any doubt that JPM was well aware or should have been aware of the outsized risks its unique investment strategies posed to Plaintiffs and other investors in its Stable Value Funds at the times when JPM made and maintained these investments. This evidence is adduced in detail throughout this Complaint.



[6] As set forth below, this observation was surely accurate and, if anything, an understatement. Yet even confronted with this striking piece of information, JPM refused to rethink, much less modify, its risky mortgage-related investment strategy for the JPM Stable Value Funds.

[7] Furthermore, Victoria Paradis, Managing Director of JPM Morgan Asset Management and then-manager of the Stable Value Funds, herself acknowledged in a trade publication that "[d]irectly placed [commercial mortgage] loans ***are not appropriate within any portfolio with liquidity demands***."[8] Nonetheless, as explained further below, the JPM Stable

_____

[5]

[6]

[7]

[8] *Stable Times*, First Quarter 2007, "Private Mortgages – A Compelling Stable Value Investment" (emphasis added).

Value Funds (with the exception of the ACSAF/JPM Stable Value Fund after 2008) – which faced liquidity demands during much of the class period – invested heavily in such loans.

**ANSWER:**   The allegations in the fourth, seventh and eighth sentences purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied. The remaining allegations in Paragraph 13 are denied.  Footnotes 5 through 8 contain no allegations and require no response.

14.   So this case is not one that turns on hindsight allegations based on general market indicators. Rather, at the times it made and maintained the highly-leveraged mortgage-related investments at issue here, JPM disregarded the stated purposes of the JPM Stable Value Funds, ignored important stable value fund-related management advice from its own consultants and managers, and intentionally adopted a high risk, leveraged strategy to reach for yield and increase its market share and thus management fees. Accordingly, JPM had actual, contemporaneous knowledge that it was pursuing an investment strategy that was imprudent given the "character and aims" of stable value fund investing.

**ANSWER:**   Defendants deny the allegations in Paragraph 14.

15.   When the financial crisis hit, the JPM Stable Value Funds sustained catastrophic - but predictable – losses directly related to JPM's inappropriate high risk, leveraged strategy.

**ANSWER:**   Defendants deny the allegations in Paragraph 15.  By way of further answer, Defendants state that no investor in the Stable Value Funds lost any principal or accumulated interest.

16.   This loss was caused by JPM's unique and inappropriate investment strategies and not by unforeseeable market conditions. Competing stable value funds continued to perform well during the financial crisis, as would be expected of investment vehicles that by design are intended to preserve principal above all and by limiting volatility from market fluctuations.

**ANSWER:**   Defendants deny the allegations in Paragraph 16.

17.   As set forth below, JPM breached its ERISA duty of prudence and duty to diversify owed to investors in the JPM Stable Value Funds. In addition, JPM breached its duty of loyalty and engaged in a conflict of interest by causing the JPM Stable Value Funds to engage in prohibited transactions with JPM itself.

**ANSWER:**   Defendants deny the allegations in Paragraph 17.

18.   As set forth below, JPM committed additional breaches of ERISA with respect to the pooled Stable Value Funds. JPM acted in its own interests and not in the interests of the

participants and beneficiaries of the plans which invested in the pooled Stable Value Funds by "reaching for yield" solely in an effort to rapidly increase its market share in stable value products as compared to competitors and even its own erstwhile partner, American Century Investments. JPM's breaches of the duties of prudence and loyalty with respect to the JPM Stable Value Funds generally were magnified and exacerbated in the context of its pooled Stable Value Funds due to the well-known and unique features of such funds as explained below.

**ANSWER:**   Defendants deny the allegations in Paragraph 18.

19.   JPM's breaches of duty caused cognizable injury to Plaintiffs and the members of the proposed Class. Although, as explained below, the recognition of these massive losses in Plaintiffs' accounts was "smoothed" (*i.e.*, amortized over time), the losses were nevertheless sustained in full. The investors paid for their losses through a substantially lower crediting rate during the relevant time period than they would have realized had JPM engaged in a prudent stable value investment strategy. JPM should now be held fully liable for this reduction in the yielded returns of the JPM Stable Value Funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 19.  Defendants note that investors

in the Stable Value Funds maintained their principal and accumulated interest and, during the

Class Period, received returns higher than those available from money market funds.

20.   JPM is also liable for disgorging management fees and other consideration received in connection with its management of the JPM Stable Value Funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 20.

21.   Plaintiffs are not the only parties complaining about JPM's management of its stable value fund business. ███████████████████████████████████
████████████████████████████████████████████████

**ANSWER:**   ████████████████████████████████████████

████████████████████████████████████████████████

22.   The result of litigation and related arbitration between JPM and one of its business partners (American Century Investments, as referenced above) also shows that JPM habitually mischaracterized the performance and investment strategy of its Stable Value Funds. American Century Investments won a large arbitration judgment against one of the JPM entities here because, among other things, that entity misrepresented the risk profile of the investment funds at issue in that case including the JPM Stable Value Funds at issue here.[9] That decision exposed how JPM used risky investments that were unsuitable for a stable value fund to

---

[9] *Am. Century Inv. Mgmt., Inc. v. J.P. Morgan Invest Holdings LLC*, No. 58 148 Y 00220 9 (Am. Arb. Ass'n).

temporarily achieve high yield and thereby attract additional fees by increasing the amount of assets under its management.[10]

**ANSWER:**   The allegations in Paragraph 22 purport to characterize the terms of the

Arbitration award which is a written document that speaks for itself, and thus are denied.

Footnotes 9 and 10 contain no allegations and require no response.

23.   In addition, JPM along with Defendants JPMRPS and JPMAC intentionally caused a run on the more conservatively-managed pooled stable value fund offered by American Century Investments, which American Century was forced to surrender to JPM to avoid catastrophic damage to the fund. JPM's actions caused harm to those investors left behind in that fund (who eventually were invested in the risky ACSAF/JPM Stable Value Fund after American Century ceded control of the fund to JPM). JPM also harmed those investors who it caused to be switched into its own, more risky pooled stable value fund (the Stable Asset Income Fund or "SAIF").

**ANSWER**:   Defendants deny the allegations in Paragraph 23.

## PARTIES

24.   Plaintiff Richard Whitley has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Hospira, Inc. 401(k) Retirement Plan ("the Hospira Plan"). The Hospira Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Whitley, prior to withdrawing from the Hospira Plan on or about July 27, 2012, had 401(k) funds allocated to JPM's Hospira Stable Value Fund, which is one of the Stable Value Funds described above.

**ANSWER:**   Defendants admit only that Mr. Whitley was a participant in the Hospira Plan,

that the Hospira Plan is a defined contribution plan, that JPMIM managed a separate account

stable value portfolio for Hospira pursuant to an IMA, and that Mr. Whitley invested in the

Hospira stable value fund before July 27, 2012.  The remaining allegations in the first and second

sentence of Paragraph 24 state legal conclusions to which no response is required.  Defendants

deny any remaining allegations in Paragraph 24.

25.   Plaintiff Terry J. Koch has been, and continues to be, a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan"). The Caterpillar Plan is a defined contribution retirement plan subject to ERISA. At all

---

[10] *Id.*

relevant times, Mr. Koch has had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund, which is one of the Stable Value Funds described above.

**ANSWER:**    Defendants admit only that Mr. Koch was a participant in the Caterpillar Plan, that the plan is a defined contribution plan, that JPMIM managed a separate account stable value portfolio for Caterpillar pursuant to an IMA, and that Mr. Koch invested in the Caterpillar stable value fund.  The remaining allegations in the first and second sentence of Paragraph 25 state legal conclusions to which no response is required.  Defendants deny any remaining allegations in Paragraph 25.

26.    Plaintiff Caroleta M. Duran has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Caterpillar Plan. At all relevant times, prior to withdrawing from the Caterpillar's Plan on or about, August 22, 2011, Ms. Duran had 401(k) funds allocated to JPM's Caterpillar Stable Principal Fund.

**ANSWER:**    Defendants admit only that Ms. Duran was a participant in the Caterpillar Plan, that the plan is a defined contribution plan, that JPMIM managed a separate account stable value portfolio for Caterpillar pursuant to an IMA, and that Ms. Duran invested in the Caterpillar stable value fund before August 22, 2011.  The remaining allegations in the first and second sentence of Paragraph 26 state legal conclusions to which no response is required.  Defendants deny any remaining allegations in Paragraph 26.

27.    Plaintiff Mark D. Grandy has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mitsubishi Motors North America, Inc. Manufacturing Division 401(k) Savings Plan (the "Mitsubishi Plan"). The Mitsubishi Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Grandy has had 401(k) funds allocated to JPM's Stable Value Fund, which is one of the Stable Value Funds described above.

**ANSWER:**    Defendants admit only that Mr. Grandy was a participant in the Mitsubishi Plan, that the plan is a defined contribution plan, that JPMIM managed a separate account stable value portfolio for Mitsubishi pursuant to an IMA, and that Mr. Grandy invested in the Mitsubishi stable value fund.  The remaining allegations in the first and second sentence of Paragraph 27

state legal conclusions to which no response is required.  Defendants deny any remaining allegations in Paragraph 27.

28.     Plaintiff John M. Gates has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan International, Inc., Employees' Retirement Savings Plan (the "Titan Plan"). The Titan Plan is a defined contribution retirement plan subject to ERISA. At all relevant times, Mr. Gates has had 401(k) funds allocated to JPM's Stable Asset Income Fund, which is one of the Stable Value Funds described above.

**ANSWER:**     Defendants admit only that Mr. Gates was a participant in the Titan Plan, that the plan is a defined contribution plan, that the Titan Plan offered participants the opportunity to invest in SAIF, and that Mr. Gates invested in SAIF.  The remaining allegations in the first and second sentence of Paragraph 28 state legal conclusions to which no response is required. Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any remaining allegations in Paragraph 28.

29.     Plaintiff Scott Newell has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Titan Plan. At all relevant times, Mr. Newell has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

**ANSWER:**     Defendants admit only that Mr. Newell was a participant in the Titan Plan, that the plan is a defined contribution plan, that the Titan Plan offered participants the opportunity to invest in SAIF, and that Mr. Newell invested in SAIF.  The remaining allegations in the first and second sentence of Paragraph 29 state legal conclusions to which no response is required. Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any remaining allegations in Paragraph 29.

30.     Plaintiff Michael Knee has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Modern Drop Forge Company Employees' Retirement Benefit Plan (the "Modern Drop Forge Plan"). The Modern Drop Forge Plan is a defined contribution retirement plan subject to ERISA. Mr. Knee had 401(k) funds allocated to the American Century Stable Asset Fund ("ACSAF") at the time JPM executed the agreement to transfer those funds to the ACSAF/JPM Stable Value Fund on September 10, 2007, at the time those funds were actually received into the ACSAF/JPM Stable Value Fund on September 17, 2007, when the fund commenced operations, and continuing thereafter in the successor fund, the ACSAF/JPM Stable Value Fund, until withdrawing from the Modern Drop Forge Plan on or about June 11,

2014. Prior to September 17, 2007, none of Plaintiff Knee's 401(k) funds were invested in the ACSAF/JPM Stable Value Fund.

**ANSWER:**   Defendants admit only that Mr. Knee was a participant in the Modern Drop Forge Plan, that the plan is a defined contribution plan, that the Modern Drop Forge Plan offered participants the opportunity to invest in SVF, that Mr. Knee invested some of his 401(k) funds in ACSAF prior to September 17, 2007, and that Mr. Knee had some of his 401(k) funds invested in SVF after September 17, 2007.  The remaining allegations in the first and second sentence of Paragraph 30 state legal conclusions to which no response is required.  Defendants admit that SVF is one of the Funds at issue in this case.  Defendants deny any remaining allegations in Paragraph 30.

31.    Plaintiff Eric M. Murphy has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Mayer Electric Supply Co., Inc. Capital Accumulation Plan (the "Mayer Electric Plan"). The Mayer Electric Plan is a defined contribution retirement plan subject to ERISA. Mr. Murphy had 401(k) funds allocated to the ACSAF at the time JPM executed the agreement to transfer those funds to the ACSAF/JPM Stable Value Fund on September 10, 2007, at the time those funds were actually received into the ACSAF/JPM Stable Value Fund on September 17, 2007, when the fund commenced operations, and continuing thereafter in the ACSAF/JPM Stable Value Fund. Prior to September 17, 2007, none of Plaintiff Murphy's 401(k) funds were invested in the ACSAF/JPM Stable Value Fund.

**ANSWER:**   Defendants admit only that Mr. Murphy was a participant in the Mayer Electric Plan, that the plan is a defined contribution plan, that the Mayer Electric Plan offered participants the opportunity to invest in SVF, that Mr. Murphy invested some of his 401(k) funds in ACSAF prior to September 17, 2007, and that Mr. Murphy had some of his 401(k) funds invested in SVF after September 17, 2007.  The remaining allegations in the first and second sentence of Paragraph 31 state legal conclusions to which no response is required.  Defendants admit that the SVF is one of the Funds at issue in this case.  Defendants deny any remaining allegations in Paragraph 31.

32.    Plaintiff Nancy Dye has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Government Employees Health Association ("GEHA") 401(k)

Retirement Plan ("GEHA Plan"). The GEHA Plan is a defined contribution retirement plan subject to ERISA. Ms. Dye has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

**ANSWER:**    Defendants admit only that Ms. Dye was a participant in the GEHA Plan, that the

plan is a defined contribution plan, that the GEHA Plan offered participants the opportunity to

invest in SAIF, and that Ms. Dye invested in SAIF.  The remaining allegations in the first and

second sentence of Paragraph 32 state legal conclusions to which no response is required.

Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any

remaining allegations in Paragraph 32.

33.    Plaintiff John Stolwyk has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Kansas City Power and Light 401(k) Retirement Plan ("the KCPL Plan"). The KCPL Plan is a defined contribution retirement plan subject to ERISA. Mr. Stolwyck has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

**ANSWER:**    Defendants admit only that Mr. Stolwyk was a participant in the KCPL Plan, that

the plan is a defined contribution plan, that the KCPL Plan offered participants the opportunity to

invest in SAIF, and that Mr. Stolwyk invested in SAIF.  The remaining allegations in the first

and second sentence of Paragraph 33 state legal conclusions to which no response is required.

Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any

remaining allegations in Paragraph 33.

34.    Plaintiff Clay Hedges has been and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Ferrell Gas 401(k) Retirement Plan ("Ferrell Gas Plan"). The Ferrell Gas Plan is a defined contribution retirement plan subject to ERISA. Mr. Hedges had 401(k) funds allocated to the ACSAF at the time JPM executed the agreement to transfer those funds to the ACSAF/JPM Stable Value Fund on September 10, 2007, at the time those funds were actually received into the ACSAF/JPM Stable Value Fund on September 17, 2007, when the fund commenced operations, and continuing thereafter in the ACSAF/JPM Stable Value Fund. Prior to September 17, 2007, none of Plaintiff Hedges' 401(k) funds were invested in the ACSAF/JPM Stable Value Fund.

**ANSWER:**    Defendants admit only that Mr. Hedges was a participant in the Ferrell Gas Plan,

that the plan is a defined contribution plan, that the Ferrell Gas Plan offered participants the

opportunity to invest in SVF, that Mr. Hedges invested some of his 401(k) funds in ACSAF prior

to September 17, 2007, and that Mr. Hedges had some of his 401(k) funds invested in SVF after

September 17, 2007.  The remaining allegations in the first and second sentence of Paragraph 34

state legal conclusions to which no response is required.  Defendants admit that SVF is one of

the Funds at issue in this case.  Defendants deny any remaining allegations in Paragraph 34.

35.     Plaintiff Rosemary Dotson has been and is a participant, as defined in § 3(7), 29 U.S.C. § 1002(7), in the GEHA Plan. Ms. Dotson has had 401(k) funds allocated to JPM's Stable Asset Income Fund.

**ANSWER:**     Defendants admit only that Ms. Dotson was a participant in the GEHA Plan, that

the plan is a defined contribution plan, that the GEHA Plan offered participants the opportunity

to invest in SAIF, and that Ms. Dotson invested in SAIF.  The remaining allegations in the first

and second sentence of Paragraph 35 state legal conclusions to which no response is required.

Defendants admit that the SAIF is one of the Funds at issue in this case.  Defendants deny any

remaining allegations in Paragraph 35.

36.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, Newell, Knee, Murphy, Dye, Stolwyk, Hedges, and Dotson  sue on their own behalf and, as specified below, on behalf of participants in 401(k) plans in which any of the JPM Stable Value Funds is or has been offered as an investment option and who have allocated monies to any of the JPM Stable Value Funds during the class period.

**ANSWER:**     Defendants admit only that Plaintiffs purport to sue on behalf of a putative class

but deny that class certification is appropriate.  Defendants deny any remaining allegations in

Paragraph 36.

37.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a financial services provider whose headquarters is in New York, New York. JPMC was a fiduciary with respect to the plans offering any of the JPM Stable Value Funds and the participants in and beneficiaries of such plans at all relevant times.

**ANSWER:**     Defendants admit the allegations in the first sentence.  Defendants deny the

remaining allegations in Paragraph 37.

38.     JPMorgan Chase, N.A. ("JPMC, NA") is a bank operating in the United States and abroad with a registered address of 270 Park Avenue, New York, New York 10017-2014.

JPMC, NA acts as trustee and fiduciary (either directly or through one or more wholly-owned subsidiaries) of the JPM Stable Value Funds. For example, the Commingled Pension Trust (Stable Asset Income) of JP Morgan Chase, N.A. is a collective trust fund established and maintained by JPMC, NA under a declaration of trust. JPMC, NA was a fiduciary with respect to the plans offering any of JPM's Stable Value Funds and the participants in and beneficiaries of such plans at all relevant times.

**ANSWER:**   Because there is no such entity, Defendants interpret Paragraph 38's reference to

"JPMorgan Chase, N.A." as a reference to JPMC Bank.  Defendants admit that JPMC Bank is a

bank operating in the United States and state that 1111 Polaris Parkway, Columbus, Ohio, is the

main office of JPMC Bank, as  designated in its articles of association on file with the Office of

the Comptroller of the Currency.  Defendants further admit that JPMC Bank is the trustee and an

ERISA fiduciary for certain purposes for SAIF, SVF, and the commingled trust funds in which

they and the other Stable Value Funds invested.  Defendants also admit that "the Commingled

Pension Trust (Stable Asset Income)" (i.e. SAIF) is a collective trust fund established and

maintained by JPMC Bank under a declaration of trust.  Defendants deny the remaining

allegations in Paragraph 38.

39.     Through defendant JPMAC Holdings Inc. ("JPMAC"), JPMC owned at all relevant times between 40% and 48% interest in American Century Companies, Inc. ("ACC"). Throughout the period of its ownership, JPMC and/or JPMAC had the right to appoint and did appoint at least one board member to the ACC Board of Directors, who thus served as a fiduciary of ACC.  The basis of JPMAC's liability as to some of the claims alleged in this Complaint is set forth below under "Allegations Specific to JPM's Pooled Separate Value Funds."

**ANSWER:**    Defendants admit that JPMAC owned a minority interest in ACC at certain times,

and that JPMAC had the right to and did appoint a Board Member to the ACC Board of

Directors, who owed certain obligations under governing corporate law to ACC. Defendants

deny the remaining allegations in Paragraph 39

40.     Defendant J.P. Morgan Investment Management, Inc., a.k.a. J.P. Morgan Asset Management ("JPMAM") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. J.P. Morgan Asset Management is the marketing name for the asset management business of JPM and its subsidiaries worldwide. JPMAM is the entity that managed the JPM Stable Value Funds. JPMAM was a fiduciary with respect to the

plans offering any of the JPM Stable Value Funds and the participants in and beneficiaries of such plans at all relevant times.

**ANSWER:**     Defendants admit that J.P. Morgan Investment Management Inc. is a Delaware

corporation with its principal place of business at 270 Park Ave., New York, New York 10017.

Defendants further admit that J.P. Morgan Asset Management is the marketing name for certain

of JPMorgan Chase & Co.'s asset management businesses.  Defendants admit that JPMIM acted

as an investment manager under ERISA for certain separate accounts pursuant to IMAs during

certain times.  Defendants deny the remaining allegations in Paragraph 40.

41.     Defendant J.P. Morgan Retirement Plan Services LLC ("JPMRPS") is a wholly-owned subsidiary of JPMC. The basis of JPMRPS's liability as to some of the claims alleged in this Complaint is set forth below under "Allegations Specific to JPM's Pooled Separate Value Funds."

**ANSWER:**     Defendants admit that, from approximately January 29, 2003 to August 29, 2014,

RPS was an indirect, wholly-owned subsidiary of JPMC. Defendants deny the remaining

allegations in Paragraph 41.

## JURISDICTION AND VENUE

42.     The Court has subject matter jurisdiction over this matter pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1331.

**ANSWER:**     The allegations in Paragraph 42 state a legal conclusion requiring no response.

To the extent a response is required those allegations are admitted.  Defendants further state, on

information and belief, that this Court has subject matter jurisdiction over this matter pursuant to

28 U.S.C. § 1332.

43.     Venue is proper in this District because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

**ANSWER:**     The allegations in Paragraph 43 state a legal conclusion requiring no response.

To the extent a response is required, and assuming the truth of Plaintiffs' allegations for these

purposes only, Defendants admit venue is proper in this District.

## FACTUAL ALLEGATIONS

### The 401(k) Plans and JPM's Role as Fiduciary

44.     At all times relevant to this Complaint, the 401(k) plans involved in this matter
were employee benefit plans within the meaning of ERISA.

**ANSWER:**     Defendants admit only on information and belief that the plans in which the

Plaintiffs participated were employee benefit plans within the meaning of ERISA.

45.     At all times relevant to this Complaint, the plans were "defined contribution" or
"individual account" plans within the meaning of ERISA because, among other reasons, the
plans provided for individual accounts for each participant and for benefits based solely upon the
amount contributed to the participant's account, as well as any income, expenses, gains and
losses, and forfeitures of accounts of other participants that could be allocated to such
participant's accounts.

**ANSWER:**     Defendants admit only on information and belief that the plans in which the

Plaintiffs participated were defined contribution individual account plans.

46.     At all times relevant to this Complaint, these plans provided the Plaintiffs and
members of the proposed Class with various options for investment, and they could direct the
plans to purchase investments from among these options and allocate them to their individual
accounts. The JPM Stable Value Funds are and were among these options.

**ANSWER:**     Defendants admit only that the plan sponsors for the plans in which the Plaintiffs

participated chose to offer various options for investment, that Plaintiffs could direct the

investment of their plan accounts among the choices made by the plan sponsors, and that SAIF,

SVF, or a separate account stable value fund managed by JPMIM were among these options,

depending on the plan.  Defendants deny the remaining allegations in Paragraph 46.

47.     Plaintiffs Whitley, Koch, Duran, Grandy, Gates, Newell, Knee, Murphy, Dye,
Stolwyk, Hedges, and Dotson were and/or are, respectively, participants in the Hospira,
Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell
Gas Plans at times relevant to this action. At all relevant times, each of these Plans offered one of

16

the JPM Stable Value Funds as an investment option that Plaintiffs invested in, and at those times, one or more of the JPM entities served as trustee for each of these Plans.

**ANSWER:**   Defendants admit that Plaintiffs were and/or are participants in the Caterpillar,

Ferrell Gas, GEHA, Hospira, KCPL, Mayer Electric, Mitsubishi, Modern Drop Forge, and Titan

plans, that these plans offered SAIF, SVF, or a separate account stable value fund managed by

JPMIM as an investment option, and that JPMC Bank has acted as trustee with respect to SAIF,

SVF, and the JPMC Bank commingled trust funds in which they and these plans' separate

account stable value funds invested.   Defendants also admit that JPMC Bank acted as trustee for

the Mayer Electric plan and as directed trustee with respect to the Ferrell Gas, GEHA, Great

Plains Energy (the holding company of KCPL), Hospira, and Mitsubishi plans.   JPMC Bank did

not act as a trustee for the Modern Drop Forge plan during the putative class period.   Defendants

deny that any JPM entity acted as trustee for the Caterpillar or Titan International plans.

Defendants deny the remaining allegations in Paragraph 47.

48.     The Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell Gas Plans are typical of such plans, and Plaintiffs are typical and representative of participants in such plans who have chosen to invest a portion of their 401(k) holdings in one of the JPM Stable Value Funds. The Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell Gas Plans are typical of the plans involved in this matter in that each at the relevant times has offered one of the JPM Stable Value Funds as an investment option, and one or more of the JPM entities served as fiduciary, administrator and trustee for each.

**ANSWER:**   Defendants deny the allegations in Paragraph 48.

49.     Although the JPM Stable Value Funds are nominally separate, they are linked together by their common and substantial investments in other commingled JPM funds, such as the Intermediate Bond Fund (or in the case of the ACSAF/JPM Stable Value Fund, the similar Intermediate Public Bond Fund) and other underlying comingled Pension Trust Funds as described below.

**ANSWER:**   Defendants deny the allegations in Paragraph 49.

50.     At all relevant times, one or more of the JPM entities served as Investment Advisor, Investment Manager, Administrator, Trustee and/or Custodian of these plans' Stable Value Funds.

**ANSWER:**     Defendants admit that JPMC Bank served as trustee of SAIF, SVF, and the other

commingled trust funds it established and maintained, that at certain times JPMIM served as

Investment Manager for the separate account stable value funds of Hospira, Caterpillar, and

Mitsubishi, and that at certain times RPS served as recordkeeper for some of the plans in which

the named Plaintiffs invested.  Defendants deny the remaining allegations in Paragraph 50.

51.    ERISA defines a fiduciary as someone who "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). People and entities are fiduciaries pursuant to ERISA not only when they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when they perform such fiduciary functions.

**ANSWER:**     The allegations in the first sentence purport to quote selections from or paraphrase

ERISA, which speaks for itself, and thus are denied.  The remaining allegations in Paragraph 51

state a legal conclusion requiring no response.  To the extent a response is required those

allegations are denied.

52.    Investment managers are also ERISA fiduciaries. ERISA defines in relevant part an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset of a plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

**ANSWER:**     The allegations in the second sentence purport to quote selections from or

paraphrase ERISA, which speaks for itself, and thus are denied.  The remaining allegations in

Paragraph 52 state a legal conclusion requiring no response.  To the extent a response is required

those allegations are denied

53.    The JPM entities are fiduciaries with respect to the JPM Stable Value Funds and thus of the plans that offer the JPM Stable Value Funds and the participants in and beneficiaries of those plans who allocate retirement funds to one of the JPM Stable Value Funds because, among other reasons, they possess investment discretion as to the JPM Stable Value Funds. Neither plans nor plan participants possess the ability to direct the manner in which the JPM entities invest or allocate the JPM Stable Value Funds' assets. Moreover, one or more of the JPM

entities are trustees and custodians with respect to the JPM Stable Value Funds pursuant to ERISA § 403(a), and are also investment managers with respect to the Stable Value Funds. In addition, they are investment advisors to the plans in which plaintiffs are or were participants as well to other plans in which members of the proposed class are or were participants.

**ANSWER:**    Defendants admit that JPMC Bank is an ERISA fiduciary with respect to the

management of SAIF, SVF, and the JPMC Bank commingled trust funds in which they invested,

and that JPMIM is an ERISA fiduciary with respect to the management of the Hospira,

Mitsubishi, and Caterpillar separate account stable value funds.  Defendants deny the remaining

allegations in Paragraph 53.

Stable Value Funds

54.    Under ERISA, a fiduciary's investment decisions must be prudent not in the abstract but with reference to the ***specific goals*** of a particular investment fund. A fiduciary must give "appropriate consideration" to facts and circumstances relevant to "the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(i). Thus, a fiduciary's investment decisions are evaluated under ERISA "in light of the ***character and aims*** of the particular type of plan he serves." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (4th Cir. 1996) (emphasis added and quotation omitted).

**ANSWER:**    The allegations in the second and third sentences purport to quote selections from

or paraphrase written documents that speak for themselves, and thus are denied.  The remaining

allegations in Paragraph 54 represent Plaintiffs' interpretation of the law and require no response.

To the extent a response is required, Defendants deny that Plaintiffs fully or accurately state the

law.

55.    The "character and aims" of stable value funds are well defined both by industry practice and ERISA regulations.

**ANSWER:**    The allegations in Paragraph 55 are vague and ambiguous and thus denied.

56.    According to the trade association for the industry, the Stable Value Investment Association ("SVIA") – of which JPM is a prominent member – a stable value fund should be invested in a "high-quality, diversified, fixed-income portfolio" that is "designed to preserve

19

capital while providing steady positive returns."[11] Thus,"[s]table value funds are considered a conservative and low risk investment compared to other investments offered in 401(k) plans."[12]

**ANSWER:**   The allegations in Paragraph 56 purport to quote selections from or paraphrase written documents that speak for themselves, and thus are denied.  Footnotes 11 and 12 contain no allegations and require no responses.

57.   Under ERISA, employers that offer defined contribution retirement plans are required to offer at least three options for investment, each with "materially different risk and return characteristics." One of these investment options must be a safe option: an "income producing, *low risk, liquid* fund, subfund, or account." 29 C.F.R. § 2550.404c-1 (emphasis added).

**ANSWER:**   The allegations in Paragraph 57 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 57 purport to quote selections from or paraphrase the terms of a written document which speaks for itself, and thus are denied.

58.   Stable value funds are a popular investment option in 401(k) plans. Offered as an option in approximately half of all defined contribution plans, stable value funds are usually the largest conservative investment option available in such plans and, when offered, are the "low risk, liquid" investment option required by ERISA regulations.

**ANSWER:**   Defendants admit that certain plan sponsors choose to offer stable value products as an option for participants in certain 401(k) plans.  Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 58.

59.   Historically, stable value funds invested in guaranteed investment contracts ("GICs"), contracts offered by insurance companies that guaranteed a fixed return over a set duration. GICs allowed investors to participate in an insurer's investment portfolio, which is required by state solvency regulations to consist of conservative, well-diversified, and liquid investments.

---

[11] Stable Value Investment Association, "Stable Value FAQ", http://stablevalue.org/knowledge/faqs/question/what-is-a-stable-value-fund (last viewed Oct. 3, 2013).

[12] *Id.*

**ANSWER:**    Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the first clause of the first sentence and the first clause of the second sentence of

Paragraph 59.  The second clause of the second sentence of Paragraph 59 is a legal conclusion to

which no response is required.  Defendants deny any remaining allegations in Paragraph 59.

60.    Beginning in the early 1990s, stable value fund managers began to offer stable
value products designed as "synthetic GICs." A synthetic GIC consists of a fixed-income
portfolio "wrapped" with a contract with an insurer or other large financial institution that,
subject to various conditions and restrictions, guarantees the "book" value of the fund and allows
for "benefit responsiveness," which means that participants can terminate their investments in
the fund at book value rather than market value under certain conditions. The JPM Stable Value
Funds were designed as synthetic GICs.

**ANSWER:**    Defendants admit the first sentence of Paragraph 60.  Defendants further admit

that a synthetic GIC can consist of one or more fixed-income portfolios wrapped by one or more

contracts with an insurer or other financial institution which guarantee the book value of some or

all of the stable value fund's investments, allowing participants to transact at book value rather

than market value under conditions set forth in the wrap contract.  Defendants further admit that

SAIF, SVF, and the Hospira, Caterpillar, and Mitsubishi separate accounts were designed this

way.  Defendants deny any remaining allegations in Paragraph 60.

61.    The shift from actual GICs to synthetic GICs was not intended to change the basic
risk profile of stable value funds. "Consistent with the role of stable value as the 'safe' option in
most defined benefit contribution plans today, the overriding objective in managing [the
portfolios underlying the synthetic GIC] is preservation of principal. Liquidity to meet
participant withdrawals is an additional factor, as is earning a fairly stable return which exceeds
that of shorter maturity alternatives."[13]

**ANSWER:**    Defendants lack information sufficient to form a belief as to the purported intent

behind an unspecified "shift from actual GICs to synthetic GICs" and therefore deny any

allegations regarding the same.  The remaining allegations in Paragraph 61 purport to quote

---

[13] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 83.

selections from or paraphrase written documents that speak for themselves, and thus are denied.

Footnote 13 contains no allegations and requires no response.

62.     More specifically, even though a synthetic GIC invests in a partially-insured fixed income portfolio, that portfolio itself must be managed in accordance with the purposes of a stable value fund: "[t]he benchmark for these bonds, as well as the philosophy and strategies of the fixed income manager, should be consistent with the goals of a stable value fund. Since the stable value fund is typically offered as a low-risk alternative for investors in defined contribution plans, a relatively low-risk profile is in order."[14]

**ANSWER:**     The allegations following the colon purport to quote selections from or paraphrase

written documents that speak for themselves, and thus are denied.  The remaining allegations in

Paragraph 62 are denied.  Footnote 14 contains no allegations and requires no response.

63.     Stable value funds are typically affected far less than most other investment options in periods of market distress. Because they are generally comprised of well-diversified portfolios of high credit quality fixed-income securities, they were one of the few 401(k) investment options to provide positive returns throughout the market upheaval of the late 2000s, as set forth below.

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the allegations in Paragraph 50, but note that, apparently consistent with Plaintiffs'

allegations, the Stable Value Funds did indeed provide positive returns to Plaintiffs and other

investors throughout the late 2000s.

<u>JPM's Stable Value Funds</u>

64.     JPM sponsors a collection of stable value funds that is one of the largest and most utilized in the country. Between 2003 and 2009, JPM grew the amount that 401(k) participants invested in the JPM Stable Value Funds from less than $10 billion to more than $15 billion.

**ANSWER:**     Defendants admit that (1) JPMC Bank established and maintains SAIF and SVF,

(2) that JPMIM acts as investment manager for stable value separate accounts pursuant to IMAs,

and (3) that the assets under management in SAIF, SVF, and the separate account stable value

---

[14] *Id.,* 120.

funds managed by JPMIM grew from less than $10 billion to more than $15 billion between 2003 and 2009.  Defendants deny the remaining allegations in Paragraph 64.

65.     The JPM Stable Value Funds are managed by JPM and offered as investment options to numerous ERISA defined contribution 401(k) plans in the United States.

**ANSWER:**     Defendants admit that JPMC Bank manages SAIF and SVF, and that JPMIM acts as investment manager for certain separate account stable value funds pursuant to IMAs.

Defendants deny any remaining allegations in Paragraph 65.

66.     At all relevant times, the JPM entities have served as Investment Advisors, Fully Discretionary Investment Managers, Plan Administrators, Trustees and/or Custodians (per ERISA § 403(a)) of the Hospira, Caterpillar, Mitsubishi, Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL, and Ferrell Gas Plans and all the numerous other defined contribution 401(k) plans that offered one of the JPM Stable Value Funds as an investment option. As such, at all relevant times, JPM has been a fiduciary of such defined contribution 401(k) plans under ERISA.

**ANSWER:**     Defendants admit that JPMC Bank is the trustee and an ERISA fiduciary for certain delimited purposes for SAIF, SVF, and certain of its commingled trust funds.  Defendants further admit that JPMIM acted as an investment manager with respect to stable value separate accounts for Hospira, Caterpillar, and Mitsubishi.  Defendants also admit that JPMC Bank acted as trustee for the Mayer Electric plan and as directed trustee with respect to the Ferrell Gas, GEHA, Great Plains Energy (the holding company of KCPL), Hospira, and Mitsubishi plans.  JPMC Bank did not act as a trustee for the Modern Drop Forge plan during the relevant time period (i.e., prior to 2014).  Defendants deny that any JPM entity acted as trustee for the Caterpillar or Titan International plans.  Defendants deny the remaining allegations in Paragraph 66.

67.     JPM has two pooled stable value funds, the SAIF and ACSAF/JPM Stable Value Fund, ███████████████████████. Named plaintiffs represent six of those plan sponsors (Titan, Modern Drop Forge, Mayer Electric, GEHA, KCPL and Ferrell Gas plans). In addition, as of December 31, 2009, JPM has had approximately ████████████████████. Named plaintiffs invested in three of those separate stable value funds (Hospira, Caterpillar and Mitsubishi plans).

**ANSWER**:     Defendants admit that JPMC Bank maintains SAIF and SVF, which are

commingled stable value investment options offered by over 200 plan sponsors.  Defendants also

admit that the named plaintiffs were participants in the Titan, Modern Drop Forge, Mayer

Electric, GEHA, KCPL, and Ferrell Gas plans.  Defendants further admit the third and fourth

sentences of Paragraph 67.  Defendants deny the remaining allegations in Paragraph 67.

68.     JPM has frequently and consistently stated publicly that the JPM Stable Value
Funds are typical stable value funds, as described above.



**ANSWER**:     Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 68.  The remaining allegations in

Paragraph 68 purport to quote selections from or paraphrase written documents that speak for

themselves, and thus are denied.  Defendants note that, during the alleged Class Period, investors

in the Stable Value Funds maintained their principal and accumulated interest and received

returns higher than those available from money market funds.  Footnote 15 contains no

allegations and requires no response.

69.     In addition, JPM emphasized that the JPM Stable Value Funds were typical stable
value funds, not only by calling them "Stable Value," "Stable Asset," or "Stable Income" in their
very names, but also by its characterization of their risk level ████████████████████████████
████████████████████████████████ [16] As set forth above, Ms. Paradis has stated publicly that the JPM
Stable Value Funds are among the "most conservative" investments possible in a defined
contribution plan. Furthermore, as JPM understood well, plan sponsors offered the JPM Stable
Value Funds as the "low risk, liquid" investment option required by ERISA.

---

[15] ██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
[16] ████████████████

**ANSWER:**     Defendants admit only that the names of SAIF and SVF contain the phrases

"Stable Value" and "Stable Asset," that the Stable Value Funds may have been referred to at

times by various descriptions, and that plan sponsors may have used the phrases "Stable Value,"

"Stable Asset," or "Stable Income" in the names of their separate account stable value funds.

Defendants deny the remaining allegations of the first sentence of Paragraph 69.  The allegations

in the second and third sentences of Paragraph 69 purport to quote selections from or paraphrase

written documents that speak for themselves, and thus are denied.  Defendants deny the

remaining allegations in Paragraph 69.  Footnote 16 contains no allegations and requires no

response.

<u>The JPM's Stable Value Funds' Investments in Commingled Pension Trust Funds</u>

70.     JPMorgan Chase Bank, N.A. ("JPMCB") has established and operated a number of Commingled Pension Trust Funds for the collective investment of pension trusts, profit sharing trusts, other employee benefit trusts or funds and other commingled funds. The funds are referred to as "commingled" because they invest the monies of many different ERISA plans and thus the retirement investments of the participants in those plans.

**ANSWER:**     Defendants admit that JPMC Bank established and maintains certain Commingled

Pension Trust Funds in which specified types of plans, including ERISA defined contribution

plans, may invest, and that they are called "commingled" funds because they contain money

invested by multiple plans rather than a single plan.  Defendants deny the remaining allegations

in Paragraph 70.

71.     Among these Commingled Pension Trust Funds is the Intermediate Bond Fund ("IBF").

**ANSWER:**     Defendants admit that the IBF is a collective investment fund maintained by

JPMC Bank.  Defendants deny any remaining allegations in Paragraph 71.

72.     JPM utilized the IBF for the actively managed portion of each of the Stable Value Funds with the exception of the ACSAF/JPM Stable Value Fund, which after 2008 utilized the Intermediate Public Bond Fund ("IPBF"), a fund very similar to the IBF. The primary difference

between the IPBF and the IBF is that the IPBF did not invest in JPMCB's Private Placement Mortgage Fund.

**ANSWER:**     Defendants admit that SAIF invested in the IBF and SVF invested in the IPBF.

Defendants also admit that the separate account stable value funds JPMIM managed for Hospira,

Caterpillar, and Mitsubishi were invested in the IBF.  Defendants further admit that the IPBF did

not invest in the Mortgage Private Placement Fund.  Defendants deny the remaining allegations

in Paragraph 72.

    73.     

**ANSWER:**     The allegations in Paragraph 73 purport to quote selections from or paraphrase

written documents that speak for themselves, and thus are denied.  Footnote 17 contains no

allegations and requires no response.

    74.     In investing the Stable Value Funds assets, JPM employed a fund of funds investment strategy. Thus, the IBF takes the JPM Stable Value Fund assets and in turn invests in other JPM Commingled Pension Trust Funds including the JPMCB Mortgage Private Placement Fund, the JPMCB Public Mortgages Fund, the JPMCB Intermediate Credit Fund, the JPMCB Liquidity Fund, and the JPMCB Enhanced Cash Fund. The IBF also invests in directly held securities similar to those in many of the other Commingled Pension Trust Funds. The IBF's allocation in those funds and in direct investments from 2006 through 2010 and the investments of three of the commingled funds in which the IBF invested (the Public Mortgage Fund, the Private Placement Mortgage Fund, and the Enhanced Cash Fund) on an annual basis is set forth in the attached Appendix A. In addition, Appendix B shows the percentage of the assets of the IBF that were invested in the underlying funds which constituted private mortgages - meaning non-conforming mortgages which do not comply with Freddie Mac and Fannie Mae standards.

---

17

These private mortgages are riskier than and less liquid than conforming mortgages because of their credit risk.

**ANSWER:**   Defendants admit only that SAIF and the Hospira, Caterpillar, and Mitsubishi

separate accounts employ a strategy in which the IBF makes both direct investments and

investments in other JPMC Bank commingled trust funds.  Defendants admit only that private

mortgages may have different risk and return characteristics than agency mortgages.  Defendants

deny any remaining allegations in Paragraph 74.

75.    Similarly, the IPBF takes the ACSAF/JPM Stable Value Fund assets and invests in other JPM Commingled Pension Trust Funds including the same JPMCB Public Mortgages Fund, JPMCB Intermediate Credit Fund, JPMCB Liquidity Fund, and JPMCB Enhanced Cash Fund.

**ANSWER:**   Defendants admit only that SVF employs a strategy in which the IPBF both

invests in other JPMC Bank commingled trust funds and invests directly in securities.

76.    Although the IBF and IPBF were the main investment vehicle for JPM's Stable Value Funds, management of the IBF and IPBF was completely divorced from the stated objectives of JPM's Stable Value Funds. ██████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████[18]

This is inconsistent with the basic purposes of a stable value fund, which are absolute (preserving principal and achieving consistent returns) rather than relative (performing better than a particular benchmark). ███████████████████████████████████████
███████████████████████████████████████████████████████████[19]

**ANSWER:**   Defendants deny the first and third sentences of Paragraph 76.  The allegations in

the second and fourth sentences purport to quote selections from or paraphrase the testimony of

Anthony Candelmo in an unrelated matter, which speaks for itself, and thus are denied.

Defendants deny the remaining allegations in Paragraph 76.  Footnotes 18 and 19 contain no

allegations and require no response.

_____

[18] ████████████████████████████████████████████████████████████
█████████████████████

[19] █████████████████████████

77.  which require the investment manager to act in a manner "consistent with the goals of a stable value fund" and to adopt a "relatively low-risk profile."[21]

**ANSWER:**   Defendants deny the allegations in Paragraph 77.  The allegations of Footnote 20

purport to quote selections from or paraphrase a written document that speaks for itself, and thus

are denied.  Footnote 21 contains no allegations and requires no response.

### JPM's Inappropriate Use of Leverage in the JPM Stable Value Funds

78.   Consistent with their conservative nature, stable value funds typically do not use leverage. In an April 7, 2006 letter to the U.S. Department of Labor, the SVIA opined that a particular failed stable value fund, the Circle Trust Stable Value Fund, did not invest in a way "consistent with the objectives of stable value investing" because, among other things, it invested in vehicles that "depend upon financial leverage to achieve their stated return objectives."[22] And in a letter to the Commodities Futures Trading Commission, the SVIA stated that "stable value funds themselves are generally non-leveraged investment vehicles."[23] Consistent with the SVIA's view, a leading authority on stable value investing states that "[a]ll wrappers strongly restrict the use of leverage."[24]

**ANSWER:**   Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the first sentence of Paragraph 78.  The remaining allegations in Paragraph 78

purport to quote selections from or paraphrase written documents that speak for themselves, and

thus are denied.  Footnotes 22 through 24 contain no allegations and require no response.

79.   BlackRock, a worldwide leader in investment management, describes the risks of leverage: "Funds that utilize leverage tend to exhibit greater volatility in yield, market price and net asset value than non-leveraged funds. Due to their sensitivity to changes in interest rates,

---

[20] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186, which defines as a "primary investment objective" of stable value funds "Stability: Ensuring that valuation of investment and accrued income are protected from the volatility of the financial markets and that future returns remain relatively stable from year to year."

[21] *Id.*, 120 (1998).

[22] SVIA 000676.

[23] SVIA 000221.

[24] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 127.

leveraged funds may experience larger drops in net asset value compared to similar non-levered fixed income closed-end funds. In addition, any narrowing of spreads between short- and longterm rates may diminish potential profit margins for the fund and potentially lower the dividend paid by the fund."[25]

**ANSWER:**     The allegations in Paragraph 79 purport to quote selections from or paraphrase a

website that speaks for itself, and thus are denied.  Footnote 25 contains no allegations and

requires no response

      80.     Although data about the extent to which stable value funds use leverage is not readily available, leverage is exceedingly rare in similar types of investment vehicles for which such data is available. For example, money market funds – to which stable funds are often compared – employ little to no leverage.[26] Similarly, leverage is rare in mutual funds. Of nearly 30,000 mutual funds, barely 2% have leverage of over 5% and less than 0.5% have leverage over 45% (a level exceeded by the IBF in 2006 and 2007, as set forth below). Those mutual funds that do use substantial leverage typically invest in equities rather than in fixed income securities and are expressly marketed as aggressive funds. Money market and most mutual funds are hesitant to use leverage for good reason: such funds are typically risk averse (as stable value funds also should be) and do not want the value of their holdings to fall below their initial cost.

**ANSWER:**     Defendants deny that the IBF used leverage over 45% in 2006 and 2007.  Because

they are vague, Defendants lack information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 80. Footnote 26 contains no allegations and requires no

response.

      81.     The use of substantial leverage in stable value funds increases risk in at least three ways. First, as a matter of basic finance theory, funds that use leverage exhibit greater volatility in net asset value and return than those that do not because leverage magnifies both investment gains and losses.

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as

to the truth of the allegations of the first sentence of Paragraph 81.  Defendants deny the

remaining allegations in Paragraph 81.

---

[25]  http://www2.blackrock.com/us/individual-investors/insight-education/investing-basics/a-look-at-leverage.

[26] Investment Company Institute, "Money Market Funds in 2012: Money Market Fund Are Not Banks," Feb. 14, 2012, *available at* http://www.ici.org/pdf/12_mmf_mmfs_are_not_banks.pdf.

82.     Second, leverage requires payment of interest. Thus, the investment return must account for interest expense before it creates a net positive return to the fund. To put it another way, the fund's participants are paying the interest for the leverage in the Stable Value Fund and this interest thus acts here as an additional fee charged by JPM to Plaintiffs incident to JPM's management of the JPM Stable Value Funds.

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the first sentence of Paragraph 82.  Defendants admit that a fund's gross return must exceed its expenses to result in a positive net return.  Defendants deny the remaining allegations in Paragraph 82.

83.     Third, as credit conditions tighten, a leveraged fund may be required to de-leverage, which may require liquidating fund assets at a non-optimal time.

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 83.

84.     The use of substantial leverage is inconsistent with the "character and aims" of stable value funds because, compared to a non-leveraged strategy, it: (1) places the principal at greater risk; (2) increases volatility of returns; and (3) reduces liquidity.[27]

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 84.  The allegations in Footnote 27 purport to quote selections from or paraphrase a written document that speaks for itself, and thus are denied.

85.



**ANSWER:**     Defendants deny the allegations in Paragraph 85.

86.

---

[27] *See* Frank J. Fabozzi, *The Handbook of Stable Value Investments*, (1998), 186, detailing the investment objectives of stable value funds.

███████████████████████████████

**ANSWER:**     Defendants deny the allegations in Paragraph 86.

87.     This use of leverage was by itself imprudent and inconsistent with well-established standards and principles of stable value investing. Worse still, as set forth in detail below, JPM used this imprudent amount of leverage to decrease rather than increase the level of diversification in the JPM Stable Value Funds and to invest in high risk assets. JPM thus "doubled down" on its already risky leveraging strategy in the JPM Stable Value Funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 87.

JPM's Investment Strategy is Radically Different from the Purported Benchmarks

88.     JPM consistently represented that its investment strategy for the IBF and IPBF – which at all times material hereto were the core assets of the JPM Stable Value Funds – tracked the Lehman Intermediate Aggregate Index (later known as the Barclays Intermediate Aggregate Index). The Lehman Intermediate Aggregate Index is a non-leveraged portfolio consisting of investment grade bonds including U.S. Treasury securities, U.S. government agency bonds, pass-through mortgage-backed bonds issued by government agencies, and corporate bonds. The investments have an average maturity of around 4.5 years.

**ANSWER:**     Defendants admit only that the IBF and IPBF were benchmarked to the Lehman Intermediate Aggregate Index (later called the Barclays Capital Intermediate Aggregate Index) (henceforth the "Intermediate Aggregate Index"), and deny the remaining allegations of the first sentence of Paragraph 88.  By way of further response, the IBF and IPBF were actively managed and were not designed as an index fund to track its benchmark exactly.  Defendants admit only that the Intermediate Aggregate Index is a benchmark that measures the investment grade, U.S. dollar denominated, fixed rate taxable bond market, including Treasuries, government-related and corporate securities, mortgage-backed securities ("MBS"), asset-backed securities ("ABS"), and commercial mortgage-backed securities ("CMBS").  Defendants deny the remaining allegations in Paragraph 88.

89.     ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████ Thus, JPM should have adopted an investment strategy that allowed for a small amount of tracking error for the IBF and IPBF and thus JPM's Stable Value Funds as compared to the Lehman Intermediate Aggregate Index, and it represented it would do so.

**ANSWER:**     The allegations of the first sentence of Paragraph 89 purport to characterize selected terms of a document that speaks for itself, and thus are denied.  Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 89.  Defendants deny the remaining allegations in Paragraph 89. Footnotes 28 and 30 contain no allegations and require no response.  Defendants admit only that "tracking error" is a financial tool used to measure how closely a portfolio has in the past followed (*ex post*) or may in the future follow (*ex ante*) a benchmark, that it can be computed using several formulas, and that tracking error can be modeled *ex ante* and may be used in controlling risk. Defendants deny any remaining allegations in Footnote 29.

90.     In fact, JPM adopted an investment strategy that differed radically from that of the Lehman Intermediate Aggregate Index in at least two ways, contrary to its representation that the IBF's risk profile would be similar to that of the benchmark. This was contrary to the "character and aims" of stable value funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 90.

91.     First, the Lehman Intermediate Aggregate Index does not use any leverage. JPM's substantial use of leverage should have caused JPM to predict *ex ante* that its investment returns would be more volatile than those of the benchmark. As set forth above, avoiding volatility is one of the main purposes of a stable value fund.

28 ███████████████████████████████████████████████████████████████

29 "Tracking error" is a commonly-used finance tool that measures how closely a portfolio follows the index to which it is benchmarked. Tracking error when stated *ex ante* may be thought of as a risk budget: it provides the target for how much the manager may deviate from the benchmark and thus the risk that the manager's investment strategy will underperform the benchmark.

30 ████████████████████

**ANSWER:**     Defendants deny the allegations in Paragraph 91.

92. 

**ANSWER:**     Defendants admit only that the IBF and IPBF were never intended to nor did they

track the Intermediate Aggregate Index exactly.  Defendants deny the remaining allegations in

Paragraph 92.

93. 

**ANSWER:**     Defendants deny the allegations in Paragraph 93.

94.     While some deviation from this benchmark might be acceptable, as shown in the
above tables, the IBF was so different from the benchmark that JPM should reasonably have
known – despite its representations to the contrary – that the IBF's risk profile would differ
substantially from that suggested by the benchmark and thus that JPM's IBF was an imprudent
asst for the JPM Stable Value Funds to hold in such large amounts given the stated aims of the
JPM Stable Value Funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 94.

95.     The IPBF also deviated substantially from the Lehman Intermediate Aggregate
Index, ████████████████████████████. For the reasons set forth above,
JPM should have known that the risk profile for the IPBF would differ substantially from that
suggested by the benchmark and thus that JPM's IBPF was an imprudent asset for the ACSAF /
JPM Stable Value Fund to hold in such a large amount given the stated aims of that fund.

**ANSWER:**     Defendants deny the allegations in Paragraph 95.

96.  ████████████████████████████████████████████████████████████████████████████████████████████████████ [31]

**ANSWER:**    Defendants deny the allegations in Paragraph 96.  Defendants lack information

sufficient to form a belief as to the truth of the allegations in Footnote 31 and therefore deny the

same.

97.  ████████████████████████████████████████████████████████████████████████████████████████████████████

**ANSWER:**    Defendants admit that from 2004 to 2007 the IBF outperformed its benchmark.

Defendants deny the remaining allegations in Paragraph 97.

98.    This consistently high level of performance against the benchmark before the
class period would have been extraordinarily unlikely had JPM not adopted a much more
aggressive (that is, risky) strategy than that reflected in the benchmark. ████████████ [32] a level which can rarely
be sustained for such a long time. JPM knew or should have known by 2006 that its high returns
in the IBF and thus in the JPM Stable Value Funds were not sustainable and in fact were
indicative of the fact that JPM had accepted excessive risk in the IBF and thus in the JPM Stable
Value Funds as compared to the benchmark.

**ANSWER:**    Defendants admit that the IBF generally has had a consistently high level of

performance against the benchmark.  Defendants deny the remaining allegations in Paragraph 98.

Defendants further admit the first sentence in Footnote 32, but deny the remaining allegations in

Footnote 32.

99.  ████████████████████████████████████████████████████████
████████████  Beating the benchmark, however, is no accomplishment when the risk profile of the
IBF was significantly greater than the benchmark. That is precisely what happened here, and
accepting such excess risk was wholly inconsistent with: (1) the "character and aims" of stable
value funds; (2) industry standards; and (3) JPM's own representations.

---

[31] This is based on reported data for the JP Morgan Intermediate Aggregate Index, which consists
of the IBF and other similar JPM funds. Data isolating the tracking error of the IBF was not
available but it is expected that such data will show a similar tracking error since, by definition,
this JPM aggregate may only combine like funds.

[32] "Information ratio" is a measure of alpha over tracking error. It indicates how much of the
performance of a fund is attributable to risk-neutral (relative to the benchmark) decision-making.

**ANSWER:**   Defendants deny the allegations in Paragraph 99.

JPM's Exposure to Real Estate Risk

100.   One critical aspect of ERISA's duty of prudence is the duty to diversify. ERISA requires that a fiduciary "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). The duty to diversify requires, among other things, diversity as to industries or sectors. *In re Unisys Savings Plan Litig.*, 74 F.3d at 438.

**ANSWER:**   The allegations in Paragraph 100 are conclusions of law and require no response.

To the extent a response is required Defendants deny that Plaintiffs fully or accurately state the

law.

101.   Prudent investment management requires that securities portfolios be diversified because diversification reduces risk without reducing expected returns. JPM agrees: ". . . a diversified portfolio that includes several categories of fixed income securities should have a relatively stable return portfolio."[33]

**ANSWER:**   Defendants admit only that prudent investment management may require

diversification depending on the facts and circumstances.  The allegations in the second sentence

purport to quote selections from or paraphrase a written document that speaks for itself, and thus

are denied.  Defendants deny any remaining allegations in Paragraph 101.  Footnote 33 contains

no allegations and requires no response.

102.   Principles of diversification enable an investment portfolio to take maximum advantage of market conditions in specific sectors and to protect against downturns in one particular sector.

**ANSWER:**   Defendants admit only that prudent investment management may require

diversification depending on the facts and circumstances.  Because they are vague, Defendants

lack information sufficient to form a belief as to the truth of the remaining averments of

Paragraph 102.

---

[33] Mark Huamani and Karl Mergenthaler, *Building a Diversified Fixed Income Portfolio: An Analysis of the Availability and Correlation of Excess Returns*, http://www.jpmorgan.com/tss/General/Building_a_Diversified_ Fixed_Income_Portfolio/115932 1128719.

103.    When a portfolio is concentrated in a specific sector, the value of the portfolio can drop sharply if that sector experiences a general downturn.

**ANSWER:**    Admitted.

104.    If the portfolio, however, is comprised of multiple sectors, some may go down in value while others may remain stable or go up. Different types of fixed income categories will generally not lose value at the same rate or at the same time.

**ANSWER:**    Defendants admit only that, under normal market conditions, depending on the

sector, some may go down in value while others may remain stable or go up and that the

investment performance of different types of fixed income investments may not be correlated.

Defendants deny the remaining allegations in Paragraph 104.

105.    Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of a portfolio of securities that do not move in unison. Two securities that are perfectly correlated is a 1. Two securities that are perfectly inversely correlated is -1. Two securities that have no correlation is 0 – often referred to as low correlation.

**ANSWER:**    Defendants admit that correlation measures the relationship between changes in

two or more financial variables in time and that, in certain measures of correlation, a correlation

of 1 represents perfect correlation, a value of -1 represents perfectly inverse correlation, and a

value of 0 represents no correlation. Defendants deny the remaining allegations in Paragraph

105.

106.    According to JPM, "correlation of excess returns among the major fixed income categories is relatively low." Active managers of different fixed income categories, like Mortgage Backed Securities, Core Fixed Income, and Corporates, according to JPM, add value through excess returns at times when active managers of other categories cannot.

**ANSWER:**    The allegations in Paragraph 106 purport to characterize selected terms of

unspecified written documents which speak for themselves, and thus are denied.

107.    Modern Portfolio Theory ("MPT"), the industry standard for prudent portfolio management for over twenty years, employs the use of correlations for identifying categories and sectors that are loosely correlated and do not move in tandem. Creating a diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and multiple categories, which have low correlations, is the foundation of MPT.

**ANSWER**:    Defendants admit that Modern Portfolio Theory is a theory of finance that attempts to maximize portfolio return for a given level of risk, or to minimize risk at an expected level of return, based on certain assumptions.  Defendants further admit that Modern Portfolio Theory is based on diversification.  Defendants deny the remaining allegations in Paragraph 107.

108.    As early as 2006, JPM recognized that Mortgage Backed Securities ("MBS") was just one category of a well-diversified portfolio. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As such, JPM was well aware that the excess returns of these fixed income categories, being loosely correlated, were all necessary to create a well-diversified portfolio of fixed income securities.

**ANSWER**:    The allegations in Paragraph 108 purport to characterize selected terms of unspecified written documents that speak for themselves, and thus are denied.

109.    Typically, mortgage-backed securities of all types average about 40% of the holdings of a stable value fund during the time period in question.[34]

**ANSWER**:    The allegations in Paragraph 109 purport to characterize selected terms of written documents that speak for themselves, and thus are denied.  Footnote 34 contains no allegations and requires no response.

110. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**ANSWER**:    Defendants deny the allegations in Paragraph 110.

111. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER**:    Defendants deny the allegations in Paragraph 111.

112.    Because the purpose of ERISA's diversification requirement expressly is to avoid large losses, this total exposure analysis is an appropriate measure for diversification under ERISA as exposure more accurately reflects the potential for a large loss.

---

[34] SVIA 0001259.



**ANSWER:**    Defendants deny the allegations in Paragraph 112.

113. ███████████████████████████████████████████
████████████████████████████████████████

**ANSWER:**    Defendants deny the allegations of Paragraph 113.

114. ███████████████████████████████████████████
████████████████████████████████████████████

**ANSWER:**    Defendants deny the allegations in Paragraph 114.

115.    JPM of course knew at the time it made these investments how poorly diversified they were as a whole. ████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████[35]

**ANSWER:**    Defendants deny the allegations in the first two sentences.  The remaining allegations in Paragraph 115 purport to quote selections from or paraphrase a written document that speaks for itself, and thus are denied.  Footnote 35 contains no allegations and requires no response.



116. ███████████████████████████████████████████

---

[35] ████████████████
[36] ███████████████████

**ANSWER:**   Defendants deny the allegations in Paragraph 116.  Footnote 36 contains no

allegations and requires no response.

117.   JPM's high exposure to real estate losses, in addition to violating ERISA's diversification requirement, was inconsistent with the "character and aims" of stable value funds, which emphasize proper diversification as a means to protect principal and ensure steady, positive returns and was thus a violation of its ERISA duty of prudence.

**ANSWER:**   Defendants deny the allegations in Paragraph 117.

<u>JPM's Investment in Risky Mortgage-Backed Securities</u>

118.   The sheer quantity of real estate-related investments held by the IBF and IPBF and thus by the JPM Stable Value Funds was not the only problem with such investments. JPM also chose to invest a large part of the IBF and thus JPM's Stable Value Funds in high risk, leveraged, derivative mortgage-backed securities (and, in the case of the IBF, private placement mortgages, discussed in the next section) rather than the conventional mortgage-backed securities more typically found in stable value funds.[37]

**ANSWER:**   Defendants admit only that the IBF and IPBF invested in mortgage backed

securities and that the IBF indirectly invested in private placement mortgages.  Defendants deny

the remaining allegations in Paragraph 118.  The allegations in Footnote 37 purport to quote

selections from or paraphrase a written document that speaks for itself, and thus are denied.

119.   During the relevant times, the only mortgage-backed securities in the Lehman Intermediate Aggregate Index were pass-through mortgage-backed securities insured by government agencies such as Fannie Mae and Freddie Mac (referred to in the industry as "agency MBS"). Such securities are relatively safe because the agencies ensure against default and require the mortgages to conform to stringent standards.

**ANSWER:**   Defendants admit only that the Intermediate Aggregate Index includes ABS,

CMBS, and agency fixed-rate and hybrid ARM pass-through MBS.  Defendants deny the

remaining allegations in the first sentence of Paragraph 119.  Because they are vague,

---

[37] For example, the DuPont Fixed Income Fund, which was at the time the largest single-entity stable value fund in the United States, prohibited that fund as early as 1998 from investing in what it deemed to be "risky" mortgage derivatives including IOs, POs, and inverse floaters. Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 197.

Defendants lack information sufficient to form a belief as to the truth of the allegations of the second sentence of Paragraph 119.

120. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Certain types of agency CMOs are riskier than agency MBS because the former have greater exposure to interest rate, prepayment, and default risk.

**ANSWER:**   ███████████████████████████████████████

████████████████████████████████████████████████████

The remaining allegations of the first sentence purport to characterize selected terms of written documents that speak for themselves, and thus are denied. Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations of the second sentence of Paragraph 120.

121. ███████████████████████████████████████████

████████████████████████████████████████████████████

**ANSWER:**   Defendants deny the allegations in Paragraph 121.

122.   Given the conservative nature of stable value funds, it was incumbent on JPM to select only high quality investments for the IBF and IPBF with stable cash flows, since the IBF and IPBF constituted such a large percentage of the investment holdings in the JPM Stable Value Funds. "Substantial resources and analytics are required to properly select investments within [the mortgage-backed and asset-backed] sectors, particularly where cash flow volatility could impact returns and crediting rate behavior."[38]

**ANSWER:**   The allegations in Paragraph 122 purport to characterize the terms of investment guidelines for the Stable Value Funds that speak for themselves and thus are denied. The allegations of the second sentence of Paragraph 122 purport to quote selections from or paraphrase a written document that speaks for itself and thus are denied. Footnote 38 contains no allegations and requires no response.

---

[38] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 180.

123.

[REDACTED][39][40]

**ANSWER:**    Defendants deny the allegations in Paragraph 123.  Defendants lack information

sufficient to form a belief as to the truth of the allegations of Footnote 39, which purports to

explain Plaintiffs' methodology.  Footnote 40 appears to reflect Plaintiffs' definition of an

"option ARM mortgage."  Defendants admit only that an "option ARM" mortgage is an

adjustable rate mortgage that allows the borrower to choose from several payment options.

Defendants deny the remaining allegations of footnote 40.

124.    The IPBF was also invested in the types of mortgage-backed securities described
above, although to a lesser degree.

**ANSWER:**    Defendants deny the allegations in Paragraph 124.

125.    As early as 2006, JPM was aware that subprime mortgages were excessively risky
and acted on that knowledge to reduce its own exposure to such mortgages. In October 2006,
JPM decided to sell investment positions in subprime mortgage assets it held for its own account,
and it eventually sold $12 billion worth of those investments.[41]

**ANSWER:**    Defendants deny the allegations of the first sentence of Paragraph 125.  The

allegations of the second sentence of Paragraph 125 purport to characterize selected terms of a

---

[39]



[40] An "option ARM" mortgage is one that: (1) like all ARM mortgages, periodically changes the
interest rate; and (2) allows the borrower to choose from various payment options, one or more
of which may be negative amortizing (i.e. the payment is insufficient to pay the interest then due
so the portion of the interest that is not paid is added to the principal). Option ARMs allow
borrowers to artificially qualify for higher loan amounts than they otherwise would qualify for,
As interest payments increase and the principal grows, borrowers are faced with both a higher
payment and a larger loan than expected, which in combination produces "payment shock" and
contributes to default.

[41] "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank
beat the credit crunch," Fortune, September 2, 2008, *available at*
http://money.cnn.com/2008/08/29/news/companies/ tully_dimon.fortune.

written document that speaks for itself and thus are denied.  Defendants deny any remaining

allegations in Paragraph 125.  Footnote 41 contains no allegations and requires no response.

126.    One reason for this concern was that, based on data from JPM's mortgage
servicing business, "late payments on subprime loans were rising at an alarming rate."[42]
Although the IBF and IPBF and thus the JPM Stable Value Funds did not invest in any
mortgage-backed securities involving JPM mortgages, this problem was not limited to JPM's
own mortgages. To the contrary, JPM knew that "loans originated by competitors like First
Franklin and American Home were performing three times worse than J.P. Morgan's subprime
mortgages."[43] Indeed, JPM concluded that "underwriting standards were deteriorating ***across the
industry.***"[44]

**ANSWER:**    The allegations in Paragraph 126 purport to characterize selected terms of a

document that speaks for itself and thus are denied.  The allegations in Footnote 42 purport to

quote selections from or paraphrase the testimony of Mr. Jamie Dimon in an unrelated matter,

which speaks for itself, and thus are denied.  Footnotes 42 through 44 otherwise contain no

allegations and require no response.

127.    In his 2007 letter to JPM shareholders, Mr. Dimon admitted that subprime was a
"high risk, high reward product." Such a product had no place in a stable value fund. Mr. Dimon
also stated that JPM "saw subprime concerns first, then mortgage-related collateralized debt
obligations, structured investment vehicles, Alt-A mortgages, [and] mortgage real estate

**ANSWER:**    The allegations in Paragraph 127 purport to quote selections from or paraphrase a

2007 letter from Mr. Jamie Dimon to JPMC shareholders, which speaks for itself, and thus are

denied.  Defendants deny the allegations in the second sentence of paragraph 127.  Defendants

deny any remaining allegations in paragraph 127.

128.    This information about the increasing risks from subprime mortgages was – or
should have been – shared with the managers of the IBF and IPBF because JPM purportedly

---

[42] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

[43] "Jamie Dimon's swat team: How J.P. Morgan's CEO and his crew are helping the big bank
beat the credit crunch," Fortune, September 2, 2008, available at
http://money.cnn.com/2008/08/29/news/ companies/tully_dimon.fortune.
[44] *Id.* (emphasis added).

"mine[s] every part of the business for detailed information – especially data that point to trouble – then share it at warp speed throughout the corporation."[45] According to the Fortune article, "[t]o Dimon the rich flow of information from different corners of the bank, like the signal from servicing that warned him about subprime, is a major advantage. 'We have a gold mine of knowledge, but you have to manage it well,' he says, so every one of our businesses benefits from it."[46]

**ANSWER:**     The allegations in Paragraph 128 purport to quote selections from or paraphrase a

written document that speaks for itself, and thus are denied.  Footnotes 45 and 46 contain no

allegations and require no response.

129.     Despite this, the IBF and IPBF and thus the JPM Stable Value Funds continued to hold a substantial amount of mortgage-backed securities backed by subprime mortgages. If in October 2006, JPM had concluded that subprime mortgages were too risky to hold for its own account, such mortgages (or CMOs based on such mortgages) were a *fortiori* too risky for a conservative investment vehicles like the JPM Stable Value Funds.

**ANSWER:**     Defendants deny the allegations in Paragraph 129.

130.     Furthermore, as Mr. Dimon testified before Congress, JPM did not itself offer Option ARM mortgages because, in his view, "we did not think they were appropriate products for consumers."[47] Similarly, in his 2006 letter to JPM shareholders, he stated that JPM "did not originate option ARMS or other negative amortization loans" because JPM "didn't think they were particularly consumer friendly or that safe." This did not prevent JPM from investing JPM Stable Value Funds' assets in mortgage-backed securities backed by those same types of mortgages. ████████████████████████████████████

**ANSWER:**     The allegations in the first sentence of Paragraph 130 purport to quote selections

from or paraphrase the testimony of Mr. Jamie Dimon in an unrelated matter, which speaks for

itself, and thus are denied.  The allegations in the second sentence of paragraph 130 purport to

quote selections from or paraphrase a 2006 letter from Mr. Jamie Dimon to JPMC shareholders,

which speaks for itself, and thus are denied.  Defendants deny the remaining allegations in

Paragraph 130.  Footnote 47 contains no allegations and requires no response.

---

[45] *Id.*

[46] *Id.*

[47] Testimony of Jamie Dimon Before the Financial Crisis Inquiry Commission, Jan. 13, 2010, p.2.

131.



**ANSWER:**

Defendants deny the remaining allegations in Paragraph 131.

132.                    IO securities do not support steady cash flows because, when interest rates decline, prepayments accelerate and the stream of payments from such securities is drastically reduced. PO securities suffer from the opposite problem: cash flows are high only where principal is paid off relatively quickly. While in theory such securities may cancel each other out if they are backed by the same underlying collateral, risks can be substantial if the collateral differs.

**ANSWER:**     Defendants deny the allegations of the first sentence of Paragraph 132.  Because

they are vague, Defendants lack information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 132.

133.                                              . Inverse floaters have rates of return that decline significantly if interest rates rise. As the court held in *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044-45 (9th Cir. 2001), investment in inverse floaters violated ERISA's prudence rule as to a trust with "very conservative investment guidelines" such as those of a stable value fund.

**ANSWER:**     Defendants deny the allegations in the first and second sentences of Paragraph

133.  The allegations in the third sentence purport to quote selections from or paraphrase a

written document that speaks for itself, and thus are denied.  Defendants deny any remaining

allegations in Paragraph 133.

134.     The mortgage-backed securities held by the IPBF were similar to those held by the IBF, although the IPBF held a relatively smaller amount of such securities.

**ANSWER:**     Defendants deny the allegations in Paragraph 134.

135. 

**ANSWER:**   Defendants deny the allegations in the first sentence.  The allegations in the

second sentence purport to characterize the terms of written documents that speak for

themselves, and thus are denied.  Footnote 48 contains no allegations and requires no response.

136.   JPM's investment of the JPM Stable Value Funds in the types of poorly collateralized and/or exotic mortgage derivatives described above was inconsistent with the "character and aims" of a stable value fund when made and held and was thus a violation of its ERISA duty of prudence.

**ANSWER:**   Defendants deny the allegations in Paragraph 136.

<u>JPM's Unique Investment in Private Placement Commercial Mortgages</u>

137.   One of the Commingled Pension Trust Funds in which the IBF invested was the Mortgage Private Placement Fund ("MPPF"). The MPPF invests in, among other things, directly-placed mortgages on multi-family dwellings, shopping centers, office buildings, co-ops, and other commercial real estate projects. The MPPF through JPM originates its own commercial mortgages.

**ANSWER:**   Defendants admit only that the IBF invested in the MPPF, that the MPPF's

investments include direct loans secured by commercial real estate, and that the MPPF originated

commercial mortgages.  Defendants deny the remaining allegations in Paragraph 137.

138. 

**ANSWER:**   The allegations in Paragraph 138 purport to paraphrase deposition testimony of

Ms. Paradis in an unrelated matter, which speaks for itself, and thus are denied.  Footnote 49

contains no allegations and requires no response.

---

48
49

139.     These private placement mortgages were not public securities. They ███████████ ██████████████████████████████████████████████ [50]

**ANSWER:**     Defendants admit that the MPPF invested in private mortgages that are not valued or rated by a third party.  Defendants deny any remaining allegations in Paragraph 139.  Footnote 50 contains no allegations and requires no response.

140.     Relatedly, the valuation of these private placement mortgages was determined solely by JPM. ██████████████████████████████████████████████████ [51]

**ANSWER:**     Defendants admit that the MPPF invested in private mortgages that are not valued or rated by a third party.  The allegations in quotation marks in Paragraph 140 purport to quote selections from or paraphrase a written document that speaks for itself, and thus are denied. Defendants deny any remaining allegations in Paragraph 140.  Footnote 51 contains no allegations and requires no response.

141.     This lack of objective valuation data allowed JPM to hide losses in the private placement mortgages during the financial crises.

**ANSWER:**     Defendants deny the allegations in Paragraph 141.

142.     ███████████████████████████████████████████ [52] ██████████████████████████████████ [53]

**ANSWER:**     ████████████████████████████████████████████ ██████████████████████████████ Defendants deny the remaining allegations of the first sentence of Paragraph 142.  The remaining allegations in Paragraph 142 purport to characterize selections from the deposition testimony of Mr. Candelmo in an unrelated

_____

50 ████████████████
51 ████████████████
52 ████████████████
53 ████████████████

matter, which speaks for itself, and thus are denied.  Footnotes 52 and 53 contain no allegations

and require no response.

143.    Ms. Paradis also knew that the private placement mortgages increased liquidity
risk. In a 2007 industry publication, she stated that "[d]irectly placed loans are not appropriate
within any portfolio with liquidity demands."[54]

**ANSWER:**    The allegations in Paragraph 143 purport to quote selections from or paraphrase a

written document that speaks for itself, and thus are denied.  Footnote 54 contains no allegations

and requires no response.

144.   

**ANSWER:**    Defendants deny

the remaining allegations in Paragraph 144.

145.

**ANSWER:**    Defendants deny the allegations in Paragraph 145.

146.    Although these mortgage loans were funded by the MPPF, as explained below, it
may be inferred from JPM documents and industry practice that at least some of the loans were
originated, arranged and underwritten by affiliated JPM entities who in turn received substantial
fees for these services from the borrowers.[55] These fees variously were called application,
originating, placement, and underwriting fees.

**ANSWER:**    Defendants deny the allegations in Paragraph 146.  Footnote 55 purports to

summarize the terms of a written document that speaks for itself, and thus are denied.



147. ███████████████████████████

████████████████ 56 ██████████████████████

██████████████████████████████████ Such

payments and commissions were and are made to entities that arrange, broker and underwrite commercial mortgage loans, bringing loans to the lender, and customarily were paid by the borrower to the arranger. When the loan is arranged, originated, and/or underwritten with the MPPF by a JPM affiliated, the charges paid by the borrower go to the JPM affiliate.

**ANSWER:**     The first two sentences of Paragraph 147 purport to characterize the terms of a

written document that speaks for itself, and thus are denied.  Defendants deny the remaining

allegations in Paragraph 147.  Footnote 56 contains no allegations and requires no response.

148.     When the loan is arranged, originated, and/or underwritten with the MPPF by a JPM affiliate, the charges paid by the borrower may go to the JPM affiliate as set forth in the Declaration of Trust for the MPPF (the "Declaration of Trust"). The Declaration of Trust states at Section 4.4 "In addition to the powers otherwise herein granted to the Trustee, the Trustee is authorized and empowered in its discretion, but not by way of limitation: . . . (q) if not otherwise prohibited by ERISA (or if prohibited, subject to an exemption under ERISA),or other applicable law, to invest in any investment vehicle with respect to which (i) the Trustee or any of its affiliates has participated in any way in the issuance, underwriting or original sale thereof . . . (iii) a part or all of the proceeds received by the issuer or seller are used or to be used to satisfy any obligation to the Trustee or any of its affiliates . . . "[57]

**ANSWER:**     Paragraph 148 purports to characterize the terms of a written document that

speaks for itself, and thus are denied.  Footnote 57 contains no allegations and requires no

response.

149.     Pursuant to this Court's direction that the parties attempt to ascertain whether there is a factual basis for the prohibited transaction claims and in specifically referencing the September 4, 2008 loan closing statement discussed above, Plaintiffs, by letter dated September 19, 2013, asked JPM to state that during the relevant period that none of its affiliates received any payments from any borrower for any loans to the borrower funded by the MPPF (and thus by the JPM Stable Value Funds). JPM has declined to so state, and given the Declaration of Trust allowing for this practice as well as the industry practice of making such payments and commissions to entities that arranged, originated, placed and/or underwrote such loans, Plaintiffs infer that JPM affiliates received such payment for loans from borrowers on loans they underwrote, arranged and/or brokered and which were funded by the MPPF (and thus by the JPM Stable Value Funds).

---

[56] ████████████████████
[57] JPM-Whitley 011013 – 011017.

**ANSWER:**      Defendants deny the allegations in Paragraph 149.

150.     Because JPM was also the originator of these private placement mortgages, it thus had unique knowledge of the risks inherent in such assets and knew or should have known that they were inappropriate for inclusion in a stable value fund portfolio under the market conditions prevailing during the relevant time period.

**ANSWER:**      Defendants deny the allegations in Paragraph 150.

151.     As early as 2007, JPM was aware of the liquidity and default risks of these private placement mortgages. In 2007 JPM created IPBF.



[58] As set forth above, however, the investment strategy of the IPBF was imprudent for several other reasons, even though it did not invest in the PPMF.

**ANSWER:**      Defendants deny the allegations in the first sentence of Paragraph 151.  The

allegations in the third and fourth sentences of Paragraph 151 purport to characterize the

deposition testimony of Mr. Candelmo in an unrelated matter, which speaks for itself, and thus

are denied.  Defendants deny the remaining allegations in Paragraph 151.  Footnote 58 contains

no allegations and requires no response.

152.



[59]

**ANSWER:**      The allegations in Paragraph 152 purport to characterize selected terms of a

written document that speaks for itself, and thus are denied.  Footnote 59 contains no allegations

and requires no response.

153.

[60]

---

[58]

[59]

[60]

**ANSWER:**   The allegations in Paragraph 153 purport to characterize selected terms of a written document that speaks for itself, and thus are denied.  Footnote 60 contains no allegations and requires no response.

154.  ███████████████████████████████████████████ [61]

**ANSWER:**   The allegations in Paragraph 154 purport to characterize selected terms of a written document that speaks for itself, and thus are denied.  Footnote 61 contains no allegations and requires no response.

155.  ██████████████████████████████████████.  Rather, its view was that the private placement mortgages had *always* been an inappropriate investment given the conservative nature of stable value funds.

**ANSWER:**   The allegations in Paragraph 155 purport to characterize selected terms of a written document that speaks for itself, and thus are denied.

156.  ████████████████████████████████████████████
██████████████ [62] ████████████████████████████
██████████████████████████

**ANSWER:**   Defendants deny the allegations in the first sentence of Paragraph 156.  The allegations in the second and third sentences purport to characterize the terms of a written document that speaks for itself, and thus are denied.  Defendants deny any remaining allegations in Paragraph 156.  Footnote 62 contains no allegations and requires no response.

157.   JPM's investment in billions of dollars of illiquid and arbitrarily-valued private placement mortgages was contrary to the "character and aims" of a stable value fund, was thus a violation of its ERISA duty of prudence, and caused damages to Plaintiffs and the proposed class for which they seek relief here.[63]

---

[61] ████████████████████████

[62] ████████████████████

[63] Not only were Plaintiffs damaged by JPM's leveraged investment in and holding of illiquid private placement mortgages in the Stable Value Funds, but they were further damaged when JPM later needed to unload these mortgages because of their excessive risk. See

**ANSWER:**     Defendants deny the allegations in Paragraph 157 and Footnote 63.

<u>The Causal Connection Between JPM's Risky Investment Strategies and the Catastrophic
Decline in the Market Value of JPM's Stable Fund's Investments</u>

158.     ███████████████████████████████████████████
██████████████[64]

**ANSWER:**     Defendants deny the allegations in Paragraph 158 and Footnote 64.

159.     Based on industry standard performance attribution techniques, the cumulative
loss to the IBF's portfolio can be decomposed into specific losses from the Commingled Pension
Trust Funds in which it invested.

**ANSWER:**     Defendants deny that any plan participant suffered a "loss"; investors in the Stable

Value Funds maintained their principal and accumulated interest and, during the Class Period,

received returns higher than those available from money market funds.  Defendants lack

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph

159.

160.     ████████████████████████████████████
█████████████████████████████████████████

**ANSWER:**     Defendants deny the allegations in Paragraph 160.

161.     █████████████████████████████████████



http://www.reuters.com/article/2012/04/03/us-jpmorgan-stablevalue-idUSBRE83216820120403
(last viewed October 6, 2013) ("Meanwhile, the JPMorgan stable value fund has trailed its peers
each year since 2008, according to data provided by JPMorgan and Hueler, which tracks an
index of 17 stable value collective trusts with $104.6 billion in assets. Some experts have
suggested that the drop in performance is due to JPMorgan's exit from private mortgages.").
[64] ████████████████████████████████████████

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 161.

162. 

**ANSWER:**

Defendants deny the remaining allegations in Paragraph 162.

163.     The allocation of investments in the Enhanced Cash Fund is shown in Appendix A.

**ANSWER:**     Defendants deny the allegations in Paragraph 163.  Defendants lack information sufficient to form a belief as to the truth of the allegations in Footnote 65 regarding how Plaintiffs constructed their table.

164.     Although Table 17 shows

**ANSWER:**     Defendants deny the allegations in Paragraph 164.

165.     Table 18 understates the role of the Enhanced Cash Fund in the total loss to Plaintiffs.

**ANSWER**:    Defendants admit only that before May 2011 the IBF invested in the Enhanced

Cash Fund.  The allegations in the first and third sentences of Paragraph 165 are vague and

ambiguous and are thus denied.  Defendants deny the remaining allegations in Paragraph 165.

<u>The Causal Connection Between the IBF's Market Value Loss and Injury to Plaintiffs</u>

166.    As a result of the rapid decline in the market value of the IBF's investments, the
ratio of market value to book value of the JPM Stable Value Funds declined to dangerous levels
as of the end of 2008:

**ANSWER:**    Defendants admit only that the market to book value ratios of SAIF, SVF, and the

Hospira, Mitsubishi, and Caterpillar separate account stable value funds had declined and were

below 100% as of the end of 2008.  Defendants deny the remaining allegations in Paragraph 166.

167.    By this measure, the JPM Stable Value Funds performed far worse than their
competitor funds. According to the SVIA, as of the end of 2008 (the height of the financial
crises), the average ratio of market value to book value for stable value funds was about 95 per
cent.[66]

**ANSWER:**    Defendants deny the allegations in the first sentence of Paragraph 167.  The

allegations in the second sentence purport to characterize selected terms of a written document

that speaks for itself, and thus are denied.  Footnote 66 contains no allegations and requires no

response.

168.    Table 20 also shows that JPM failed in the most basic objective of stable fund
investing: to protect the principal of the fund.

**ANSWER:**    Defendants deny the allegations in Paragraph 168, and further state that no

investor in the Stable Value Funds at any time lost any principal or accumulated interest.

169.    It further shows the risky nature of JPM's stable value strategy. As Ms. Paradis
herself admitted, the relationship between the market value and book value of a stable value fund
over time "is the best summary risk measure for a stable value strategy."[67]

---

[66] SVIA 000221.
[67] *Essential Metrics for Evaluating Stable Value Strategies: Q & A with Victoria Paradis*,
http://www.jpmorganinstitutional.com/cm/Satellite?blobcol=urldata&blobheader=application%2

**ANSWER:**    Defendants deny the allegations in the first sentence of Paragraph 169.  The

allegations in the second sentence purport to paraphrase or quote a selection from a written

document which speaks for itself, and thus are denied.  Footnote 67 contains no allegations and

requires no response.

170.    Although the wrap agreements for the Stable Value funds allow participants to transact with the funds at book value, over the long term the market value and book value of the funds must converge. This is accomplished by, among other things, reducing the crediting rate paid on a periodic basis to participants.

**ANSWER:**    Defendants admit that the wrap agreements for the Stable Value Funds guaranteed

investors (1) the ability to transact at book value – that is, their principal plus accumulated

interest (their account balance or book value) is always guaranteed, and (2) a positive "interest

crediting rate."  The remaining allegations in Paragraph 170 purport to characterize the crediting

rate formulas, which speak for themselves and thus are denied.

171.    Indeed, the financial condition of the JPM Stable Value Funds grew so dire that, JPM began to set its crediting rates through negotiation with the wrap insurers rather than complying with the formula for setting such rates in its contracts with the plans and the wrappers – formulas in which the market value of the funds' investments was as key input.

**ANSWER:**    Defendants deny the allegations in Paragraph 171.

172.    Moreover, the investors in JPM Stable Value Funds were effectively trapped in these investments, and members of the class and subclasses sustained damages through 2012, past the end of the class and subclass periods, as a result of JPM's earlier actions. The pooled fund investors were denied access to the decimated market value of the funds by virtue of ███ ████████████████████████████████████████████████ Plan Sponsors in pooled accounts were subject to up to a 1 year put requirement, effectively locking them into the fund for a period JPM would use to immunize the fund by reducing the crediting rate to 0 to rebuild the market value to book value during that 12 month period, effectively at the expense of the participants. Finally, a plan sponsor in a separate account could not exit at book value.

**ANSWER:**    Defendants deny the allegations in Paragraph 172.

Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1321475042065&ssbinary=true (last viewed Oct. 3, 2013).

173.   JPM made it clear these gates would be enforced. ████████████

████████████████████████████████████████████████

**ANSWER:**   The allegations in Paragraph 173 purport to paraphrase or quote a selection from a written document which speaks for itself, and thus are denied.

174.   Beginning in 2009, JPM paid a substantially lower crediting rate to participants than the industry average:[68]

**ANSWER:**   Defendants admit only that, in 2009, SAIF's crediting rate was below the average of the Hueler pooled fund index, and that the Hueler pooled fund index is a composite based on a survey of pooled stable value funds.  Defendants deny the remaining allegations in Paragraph 174 and Footnote 68.

175.   In other words, had JPM followed an investment strategy for its Stable Value Fund that was similar to the appropriately conservative strategies employed by most of its competitors, participants in JPM's Stable Value Funds would have obtained substantially higher returns from their investments.

**ANSWER:**   Defendants deny the allegations in Paragraph 175.

176.   JPM will doubtless argue that it was not at fault for these lower returns to plan participants because the poor returns were solely attributable to the putatively unforeseeable financial crisis. What this argument ignores, however, is that one of the key tenets of stable value fund investing is to insulate investments from sharp market fluctuations.[69] For the most part, JPM's competitors were able to achieve this goal. JPM did not because, as set forth above, it implemented an investment strategy that was in several ways inconsistent with the "character and aims" of stable value funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 176 and note that, consistent with the stated goals of the Stable Value Funds, investors in the Stable Value Funds maintained their principal and accumulated interest and, during the Class Period, received returns higher than

---

[68] The Heuler Index is an industry composite that is based on a survey of 30 stable value funds.
[69] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 186.

those available from money market funds.  Footnote 69 contains no allegations and requires no response.

<u>JPM Acted For Its Own Interests and Not the Interests of Stable Value Fund Investors</u>

177.   JPM's behavior here was diametrically opposed to ERISA's mandate that fiduciaries operate with an "eye single" to the interests of plan participants and beneficiaries. *See, e.g., John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994). ERISA's fiduciary duties are, of course, "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

**ANSWER:**   Defendants deny the allegations in the first sentence.  The allegations in the second sentence purport to quote selections from or paraphrase a written document that speaks for itself, and thus are denied.

178.   JPM's motive for its risky investment strategies was simple: greed. While times were good, this strategy allowed the JPM Stable Value Funds to offer what appeared to be higher returns than competing stable value funds at no additional risk, and thus attract new participants. This inured to JPM's financial benefit through the generation of additional AUM fees and otherwise inured to the benefit of the JPM executives who received substantial bonuses tied to the growth of JPM's stable value fund business. █████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████

**ANSWER:**   Defendants deny the allegations in Paragraph 178.

179.   Although this strategy was doomed to fail over the long term, while history demonstrates credit market dislocations occur periodically, executives of financial institutions are often motivated by the prospect of short term gain while disregarding long term, systematic risk – especially when they are in essence gambling with the money of others.

**ANSWER:**   Defendants deny the allegations in Paragraph 179.

<u>Allegations Specific to JPM's Pooled Stable Value Funds</u>

180.   Investors in JPM's pooled Stable Value Funds, the ACSAF / JPM Stable Value Fund and the SAIF, suffered from JPM's breaches of the duties of prudence and loyalty set forth above. In addition (1) the circumstances under which JPM caused certain members of the Plaintiff Class to be invested in those funds and (2) features unique to pooled stable value funds raise additional claims for breach of fiduciary duty that are specific to these pooled funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 180.

181.     Although JPM has offered separate stable value funds for several years, it is a relatively late entrant into the market for pooled stable value funds.

**ANSWER:**     Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 181.

182.     JPMC or one of its affiliates held a significant minority interest in American Century Companies, Inc. ("ACC"), the parent company of American Century Investments ("ACI").

**ANSWER:**     Defendants admit that, from January 15, 1998 until August 31, 2011, JPMAC held a minority interest in American Century Companies, Inc. ("ACC"), which owned American Century Investment Management ("ACI").

183.     Before JPMC acquired its interest in ACC, ACC had developed a wholly-owned retirement plan recordkeeping service business known as Retirement Plan Services, Inc. ("RPS"). ACI employed RPS to assist plan sponsors in determining the plan's investment alternatives as well as providing management services needed by employer retirement plan sponsors for their 401(k) retirement plans under ERISA. ACI used RPS as a significant distribution channel to sell its own investment funds in the retirement investment market. These ACI funds were in essence "house brands," known as "proprietary funds," and were given preferential placement by RPS in the investment lineups that RPS proposed to 401(k) sponsors.

**ANSWER:**     Defendants admit that, before JPMAC acquired an interest in ACC, ACC had developed a wholly-owned retirement plan recordkeeping business known as Retirement Plan Services ("RPS"). Defendants also admit on information and belief that RPS at times identified investment options to plan sponsors and/or their third-party consultants for consideration and provided administrative services to plan sponsors. Defendants admit the third sentence of Paragraph 183 on information and belief. Because they are vague, Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 183.

184.     By 1998, JPM had acquired a 50 percent economic interest in RPS from ACC. Thereafter, JPM shared the cost of operating RPS with ACI/ACC. As part of this transaction, JPM obtained the opportunity to have its proprietary JPM funds marketed through RPS and given the same preferential placement as ACI funds in investment lineups proposed to plan sponsors by RPS.

**ANSWER:**     Defendants admit that, from January 15, 1998 until August 31, 2011, JPMAC

held a minority interest in ACC and that JPMC or an affiliate agreed to share the costs of

operating RPS.  Defendants admit on information and belief that RPS made available as

investment options for plan sponsors to choose investment products sponsored by third-parties,

JPMC or an affiliated entity and/or ACC or an affiliated entity. Defendants deny the remaining

allegations in Paragraph 184.

185.     As part of this 1998 agreement, JPM and ACI agreed that there would only be one
stable value fund product offered by RPS to a plan sponsor. Per this agreement, the stable value
fund product to be offered would be determined by the size of the plan. Thus, they agreed that
RPS would offer only JPM's separate stable value funds to larger employer plans holding $50
million or more in assets and RPS would offer ACI's pooled stable value fund to plans holding
less than $50 million in assets.

**ANSWER:**     Defendants deny the allegations in Paragraph 185.

186.     The pooled stable value fund RPF [sic] offered to its client plans was known as
the American Century Stable Asset Fund ("ACSAF"). The ACSAF was the "safe" investment
option required by ERISA that RPS offered to its clients.

**ANSWER:**     Defendants admit that RPS offered the ACSAF as an investment option.

Defendants deny the remaining allegations in Paragraph 186.

187.     Pursuant to an agreement dated June 1, 2003 between ACI and JPM (the
"Revenue Sharing Agreement"), JPM acquired ACC's interest in RPS. (RPS is referred to as
"JPMRPS," an entity that is a defendant in this action, with regard to the period after JPM's
acquisition of 100% of RPS.) Under the Revenue Sharing Agreement and thereafter, JPMRPS
continued to provide services to both JPM and ACI retirement investment product funds and the
401(k) plan sponsors and participants who invested in those funds.

**ANSWER:**     Defendants admit that, pursuant to an agreement dated May 16, 2003, J.P.

Morgan Invest Inc. acquired all of the common stock of American Century Retirement Plan

Services, Inc. Defendants further admit that, after the acquisition, RPS continued to provide

services to 401(k) plan sponsors who contracted with RPS. Because they are vague, Defendants

lack information sufficient to form a belief as to the truth of the remaining allegations of the

second sentence of Paragraph 187.

188.    As detailed below, JPMRPS was at all relevant times an ERISA fiduciary to the 401(k) plan and participants invested in the ACSAF and its successor fund, the ACSAF/JPM Stable Value Fund. JPM by virtue of its ownership and control of every aspect of JPMRPS was and is also a fiduciary to participants in the ACSAF under ERISA at least from the date of the Revenue Sharing Agreement.

**ANSWER:**    Defendants deny the allegations in Paragraph 188.

189.    JPM agreed in the Revenue Sharing Agreement that it would maintain the status quo as to existing ACI stable value fund sponsors and not attempt to lure them away from the ACSAF into any JPM stable value fund. In furtherance of this obligation, JPM was obliged both directly and through RPS to (a) offer the same preferential treatment to ACI investment products (including ACSAF) as RPS had previously offered, (b) provide the same level of marketing and sales support to ACI investment products as were offered to JPM products, and (c) establish a compensation structure substantially the same for both ACI and JPM stable value products. In return, JPM was permitted to offer its own stable value funds to plans with less than $50 million in assets that were not already invested in the ACSAF. In addition, JPM agreed to pay ACI a multi-year commission on sales of ACI products sold through RPS.

**ANSWER:**    The allegations in Paragraph 189 purport to characterize selections from written

documents which speak for themselves, and thus are denied.

190.    Despite the Revenue Sharing Agreement. JPM embarked on a plan to use JPMRPS (now a wholly owned JPM subsidiary) to enfeeble the ACSAF so that it would not be able to compete with JPM's stable value funds and would not be able to survive at all as an independent, non-JPM entity.

**ANSWER:**    Defendants deny the allegations in Paragraph 190.

191.    In support of this plan, and despite its contractual commitment to manage the ACSAF in such a manner as not to impair ACI's future revenues, JPMRPS embarked on a course of conduct by which it wrongfully lured and enticed ACSAF plan sponsors away from the ACSAF and into JPM's SAIF and/or JPM's separate Stable Value Funds. Throughout this course of conduct, JPM and JPMRPS knew full well that such conduct would damage the ACSAF and investors in it.

**ANSWER:**    Defendants deny the allegations in Paragraph 191.

192.    At the time of the Revenue Sharing Agreement in 2003, JPM did not have a pooled stable value fund with which to compete with the ACSAF. In 2004, JPM, as part of its acquisition of Bank One, acquired Bank One's Stable Asset Income Fund. This fund, which became the JPM Stable Asset Income Fund ("SAIF"), was a pooled stable value fund which like the ACSAF targeted 401(k) plans with less than $50 million in assets – in other words, the very same market on which the ACSAF was focused. This acquisition allowed JPM to offer a product through JPMRPS that competed directly with the ACSAF.

**ANSWER:**   Defendants admit that in 2003 at the time of the Revenue Agreement, JPMC Bank did not operate a pooled stable value product and that in 2004, as part of the acquisition of Bank One, JPMC Bank acquired SAIF. Defendants deny the remaining allegations in Paragraph 192.

193.   With the acquisition of Bank One's SAIF, JPM actively pursued existing ACSAF sponsors to switch to its fund. Thus, in December 2004, JPMRPS' chief financial officer, Mary J. Block, stated that "JPM/ I want to replace all ACI with JPM Stable Value . . . ." As early as June 2004, JPMRPS employee Paul Shahrocki had written that the takeover of RPS and the availability of the Bank One SAIF would be the "end" of ACSAF.

**ANSWER:**   Defendants deny the allegations of the first sentence of Paragraph 193. The allegations of the second and third sentences of Paragraph 193 purport to quote or paraphrase selections from documents that speak for themselves, and thus are denied.

194.   To further achieve this aim, JPM systematically used the newly acquired SAIF to steer current ACI plan sponsor clients away from ACSAF and into JPM's SAIF. Acknowledging this plan, the co-head of JPMRPS's Strategic Relationship wrote in late 2004 or early 2005 that "we are on officially the path to moving clients from ACI to JPM stable value, w/priority on larger accounts."

**ANSWER:**   Defendants deny the allegations of the first sentence of Paragraph 194. The allegations of the second sentence of Paragraph 194 purport to quote selections from a document that speaks for itself, and thus are denied.

195.   Almost from the inception of the Revenue Sharing Agreement in September 2003, JPMRPS and JPM offered substantial rewards to JPMRPS employees for promoting JPM stable value funds to the detriment of ACSAF and participants who invested in it. For example, JPMRPS employees were informed that their compensation opportunities were greater for sales and promotion of JPM's stable value fund than ACSAF. Also, JPMRPS gave JPM's stable value funds the exclusive opportunity to compete with third party funds, a role previously occupied solely by ACI's funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 195.

196.   JPMRPS, through its actions, was able to influence, manage and control fund selection for 401(k) plans and participants invested in the ACSAF and move many plan sponsors to JPM's SAIF and/or separate Stable Value Funds. Ultimately, the ACSAF was so totally decimated by JPM's conduct that it was no longer economically viable for the ACSAF to exist at all, and JPM caused what remained of that fund to be merged or otherwise become part of the ACSAF/JPM Stable Value Fund on September 17, 2007.

**ANSWER:**      Defendants deny the allegations in Paragraph 196.

197.      The mass exodus of plan participants from the ACSAF caused by such conduct and the concomitant exodus of plan assets, which were recorded as required at book value, caused the market value of that fund to decrease so that as of September 17, 2007 it was further below book value than otherwise, to the loss and detriment of investors in the ACSAF. These investors were further injured by the loss and detriment associated with the poor performance of the ACSAF/JPM Stable Value Fund, which suffered from the same deficiencies alleged above with respect to all of JPM's Stable Value Funds, including improper leveraging and reaching for yield.

**ANSWER:**      Defendants deny the allegations in Paragraph 197.

198.      In other words, if the ACSAF had remained in business, managed by ACI on the same principles as were in place prior to the transfer to JPM's fund, investors in the ACSAF would have fared far better than they actually did after the involuntary transfer to the ACSAF/JPM Stable Value Fund. JPM injured these investors by transferring the ACSAF funds into the ACSAF/JPM Stable Value Fund that JPM imprudently managed.

**ANSWER:**      Defendants deny the allegations in Paragraph 198.

199.      RPS, both before and after JPM's acquisition of 100% ownership, and JPM by virtue of its ownership and control of JPMRPS, were and are fiduciaries to investors in the ACSAF and the plans in which they participated in that, among other things, they provided investment management services and discretionary administrative authority and responsibilities with regard to management of the ACSAF, both up to and after it became part of the ACSAF/JPM Stable Value Fund.

**ANSWER:**      Defendants deny the remaining allegations in Paragraph 199.

200.      The status of RPS and JPMRPS as fiduciaries is shown by the fact that JPM worked through and in conjunction with RPS to acquire plan sponsors who were invested with ACSAF for JPM. JPM and RPS were able to attract a large number of plan sponsors to switch their investments to JPM's separate Stable Value Funds and/or the SAIF by use of the control that RPS had over the investment decisions made by its clients, the 401(k) plan sponsors. RPS was so successful at controlling its client's decisions on where to invest that it created a run on the bank at ACSAF that resulted in ACSAF agreeing to transition the fund to the ACSAF/JPM Stable Value Fund with no compensation to ACSAF. Again, the Arbitration Panel Findings point to evidence of admissions reflected in various internal documents among JPM representatives "that RPS personnel had significant power to influence and control selection of funds in 401(k) plans by sponsors" leading the Arbitration Panel to conclude "that RPS had substantial ability to and did impact, influence, manage, or control sponsor selection of products for inclusion in 401(k) plans." Arbitration Award at p. 29 (attached as Exhibit "1").

**ANSWER:**     The allegations in the fourth sentence of Paragraph 200 purport to characterize

selections from a written document that speaks for itself, and thus are denied.  Defendants deny

the remaining allegations in Paragraph 200.

201.     Moreover, one or more of the JPM entities were and are fiduciaries as trustees and custodians with respect to the ACSAF/JPM Stable Value Fund and other JPM stable value funds pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a), and are also fiduciaries as investment managers with respect to these funds in that they provided investment, trust and administrative services to these funds.

**ANSWER:**     Defendants admit that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for the SVF and the commingled trust funds sponsored by JPMC

Bank. Defendants deny the remaining allegations in Paragraph 201.

202.     The actions of JPMRPS and the related JPM entities constitute a breach of fiduciary duty to investors in the ACSAF violation of ERISA sections 404 and 409, 29 U.S.C. §§ 1104 and 1109.

**ANSWER:**     Defendants deny the allegations in Paragraph 202.

203.     Through JPMAC Holdings Inc. ("JPMAC"), JPMC owned at all relevant times between 40% and 48% interest in ACC. Throughout the period of its ownership, JPMC and/or JPMAC had the right to appoint and did appoint at least one board member to the ACC Board of Directors, who thus served as a fiduciary of ACC. In addition, by virtue of their ownership and control of JPRMS [sic], JPMC and/or JPMAC, or both, have been ERISA fiduciaries with regard to the relevant 401(k) plans and plan participants.

**ANSWER:**     Defendants admit the allegations in the first sentence of Paragraph 203.

Defendants also admit that JPMAC owned a minority interest in ACC, and that JPMAC had the

right to and did appoint a Board Member to the ACC Board of Directors, who owed certain

obligations under governing corporate law to ACC.  Defendants deny the remaining allegations

in Paragraph 203.

204.     At the times relevant to this Complaint, as set forth above, JPM consistently "reached for yield" in its Stable Value Funds. JPM's motive to reach for yield was, among other things, to compete with ACSAF for stable value AUM for both SAIF and the separate stable value accounts JPM managed. By increasing yield, JPM was able to convince retirement fund sponsors to move their investments in ACSAF to JPM stable value products, including the SAIF.

This in turn caused a "run on the bank" as to the ACSAF, causing ACI to surrender the ACSAF to JPM because of the ongoing damages to the fund.

**ANSWER:**    Defendants deny the allegations in Paragraph 204.

205.    The allegations in this part of the Complaint are supported by findings of the arbitration panel in *Am. Century Inv. Mnmt., Inc. v. J.P. Morgan Investment Holdings, LLC*, No. 58 148 Y 00220 9 (Am. Arb. Ass'n) referenced above and attached as Exhibit "1." That panel issued a $373 Million breach of contract award against JPMRPS on August 10, 2011 for promotion of its proprietary products over ACI's products– over $130 Million of that Award was for JPM's promotion of SAIF over the prudently managed stable value product offered by ACI, such as the ACSAF.

**ANSWER:**    The allegations in the second sentence of Paragraph 205 purport to summarize the

terms of a written document that speaks for itself, and thus are denied.  Defendants deny the

remaining allegations in Paragraph 205.

206.    The way the various JPM entities named in this Consolidated Complaint acted in concert with each other with the intent to harm the ACSAF/JPM Stable Value Plaintiffs is set forth in the findings of the Arbitration Panel and is incorporated here by reference. *Id.* See, e.g., id. at pp. 51-53.

**ANSWER:**    Defendants deny the allegations in Paragraph 206.

207. Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Ex. 1, Arbitration Award ¶¶ 34-35, 38, 39, 42, 69, 73, 88. See also, ¶ 41("availability of [SAIF] ... was the end for ACI's ACSAF").

a.    Prior to setting up SAIF, JPM had never managed a pooled stable value fund. JPM acquired SAIF as a "competing fund" to the American Century Stable Value Fund ("ACSAF") traditionally marketed to JPMRPS clients like GEHA. Through JPMRPS's control of its retirement distribution channel it "cannibalized" American Century's clients within Plans administered by JPMRPS. Award ¶¶ 34-35; ████████████████████ [70]
████████████████████████████████

b.    Plaintiffs moving to the SAIF became collateral damage in the scheme to attract AUM by designing a bond fund that took on more risk than a fiduciary should take on in a pooled stable value product in order to temporarily produce a higher rate of return—in

---

[70] ████████████████████████████████
████████████████████████████████████████
████████████

major part achievable solely because JPM invested in lower quality bonds that paid a higher yield than higher quality bonds paid out. Award ¶¶ 38-40. Historically, Defendants used this temporary high rate of return to cause a "run" on the ACSAF and, like GEHA, to cause it to insert SAIF into the line-up – not ACSAF. This enabled JP Morgan to capture the approximate $2 Billion AUM available in JPMRPS's administered Plans for the pooled stable value fund "slot" or line-up option.

c.      JPM's "defense" in the arbitration was that SAIF was a "better" managed, higher yielding fund than ACSAF for JPMRPS clients like GEHA. Thus, Dr. Goetzmann was asked to address whether SAIF's higher yield was the result of prudent management. He found that JPM took on more risk than prudent in order to temporarily gain a higher yield. The arbitration panel awarded American Century $132.6 Million. Award ¶ 88.

**ANSWER:**      The allegations in Paragraph 207 and Footnote 70 purport to characterize

selections from a written document that speaks for itself, and thus are denied.

208. Thus, JPM inserted SAIF in the "line-up" of investment options – as the "default" option to represent the "safe-harbor" investment in JPMRPS's administered ERISA plans. To further promote the capture of the AUM, JPMRPS offered to accept a portion of the total fee charged in connection with the SAIF investment as a "credit" or offset to the administrative fee that JPMRPS charged. SAIF participants - not the Plan Employers - paid JPMRPS's fee and, in return, received a mismanaged JPM Product.

**ANSWER:**      Defendants deny the allegations in Paragraph 208.

209.      As set forth above, the SAIF – like all of JPM's Stable Value Funds including the ASCAF/JPM Stable Value Fund – used undisclosed and improper leverage to acquire a concentrated, non-diversified portfolio overweighed in non-agency mortgages and other real-estate backed debt instruments that had a higher risk (in terms of liquidity risk, non-diversification, prepayment risk, duration risk, and credit risks), and higher volatility than prudent for any stable value fund, but especially for a pooled stable value fund product.

**ANSWER:**      Defendants deny the allegations in Paragraph 209.

210.      A pooled stable value fund requires even more prudent management than a separate stable value fund with respect to volatility of fixed income assets and the resulting differences between the market and book value of the fund. This is so for several reasons. First, a pooled fund is made up of multiple sponsors rather than a single sponsor and, therefore, is subject to large unanticipated negative cash flows if a plan sponsor or sponsors exits the fund. ████████████████████████████████████████████████████████████ Withdrawals are made at book value. Withdrawals that occur at a point in time when the market value is less than the book value lower the remaining asset base, thus exacerbating the difference between the market and book value of the remaining assets, and further lowering the crediting rate to amortize the larger loss. As the crediting rate drops, additional withdrawals can occur because the fund appears to be underperforming relative to its peers. If that cycle continues a "run on the bank" can occur

endangering the fund's very existence. Accordingly, pooled stable value funds must be managed to minimize volatility and the resulting dislocations between market and book value.

**ANSWER:**   The fourth sentence in Paragraph 210 purports to characterize the terms of a

written documents that speaks for itself, and thus are denied.  Defendants deny the remaining

allegations in Paragraph 210.

211.    JPM had historically used the IBF for separate accounts and continued that practice after starting the SAIF. In other words, JPM never managed the IBF as an investment designed for pooled stable value funds. By using an "all-purpose" IBF, JPM effectively never managed the ACSAF/JPM Stable Value Fund or the SAIF as a pooled stable value fund with its particularized, product specific investment management needs.

**ANSWER:**   Defendants deny the allegations in Paragraph 211.

212.    JPM found it cheaper to simply tag on to the IBF for the SAIF's investment management as it added no additional investment fixed costs in a scalable fund and used the similar IPBF for the ACSAF/JPM Stable Value Fund for similar reasons. Rather than establish a new fund and design an investment approach suited for a pooled stable value product, JPM took the SAIF's assets and added them into the IBF. Thus, JPM's management fee charged to SAIF investors simply fell to the bottom line. For this reason, disgorgement of all fees is one of the appropriate remedies in this case. 29 U.S.C. § 1109. ████████████████████████ ████████████████

**ANSWER:**   The allegations in the fourth and fifth sentences of Paragraph 212 state legal

conclusions to which no response is required.  Defendants deny the remaining allegations in

Paragraph 212.

213.    JPM's motive was that by taking these risks with these higher yielding assets placed into the fund, that "high yield" would attract and keep more investments into the JPM stable value products, earning yet more management and administrative fees for JPM.

**ANSWER:**   Defendants deny the allegations in Paragraph 213.

214.    JPM grew the SAIF by 100% in the year preceding September, 2008, increasing SAIF assets by $500 Million. These new monies would, within months, suffer the largest market value losses in the industry.

**ANSWER:**      Defendant admits that SAIF had $508 million in assets under management as of

September 30, 2007 and that SAIF had $1,035.6 million in assets under management as of

December 31, 2008.  Defendants deny the remaining allegations in Paragraph 214.

215.      In 2009, the market value of the investments in the SAIF fell to the mid-80% of book value, at the bottom of all stable value funds. This type of volatility was exactly what a stable value product should be designed to avoid.

**ANSWER:**      Defendants deny the allegations in Paragraph 215.

216.      Thus, from 2009-2012, JPM sought new money flows to make up for its mismanagement. New contributions coming into the SAIF from 2009-2012 helped absorb the pain of the amortization █████████████████ market value losses the SAIF experienced before this time period.

**ANSWER:**      Defendants deny the allegations in Paragraph 216.

217.      Although the market value of the misnamed "SAIF" had ███████████ ███████████ JPM omitted and failed to keep SAIF participants advised of the deteriorating value of SAIF's underlying assets. JPM continued to market SAIF to the public as "stable value." SAIF participants in 2009 and the following years suffered an immediate loss by buying into the fund at above the market or true value of SAIF's assets. █████████ ████████████████████████████████████████ ███████

**ANSWER:**      The allegations in the second sentence of Paragraph 217 regarding marketing

actions at some unidentified time are vague and ambiguous and are thus denied.  Defendant

denies the remaining allegations in Paragraph 217.  By way of further answer, Defendant denies

that Plaintiffs suffered a loss or damages.  Investors in SAIF and SVF maintained their principal

and accumulated interest and, during the proposed class period, received returns higher than

those available from money market funds.

218.      While this self-dealing benefited JPM in accumulating fees based ████████ ████████████████████ in the SAIF and in the transfer of fees to JPMRPS coming from retirement accounts, it harmed SAIF participants, who were stuck with paying JPMRPS a "revenue share" (administrative fee) out of the SAIF and with amortizing the market losses via the impaired crediting rate.

**ANSWER:**      Defendants deny the allegations in Paragraph 218.

219.    In short, JPM controlled and steered the SAIF investors away from safer and true stable value products, and also forced ACI to cede control of the ACSAF to JPM, for the purpose of getting the investors into JPM products from which JPM could earn multiple disclosed and undisclosed fees including a fee (sometimes called "revenue sharing") for JPMRPS. Ex. 1, Arbitration Award at 14-15, 21-23, 26-31; ███████████████████████████.

**ANSWER:**    Defendants deny the allegations in Paragraph 219.

220.    Investors in the ACSAF / JPM Stable Value Fund and the SAIF were collateral damage in JPM's scheme to enrich itself by capturing amount under management fees ("AUM") in the $2 Billion "stable value slot" in JPMRPS's investment line-ups. The undisclosed and disguised higher risk (taken to temporarily gain a higher yield) predictably caused the ACSAF/JPM Stable Value Fund and the SAIF to perform poorly in terms of lost market value and reduced crediting rate during the financial downturn, starting in 2009 and continuing for several years. ████████████████████████████████████████████

**ANSWER:**    Defendants deny the allegations in Paragraph 220.

221.    JPMRPS profited by receiving monies equal to 50% of the disclosed management fee and by earning or receiving other substantial JPM created internal incentive credits to promote JPM's product over non-proprietary products.

**ANSWER:**    Defendants admit only that RPS agreed to credit 50% of the SAIF management fee against the Contingent Per Participant Fee it charged to the Plan as described in the Master Services Agreement.  Defendants deny the remaining allegations in Paragraph 221.

222.    JPM touted on a 2008 Fact Sheet available for months on the Internet that the "estimated annual return" for its SAIF investors would be between 4.25% and 5.25%. ██████████ ████████████████

**ANSWER:**    The allegations in Paragraph 222 purport to characterize or quote selections from written documents that speak for themselves and thus are denied.

223.    ████████████████████████████████████████ ██████

**ANSWER:**    The allegations in Paragraph 223 purport to characterize selections from written documents that speak for themselves, and thus are denied.

224.    JPM required investors in the ACSAF/JPM Stable Value Fund and the SAIF to make up the market value losses it caused by reducing the income credited to its investors'

67

accounts. In other words, JPM did not pay out all the yield received from its stressed investments. Rather, it held back a portion of that yield (i.e. interest payments) to buy assets to insert into the fund to make up for its losses. Investors in the ACSAF/JPM Stable Value Fund and the SAIF would not have suffered the low-returns starting in 2009 if JPM had offered its investors, i.e. the JPMRPS Plans, a true stable value fund.

**ANSWER:**   Defendants deny the allegations in Paragraph 224.

225.   The SAIF trailed its peers for each year since 2008 according to Hueler. From 2009-2012, the SAIF's crediting rate fell precipitously. At the same time, relevant benchmarks greatly exceeded the SAIF's yield, and competitors' stable value funds were consistently yielding much higher annual returns. Had the SAIF been prudently managed and had JPM not required the 2009-2012 investors to take an industry low crediting rate in order to buy assets to make-up for losses in market value, the SAIF's yielded returns from 2009 through 2012 would have been substantially higher.

**ANSWER:**   Defendants admit only that SAIF's crediting rate fell during the global financial

crisis. Defendants further admit only that SAIF's crediting rates outperformed the Citigroup 3

month Treasury Bill Index during the period 2008 through 2012. Defendants further admit only

that, during the period 2008-2012, SAIF's crediting rate was lower than some competing stable

value funds' crediting rates and higher than others. Defendants further admit only that, at some

times during the period 2008-2011, SAIF's underlying fixed income portfolio outperformed the

Lehman (or Barclay's) Intermediate Aggregate Index, and at others underperformed that index.

Defendants deny the remaining allegations in Paragraph 225.

226.   ███████████████████████████████
███████

███████████████

**ANSWER:**   The allegations in Paragraph 226 purport to characterize or quote selections from

written documents that speak for themselves, and thus are denied.

227.   ███████████████████████████
███████████████

**ANSWER:**   The allegations in Paragraph 227 purport to characterize or quote selections from

written documents that speak for themselves, and thus are denied.

228. ██████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

**ANSWER:**     Defendants admit the allegations in the first sentence of Paragraph 228.  The

remaining allegations in Paragraph 228 purport to characterize selections from written

documents that speak for themselves, and thus are denied.

## CLASS ALLEGATIONS

229.     *Class Definition*. Plaintiffs brings this matter as a class action pursuant to Federal
Rules of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3). Plaintiffs file this
case on behalf of the following proposed class:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were
> invested directly or indirectly in any of the JPM Stable Value Funds that invested
> in the JPM Intermediate Bond Fund and/or the JPM Intermediate Public Bond
> Fund between January 1, 2009 and December 31, 2010. Excluded from the Class
> are the jurists to whom this case is assigned, as well as their respective staffs;
> counsel who appear in this case, as well as their respective staffs, including
> experts they employ; the Defendants in this matter, as well as their officers and
> directors; any person, firm, trust, corporation, officer, director, or other individual
> or entity in which a Defendant has a controlling interest or that is related to or
> affiliated with any of the Defendants; and the legal representatives, agents,
> affiliates, heirs, successors-in-interest, or assigns of any such excluded party.[71]

**ANSWER:**     Defendants admit that Plaintiffs purport to represent the putative class defined in

Paragraph 229 but deny that a class should be certified.  Defendants deny any remaining

allegations in Paragraph 229.  Defendants deny the allegations in Footnote 71.

230.     *Numerosity*. The members of this Class are so numerous that joinder of all
members is impracticable. While the exact number of members is unknown to Plaintiffs at this
time, and can be ascertained only through discovery, Plaintiffs reasonably believe that more than
100 ERISA plans throughout the country offered one of the Stable Value Funds during the Class
Period. These Plans collectively have more than one million participants and beneficiaries, and

---

[71] This Class definition and the definitions for the two Subclasses below delineate membership in
the Class, but are not intended to circumscribe the relevant time period for this action. The
conduct about which Plaintiffs complain occurred largely before the class period but caused
injury to class members during the class period. Furthermore, that injury to class members
continued past the end of the class period.

plaintiffs believe that a substantial number of these persons had invested in one of JPM's Stable Value Funds.

**ANSWER:**   Defendants admit only that the number of putative class members is sufficiently large that joinder of all members would be impracticable.  Defendants lack information sufficient to form a belief as to what Plaintiffs reasonably believe regarding the number of potential class members.

231.   ***Commonality***. The claims of Plaintiffs and the proposed Class have a common origin and share a common basis. All Class members suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA that form the basis of this lawsuit. Proceeding as a class is particularly appropriate here because the Stable Value Funds' assets are held in one or more collective trusts managed by JPM, each of which held invested substantial assets in JPM's Intermediate Bond Fund and Commingled Pension Trust Funds. Furthermore, common questions of law and fact exist as to all members of the class. The many questions of law and fact common to the Class include, but are not limited to:

     a.     whether the JPM entities are fiduciaries under ERISA;

     b.     whether JPM breached its fiduciary duties under ERISA;

     c.     whether JPM deviated from the proper and/or stated purpose of Stable Value Funds when it adopted a high risk, leveraged investment strategy for such funds;

     d.     whether any of the transactions by JPM with regard to the Stable Value Fund, Intermediate Bond Fund and Pension Trust Funds were prohibited transactions; and

     e.     whether JPM's actions complained of herein injured plan participants and their beneficiaries who had invested in one of the Stable Value Funds.

**ANSWER:**   Defendants deny the allegations in Paragraph 231.

232.   ***Typicality***. Plaintiffs' claims are typical of the claims of the members of the Class because they are substantively identical to the claims of the class members. If each member of the Class were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

**ANSWER:**   Defendants deny the allegations in Paragraph 232.

233.   ***Adequacy***. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the Class members of the Class or the SAIF Subclass or the ACSAF/JPM Stable Value Fund Subclass. Plaintiffs will vigorously protect the interests of the members of the Class. Moreover, Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters. Such counsel have been appointed as Lead Counsel and Interim Class Counsel in numerous class action lawsuits. The undersigned counsel have and will devote the time and other resources necessary to litigate this case as effectively as possible.

**ANSWER:**    Defendants lack information sufficient to form a belief as to the truth of the

allegations in Paragraph 233 and therefore deny the same.

234.    ***Rule 23(b)(1)(A) and (B) requirements***. Class certification in this ERISA action
is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate
actions by members of the Class would create a risk of establishing incompatible standards of
conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure
23(b)(1)(B) because prosecution of separate actions by individual Class members would, as a
practical matter, be dispositive of the interests of the other members not parties to the actions, or
substantially impair or impede their ability to protect their interests.

**ANSWER:**    Defendants deny the allegations in Paragraph 234 and deny that a class should be

certified.

235.    ***Rule 23(b)(2) requirements***. Class certification under Federal Rule of Civil
Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally
applicable to the Class, thereby making appropriate final injunctive, declaratory, or other
equitable relief with respect to the Class as a whole.

**ANSWER:**    Defendants deny the allegations in Paragraph 235 and deny that a class should be

certified.

236.    ***Rule 23(b)(3) requirements***. In the alternative, certification under Federal Rule of
Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members
of the Class predominate over any questions (if any) affecting only individual Class members.
Moreover, a class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

**ANSWER:**    Defendants deny the allegations in Paragraph 236 and deny that a class should be

certified.

237.    The SAIF Subclass. Plaintiffs Gates, Newell, Dye, Stolwyk, and Dotson
(collectively the "SAIF Plaintiffs") also seek to represent a subclass of investors in JPM's pooled
SAIF. As set forth above, although investors in the SAIF were injured by the same breaches of
fiduciary duty that injured all members of the Class, members of the proposed SAIF Subclass
advance theories of liability and damages and for the propriety of class certification based on
features of pooled stable value funds.

**ANSWER:**    Defendants admit that Plaintiffs purport to represent the putative class defined in

Paragraph 237 but deny that a class should be certified.  Defendants deny the remaining

allegations in Paragraph 237.

238.   *Definition of the SAIF Subclass*

All participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in the JPM Stable Asset Income Fund from between January 1, 2009 and December 31, 2010. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

**ANSWER:**   Defendants admit that Plaintiffs purport to represent the putative subclass defined

in Paragraph 238 but deny that a subclass should be certified.  Defendants deny any remaining

allegations in Paragraph 238.

239.   *Numerosity of the SAIF Subclass*. Tens of thousands of investors, through over two hundred ERISA plans, invested in the SAIF during the relevant time period.

**ANSWER:**   Defendants admit only that the number of putative subclass members is

sufficiently large that joinder of all members would be impracticable.  Defendants lack

information sufficient to form a belief as to what Plaintiffs reasonably believe regarding the

number of potential subclass members.

240.   Typicality of the SAIF Plaintiffs. The SAIF Plaintiffs' claims are typical of the claims of the members of the SAIF Subclass because they are substantively identical to the claims of the members of the SAIF Subclass. If each member of the SAIF Subclass were to bring and prosecute these claims individually, each member of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

**ANSWER:**   Defendants deny the allegations in Paragraph 240.

241.   Adequacy of the SAIF Plaintiffs and Their Counsel. The SAIF Plaintiffs will fairly and adequately protect the interests of the members of the SAIF Subclass. The SAIF Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the members of the SAIF Subclass or the Class or the ACSAF/JPM Stable Value Fund Subclass. The SAIF Plaintiffs will vigorously protect the interests of the members of the SAIF Subclass Moreover, the SAIF Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters, as set forth above.

**ANSWER**:     Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 241 and therefore deny the same.

242.    Rule 23(b)(1)(A) and (B) requirements. Certification of the SAIF Subclass is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the SAIF Subclass would create a risk of establishing incompatible standards of conduct for JPM. Certification also is warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual members of the SAIF Subclass would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

**ANSWER**:     Defendants deny the allegations in Paragraph 242 and deny that a class should be certified.

243.    Rule 23(b)(2) requirements. Certification of the SAIF Subclass under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM has acted or refused to act on grounds generally applicable to that Subclass, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the SAIF Subclass as a whole.

**ANSWER**:     Defendants deny the allegations in Paragraph 243 and deny that a class should be certified.

244.    Rule 23(b)(3) requirements. In the alternative, certification of the SAIF Subclass under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the SAIF Subclass predominate over any questions (if any) affecting only individual members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**ANSWER**:     Defendants deny the allegations in Paragraph 244 and deny that a class should be certified.

245.    The ACSAF/JPM Stable Value Fund Subclass. Plaintiffs Knee, Murphy, and Hedges (collectively the "ACSAF/JPM Stable Value Fund Plaintiffs") also seek to represent a subclass of individuals previously invested in the ACSAF who were made to be investors in the ACSAF/JPM Stable Value Fund. As set forth above, although investors in the ACSAF/JPM Stable Value Fund were injured by the same breaches of fiduciary duty that injured all members of the Class, members of the proposed ACSAF/JPM Stable Value Fund Subclass suffered additional injuries and bring additional claims based on the circumstances under which they became investors in the ACSAF/JPM Stable Value Fund. In addition, members of the ACSAF/JPM Stable Value Fund Subclass advance theories of liability and damages and for the propriety of class certification based on features of pooled stable value funds.

**ANSWER:**   Defendants admit that Plaintiffs purport to represent the putative class defined in Paragraph 245 but deny that a class should be certified.  Defendants deny the remaining allegations in Paragraph 237.

246.   Definition of the ACSAF/JPM Stable Value Fund Subclass. The proposed ACSAF/JPMorgan Stable Value Fund Subclass is defined as follows:

> All participants of ERISA plans, as well as beneficiaries of those plans, who were invested directly or indirectly in the American Century Stable Asset Fund immediately before JPMAM took over the Fund and received its assets in the ACSAF/JPM Stable Value Fund on or about September 17, 2007 and continuing to December 31, 2010. Excluded from the Class are the jurists to whom this case is assigned, as well as their respective staffs; counsel who appear in this case, as well as their respective staffs, including experts they employ; the Defendants in this matter, as well as their officers and directors; any person, firm, trust, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or that is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

**ANSWER**:   Defendants admit that Plaintiffs purport to represent the putative subclass defined in Paragraph 246 but deny that a subclass should be certified.  Defendants deny any remaining allegations in Paragraph 246.

247.   Numerosity of the ACSAF/JPM Stable Value Fund Subclass. The members of this ACSAF/JPM Stable Value Fund Subclass are so numerous that joinder of all members is impracticable. While the exact number of Subclass members is unknown to Plaintiffs at this time, and can be ascertained only through discovery, the ACSAF/JPM Stable Value Fund had over 900 million in net assets as of September 30, 2007, with funds several dozen individual ERISA plans [sic] with many thousands of participants and beneficiaries.

**ANSWER**:   Defendants admit only that the number of putative class members is sufficiently large that joinder of all members would be impracticable.  Defendants lack information sufficient to form a belief as to what Plaintiffs reasonably believe regarding the number of potential class members.  Defendants deny the remaining allegations in Paragraph 247.

248.   Commonality. The claims of the ACSAF/JPM Stable Value Fund Plaintiffs and the proposed Subclass have a common origin and share a common basis. All members of the ACSAF/JPM Stable Value Fund Subclass suffered from the same misconduct complained of herein, and they all suffered injury as a result of the breaches of duties and violations of ERISA

that form the basis of the claims specific to the ACSAF/JPM Stable Value Fund Subclass. Proceeding as a Subclass is particularly appropriate here because the ACSAF's assets were held in a collective trust while at ACI and were subsequently transferred together when JPM took the fund over in 2007. Furthermore, common questions of law and fact exist as to all members of the Subclass. The many questions of law and fact common to the Subclass include, but are not limited to:

a.      whether JPMRPS and any of the other JPM affiliates are fiduciaries under ERISA with respect to the conduct alleged with respect to the ACSAF/JPM Stable Value Fund;

b.      whether JPMRPS and any of the other JPM affiliates breached fiduciary duties under ERISA by virtue of this conduct;

c.      whether any of the transactions by JPMRPS and other JPM defendants with respect to the ACSAF/JPM Stable Value Fund were prohibited transactions; and

d.      whether JPM's actions complained of herein have injured plan participants and their beneficiaries who were invested in the ACSAF.

**ANSWER**:      Defendants deny the allegations in Paragraph 248.

249.    Typicality. The claims of the ACSAF/JPM Stable Value Fund Plaintiffs are typical of the claims of the members of the Subclass because they are substantively identical to the claims of the members of the Subclass. All members of the ACSAF/JPM Stable Value Fund were investors in the same fund, the ACSAF, at the time its assets were acquired by JPM and all became investors in JPM's successor fund, the ACSAF/JPM Stable Value Fund. If each member of the Subclass were to bring and prosecute these claims individually, each member of the Subclass would necessarily be required to prove the instant claims upon the same material and substantive facts and would seek the same type of relief.

**ANSWER**:      Defendants deny the allegations in Paragraph 249.

250.    Adequacy. The ACSAF/JPM Stable Value Fund Plaintiffs will fairly and adequately protect the interests of the members of the Subclass. These Plaintiffs have no interests that are, or would be, antagonistic to or in conflict with those of the members of the ACSAF/JPM Stable Value Fund Subclass, the Class, or the SAIF Subclass. These Plaintiffs will vigorously protect the interests of the members of the Subclass. Moreover, the ACSAF/JPM Stable Value Fund Plaintiffs have retained counsel who are competent and experienced in class actions and ERISA matters, as set forth above.

**ANSWER**:      Defendants lack information sufficient to form a belief as to the truth of the

allegations in Paragraph 250 and therefore deny the same.

251.    Rule 23(b)(1)(A) and (B) requirements. Certification of the ACSAF/JPM Stable Value Fund Subclass is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by members of the Subclass would create a risk of establishing incompatible standards of conduct for JPM. Certification of the Subclass is also warranted under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by individual members of the Subclass would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

**ANSWER**:    Defendants deny the allegations in Paragraph 251 and deny that a class should be

certified.

252.    Rule 23(b)(2) requirements. Certification of the ACSAF/JPM Stable Value Fund Subclass under Federal Rule of Civil Procedure 23(b)(2) is warranted because JPM and the other Defendants have acted or refused to act on grounds generally applicable to the Subclass, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Subclass as a whole.

**ANSWER**:    Defendants deny the allegations in Paragraph 252 and deny that a class should be

certified.

253.    Rule 23(b)(3) requirements. In the alternative, certification of the ACSAF/ JPM Stable Value Fund Subclass under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to members of the Subclass predominate over any questions (if any) affecting only individual members of the Subclass. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**ANSWER**:    Defendants deny the allegations in Paragraph 253 and deny that a class should be

certified.

## COUNT I: VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
## BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

254.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Defendants incorporate by reference their answer to each of the preceding

paragraphs.

255.     The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

**ANSWER:**     Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value funds.  Defendants deny the remaining allegations in Paragraph 255.

256.     A fiduciary must comply with the duty of prudence, which includes the duty to diversity. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

**ANSWER:**     The allegations in Paragraph 256 state a legal conclusion to which no response is required.  To the extent a response is required those allegations are denied.

257.     The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors ...: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

**ANSWER:**     The allegations in Paragraph 257 state a legal conclusion to which no response is required.  To the extent a response is required those allegations are denied.

258.     JPM's conduct with respect to the JPM Stable Value Funds violated – in numerous ways – its fiduciary duties of prudence and to diversify as alleged above.

**ANSWER:**     Defendants deny the allegations in Paragraph 258.

259.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class and Subclasses. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 259 and further deny that any

named Plaintiff or other plan participant suffered a "loss"; investors in the Stable Value Funds

maintained their principal and accumulated interest and, during the Class Period, received returns

higher than those available from money market funds.

### COUNT II: VIOLATION OF ERISA § 404(a)(1)(A)
### EXCLUSIVE BENEFIT

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

260.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Defendants incorporate by reference their answers to each of the preceding

paragraphs.

261.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

**ANSWER:**    Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC

Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes

pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value

funds.  Defendants deny the remaining allegations in Paragraph 261.

262.    ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

**ANSWER:**    The allegations in Paragraph 262 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

263.    Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), the JPM entities, while fiduciaries, caused the JPM Stable Value Funds to engage in a high risk, leveraged investment strategy as alleged above.

**ANSWER:**    Defendants deny the allegations in Paragraph 263.

264.    JPM's aforementioned actions were not in the best interest of the JPM Stable Value Funds' participants and beneficiaries. Rather, JPM sought to inflate the yields for the JPM Stable Value Funds while at the same time disguising the corresponding risks with the goal of increasing its market share in the stable value retirement investing market segment and causing more retirement funds to be invested in the JPM Stable Value Funds as compared to those offered by its competitors.

**ANSWER:**    Defendants deny the allegations in Paragraph 264.

265.    JPM's actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class and Subclasses. As a result of this wrongdoing, JPM is liable for all resulting loss and damage. JPM must also disgorge all monies it wrongfully made through use of the plans' assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 265.  Investors in the Stable Value

Funds maintained their principal and accumulated interest and, during the Class Period, received

returns higher than those available from money market funds.

## COUNT III: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (D) PROHIBITED TRANSACTIONS

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

266.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Defendants incorporate by reference their answers to each of the preceding

paragraphs.

267.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

**ANSWER:**    Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC

Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes

pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value

funds.  Defendants deny the remaining allegations in Paragraph 267.  Defendants deny the

remaining allegations in Paragraph 267.

268.    ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries
from causing a plan to engage in a transaction that they know, or should have known, constitutes
a sale or exchange of property between the plan and a party in interest.

**ANSWER:**    The allegations in Paragraph 268 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

269.    The JPM entities were parties in interest within the meaning of ERISA. A "party
in interest" with respect to a plan includes any fiduciary of the plan, as well as any person
providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, the
JPM entities were parties in interest because they were fiduciaries.

**ANSWER:**    The allegations in Paragraph 269 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

270.    Despite the clear prohibition of Section 406(a)(1)(A), the JPM entities, while
fiduciaries and parties in interest, caused the JPM Stable Value Funds to purchase and hold
private placement mortgages that they themselves had arranged, originated, placed and/or
underwrote, and the transfer of this lending opportunity was in violation of this section.

**ANSWER:**    Defendants deny the allegations in Paragraph 270.

271.    In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. §
1106(a)(1)(D), the JPM entities while fiduciaries and parties in interest, used the assets of the
JPM Stable Value Funds for their benefit through the receipt of fees by JPM affiliates for their
services relating to the origination, arrangement and underwriting of the mortgages.

**ANSWER:**    Defendants deny the allegations in Paragraph 271.

272.    JPM must therefore disgorge all monies made through wrongful use of the plans'
assets, including all fees and commissions received by JPM from borrowers with respect to such
loans, as well as management and other fees received by JPM from 401(k) plans for managing
such assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 272.

## COUNT IV: VIOLATION OF ERISA §§ 406(b)(1), (b)(2) AND (b)(3) PROHIBITED TRANSACTIONS

### (By All Plaintiffs Against J.P. Morgan Chase & Co., JPMorgan Chase N.A., and J.P. Morgan Investment Management, Inc.)

273.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Defendants incorporate by reference their answers to each of the preceding

paragraphs.

274.    The JPM entities were fiduciaries, as discussed above, for the plans and their participants, including Plaintiffs and the proposed Class and Subclasses.

**ANSWER:**    Defendants admit only that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SAIF, SVF, and the commingled trust funds sponsored by JPMC

Bank, and that JPMIM was the investment manager and an ERISA fiduciary for limited purposes

pursuant to IMAs for the Hospira, Mitsubishi, and Caterpillar separate account stable value

funds.  Defendants deny the remaining allegations in Paragraph 274.

275.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

**ANSWER:**    The allegations in Paragraph 275 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

276.    Despite the clear prohibition of Section 406(b)(1), JPM used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, i.e. mortgages that were originated, underwritten, and/or brokered by JPM affiliates.

**ANSWER:**    Defendants deny the allegations in Paragraph 276.

277.    JPM's efforts on behalf of the borrowers also violates section 406(b)(2)'s ban on acting on behalf of a party whose interests are adverse to the plan—here acting on behalf of the borrower in its dealing with the Mortgage Private Placement Fund.

**ANSWER:**    Defendants deny the allegations in Paragraph 277.

278.   In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C. § 1106(b)(3), JPM received consideration for its own personal account in connection with causing the Stable Funds to acquire the mortgage assets at issue. This consideration included without limitation application, originating, placement, and underwriting fees and yield spread premiums.

**ANSWER:**   Defendants deny the allegations in Paragraph 278.

279.   JPM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received by JPM from borrowers with respect to such loans, as well as management and other fees received by JPM from 401(k) plans for managing such assets.

**ANSWER:**   Defendants deny the allegations in Paragraph 279.

### COUNT V: VIOLATION OF ERISA §§ 406(a)(1)(A) AND (a)(1)(D) PROHIBITED TRANSACTIONS

### (By the ACSAF/JPM Stable Value Fund Plaintiffs Against All Defendants)

280.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**   Defendants incorporate by reference their answers to each of the preceding

paragraphs.

281.   JPMRPS, JPMC, JPMAC and other JPM entities were fiduciaries, as discussed above, for ACSAF and for the 401(k) plans and plans' sponsors and plan participants to whom they provided investment advice and services and to successor ACSAF / JPM Stable Value Fund and their plan sponsors and participants, including Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.

**ANSWER:**   Defendants admit that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SVF.  Defendants also admit that JPMC Bank acted as trustee for

the Mayer Electric plan and as directed trustee with respect to the Ferrell Gas, GEHA, Great

Plains Energy (the holding company of KCPL), Hospira, and Mitsubishi plans.  JPMC Bank did

not act as a trustee for the Modern Drop Forge plan during the putative class period.  Defendants

deny that any JPM entity acted as trustee for the Caterpillar or Titan International plans.

Defendants deny the remaining allegations in Paragraph 281.

282.    The Defendants other than JPMRPS and JPMC are parties in interest pursuant to ERISA section 3, 29 U.S.C. § 1002, in that they were either fiduciaries of the plans or provided services to the plans.

**ANSWER:**    The allegations in Paragraph 282 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

283.    In violation of section 406(a)(1)(A), JPMRPS and JPMC caused the plans to sell property to one or more of these parties in interest in that they caused the plans to transfer to these parties the assets of the plans invested in the ACSAF and caused the plans to transfer to these parties in interest the management of such assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 283.

284.    In addition, in violation of section 406(a)(1)(D), JPMRPS and JPMC caused the plans to transfer to or use by or for the benefit of one or more of these parties in interest assets of the plans.

**ANSWER:**    Defendants deny the allegations in Paragraph 284.

285.    JPMRPS' and JPMC's actions caused substantial financial harm to Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass. As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage. JPMRPS and JPMC must also disgorge all monies they wrongfully made through use of the plans' assets.

**ANSWER:**    Defendants deny the allegations in Paragraph 285.

## COUNT VI: VIOLATION OF ERISA §§ 406(b)(1), (b)(2) AND (b)(3) PROHIBITED TRANSACTIONS

### (By the ACSAF/JPM Stable Value Fund Plaintiffs Against All Defendants)

286.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**    Defendants incorporate by reference their answers to each of the preceding

paragraphs.

287.    JPMRPS, JPMC, JPMAC and other JPM affiliates were fiduciaries, as discussed above, for ACSAF and successor ACSAF / JPM Stable Value Fund and their plan sponsors and participants, including Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass.

**ANSWER:**    Defendants admit that JPMC Bank is the trustee and an ERISA fiduciary for

certain delimited purposes for SVF.  Defendants also admit that JPMC Bank acted as trustee for

the Mayer Electric plan and as directed trustee with respect to the Ferrell Gas, GEHA, Great

Plains Energy (the holding company of KCPL), Hospira, and Mitsubishi plans.  JPMC Bank did

not act as a trustee for the Modern Drop Forge plan during the putative class period.  Defendants

deny that any JPM entity acted as trustee for the Caterpillar or Titan International plans.

Defendants deny the remaining allegations in Paragraph 287.

288.   ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

**ANSWER:**   The allegations in Paragraph 288 state a legal conclusion to which no response is

required.  To the extent a response is required those allegations are denied.

289.   In violation of ERISA section 406(b)(1), 29 U.S.C § 1160(b) (1), JPMRPS and JPMC dealt with the assets of the plans in their own interest and for their own accounts by causing the plan assets to be transferred to another JPM Defendant, either a parent or co-subsidiary.

**ANSWER:**   Defendants deny the allegations in Paragraph 289.

290.   In addition in violation of ERISA section 406(b)(2), they acted in transactions involving the plans on behalf of other JPM defendants whose interests were adverse to the interests of the plans and their participants in that they caused ACSAF no longer to be viable as an investment option for 401(k) plans so that its assets and participants would be transferred to JPM's successor ACSAF / JPM Stable Value Fund.

**ANSWER:**   Defendants deny the allegations in Paragraph 290.

291.   In addition, in violation of ERISA section 406(b)(3), 29 U.S.C. § 1106(b)(3), JPMRPS and JPMC received consideration for their own personal accounts in connection with influencing, managing and controlling fund selection for ACSAF plans they represented to the detriment of the remaining plan participants in the successor fund, the ACSAF / JPM Stable Value Fund, and to increase their own revenues.

**ANSWER:**   Defendants deny the allegations in Paragraph 291.

292.   The actions of JPMRPS and JPMC caused substantial financial harm to Plaintiffs and the proposed ACSAF / JPM Stable Value Fund Subclass. As a result of this wrongdoing, JPMRPS and JPMC are liable for all resulting loss and damage to the plans, the plaintiffs and the subclass. JPMRPS and JPMC must also disgorge all monies made through wrongful use of the plans' assets.

**ANSWER:**     Defendants deny the allegations in Paragraph 292.

## COUNT VII: KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY (PLED IN THE ALTERNATIVE)

293.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

**ANSWER:**     Defendants incorporate by reference their answers to each of the preceding

paragraphs.

294.     To the extent they are not otherwise fiduciaries with regard to the conduct here alleged, the JPM Defendants, other than JPMC, are liable under ERISA section 405(a), 29 U.S.C. § 1105(a), to Plaintiffs, the Class, the SAIF Subclass and the ACSAF/JPM Stable Value Fund Subclass for all recoverable damage and relief as non-fiduciaries that knowingly participated with fiduciary JPMC in their breaches of trust.

**ANSWER:**     Defendants deny the allegations in Paragraph 294.

295.     The JPM Defendants', other than JPMC, acts and omissions proximately caused substantial harm to Plaintiffs and the proposed class and subclasses. As a result of their wrongdoing, each is liable for all resulting loss and damage. These defendants must also disgorge all monies made through wrongful use of the plans' assets.

**ANSWER:**     Defendants deny the allegations in Paragraph 295.

## PRAYER FOR RELIEF

Answering Plaintiffs' "Prayer for Relief" and the subparts thereto, Defendants deny that a

class should be certified, any law was violated or that Plaintiffs are entitled to any relief

whatsoever.

## AFFIRMATIVE DEFENSES

A.     Plaintiffs' claims are barred in whole or in part by the applicable statute of

limitations, including ERISA Section 413, 29 U.S.C. § 1113, and/or the doctrines of laches.

B.     Any alleged breach and/or any purported losses suffered by Plaintiffs resulted

from their exercise of control over the assets in their accounts, and therefore Defendants cannot

be liable for any loss, or by reason of any breach, under ERISA 404(c), 29 U.S.C. § 1104(c).

C.     Plaintiffs have failed to mitigate their damages, if any.

D.     To the extent Plaintiffs can establish any transaction prohibited by ERISA Section 406, 29 U.S.C. § 1106, those claims are barred because those transactions are exempted by ERISA Section 408, 29 U.S.C. § 1108, and/or class or individual exemptions promulgated by the Department of Labor.

E.     The claims of the Caterpillar Plaintiffs are barred in whole or in part by the release and waiver incorporated in the class action settlement agreement in *Martin v. Caterpillar Inc.*, 07-CV-1009 (C.D. Ill. Dkt. 152-1).

F.     The claims of the Caterpillar Plaintiffs are barred in whole or in part by collateral estoppel and/or the res judicata effect of the final judgment in *Martin v. Caterpillar Inc*.

G.     Defendants reserve the right to assert, and hereby give notice that they intend to rely upon, any other defense that may become available or appear during the discovery proceedings or otherwise in this case and hereby reserve the right to amend the Answer to assert any such defense.

WHEREFORE, Defendants respectfully request that judgment be entered in their favor, that Plaintiffs' Amended and Consolidated Complaint be dismissed with prejudice, that Plaintiffs be denied any remedy or relief, and that Defendants be awarded any costs of this action, their attorneys' fees, and such other relief as the Court deems appropriate.

Dated:     February 10, 2015                    Respectfully Submitted,
                                                /s/ Gregory C. Braden
                                                Gregory C. Braden (admitted pro hac vice)

86

Sean K. McMahan (admitted pro hac vice)
Abbey M. Glenn (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: 202.739.5217
Fax: 202.739.3001
gbraden@morganlewis.com
smcmahan@morganlewis.com

Jeremy P. Blumenfeld
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Tel.: 212.309.6062
Fax: 212.309.6001
jblumenfeld@morganlewis.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 10, 2015, a true and correct copy of the Defendants' Redacted Answer to Plaintiffs' Amended and Consolidated Complaint was filed electronically and is available for viewing and downloading from the ECF system of the U.S. District Court for the Southern District of New York, and that I served the same via electronic filing on February 10, 2015.  I certify that I served the unredacted version via email upon the following:

Peter J. Mougey
James L. Kauffman
Laura S. Dunning
Levin, Papantonio, Thomas, Mitchell, Rafferty
   & Proctor, P.A
316 S. Baylen Street, Suite 600
Pensacola, FL 32507
pmougey@levinlaw.com
jkauffman@levinlaw.com
ldunning@levinlaw.com

Todd Schneider
Jason Kim
Michael C. McKay
Schneider Wallace Cottrell Konecky
   Wotkyns LLP
180 Montgomery Street, Suite 2000
San Francisco, California 94104
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mmckay@schneiderwallace.com

Michael M. Mulder
Elena N. Liveris
Law Offices of Michael M. Mulder
321 S. Plymouth CT., Suite 1250
Chicago, IL 60604
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Joseph C. Peiffer
Pfeiffer Rosca Wolf Abdulla Carr & Kane
   LLC
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170-4600
jpeiffer@fishmanhaygood.com

Kirk T. May
Phillip G. Greenfield
Rouse Hendricks German May PC
1201 Walnut, Suite 2000
Kansas City, MO 64106

Kevin Joseph Madonna
Kennedy & Madonna, LLP
48 Dewitt Mills Rd
Hurley, NY 12443
kmadonna@kennedymadonna.com

Garrett W. Wotkyns
Schneider Wallace Cottrell Konecky Wotkyns
   LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, AZ 85253

*ATTORNEYS FOR PLAINTIFFS*

s/ Gregory C. Braden
Gregory C. Braden